**FLEISCHMAN BONNER & ROCCO LLP**
ATTORNEYS AT LAW

81 MAIN STREET • SUITE 515 • WHITE PLAINS • NEW YORK • 10601
TEL: 908-337-1426 • FAX: 908-516-2049 • WEB: WWW.FBRLLP.COM

EMAIL: PRocco@fbrllp.com

January 26, 2022

**BY ECF**

The Honorable Ann M. Donnelly
U.S. District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

**Re:** *Henkin, et al. v. Qatar Charity, et al.*, 1:21-cv-05716-AMD-VMS

Dear Judge Donnelly:

We write on behalf of Plaintiffs in the above-captioned case to respond to the January 19 and 20, 2022 pre-motion letters submitted by defendants Masraf Al Rayan ("Masraf"), Qatar National Bank ("QNB") and Qatar Charity. (ECF 48-50.) Plaintiffs are the surviving family members of U.S. citizens who were murdered in terrorist attacks in Israel sponsored by Hamas, a notorious organization designated by the U.S. as a Foreign Terrorist Organization ("FTO").

Defendants' letters demonstrate that all three participants in the conspiracy Plaintiffs outline seek to make virtually identical arguments for dismissal. Under those circumstances their requests for a total of 105 pages to brief those arguments is excessive and should be denied.[1]

**The Relevant Facts**

Defendants principally rely on inapposite cases where financial institutions and their customers played only a remote, speculative role in terrorism. In contrast, each of the Defendants here knowingly and directly participated in a conspiracy to commit terrorism spearheaded by the Qatari government, which controls each of them (¶¶ 5-7, 73, 85, 125[2]). Over the last decade, Qatar has openly provided substantial funding and support to Hamas, a U.S.-designated FTO, including providing safe haven to fugitive members of Hamas's senior leadership. ¶¶ 3-7, 73-74, 104-122. Indeed, from 2012 through 2018, Qatar officially provided Hamas with more than $1.1 billion, making Qatar Hamas's largest single funder. ¶ 115.

Defendant Qatar Charity, the customer of the bank Defendants Masraf and QNB, is itself a long-standing and notorious funder of international terrorism. The countries that have officially

---

[1] Having also sought similar page-extensions in the other two substantially similar cases pending against them in this Court, Defendants plan to use a total of 315 pages to make the very same arguments. *See* Defendants' pre-motion letters to the Court in *Force v. Qatar Charity,* No. 1:20-cv-02578-BMC (ECF 51-53); *Przewozman v. Qatar Charity,* No. 1:20-cv-06088-NGG-RLM (ECF 42).

[2] References herein to "¶ __" and "¶¶ __ - __" refer to specific paragraphs of Plaintiffs' Complaint (ECF 1).

recognized Qatar Charity as a terrorist organization include: the United States, which designated Qatar Charity as "a priority III terrorism support entity"; Saudi Arabia, Bahrain, Egypt and UAE, which identified Qatar Charity as "a financial supporter of terrorism"; and Israel, which banned Qatar Charity for its support of terrorism and designated it as a member of the Union of Good, an organization that the United States declared a Specially Designated Global Terrorist ("SDGT") in 2008.  ¶¶ 7, 59-69, 137.  Qatar Charity's terrorist beneficiaries include not only Hamas, but a long and notorious list of terrorists hostile to the United States, including Osama Bin Laden and the Al-Qaida network.  ¶¶ 44-70.  As just one of many examples, 2003 testimony before the U.S. House of Representatives highlighted Qatar Charity's "active financing of Al-Qaida and other designated international terror groups."  ¶ 51.  Given the extensive and notorious nature of Qatar Charity's longstanding support for terrorist organizations (¶¶ 75, 320, 322), no financial institution could have remained unaware of that illicit conduct.

But the Defendant banks did not merely ignore Qatar Charity's leading role in advancing the Qatari government's conspiracy to fund FTOs.  To further its goal of supporting FTOs like Hamas, Qatar coopted the Defendant banks to join the conspiracy to funnel millions of coveted U.S. dollars (the chosen currency of Middle East terrorist networks) through the U.S. financial system to those FTOs under the false guise of "charitable donations."  ¶¶ 3-7, 123-131.

Each Defendant played an integral role in that conspiracy.  Masraf processed the many payments ultimately bound for terrorists through its correspondent bank account in New York.  ¶¶ 10, 130-131.  The Defendants repeatedly used that New York correspondent account to process "donations [that Qatar Charity had] solicited in Qatar and around the world" and funnel U.S. dollars to Hamas.  ¶¶ 9-10, 23, 126-130, 162-165.  The access to the U.S. financial system that Defendants provided allowed Hamas to obtain the U.S. dollars needed to sustain their terrorist activities.  ¶¶ 5, 23, 372.

QNB also furthered the goals of the conspiracy by maintaining at least six bank accounts that Qatar Charity used to fund terrorism.  In addition, QNB maintained accounts for Hamas's senior leadership—including terrorists convicted for murdering innocent civilians—and those accounts were also used to fund Hamas's terrorism.  ¶¶ 14, 104-122, 172.

**This Court has Specific Personal Jurisdiction Over Each Defendant in the Conspiracy**

This Court has personal jurisdiction over all of the Defendant Co-Conspirators based on their purposeful use of a correspondent bank in New York to funnel substantial U.S. dollars to Hamas, a U.S.-designated FTO.  *See Official Comm. of Unsecured Creditors of Arcapita Bank, B.S.C. v. Bahr. Islamic Bank*, 549 B.R. 56, 67-68 (S.D.N.Y. Mar. 30, 2016) ("[T]he use of a correspondent bank account, even if the defendant has no other contacts with New York, satisfies the first prong of New York's long-arm statute so long as the use was purposeful and not coincidental or adventitious.").  "[A] foreign bank's repeated use of a correspondent account in New York on behalf of a client—in effect, a 'course of dealing'—show[s] purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States."  *Licci v. Lebanese Can. Bank, SAL*, 20 N.Y.3d 327, 339 (2012) ("*Licci III*"); *accord Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 43 (E.D.N.Y. 2019) (Cogan, J.).

January 26, 2022
Page 3

  QNB's claim that Plaintiffs have alleged "no facts regarding the volume, frequency or deliberate nature of such funds transfers by QNB through New York" ignores myriad allegations of the Complaint demonstrating Defendant Co-Conspirators' pattern and practice of repeatedly using a New York correspondent account to "funnel[] millions of dollars of donations through the U.S. financial system" to obtain U.S. dollars for distribution to Hamas.  ¶¶ 9-11; *see also* ¶ 10 ("Qatar Charity solicited donations in Qatar and around the world . . . .  [Masraf] then utilized its 'correspondent' bank account located in New York to transfer [U.S. dollars] from Doha, through New York, to Qatar Charity's accounts."), ¶ 23 (QNB and Masraf "knowingly accessed and utilized the banking system in the United States to transmit funds to Hamas and effectuated U.S. dollar-denominated transfers on behalf of Qatar Charity through the Bank of New York Mellon in New York"), ¶¶ 126-129 (describing the transfer of $28 million in just six months), ¶ 130 (setting forth the conspiracy's operating procedures for using a New York correspondent bank to process Qatar Charity's donations),  ¶¶ 163-164 (noting Masraf's use of a New York correspondent account to process "USD and to distribute those dollars to terrorists and their family members in the Palestinian Territories").

  Importantly, "defendant's use of the correspondent bank account need not be at the 'very root' of the plaintiff's claim."  *Arcapita Bank*, 549 B.R. at 68 (citing *Licci III*, 20 N.Y.3d at 339-41).  "Rather, as long as the use of the correspondent bank account is not 'completely unmoored' from one of the elements of the plaintiff's cause of action," the Court may exercise personal jurisdiction."  *Id.* (quoting *Licci III*, 20 N.Y.3d at 340).  Here, the connection to this forum is far more substantial than required by the controlling *Licci* decisions, as use of the New York correspondent account was essential to Defendants' conspiracy because Hamas required U.S. dollars to fund their widespread terrorism. ¶¶ 155-167.

  Qatar Charity's claim that the use of a correspondent bank account in New York cannot be the basis for exerting specific jurisdiction over Qatar Charity—a non-bank defendant—ignores the Complaint's conspiracy allegations.  *See Allianz Global Inv'rs GMBH v. Bank of Am. Corp.*, 457 F. Supp. 3d 401, 408 (S.D.N.Y. 2020) ("Specific jurisdiction may . . . exist where a defendant's connection to the forum state arises from participation in a conspiracy connected to the forum state by a co-conspirator's acts in furtherance of the conspiracy.") (citing *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 86-87 (2d Cir. 2018)).

  In any event, because Plaintiffs have alleged a good faith basis for exerting personal jurisdiction over all three Defendants, the Court should not decide Defendants' motions to dismiss for lack of personal jurisdiction until Plaintiffs are allowed jurisdictional discovery.  *See Singer v. Bank of Palestine*, 2021 U.S. Dist. LEXIS 177860, at *61 (E.D.N.Y. Apr. 30, 2021) (permitting jurisdictional discovery where plaintiff alleged that defendant "used correspondent bank accounts in New York to issue large volumes of payments in U.S. dollars to organizations affiliated with Hamas during the relevant period"); *Vasquez v. H.K. & Shanghai Banking Corp.*, 2019 U.S. Dist. LEXIS 90716, at *34 (S.D.N.Y. May 29. 2019) (allowing jurisdictional discovery where defendant bank depicted its correspondent banking as "entirely passive").  Plaintiffs have sought to engage Defendants regarding that discovery since shortly after Plaintiffs served their Complaint, but Defendants have asserted that discovery is "premature" and have refused to conduct the Rule 26(f) conference in which the parties are obligated to participate "as soon as practicable" and which, absent court order, must precede the taking of discovery.  Defendants have offered no explanation

concerning why scheduling the Rule 26(f) conference has been "impracticable" because no such excuse exists.

### Service of Process on All Defendants Was Adequate Pursuant to Rule 4(f)(2)(C)(ii)

Both Qatar Charity and Masraf misstate the standard applicable to their legal challenges to the sufficiency of the service effectuated by the Clerk of this Court under Rule 4(f)(2)(C)(ii). Such service by "any form of mail . . . that requires a signed receipt" is sufficient "unless *prohibited* by the foreign country's law." Rule 4(f)(2)(C)(ii) (emphasis added). That standard has been met. Indeed, Article 11 of the Qatari Civil and Commercial Procedures Law (Law No. 13 of 1990) explicitly authorizes delivery of a summons "by registered mail [*i.e.*, mail requiring signed receipt] or any other appropriate means."[3] All three Defendants also purport to challenge Plaintiffs' proofs of service by asserting that Plaintiffs have not shown that the individuals who signed for receipt of the summonses and complaints (*see* ECF 19-1 (M. Mohamed for Masref), ECF 19-2 (H. Hussain for QNB), ECF 40 (A. Abdulla for Qatar Charity) were "authorized to accept service" on Defendants' behalf. However, in order to prove service on a corporation outside of the United States pursuant to Rule 4(f)(2)(C)(ii), Plaintiffs need only demonstrate "that the summons and complaint were delivered to the addressee." Rule 4(l)(2)(B). Defendants' appearances here are proof of that. But, if Defendants seriously intend to raise a factual dispute as to their receipt of the summonses and complaints, Plaintiffs should be permitted to conduct discovery on this issue before responding to the motions to dismiss.

In any event, Defendants' challenges to the sufficiency of service under Rule 4(f)(2)(C)(ii) will be rendered moot when the letters rogatory recently issued by this Court (ECF 16-18, 35) are executed by the appropriate authority in Qatar. According to the official website of the U.S. Department of State, that process "may take a year or more."[4] Contrary to Masraf's claim, Plaintiffs have never "asserted that service by letters rogatory was necessary" in this action. Rather, Plaintiffs have invoked the time-consuming and expensive letters rogatory procedure only "because of the likelihood that they will need to enforce the judgment in this case against the Defendants outside the United States." ECF 14 (Plaintiffs' Memorandum of Law in Support of Motion for Issuance of Letters Rogatory) at 3.

### Plaintiffs Have Stated Valid Claims Under the ATA, as Revised By JASTA

Plaintiffs have adequately pled secondary liability claims against all Defendants under the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852 (2016). Congress made clear that "[t]he purpose of [JASTA] is to provide civil litigants with the *broadest possible basis*, consistent with the Constitution of the United States, to seek relief against persons,

---

[3] *See* https://almeezan.qa/LawArticles.aspx?LawTreeSectionID=8075&lawId=2492&language=en (last visited Jan. 21, 2022). As in the United States, "registered mail" in Qatar is a "postal service which allows sender proof of mailing upon request and a signed proof of delivery upon delivery." https://qatarpost.qa/FAQs (last visited Jan. 25, 2022).

[4] *See* https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/internl-judicial-asst/obtaining-evidence/Preparation-Letters-Rogatory.html (last visited January 21, 2022).

FLEISCHMAN BONNER & ROCCO LLP
ATTORNEYS AT LAW

January 26, 2022
Page 5

entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, ***directly or indirectly***, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA § 2(b) (emphasis added); *see also Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, 495 F. Supp. 3d 144, 154 (E.D.N.Y. 2020) (Cogan, J.). By knowingly providing financial services to further the fundraising efforts of the FTO Hamas, the Defendants engaged in precisely the type of conduct that Congress intended JASTA to address. They conspired to further the interests of Hamas and aided and abetted its pursuit of international terrorism. *See* 18 U.S.C. § 2333(d); *Estate of Henkin*, 495 F. Supp. 3d at 151 (denying bank's motion to dismiss where the complaint alleged that the bank maintained "multiple bank accounts for a notorious Hamas operative, Hamas' most prominent fundraiser in Turkey, and a key Hamas institution in Gaza," and that the bank "understood that it was providing vital financial services to the terrorist organization responsible" for the plaintiffs' deaths).

Defendants are not "relieve[d] of liability for aiding and abetting Hamas simply because the terrorist organization intentionally raised funds through an intermediary, an alter ego, or a mere front to engage in violence." *Estate of Henkin,* 495 F. Supp. 3d at 158; *see also, e.g., Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 855 (2d Cir. 2021) (JASTA "simply says the defendant must have given 'substantial assistance,'" to an act of international terrorism, not substantial assistance to the principal engaging in an act of international terrorism—*i.e.*, for aiding and abetting liability to attach under JASTA, a defendant's substantial assistance may be "indirect"). Defendants' arguments that their conduct is too remote ignore that they "may be liable under the ATA for aiding and abetting the organization behind the attacks, not only the 'triggerman' or suicide bomber." *Miller*, 372 F. Supp. 3d at 48; *see also id.* at 46 ("Allegations that a defendant provided money to terrorist organizations, or transferred money that was given to terrorist organizations, strengthen[] the inference that plaintiff's injuries were proximately caused by a defendant's conduct under the ATA.").[5]

Defendants' claims that they lacked the requisite scienter to provide substantial assistance are belied by Plaintiffs' allegations, which leave no doubt that all Defendants acted knowingly and

---

[5] Masraf's claim that Plaintiffs have not alleged a sufficient nexus between their injuries and Defendants' scheme is also unavailing. Plaintiffs have alleged that Masraf's knowing support of Hamas occurred before, during, and after the time periods of the attacks at issue. ¶¶ 75, 135. Moreover, given the fungibility of U.S. currency, courts have declined to require that ATA plaintiffs trace payments to specific attacks. *See Strauss v. Crédit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 433-34 (E.D.N.Y. 2013) (stating that requiring such proof "would be impossible and would make the ATA practically dead letter"). Courts have also declined to conclude at the motion to dismiss stage that a specific payment's temporal proximity to an attack could not satisfy the causation requirement as a matter of law. *See Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 632 (E.D.N.Y. 2006) (finding plaintiffs sufficiently alleged proximate cause of terrorist attacks "given the fungible nature of money and the fact that it is difficult to say when the particular dollar given to a terrorist is actually used"). Instead, the payment need only be a "substantial factor in the sequence of responsible causation" and the plaintiff's injury "reasonably foreseeable or anticipated as a natural consequence" of the defendants' scheme. *Miller*, 372 F. Supp. 3d at 46 (quoting *Rothstein v. UBS AG*, 708 F.3d 82, 92 (2d Cir. 2013)).

FLEISCHMAN BONNER & ROCCO LLP
ATTORNEYS AT LAW

January 26, 2022
Page 6

in concert to carry out Qatar's open sponsorship of the FTO Hamas.[6] Defendants' clear knowledge that they were facilitating the funding of terrorist organizations far exceeds the "general awareness" that JASTA requires. As the Second Circuit held in *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018), JASTA's requirement of general awareness does not require "the specific intent demanded for criminal aiding and abetting culpability" or that defendant "knew of specific attacks at issue when it provided financial services for Hamas." Rather, a plaintiff must only show a defendant's "general[] aware[ness] of his role as part of an overall illegal or tortious activity at the time that he provides the assistance." *Id.; accord, e.g.*, *Lelchook v. Islamic Republic of Iran*, 393 F. Supp. 3d 261, 267 (E.D.N.Y. 2019) (finding Bank Saderat liable for aiding and abetting Hezbollah based on a funding scheme involving Iran, its controlled banks, and Hezbollah because Bank Saderat "was more than generally aware that it was playing a significant role" in financing terrorism and it "knowingly and substantially assisted" that illicit conduct).[7]

Moreover, courts may only rarely adjudicate fact-intensive scienter issues as matter of law at the motion to dismiss stage. Indeed, the Second Circuit has instructed that courts should be "'lenient in allowing scienter issues to withstand [even] summary judgment based on fairly tenuous inferences,' because such issues are 'appropriate for resolution by the trier of fact.'" *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F. 3d 677, 693 (2d Cir. 2009) (quoting *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999)); *accord, e.g., Linde*, 882 F. 3d at 330 (finding itself "obliged to vacate and remand for a jury to decide that question [of scienter]" and noting that "traditionally a jury resolves questions about a tortfeasor's state of mind.") (citations omitted).

Defendants also offer no valid basis for dismissing Plaintiffs' direct claims under the ATA. Rather, they rely on district court cases that conflict with binding Second Circuit precedent to argue that, to establish a direct claim under the ATA, Plaintiffs must allege that Defendants themselves engaged in "violent or dangerous acts" beyond providing financial services and financing to a terrorist organization. Contrary to Defendants' arguments, Plaintiffs can establish a primary liability claim by alleging that Defendants provided financial services to Qatar Charity, a notorious fundraiser for FTOs, with the requisite knowledge that those funds were destined for Hamas's coffers. *See Miller*, 372 F. Supp. 3d at 44-45 (providing financial services to members

---

[6] Here, the Qatari government's domination of both Masraf and QNB, and its open support for Hamas, dispel any doubt that Defendant banks were knowingly complicit in financing the Hamas terrorist organization. Even if, contrary to the well-plead allegations of the Complaint, the bank Defendants had been more distant third-party financial institutions, their antiterrorism policies and procedures would have certainly alerted them to the facts that their customer, Qatar Charity, was an open and notorious financer of terrorism engaged in unlawfully financing and supporting Hamas. *See, e.g.*, ¶¶ 314-323.

[7] QNB's claim that Plaintiffs' alternative conspiracy allegations are deficient because Plaintiffs fail to allege that Defendants conspired directly with the entity that committed the acts of terrorism is directly contradicted by the Complaint, which specifically states that all Defendants conspired with Hamas. ¶ 104.

January 26, 2022
Page 7

and associates of terrorist organizations may constitute an act of "international terrorism" under the ATA because that illicit conduct may be "dangerous to human life").

Defendants present the oft-rejected claim that they are entitled to dismissal because they provided "only" "routine banking services." This meritless argument "does not require extended discussion." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 858 (2d Cir. 2021) (rejecting defendant bank's "routine banking services" defense because the complaint alleged that the bank violated banking regulations, disregarded its internal policies, and subsidized suicide bombers and their families both retrospectively and prospectively). *Linde* held that while routine banking services provided to an organization affiliated with a terrorist organization do not *necessarily* establish causation under the ATA's primary liability provisions, only a jury may normally decide whether the banking services provided by a defendant were "routine." *Linde*, 882 F.3d at 327. In any event, the services the bank Defendants provided here were anything but routine. Rather, the Defendant banks provided financial services to Qatar Charity—a notorious, U.S.-designated supporter of terrorism—as well as to notorious Hamas operatives, as part of a Qatari state-sponsored conspiracy to fund FTO terrorism, as Qatar has done openly for the last decade.

Lastly, Masraf mistakenly relies on *Crosby v. Twitter, Inc.*, 921 F. 3d 617 (6th Cir. 2019) to argue that Plaintiffs have not plausibly alleged that an FTO committed, planned, or authorized the attacks on Plaintiffs. The allegations in *Crosby*, however, bear no resemblance to Plaintiffs' unequivocal allegations here that Hamas committed both of the attacks that injured Plaintiffs and killed their loved ones. *Compare Crosby*, 921 F.3d at 626 (dismissing complaint that "contain[ed] no allegations that ISIS was involved with the Pulse Night Club shooting" and merely asserted that the actual perpetrator consumed ISIS-related content online) *with, e.g.*, ¶¶ 325-345 (five Hamas operatives perpetrated the murderous terrorist attack on Eitam Simon Henkin, Na'ama Henkin, and their family; the Hamas operatives confessed to the murders and provided "extensive details regarding the planning and execution of the attack;" Hamas repeatedly claimed responsibility, praised the attack, and displayed photos of the Henkins' car and the perpetrators in announcements and on its website). Thus, Plaintiffs' allegations that Hamas was responsible for the attacks in question are more than adequate to survive a motion to dismiss.

Accordingly, Plaintiffs will oppose Defendants' motions to dismiss in their entirety. Plaintiffs respectfully request that the Court establish a briefing schedule that provides for Plaintiffs to file their memorandum of law in opposition after the completion of expedited jurisdictional discovery. In addition, given the entirely overlapping nature of Defendants' arguments, Plaintiffs request that the Court require Defendants to adhere to the Court's 25-page limit for opening memoranda of law, a goal Defendants can easily achieve by engaging in the same coordinated conduct that has marked their defense efforts to date.

Respectfully submitted,

/s/ Patrick L. Rocco

Patrick L. Rocco

CC: All counsel of record (via ECF)