UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ANNE CHANA HENKIN, *et al.*,

                              Plaintiffs,                    1:21-cv-05716 (AMD) (VMS)

        - against -

QATAR CHARITY, *et al*.,

                              Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANT MASRAF AL RAYAN'S MOTION TO DISMISS THE COMPLAINT</u>**

PILLSBURY WINTHROP SHAW PITTMAN LLP
31 West 52nd Street
New York, NY 10019-6131
Tel.:    (212) 858-1000
Fax:    (212) 858-1500

March 18, 2022

4861-4762-9327

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................. 1

STATEMENT OF FACTS ................................................. 1

ARGUMENT ................................................. 2

I.   THE COURT LACKS PERSONAL JURISDICTION OVER MAR REQUIRING DISMISSAL UNDER RULE 12(b)(2) ................................................. 2

   A.   Plaintiffs Cannot Satisfy New York's Long-Arm Statute ........................... 4

      1.   Plaintiffs Fail to Allege Purposeful Availment of the New York Forum ........... 4

      2.   Plaintiffs Fail to Establish an Articulable Nexus Between Their Causes of Action and the Transactions Alleged Against MAR ....................... 7

   B.   Plaintiffs Fail to Satisfy Constitutional Requirements of Minimum Contacts and Reasonableness ................................................. 10

II.   DISMISSAL FOR IMPROPER SERVICE UNDER RULE 12(b)(5) IS PROPER FOR FAILURE TO COMPLY WITH THE FEDERAL RULES OR QATARI LAW ................................................. 11

III.   PLAINTIFFS FAIL TO STATE A CLAIM FOR PRIMARY LIABILITY UNDER THE ATA BECAUSE MAR'S BANKING SERVICES ARE NOT ACTS OF INTERNATIONAL TERRORISM PROXIMATELY CAUSING PLAINTIFFS' INJURIES, REQUIRING DISMISSAL UNDER RULE 12(b)(6) .................... 13

   A.   MAR's Alleged Commercial Banking Activity Is Not an Act of International Terrorism Involving Violence or Intending to Intimidate or Coerce ................. 13

   B.   Plaintiffs Fail to Plausibly Allege Any Facts Which Support an Inference that MAR's Financial Services Were the Proximate Cause of Plaintiffs' Injuries ........... 15

   C.   Plaintiffs Fail to Plausibly Allege Facts Sufficient to Assert that MAR Had the Requisite *Mens Rea* for Primary Liability under the ATA ..................... 18

IV.   PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE SECONDARY LIABILITY UNDER JASTA, REQUIRING DISMISSAL UNDER RULE 12(b)(6) .................... 19

   A.   Plaintiffs Fail to Meet the Standards for Aiding and Abetting Liability .................. 19

      1.   No Allegations Establish MAR's "General Awareness" of Illegal Acts .......... 20

         a.   Pre-2008 Allegations Do Not Provide MAR with Knowledge ................. 23

         b.   Information Unavailable Until After the Transactions Cannot Impute Knowledge Upon MAR ................................. 25

         c.   Allegations of Control by Qatar Are a Red Herring ................... 26

      2.   Plaintiffs Cannot Allege that MAR "Knowingly and Substantially" Assisted in the Principal Violation ................................. 27

B.    Plaintiffs Fail to Allege that MAR Knowingly Entered into an Agreement to Support Conspiracy Liability Under 18 U.S.C. § 2333(d) ......................................... 30

C.    Plaintiffs Fail to Plausibly Allege that an FTO "Committed, Planned or Authorized" the 2018 Attack ................................................................................... 31

V.    JURISDICTIONAL DISCOVERY IS NOT WARRANTED .............................................. 32

CONCLUSION ............................................................................................................................. 35

4861-4762-9327

# TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*Al Rushaid v. Pictet & Cie*,
  28 N.Y.3d 316 (2016) ...................................................................................................7

*Alexander v. Porter*,
  No. 13-cv-6834 (SLT) (JO), 2014 WL 7391683 (E.D.N.Y. Dec. 29, 2014) .........................33

*Ansbacher, et al. v. Qatar Charity, et al.*,
  Jerusalem District Court, CC 21387-06-21, November 10, 2021 ...........................................11

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ....................................................................................................15

*Averbach v. Cairo Amman Bank*,
  No. 19-cv-0004 (GHW) (KHP), 2020 WL 486860 (S.D.N.Y. Jan. 21, 2020),
  *report and recommendation adopted sub nom. Averbach ex rel. Averbach v.
  Cairo Amman Bank*, No. 19-cv-00004 (GHW), 2020 WL 1130733 (S.D.N.Y.
  Mar. 9, 2020) .........................................................................................................6, 27

*Bartlett v. Société Générale de Banque Au Liban SAL*,
  No. 19-cv-00007 (CBA) (VMS), 2020 WL 7089448 (E.D.N.Y. Nov. 25,
  2020) ................................................................................................................ *passim*

*Berdeaux v. OneCoin Ltd.*,
  No. 19-cv-4074 (VEC), 2021 WL 4267693 (S.D.N.Y. Sept. 20, 2021) .........................6, 7, 28

*Boyer Works USA, LLC v. Rubik's Brand Ltd.*,
  No. 21-cv-7468 (AKH), 2022 WL 355398 (S.D.N.Y. Feb. 7, 2022) .....................................34

*Cabrera v. Black & Veatch Special Projects Corp.*,
  No. 19-cv-3833 (EGS) (ZMF), 2021 WL 3508091 (D.D.C. July 30, 2021) .......................9, 17

*In re Chiquita Brands Int'l, Inc.*,
  284 F. Supp. 3d 1284 (S.D. Fla. Jan. 3, 2018) .................................................................17, 18

*Clean Coal Techs., Inc. v. Leidos, Inc.*,
  377 F. Supp. 3d 303 (S.D.N.Y. 2019) ....................................................................................3

*Cmty. Fin. Grp., Inc. v. Stanbic Bank Ltd.*,
  No. 14-cv-5216 (DLC), 2015 WL 4164763 (S.D.N.Y. July 10, 2015) ...................................4

*Colon v. Twitter, Inc.*,
  14 F.4th 1213 (11th Cir. 2021) ...........................................................................................32

iii

*Copeland v. Twitter, Inc.*,
    352 F. Supp. 3d 965 (N.D. Cal. 2018) ................................................................31

*Daou v. BLC Bank, S.A.L.*,
    No. 20-cv-4438 (DLC), 2021 WL 1338772 (S.D.N.Y. Apr. 9, 2021)...................5, 9

*EM Ltd. v. Banco Cent. De La República Arg.*,
    800 F.3d 78 (2d Cir. 2015)..................................................................................26

*Force v. Qatar Charity*,
    No. 20-cv-02578 (E.D.N.Y. Mar. 2, 2022)...........................................................35

*Freeman v. HSBC Holdings PLC ("Freeman I")*,
    413 F. Supp. 3d 67 (E.D.N.Y. 2019) .............................................9, 13, 14, 15

*Fuld v. Palestinian Liberation Org.*,
    20-cv-03374 (JMF), 2022 WL 62088 (S.D.N.Y. Jan. 6, 2022), *appeal
    docketed*, No. 22-76 (2d Cir. Jan. 13, 2022) ......................................................32

*Gonzalez v. Google LLC*,
    2 F.4th 871 (9th Cir. 2021) ................................................................................31

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ..............................................................20, 27, 30

*Harris v. Mills*,
    572 F.3d 66 (2d Cir. 2009)....................................................................................1

*Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*,
    495 F. Supp. 3d 144 (E.D.N.Y. 2020), *appeal filed*, No. 21-513 (2d Cir. Sept.
    8, 2021) ..........................................................................................................22, 23

*Honickman v. BLOM Bank SAL*,
    6 F.4th 487 (2d Cir. 2021) ......................................................................... *passim*

*Int'l Shoe Co. v. Wash.*,
    326 U.S. 310 (1945).............................................................................................10

*Jazini v. Nissan Motor Co.*,
    148 F.3d 181 (2d Cir. 1998)..................................................................................3

*Jerusalem NY Enters. LLC v. Huber Erectors & Hoisting, LLC*,
    No. 21-cv-376 (MKB), 2021 WL 5827934 (E.D.N.Y. Dec. 8, 2021) ..................33

*Kaplan v. Jazeera*,
    No. 10-cv-5298, 2011 WL 2314783 (S.D.N.Y. June 7, 2011) .............................15

4861-4762-9327

*Kaplan v. Lebanese Canadian Bank, SAL*,
    405 F. Supp. 3d 525 (S.D.N.Y. 2019), *vacated and remanded on other*
    *grounds*, 999 F.3d 842 (2d Cir. 2021) ...................................................................30

*Kaplan v. Lebanese Canadian Bank, SAL*,
    999 F.3d 842 (2d Cir. 2021)............................................................................... *passim*

*Khan v. Khan*,
    360 F. App'x 202 (2d Cir. 2010) ...................................................................11

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL ("Licci II")*,
    673 F.3d 50 (2d Cir. 2012).............................................................................13

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL ("Licci IV")*,
    732 F.3d 161 (2d Cir. 2013)..............................................................4, 7, 8, 10, 11

*Linde v. Arab Bank, PLC ("Linde I")*,
    882 F.3d 314 (2d Cir. 2018)...............................................................15, 17, 18, 27

*Mednik v. Specialized Loan Serving, LLC*,
    No. 20-cv-427 (MKB), 2021 WL 707285 (E.D.N.Y. Feb. 23, 2021) ..............................33, 34

*Miller v. Arab Bank, PLC*,
    372 F. Supp. 3d 33 (E.D.N.Y. 2019) ..................................................................7, 14, 22, 28

*Milton v. Wazed*,
    No. 16-cv-4542 (MKB) (JO), 2018 WL 2074179 (E.D.N.Y. Mar. 30, 2018).......................34

*Nabulsi v. Nahyan*,
    No. H-06-2683, 2008 WL 1924235 (S.D. Tex. Apr. 29, 2008).............................................12

*In re NYSE Specialists Sec. Litig.*,
    503 F.3d 89 (2d Cir. 2007)................................................................................1

*O'Sullivan v. Deutsche Bank AG*,
    No. 17-cv-8709 (LTS) (GWG), 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019)...............25, 30

*Ofisi v. BNP Paribas, S.A.*,
    278 F. Supp. 3d 84 (D.D.C. 2017), *order vacated in part on other grounds*,
    285 F. Supp. 3d 240 (D.D.C. 2018) ..................................................................18, 19

*Rosenberg v. Lashkar-e-Taiba*,
    No. 10-cv-5381 (DLI) (CLP), 2017 WL 11647006 (E.D.N.Y. Mar. 31, 2017) .....................12

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013), *superseded by statute on other grounds*, JASTA,
    Pub. L. No. 114-222, 130 Stat. 852, 854 (2016)........................................................15, 16, 17

4861-4762-9327

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
   573 F.3d 98 (2d Cir. 2009).................................................................................35

*Schansman v. Sberbank of Russia PJSC*,
   No. 19-cv-2985 (ALC), 2021 WL 4482172 (S.D.N.Y. Sept. 30, 2021)..................................14

*Siegel v. HSBC N. Am. Holdings, Inc.*,
   933 F.3d 217 (2d Cir. 2019)...............................................................27, 29, 30

*Spetner v. Palestine Inv. Bank*,
   495 F. Supp. 3d 96 (E.D.N.Y. 2020) .......................................................................3

*Strauss v. Crédit Lyonnais, S.A.*,
   175 F. Supp. 3d 3 (E.D.N.Y. 2016) ......................................................................8, 9

*Tamam v. Fransabank Sal*,
   677 F. Supp. 2d 720 (S.D.N.Y. 2010)...............................................7, 8, 32, 33

*In re Terrorist Attacks on Sept. 11, 2001*,
   298 F. Supp. 3d 631 (S.D.N.Y. 2018).................................................................26

*In re Terrorist Attacks on Sept. 11, 2001*,
   714 F.3d 118 (2d Cir. 2013), *superseded by statute on other grounds*, JASTA,
   Pub. L. No. 114-222, 130 Stat. 852, 854 (2016)......................................................17

*Vasquez v. Hong Kong & Shanghai Banking Corp.*,
   477 F. Supp. 3d 241 (S.D.N.Y. 2020)....................................................................6

*Waldman v. Palestine Liberation Org.*,
   835 F.3d 317 (2d Cir. 2016).........................................................................4, 11

*Weiss v. Nat'l Westminster Bank PLC*,
   381 F. Supp. 3d 223 (E.D.N.Y. 2019) ..................................................................15

*Weiss v. Nat'l Westminster Bank PLC*,
   453 F. Supp. 2d 609 (E.D.N.Y. 2006) ...................................................................9

*Weiss v. Nat'l Westminster Bank PLC*,
   768 F.3d 202 (2d Cir. 2014).............................................................................14

*Zapata v. HSBC Holdings PLC*,
   414 F. Supp. 3d 342 (E.D.N.Y. 2019) ...................................................14, 15, 16

<u>Constitutions</u>

United States Constitution
   Fourteenth Amendment ..................................................................................10

vi

4861-4762-9327

### Statutes and Codes

18 U.S.C. § 2331(1) ...................................................................................................13, 15
18 U.S.C. § 2333(a) ...............................................................................................1, 13, 14
18 U.S.C. § 2333(d) ...........................................................................................................30
18 U.S.C. § 2333(d)(2) ................................................................................................1, 19, 31
18 U.S.C. § 2334(a) .............................................................................................................3
18 U.S.C. § 2339A .....................................................................................................13, 18, 19
18 U.S.C. § 2339B ............................................................................................................18
18 U.S.C. § 2339B(a)(1) ......................................................................................................13

New York Civil Practice Law and Rules
    Section 302(a)(1) ...................................................................................................3, 4, 7, 9
    Section 302(a)(2) ...............................................................................................................3

Qatari Civil & Commercial Procedures Law,
    Article 10 (Law No. 13 of 1990, as amended by Law No. 7 of 1995) ...................................12
    Article 11 (Law No. 13 of 1990) .........................................................................................12

### Rules and Regulations

Federal Rules of Civil Procedure,
    Rule 4(f) ............................................................................................................................11
    Rule 4(f)(1) .......................................................................................................................11
    Rule 4(f)(2)(C)(i) ...............................................................................................................11
    Rule 4(f)(2)(C)(ii) ..............................................................................................................12
    Rule 4(h)(2) .......................................................................................................................11
    Rule 4(k)(2) .........................................................................................................................3
    Rule 8 ...............................................................................................................................34
    Rule 11 ...............................................................................................................................3
    Rule 12(b)(2) .................................................................................................................2, 34
    Rule 12(b)(5) ....................................................................................................................11
    Rule 12(b)(6) ...............................................................................................................13, 19

### Other Authorities

U.S. Department of Defense, *'Major Non-NATO Ally' Designation Will Enhance*
    *U.S., Qatar Relationship*, Jan. 31, 2022,
    https://www.defense.gov/News/News-Stories/Article/Article/2917336/major-
    non-nato-ally-designation-will-enhance-us-qatar-relationship/ ............................................34

4861-4762-9327

## PRELIMINARY STATEMENT

Plaintiffs suffered tragic injuries in two attacks allegedly committed by Hamas terrorists in 2015 and 2018.  These attacks were not financed, supported, or in any way known to Masraf Al Rayan ("MAR"), a foreign financial institution based in Doha, Qatar, with no presence in the United States.  Even so, Plaintiffs assert this action under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a), *et seq.*, and, as amended, under the Justice Against Sponsors of Terrorism Act ("JASTA"), 18 U.S.C. § 2333(d)(2), *et seq.*, against MAR because it provided banking services to Qatar Charity, a world-renowned charitable organization that is not designated as a Foreign Terrorist Organization ("FTO") or Specially Designated Global Terrorist ("SDGT").

Plaintiffs' broad allegations amount to MAR being a distant link in an alleged chain of financial transactions that fails to connect MAR to Plaintiffs' injuries.  Simply put, ordinary banking transactions for one charitable organization are neither acts of international terrorism nor the proximate cause of them under the ATA.  Moreover, Plaintiffs also fail to allege any set of facts from which MAR could be imputed to be "generally aware" that transacting with Qatar Charity was akin to transacting with Hamas under JASTA.  Plaintiffs' Complaint thus warrants dismissal for failure to state a claim, as well as for lack of jurisdiction and improper service.

## STATEMENT OF FACTS[1]

Plaintiffs were victims of two indisputably tragic terrorist attacks in Israel in 2015 and 2018.  On October 1, 2015, Eitam Simon Henkin was shot and killed in a terrorist attack allegedly committed by Hamas, an SDGT and FTO.  (Compl. ¶¶ 25, 90, 103, 325-26).  On September 16, 2018, Ari Yoel Fuld was stabbed and killed by an individual terrorist in an attack that Hamas

---

[1] For purposes of this motion, the facts as alleged in the Complaint are assumed true.  *See In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 91 (2d Cir. 2007).  However, "that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (internal quotation marks and citation omitted).

allegedly praised afterwards but is not alleged to have committed, planned, or authorized.  (*Id.* ¶¶ 33, 346-47, 351-52).

Plaintiffs assert claims for these injuries not against the terrorists who caused the attacks but rather against MAR, a foreign bank publicly held and headquartered in Doha, Qatar and regulated by the Qatar Central Bank.  (*Id.* ¶¶ 71-72).  MAR, which has no U.S. branch or office, engages in banking, financing, and investing activities for its customers.  (*Id.* ¶¶ 72, 156).  One of MAR's customers is Qatar Charity, a well-known charitable organization, which "used its accounts at [MAR] to solicit contributions from donors, purportedly for humanitarian purposes such as assisting Syrian refugees."  (*Id.* ¶¶ 52, 146).[2]  Qatar Charity is not an SDGT or FTO.  (*See, e.g.*, *id.* ¶¶ 3, 7, 90).

Lacking any nexus between their claims and MAR's alleged actions, Plaintiffs attempt to reverse engineer a complaint against MAR for their injuries in the 2015 and 2018 attacks. Plaintiffs allege Hamas received an unspecified amount of funds for these attacks from Qatar Charity's Palestinian branches (or from Hamas-affiliated charities who received the funds from those same branches), who allegedly received the funds from Qatar Charity's Doha account through U.S. dollar transactions with New York correspondent banks maintained by MAR.  (*Id.* ¶¶ 10-11, 127).  This alleged chain of events fails to tie MAR to Plaintiffs' injuries and is instead strained, tenuous, and rife with speculation.

## ARGUMENT

## I.   THE COURT LACKS PERSONAL JURISDICTION OVER MAR REQUIRING DISMISSAL UNDER RULE 12(b)(2)

Although the Complaint conclusorily alleges that MAR is subject to jurisdiction under New

---

[2] MAR incorporates by reference Defendant Qatar Charity's Memorandum of Law in Support of Its Motion to Dismiss the Complaint, which demonstrates that Qatar Charity is and was a legitimate charitable organization, well known for its humanitarian efforts.

4861-4762-9327

York's long-arm statute[3] due to its correspondent banking activity (Compl. ¶ 22), Plaintiffs have not alleged facts upon which it would be appropriate for this Court to exercise jurisdiction over MAR, a foreign bank with no presence in the United States.[4]  While the point at which MAR's alleged misconduct began varies throughout the Complaint, Plaintiffs do not allege (in a conclusory manner or otherwise) that MAR availed itself of the New York forum *at all* after 2015. (*See, e.g.*, *id*. ¶ 104 ("From at least 2011 through 2015 . . . ."); ¶ 126 ("From March 1, 2015 until September 7, 2015 alone . . . ."); ¶ 130(c) ("Between 2009 and 2015, [MAR] . . . .")).  And the alleged conduct prior to 2015 is far too attenuated and generalized to plead any connection between MAR and New York, and it is far too insufficient to plead that MAR's correspondent banking activity gave rise to either of the attacks that injured Plaintiffs.

For this Court to have personal jurisdiction over MAR, Plaintiffs must present a *prima facie* case that (1) the New York long-arm statute and (2) U.S. constitutional requirements have been satisfied.  *See Spetner v. Palestine Inv. Bank*, 495 F. Supp. 3d 96, 108 (E.D.N.Y. 2020).  *Prima facie* jurisdiction has not been established unless a plaintiff pleads "in good faith, *see* Fed. R. Civ. P. 11, legally sufficient allegations of jurisdiction." *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184 (2d Cir. 1998) (citations omitted).  Courts accept jurisdictional allegations as true for purposes of a motion to dismiss, but not conclusory allegations.  *See Spetner*, 495 F. Supp. 3d at 112 (internal quotation marks and citations omitted) (rejecting "Plaintiffs' key contentions" that

---

[3] Under New York's long-arm statute, a court may exercise personal jurisdiction over "any non-domiciliary . . . who in person or through an agent . . . *transacts any business within the state* . . . ." N.Y. C.P.L.R. § 302(a)(1) (emphasis added).  Plaintiffs contend that correspondent banking is transacting business in New York under Section 302(a)(1). (*See* Compl. ¶ 22).  Plaintiffs do not allege jurisdiction under Section 302(a)(2), nor could they, because they do not allege the "physical commission of the tortious act in New York." *Clean Coal Techs., Inc. v. Leidos, Inc.*, 377 F. Supp. 3d 303, 314 (S.D.N.Y. 2019) (citation omitted).

[4] The Complaint alleges two other bases for personal jurisdiction: (i) 18 U.S.C. § 2334(a), requiring proper service in the United States of the Complaint, as provided in the ATA, and (ii) minimum contacts with the United States under Fed. R. Civ. P. 4(k)(2). (Compl. ¶ 22).  However, Plaintiffs have not attempted to serve MAR in the United States, and Plaintiffs do not allege any contacts, sufficient or not, with any state besides New York, rendering Rule 4(k)(2) inapplicable.

were "styled as factual allegations but mostly amount to legal conclusions," including allegations that defendant "purposefully and knowingly directed its agents to use correspondent bank accounts in New York"). Plaintiffs have failed to establish either "a statutory basis for personal jurisdiction" or that the "exercise of personal jurisdiction" comports "with constitutional due process principles." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 327 (2d Cir. 2016) (internal quotation marks and citations omitted).

**A.      Plaintiffs Cannot Satisfy New York's Long-Arm Statute**

Under Section 302(a)(1), New York courts employ a two-pronged test to determine whether correspondent banking amounts to "transacting business": Plaintiffs must demonstrate that the foreign bank's maintenance and use of the correspondent account is "purposeful" and also that a "nexus" exists between the plaintiffs' claims and the foreign bank's alleged use of the account. *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL ("Licci IV")*, 732 F.3d 161, 168-69 (2d Cir. 2013). Here, Plaintiffs do not sufficiently allege either.

**1.      Plaintiffs Fail to Allege Purposeful Availment of the New York Forum**

Plaintiffs' allegations of purposeful availment are legally deficient because they lack specificity and are conclusory. Plaintiffs' allegations fail to plead MAR's "frequen[t] and deliberate . . . use of its correspondent account." *Id.* at 168 (citations omitted). Nor do Plaintiffs allege "an established course of dealing." *Cmty. Fin. Grp., Inc. v. Stanbic Bank Ltd.*, No. 14-cv-5216 (DLC), 2015 WL 4164763, at *4-5 (S.D.N.Y. July 10, 2015) (dismissing complaint for lack of personal jurisdiction and finding that plaintiffs alleged "only one connection between this case and New York," which was not purposeful).

There are only two references in the Complaint that attempt to allege MAR's conduct with specificity. First, Plaintiffs allege that "[f]rom March 1, 2015 until September 7, 2015 alone, Defendants conspired to use [MAR] to transfer over $28 million" in donations from Qatar Charity.

(Compl. ¶ 126).   But significantly, Plaintiffs do not allege *that these transfers touched correspondent accounts in New York*.   Nor do Plaintiffs allege any other details to support purposeful availment, such as when MAR allegedly made these transfers to New York, to whom, how often, or the amounts.   (*Id.*).

Second, Plaintiffs allege that "[b]etween 2009 and 2015, [MAR] arranged for currency exchange transactions that involved converting in excess of $3.5 million in USD *and* Euros held by Qatar Charity in Doha into Israeli shekels and moving those funds to Qatar Charity in the Palestinian Territories."  (*Id.* ¶ 130(c)) (emphasis added).   They further allege that the "USD used in connection with those transactions passed through Bank of New York Mellon in New York and on to the Qatar Charity accounts held at either the Bank of Palestine or the Islamic Bank in Ramallah." (*Id.* ¶ 130(d)).  Plaintiffs fail to identify what *amount* or *frequency* of those funds were actually U.S. dollars versus Euros, meaning their allegation may amount to only a *de minimis* amount of dollars passing through New York.   *See Daou v. BLC Bank, S.A.L.*, No. 20-cv-4438 (DLC), 2021 WL 1338772, at *8-9 (S.D.N.Y. Apr. 9, 2021) (dismissing complaint where "[p]laintiffs point to only four instances in which [defendant] used its New York correspondent account in connection with the plaintiffs"); *cf. Bartlett v. Société Générale de Banque Au Liban SAL*, No. 19-cv-00007 (CBA) (VMS), 2020 WL 7089448, at *5 (E.D.N.Y. Nov. 25, 2020) (finding personal jurisdiction where "specific transactions . . . number in the dozens and total millions of dollars").   In addition, Plaintiffs plead that the funds were converted "into Israeli shekels." (Compl. ¶ 130(c)).  The sheer implausibility of using correspondent banking in New York to obtain U.S. dollars only to transfer those funds to local branches of Qatar Charity to obtain Israeli shekels further underscores the conclusory nature of the allegations for personal jurisdiction, directly undermining Plaintiffs' allegation that Hamas needed "coveted U.S. dollars"—and not shekels—

5

"to conduct its terrorist operations."  (*Id.* ¶¶ 5, 155, 164).

Moreover, the Complaint is careful to avoid pleading that MAR, who was not the recipient of the alleged funds, *chose* New York as a forum; instead, it alleges just that the transactions "passed through" New York. *See Vasquez v. Hong Kong & Shanghai Banking Corp.*, 477 F. Supp. 3d 241, 259 (S.D.N.Y. 2020) (dismissing complaint because "there is no evidence that [defendant] directed the funds to be deposited or controlled the route of the plaintiffs' funds through the correspondent account"); *cf. Averbach v. Cairo Amman Bank*, No. 19-cv-0004 (GHW) (KHP), 2020 WL 486860, at *7 (S.D.N.Y. Jan. 21, 2020) (internal quotation marks and citations omitted) (finding purposeful availment where bank allegedly used money transferred into its correspondent accounts to then credit money to its customers at least twenty-three times, as "affirmatively act[ing] on" a customer's deposit constitutes purposeful availment), *report and recommendation adopted sub nom. Averbach ex rel. Averbach v. Cairo Amman Bank*, No. 19-cv-00004 (GHW), 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020).[5]

The other allegations as to MAR's alleged connections with New York are conclusory and vague, (*e.g.*, Compl. ¶ 161 ("At all times relevant to Plaintiffs' claims, [MAR] maintained a direct or indirect correspondent banking relationship with Bank of New York Mellon, and perhaps other U.S. banks.")), or simply state legal conclusions, (*e.g.*, *id.* ¶ 23 ("Specifically, in furtherance of their conspiracy, Qatar Charity and [MAR] . . . knowingly accessed and utilized the banking system in the United States to transmit funds to Hamas and effectuated U.S. dollar-denominated funds transfers on behalf of Qatar Charity through the Bank of New York Mellon in New York.")). As a result, these allegations cannot be credited.  *See Berdeaux v. OneCoin Ltd.*, No. 19-cv-4074

---

[5]  Plaintiffs also allege that "[i]n addition to those funds, between 2011 and 2013, Qatar Charity moved $25 million from Doha to the banned Qatar Charity entity operating in the Gaza Strip," and that "[t]hose dollars also passed through the Bank of New York."  (Compl. ¶ 130(f)-(g)).  This allegation, however, contains no factual allegations as to MAR or any references of *purposefully* choosing New York.

6

(VEC), 2021 WL 4267693, at *10 (S.D.N.Y. Sept. 20, 2021) ("Although Plaintiffs allege that [defendants] 'directed their money laundering efforts' at BNYM, which is headquartered in New York and does business here, that wholly conclusory allegation is patently inadequate . . . .").

If deemed sufficient, the Complaint's jurisdictional allegations as to MAR could be used to assert jurisdiction over virtually any foreign financial institution given the ubiquity of correspondent banking today; instead, the "use of the correspondent account" must be "repeated" and used "as an instrument to achieve the wrong complained of in this suit." *Licci IV*, 732 F.3d at 173; *see also Berdeaux*, 2021 WL 4267693, at *12 ("[T]he mere use of a correspondent account does not subject [the defendant] to jurisdiction under Section 302(a)(1)."). Plaintiffs' allegations thus fail to meet a *prima facie* case of purposeful availment of New York.

## 2. Plaintiffs Fail to Establish an Articulable Nexus Between Their Causes of Action and the Transactions Alleged Against MAR

Even if Plaintiffs sufficiently alleged that MAR purposefully availed itself of the New York forum in connection with its correspondent banking activity (they do not), Plaintiffs fail to allege that MAR's correspondent banking activity gave rise to Plaintiffs' injuries. A *prima facie* pleading of personal jurisdiction requires "an articulable nexus or a substantial relationship between transactions occurring within the state and the cause of action sued upon." *Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720, 726 (S.D.N.Y. 2010) (internal quotation marks and citations omitted) (dismissing claim); *see also Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 344 n.4 (2016) (citation omitted) (explaining that determination that frequency of business transactions is "sufficient" for purposeful availment is limited by the "'requirement that the cause of action arise from the very transaction or transactions which are relied upon to provide the contact with the forum'"). Although a single transaction may be sufficient, it must be "relevant" to the claims at issue. *See Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 42 (E.D.N.Y. 2019); *see also Licci IV*, 732 F.3d at

171-72 n.7 (citation omitted) ("[U]se of a forum's banking system . . . may expose the user to suits seeking redress in that forum when that use is an integral part of the wrongful conduct.").

Here, Plaintiffs plead that MAR's alleged role was at least several steps removed from the activity that injured Plaintiffs, while failing to plead sufficient facts to allege the requisite knowledge.  As part of the nexus inquiry, Plaintiffs "must show that Defendant knew or was deliberately indifferent to the fact that [the bank customer] was financially supporting terrorist organizations." *Strauss v. Crédit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 21 (E.D.N.Y. 2016) (internal quotation marks and citations omitted); *see also Bartlett*, 2020 WL 7089448, at *6 (finding nexus where plaintiffs had alleged, *inter alia*, that defendant bank "moved millions of dollars through its correspondent bank accounts" knowing it was doing so for Hezbollah's business affairs component, and that Hezbollah was "singularly" dedicated to terrorism).  As discussed *infra* § IV.A.1, Plaintiffs fail to allege MAR could have inferred that providing banking services to Qatar Charity was essentially the same as funding Hamas or its affiliates.  Qatar Charity was not, and is not, an FTO or SDGT.  To the contrary, it helped fund humanitarian efforts.  (Compl. ¶ 146).  There is no plausible explanation for the inference that Qatar Charity—and more specifically, Qatar Charity's local branches—revealed alleged illicit intentions to its bank.

Instead, the most Plaintiffs allege is that MAR was multiple steps removed from the terrorist activity that injured Plaintiffs: unspecified funds went *first* from MAR's New York correspondent account to Qatar Charity's local branches in Palestine, *and then* from those local branches to Hamas or Hamas-affiliated charities.  (*Id.* ¶¶ 10-12).  At no point do Plaintiffs allege that MAR transferred any funds to Hamas.  *Compare Tamam*, 677 F. Supp. 2d at 729 (citations omitted) (concluding that, "[a]lthough . . . at some point Defendants obtained U.S. dollars from correspondent accounts in New York, 'a defendant may not be subject to personal jurisdiction

4861-4762-9327

under CPLR § 302(a)(1) simply because its contact with New York was a link in a chain of events giving rise to the cause of action,'" and holding that plaintiffs had not sufficiently alleged personal jurisdiction) *with Bartlett*, 2020 WL 7089448, at *6 (finding nexus where bank moved millions of dollars for Hezbollah's business affairs component).  Plaintiffs' allegations purportedly connecting MAR with the forum are thus far too attenuated and should be dismissed, as they amount to only "a remote, purely contingent, or overly indirect causal connection." *Freeman v. HSBC Holdings PLC ("Freeman I")*, 413 F. Supp. 3d 67, 84 (E.D.N.Y. 2019).

Furthermore, as to the 2018 attack (*see* Compl. ¶ 33), Plaintiffs' allegations fail for the additional reason that they lack any temporal proximity to the transfers, none of which occurred after 2015.  *See Strauss*, 175 F. Supp. 3d at 20 (citation omitted); (Compl. ¶¶ 104, 126, 130(c), 139).  Plaintiffs rely on *Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 632 (E.D.N.Y. 2006), for the assertion that "[c]ourts have [] declined to conclude at the motion to dismiss stage that a specific payment's temporal proximity to an attack could not satisfy the causation requirement as a matter of law."  (ECF No. 52 at 5 n.5).  However, courts since *Weiss* in the ATA context have found as a matter of law that a lack of temporal proximity to an attack can negate the allegation that banking activity caused the attacks at issue.  *See, e.g.*, *Cabrera v. Black & Veatch Special Projects Corp.*, No. 19-cv-3833 (EGS) (ZMF), 2021 WL 3508091, at *24 (D.D.C. July 30, 2021) (granting motion to dismiss ATA claims that "do not draw a sufficient temporal nexus between the alleged wrongdoing and Plaintiffs' injuries").

Courts have also dismissed non-ATA complaints claiming jurisdiction on the basis of Section 302(a)(1) for lack of a temporal nexus.  *See, e.g.*, *Daou*, 2021 WL 1338772, at *8 (citation omitted) (finding no "articulable nexus" or "substantial relationship" where breach of contract occurred in 2019 but alleged use of New York correspondent accounts occurred between 2016 and

4861-4762-9327

2018).  Thus, Plaintiffs incorrectly submit that this Court cannot address, as a matter of law, the issue of "a specific payment's temporal proximity to an attack" to find that causation is lacking. (ECF No. 52 at 5 n.5).  It is implausible that, when MAR allegedly executed ordinary banking transactions for a charitable organization in 2015 or earlier, it could "foresee being haled into court" in New York for an individual terrorist attack occurring in Israel in 2018.  *Licci IV*, 732 F.3d at 170 (internal quotation marks and citation omitted).  The Complaint should be dismissed for the additional reason that the allegations as to the 2018 attack lack temporal nexus.

### B.  Plaintiffs Fail to Satisfy Constitutional Requirements of Minimum Contacts and Reasonableness

Plaintiffs also fail to show that MAR has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice" under the Due Process Clause of the Fourteenth Amendment.  *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945) (internal quotation marks and citations omitted).  This inquiry is analyzed under two prongs: (1) minimum contacts, "where the defendant purposefully availed itself of the privilege of doing business in the forum," and (2) reasonableness.  *Licci IV*, 732 F.3d at 170, 173-74 (internal quotation marks and citations omitted).  Plaintiffs cannot meet this standard.

*First*, Plaintiffs have not established that MAR has minimum contacts with the forum because, as discussed *supra* § I.A.1., they have not alleged that MAR selected and repeatedly used New York's banking system for accomplishing the alleged wrongs.  *See id.* at 171 ("[W]e by no means suggest that a foreign defendant's 'mere maintenance' of a correspondent account in the United States is sufficient to support . . . personal jurisdiction over the account-holder in connection with any controversy.").

*Second*, exercising jurisdiction over MAR would be unreasonable.  This inquiry considers the burden of exercising jurisdiction on MAR, "the interests of the forum state in adjudicating the

10

case," and "the plaintiff's interest in obtaining convenient and effective relief." *Id.* at 170 (internal quotation marks and citations omitted). MAR is headquartered in Qatar (Compl. ¶ 71), and the deaths at issue occurred in Israel (*id.* ¶¶ 325, 346); *see also Licci IV*, 732 F.3d at 174. "[A]s heinous as" the attacks were, they "were not sufficiently connected to the United States to provide specific personal jurisdiction in the United States." *Waldman*, 835 F.3d at 337.

Indeed, exercising jurisdiction here would offend traditional notions of fair play and substantial justice; 132 other alleged victims have brought a lawsuit arising out of the same alleged events against MAR and nine other defendants in Israel. *Ansbacher, et al. v. Qatar Charity, et al.*, Jerusalem District Court, CC 21387-06-21, November 10, 2021. Plaintiffs would not be denied an opportunity to obtain relief, as they can bring suit in a forum outside the United States—further demonstrating that an American court is not the appropriate forum to hear these issues.

## II.   DISMISSAL FOR IMPROPER SERVICE UNDER RULE 12(b)(5) IS PROPER FOR FAILURE TO COMPLY WITH THE FEDERAL RULES OR QATARI LAW

Not only have Plaintiffs failed to plead a *prima facie* case of personal jurisdiction, but they have also failed to properly serve MAR. Plaintiffs bear "the burden of establishing that service was sufficient." *Khan v. Khan*, 360 F. App'x 202, 203 (2d Cir. 2010) (citation omitted). Here, Plaintiffs' alleged service upon MAR—a foreign defendant with no presence in the United States (Compl. ¶ 71)—via Federal Express to a Qatari address and by delivery to a person whom Plaintiffs have not demonstrated is authorized to accept service on behalf of MAR is improper.

Service of MAR, a foreign corporation, is permitted "in any manner prescribed by Rule 4(f) for serving an individual, except personal delivery under (f)(2)(C)(i)." Fed. R Civ. P. 4(h)(2). With respect to subsection 4(f)(1), Plaintiffs acknowledge that Qatar "is not a signatory to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents, or any other service treaty" and recognize that Plaintiffs "will need to enforce the judgment in this case against

the Defendants outside the United States." (*See* ECF No. 14 at 3).

However, Plaintiffs also attempt service via Federal Express, purportedly in compliance with Rule 4(f)(2)(C)(ii). (*See* ECF No. 52 at 4). But Plaintiffs have not established that service by private courier is not "prohibited by [Qatar's] law." *See Nabulsi v. Nahyan*, No. H-06-2683, 2008 WL 1924235, at *4 (S.D. Tex. Apr. 29, 2008) ("Plaintiffs' silence on the issue does not allow the court to assume that service by mail is not prohibited by U.A.E. law.").

Plaintiffs cite to Article 11 of the Qatari Civil & Commercial Procedures Law (Law No. 13 of 1990), in stating that Qatari law "explicitly authorizes delivery of a summons by registered mail . . . or any other appropriate means." (ECF No. 52 at 4) (internal quotation marks omitted).[6] However, Article 11 governs the service of an individual person. Instead, Article 10 governs service upon a corporation and only permits personal service upon "the chairperson or manager or one of the joint partners or their legal representatives or whoever acts on their behalf." Article 10 of the Qatari Civil & Commercial Procedures Law (Law No. 13 of 1990, as amended by Law No. 7 of 1995).[7] Plaintiffs fail to demonstrate their attempt at service is not prohibited by this provision of the law. *See Rosenberg v. Lashkar-e-Taiba*, No. 10-cv-5381 (DLI) (CLP), 2017 WL 11647006, at *4 (E.D.N.Y. Mar. 31, 2017) (dismissing with prejudice plaintiffs' ATA claims, and adopting Report & Recommendation in part, including a finding of improper service where plaintiffs failed to explain what position the person signing Federal Express delivery "held in the organization or why he was 'authorized to accept service on behalf of'" defendants) (citation omitted).

---

[6] *See* https://almeezan.qa/LawArticles.aspx?LawTreeSectionID=8075&lawId=2492&language=en.

[7] *See supra* note 6; (*see also* ECF No. 52 at 4 n.3) (citing same).

4861-4762-9327

III.    **PLAINTIFFS FAIL TO STATE A CLAIM FOR PRIMARY LIABILITY UNDER THE ATA BECAUSE MAR'S BANKING SERVICES ARE NOT ACTS OF INTERNATIONAL TERRORISM PROXIMATELY CAUSING PLAINTIFFS' INJURIES, REQUIRING DISMISSAL UNDER RULE 12(b)(6)**

Under the ATA, "principal perpetrators of acts of international terrorism" are not liable unless plaintiffs plausibly allege (1) an injury to a U.S. national, (2) an act of international terrorism, and (3) causation. *Freeman I*, 413 F. Supp. 3d at 82 (internal quotation marks and citations omitted). Plaintiffs allege that MAR has primary liability under the ATA for allegedly providing material support to terrorists (in violation of 18 U.S.C. §§ 2339A and 2333(a)) (Third Cause of Action) and to an FTO (in violation of 18 U.S.C. §§ 2339B(a)(1) and 2333(a)) (Fourth Cause of Action). MAR's conduct, however, does not equate to engaging in acts of international terrorism that proximately caused Plaintiffs' injuries. Section 2339A additionally requires Plaintiffs to plead that MAR acted with a heightened *mens rea*, which Plaintiffs have failed to do. Thus, Plaintiffs' Third and Fourth Causes of Action should be dismissed.

A.    **MAR's Alleged Commercial Banking Activity Is Not an Act of International Terrorism Involving Violence or Intending to Intimidate or Coerce**

To constitute an act of international terrorism under the ATA, the act at issue must: (1) involve violence or endanger human life; (2) violate federal or state criminal law if committed in the United States; (3) appear to be intended "to intimidate or coerce a civilian population" or to "influence the policy [or the conduct] of a government by intimidation[,]" "coercion[,]" "mass destruction, assassination, or kidnapping"; and (4) occur primarily outside the United States or transcend national boundaries. *See* 18 U.S.C. § 2331(1) (defining an act of international terrorism); *see also Licci ex rel. Licci v. Lebanese Canadian Bank, SAL ("Licci II")*, 673 F.3d 50, 68 (2d Cir. 2012) (citation omitted). Here, Plaintiffs have based their claims of primary liability on the assertion that MAR provided banking services to Qatar Charity, but these allegations fail to satisfy the preliminary threshold for primary liability: that MAR *itself* committed an "act of

4861-4762-9327

international terrorism" as defined by statute. *See Freeman I*, 413 F. Supp. 3d at 82 ("Plaintiffs must plausibly allege that Defendants' actions were, *themselves*, acts of international terrorism in order to give rise to primary liability under § 2333(a).") (emphasis added).

Plaintiffs cannot allege MAR committed an act of international terrorism, as they only allege MAR "used its correspondent banking relationships in New York to process USD transactions for Qatar Charity." (Compl. ¶ 164). Providing financial services—even to FTO affiliates—is not an act inherently "violent or dangerous to human life." *See Bartlett*, 2020 WL 7089448, at \*7-8 (dismissing ATA claim). Unlike in *Miller*, where the bank had committed acts of international terrorism by administering an insurance scheme for terrorist martyrs through automated services, and the bank was advertised as the site of the scheme, there are no allegations here that MAR did anything other than process transactions for one customer. *See Miller*, 372 F. Supp. 3d at 45-46.[8] Moreover, Plaintiffs allege not only that MAR provided mere banking services, but also that those services furthered humanitarian causes. (Compl. ¶ 146). Such services are not acts of international terrorism.

In addition, Plaintiffs fail to allege that MAR's activities objectively appear to have the requisite intent to coerce or intimidate. Plaintiffs have not alleged that actions undertaken by MAR meet this standard, especially because MAR dealt with only Qatar Charity, an alleged intermediary with no clear ties to terror. *See Zapata v. HSBC Holdings PLC*, 414 F. Supp. 3d 342, 358-59 (E.D.N.Y. 2019) (dismissing ATA claim); *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 207 n.6 (2d Cir. 2014) (ellipsis in original and citation omitted) ("The requirement to 'appear to

---

[8] Other decisions in the Second Circuit likewise indicate that providing financial services does not constitute an act of terrorism unless the plaintiff can sufficiently allege that the funds the bank processed were identified as destined for the terrorist group and the bank knew of such designation. *See Schansman v. Sberbank of Russia PJSC*, No. 19-cv-2985 (ALC), 2021 WL 4482172, at \*6 (S.D.N.Y. Sept. 30, 2021). In *Schansman*, the funds at issue "were confirmed by . . . the leader of the [terrorist group], and additional funds were raised by [an individual] who publicly boasted about raising millions for the [terrorist group]." *Id.* Here, Plaintiffs have made no such allegations.

be intended . . .' does not depend on the actor's beliefs, but imposes on the actor an objective standard."); *Freeman I*, 414 F. Supp. 3d at 92 & n.31 (holding that Plaintiffs did not allege intent to intimidate where "defendants [were not] alleged to have conspired directly with an FTO or front organization," but instead, "[c]rucially," there were "intervening actors" between the bank and the terrorist activity).[9]  Nor can Plaintiffs satisfy the requisite intent requirement by imputing Qatar's alleged support of Hamas to MAR by conclusorily alleging close ties between MAR and the Qatari government.  (*See* Compl. ¶¶ 108-16); *see, e.g.*, *Kaplan v. Jazeera*, No. 10-cv-5298, 2011 WL 2314783, at *5-6 (S.D.N.Y. June 7, 2011) (citation omitted) (dismissing plaintiffs' ATA claims where plaintiffs merely asserted, in conclusory fashion, that defendant news network had an official "anti-American and anti-Israel organization policy").  Such a recitation of legal elements and conclusory allegations without support "will not do," and turns the objective standard for intent into a subjective one.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Accordingly, Plaintiffs have failed to meet this threshold requirement for ATA primary liability.

> **B.**     **Plaintiffs Fail to Plausibly Allege Any Facts Which Support an Inference that MAR's Financial Services Were the Proximate Cause of Plaintiffs' Injuries**

Plaintiffs further fail to allege that MAR's correspondent banking transactions proximately caused Plaintiffs' injuries, as required for primary liability under the ATA.  *See Rothstein v. UBS AG*, 708 F.3d 82, 95 (2d Cir. 2013), *superseded by statute on other grounds*, JASTA, Pub. L. No. 114-222, 130 Stat. 852, 854 (2016).  Specifically, Plaintiffs must allege "a sufficiently direct relationship between the conduct in question and the injuries for which recovery is sought." *Zapata*, 414 F. Supp. 3d at 356 (citations omitted).

---

[9] Even the provision of financial services to a known terrorist organization—which Plaintiffs do not allege here— would require plaintiffs to allege that a defendant's conduct "manifest[s] the apparent intent required" under Section 2331(1).  *Weiss v. Nat'l Westminster Bank PLC*, 381 F. Supp. 3d 223, 235 (E.D.N.Y. 2019) (quoting *Linde v. Arab Bank, PLC ("Linde I")*, 882 F.3d 314, 326 (2d Cir. 2018) (internal quotation marks omitted)).

15

MAR did not participate in the attacks, and MAR did not provide money to the perpetrators of the attacks either directly or indirectly.  Plaintiffs acknowledge repeatedly that Hamas is well-funded without MAR.  (*See, e.g.*, Compl. ¶ 112 ("In October 2012, Qatar pledged $400 million to Hamas."); *id.* ¶ 114 (noting "$250 million had been paid from the Qatar Central Bank directly to Hamas's leader, Khaled Meshal"); *id.* ¶ 115 ("Between 2012 and 2018, Qatar officially provided Hamas with over $1.1 billion.")).  Decisions in which courts have denied motions to dismiss "have rested on the theory that giving money to terrorist organizations definitionally enables them to commit additional acts of terrorism"; however, transferring money that Qatar Charity "independently accumulate[s] is an act of a fundamentally different sort from giving terrorist organizations money that they do not already have." *Zapata*, 414 F. Supp. 3d at 358 (dismissing ATA claim); *see also Rothstein*, 708 F.3d at 97 (finding no proximate causation where "[t]he Complaint does not allege that [bank] was a participant in the terrorist attacks that injured plaintiffs.  It does not allege that U.S. currency [the bank] transferred to [its customer] was given to [the terrorist organizations].  And it does not allege that if [the bank] had not transferred U.S. currency to [its customer], [that its customer,] with its billions of dollars in reserve, would not have funded the attacks in which plaintiffs were injured.").

Plaintiffs conclusorily allege that MAR was "knowingly complicit in financing Hamas" because Qatar Charity was a member of the Union of Good and that "Qatar Charity and Hamas could not have obtained those USD without" MAR.  (Compl. ¶¶ 147, 165, 320).  But Plaintiffs also acknowledge Qatar Charity's humanitarian work and fail to allege any nonconclusory facts that the funds allegedly transferred through MAR's correspondent bank account were in fact sent to Hamas instead of those humanitarian programs.  (*See id.* ¶¶ 52, 146); *Rothstein*, 708 F.3d at 97 (holding that defendant bank's customer "is a government, and as such it has many legitimate

16

agencies, operations, and programs to fund," and identifying "no nonconclusory allegation in the Complaint that plausibly shows that the moneys [defendant bank] transferred to [its customer] were in fact sent to Hizbollah or Hamas or that [its customer] would have been unable to fund the attacks by Hizbollah and Hamas without the cash provided by [defendant bank]").

Thus, aside from conclusory statements, Plaintiffs' allegations "do not meet *Twombly*'s plausibility standard with respect to the need for a proximate causal relationship between the cash transferred by [the bank defendant] to [its customer] and the terrorist attacks . . . that injured plaintiffs." *See Rothstein*, 708 F.3d at 97; *see also Linde I*, 882 F.3d at 327 (citation omitted) (explaining that "in the context of a challenge to proof of the causation element of an ATA claim, . . . the mere provision of 'routine banking services to organizations and individuals said to be affiliated with' terrorists does not necessarily establish causation"); *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 124 (2d Cir. 2013) (citation omitted) (holding that the allegation that "[t]he September 11th Attack was a direct, intended and foreseeable product of [defendant's] participation in al Qaida's jihadist campaign" must be rejected for failure to meet *Twombly*'s plausibility standard with respect to the need for a proximate causal relationship), *superseded by statute on other grounds*, JASTA, Pub. L. No. 114-222, 130 Stat. 852, 854 (2016).

In addition, Plaintiffs fail to allege a temporal connection between MAR's alleged conduct that ended in 2015 and the 2018 attack against Plaintiff Fuld. *See Cabrera*, 2021 WL 3508091, at *23-24 (granting motion to dismiss and noting "if the defendants' conduct was distant in time from the attacks causing the plaintiffs' injuries, that fact weighs against foreseeability"); *see also In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284, 1313 (S.D. Fla. Jan. 3, 2018) ("[T]he greater the time between the payments and the attack, the more attenuated the foreseeability of the attack, and the weaker the likelihood that the support played a significant role in facilitating the attack.").

17

Plaintiffs fail to allege proximate causation with respect to both attacks, warranting dismissal.

C.      **Plaintiffs Fail to Plausibly Allege Facts Sufficient to Assert that MAR Had the Requisite *Mens Rea* for Primary Liability under the ATA**

Plaintiffs' Third Cause of Action—alleging material support to terrorists (in violation of 18 U.S.C. § 2339A)—should be dismissed for failure to plausibly allege the knowledge and intent required.  This failure is especially stark where Plaintiffs have failed to prove even the lesser knowledge requirement for secondary liability, as discussed *infra*, § IV.A.1.

Section 2339A of the ATA makes it illegal to "provide[] material support or resources or conceal[] or disguise[] the nature, location, source, or ownership of material support or resources, *knowing and intending* that they are to be used in preparation for, or in carrying out, a violation of" federal laws, including terrorism.  18 U.S.C. § 2339A (emphasis added).  Accordingly, under Section 2339A, "an ATA plaintiff must prove that the defendant acted with the specific knowledge or intent that its support would be used in preparation for, or in carrying out, one of the enumerated terrorism-related crimes."  *In re Chiquita*, 284 F. Supp. 3d at 1309.  "Section 2339A [thus] requires proof of a heightened *mens rea*" in comparison to Section 2339B.  *Id.* (internal quotation marks and citations omitted) (noting that "the mental state required under § 2339A extends both to the support itself, *and* to the underlying purposes for which the support is given")[10]; *see also Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84, 101 (D.D.C. 2017) (dismissing ATA claims where "the complaint does not contain any detailed factual allegations that [bank] knew about [its customer's] supposed connections to [terrorist organization]," and the complaint contains "no facts showing that [bank] knew what [another customer] was doing with the funds [bank] processed"), *order vacated in part on other grounds*, 285 F. Supp. 3d 240 (D.D.C. 2018).

---

[10] In contrast, Section 2339B "requires only knowledge of the organization's connection to terrorism, not intent to further its terrorist activities or awareness that one is playing a role in those activities."  *Linde I*, 882 F.3d at 330 (citation omitted).  Plaintiffs cannot plausibly assert knowledge under either § 2339A or § 2339B.

4861-4762-9327

Plaintiffs only allege that MAR processed funds for Qatar Charity, not a terrorist group. *See Ofisi*, 278 F. Supp. 3d at 102 (internal quotation marks, brackets, and citation omitted) (holding that allegations did not satisfy § 2339A where allegations asserted that defendant "[p]rocess[ed] funds for Sudan or Sudanese commercial banks, [which] is not the same as processing funds for a terrorist organization or a terrorist front"). Nor do Plaintiffs allege the temporal connection required for *mens rea*, because Plaintiffs have not alleged sufficient, non-conclusory facts to establish that MAR knew, before the attacks, that Qatar Charity was acting as an agent of Hamas or its affiliates. *See id.* at 101 (dismissing ATA claims because plaintiffs failed to allege *mens rea* where plaintiffs failed to allege bank knew its customer was acting as an agent of terrorist group prior to attack). Thus, Plaintiffs' ATA claims fail.

## IV. PLAINTIFFS FAIL TO PLAUSIBLY ALLEGE SECONDARY LIABILITY UNDER JASTA, REQUIRING DISMISSAL UNDER RULE 12(b)(6)

Under JASTA, secondary liability attaches in only a limited set of circumstances:

> In an action under subsection (a) for an injury arising from an act of international terrorism *committed, planned, or authorized* by an organization that *had been designated as a foreign terrorist organization* under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person *who aids and abets, by knowingly providing substantial assistance*, or *who conspires with the person who committed such an act of international terrorism*.

18 U.S.C. § 2333(d)(2) (emphasis added). Here, Plaintiffs' allegations are insufficient for either adding and abetting or conspiracy liability.

### A.   Plaintiffs Fail to Meet the Standards for Aiding and Abetting Liability

Secondary liability pursuant to Section 2333(d)(2) under an aiding and abetting theory (First Cause of Action) requires Plaintiffs to allege that (1) "the party whom the defendant aids must perform a wrongful act that causes an injury;" (2) "the defendant must be *generally aware* of his role as part of an overall illegal or tortious activity at the time that he provides the assistance;"

and (3) "the defendant must *knowingly and substantially* assist the principal violation." *See Honickman v. BLOM Bank SAL*, 6 F.4th 487, 494 (2d Cir. 2021) (quoting *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)). Plaintiffs have not met this legal standard. The Complaint only describes MAR as a bank performing ordinary banking activity for a single customer which is a charity engaging in humanitarian efforts. (Compl. ¶ 146).

> 1.   **No Allegations Establish MAR's "General Awareness" of Illegal Acts**

MAR is a distant link in the chain providing services to Qatar Charity, which thereafter allegedly used Qatar Charity's local branches to fund Hamas. As there are no allegations MAR directly funded the SDGT or FTO, the only basis for secondary liability against MAR is via *indirect* assistance for providing financial services to Qatar Charity.

Plaintiffs, however, have not alleged facts to support the inference of MAR's "general awareness" of a role in the overall illegal activity to fund Hamas via Qatar Charity and its local branches. To do so, Plaintiffs "must plausibly allege that [MAR] was aware that, by assisting the principal, it is itself assuming a role in the terrorist activities." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 851 (2d Cir. 2021) (internal quotation marks and citation omitted). This element "does not require proof that the defendant had a specific intent," but it does require that MAR "knowingly—and not innocently or inadvertently—gave assistance, directly or indirectly" to the FTO. *Id.* at 863-64. Put simply, "the relevant inquiry for the general awareness element is: did Plaintiffs plausibly allege" that Qatar Charity was "so closely intertwined with Hamas's violent terrorist activities that one can reasonably infer that [MAR] was generally aware while it was providing banking services to [Qatar Charity] that it was playing a role in unlawful activities from which Hamas's attacks were foreseeable?" *Honickman*, 6 F.4th at 499 (internal quotation marks, brackets, and citations omitted). The answer is no.

Here, the allegations as to general awareness pale in comparison to those in prior cases in

which JASTA liability was found.  In *Kaplan*, for example, the Second Circuit provided guidance on the type of publicly available information that rises to the level of general awareness.  The defendant bank at issue was alleged to have aided and abetted the terrorist group Hizbollah (an SDGT and FTO); plaintiffs alleged that their customers were not only "integral parts of Hizbollah" but also that the defendant bank "knew this was so because Hizbollah *repeatedly publicized those relationships on Hizbollah websites and in news media that included Hizbollah's own radio and television stations*."  999 F.3d at 848, 862 (emphasis added).  These statements were made by "senior Hizbollah officials" at "press conferences and news media interviews" and on Hizbollah's own "official websites," "official television station," and its "official radio station" during a "particular time period (*i.e.*, repeatedly in the several years leading to [the earliest date of the attacks at issue])."  *Id.* at 864 (internal quotation marks omitted) (quoting plaintiffs' complaint).  The *Kaplan* complaint also averred that the relationships between Hizbollah and the defendant's customers were reported in "a *dozen* published English-language articles" in addition to "the repeated multimedia statements by Hizbollah."  *Id.* at 850, 864-65 (emphasis added).  While *Kaplan* holds that, in JASTA cases, Plaintiffs are not required to "plead a defendant's actual state of mind," JASTA contains a "requirement" of "actual knowledge" that the defendant "know that it is providing assistance" to an FTO, so as to "avoid imposing liability on innocent, incidental participants."  *Id.* at 863-64 (internal quotation marks, brackets, and citations omitted).  The exhaustive recitation of the alleged publication of facts necessary to find that the defendant was generally aware it was aiding and abetting an FTO in *Kaplan* is far from present here.

Other cases in which courts have found that general awareness was alleged include cases where the customers themselves were FTOs or SDGTs.  *See, e.g.*, *Bartlett*, 2020 WL 7089448, at *9.  Because of *Bartlett*'s explicit "reliance on" all but one of the banks at issue "having had

21

SDGT-designated customers during the relevant period" in its finding of general awareness, *Bartlett*'s statement that "Defendant's anti-money laundering and counter-financing of terrorism procedures" would have given "the banks reason to know when a customer had been designated an SDGT" is inapposite to the Complaint's lengthy allegations about MAR's own anti-terrorism policies. *Id.* at \*9, 11 & n.10; (*see also* Compl. ¶¶ 227-313). Moreover, the one bank which did *not* have an SDGT customer, "a closer case," purportedly "provided services to members of and companies controlled by" a "prominent" family "'synonymous with Hezbollah,' with family members and businesses *designated as SDGTs*." *Bartlett*, 2020 WL 7089448, at \*11 (emphasis added) (quoting plaintiffs' complaint). Plaintiffs cannot make those allegations here.

Complaints meeting the JASTA threshold have also contained allegations that indicate the defendant bank was not only generally aware of terrorist activity, but willfully assisted it. In *Miller*, the defendant bank received lists identifying causes of death (which included "bullets, bombs, and assassinations") of payment beneficiaries. *Miller*, 372 F. Supp. 3d at 39, 47. Similarly, *Kaplan* found that the defendant bank provided "special treatment" to its customers, such as dispensing with filing requirements to allow the customers to deposit hundreds of thousands of dollars a *day* without having to identify the source of funds. *Kaplan*, 999 F.3d at 850.

Here, Plaintiffs cannot make any such allegations. Qatar Charity is not an SDGT or an FTO. And there are no "red flags" so ubiquitous as to impute knowledge. *Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, 495 F. Supp. 3d 144, 160 (E.D.N.Y. 2020) ("A single online search at any time between 2008 and October 2015 would have confirmed IHH's status as a [] Hamas conduit . . . ."), *appeal filed*, No. 21-513 (2d Cir. Sept. 8, 2021); *see also Kaplan*, 999 F.3d at 862 ("Hizbollah repeatedly publicized those relationships [between bank customers and Hizbollah] on Hizbollah websites and in news media . . . ."). This case more closely resembles

22

4861-4762-9327

*Honickman*, in which one account holder was Union of Good (the organization of which Plaintiffs claim "Qatar Charitable Society" was a member (Compl. ¶ 59)), and, like Qatar Charity, all three bank customers were involved in charitable giving. *Honickman*, 6 F.4th at 493.[11]  The *Honickman* court held that the "limited public sources" in the complaint were insufficient to plead general awareness. *Id.* at 501-02.  Faced with similarly limited public sources, Plaintiffs resort to a kitchen-sink approach of stray facts to infer MAR's knowledge, but all are implausible.

### a. Pre-2008 Allegations Do Not Provide MAR with Knowledge

To try to impute knowledge of wrongdoing by Qatar Charity onto MAR, Plaintiffs cobble together irrelevant and isolated information that predates the transactions by many years.  Plaintiffs allege that "Qatar Charitable Society," a "prior name" for Qatar Charity, (Compl. ¶ 45), was named in congressional and trial testimony in the United States in 2002 and 2003, years before MAR's founding in 2006 and a dozen years before they allege MAR transacted with Qatar Charity.  (*Id.* ¶¶ 48-52, 71).  This testimony allegedly relates entirely to a relationship between Qatar Charitable Society and a terrorist group not at issue in this case.[12]  Plaintiffs make no attempt to demonstrate how MAR should have been aware of this testimony, or even how testimony in the United States about Qatar Charitable Society supporting Al-Qaeda through a 9/11-related action rendered it foreseeable to MAR that Qatar Charity purportedly supported Hamas years later.  *See Honickman*, 6 F.4th at 501-02 ("The complaint lacks any allegations that at the time of the interviews in which al-Qaradawi—who chaired Union of Good—praised martyrdom and criticized the United States'

---

[11] In *Estate of Henkin*, decided before *Honickman*, the court credited the allegation that a customer was designated as a member of the Union of Good.  *See* 495 F. Supp. 3d at 155.  However, that allegation was coupled with the allegations that the bank customer *itself* was "a substantiated Hamas conduit and terrorist organization," that such status could be easily confirmed with a "single online search," and that the customer had participated in an internationally-publicized deadly incident before the attacks at issue—allegations that Plaintiffs here do not plead against MAR.  *See id.* at 160.

[12] Plaintiffs also allege terrorist "support" by Qatar Charity unrelated to the attacks (or even countries) at issue in this case without providing any detail or corroboration; moreover, Plaintiffs do not plead that this alleged information was publicly available (in a conclusory fashion or otherwise).  (*Id.* ¶¶ 53-57).

23

designation of Hamas, it was public knowledge that al-Qaradawi chaired Union of Good.").

The Complaint also attempts to imply knowledge should be presumed because the "U.S. Interagency Intelligence Committee on Terrorism (IICT)" listed Qatar Charity as a "priority III terrorism support entity" in 2008, yet this information was directed to "advise and assist the Director of Central Intelligence (DCI)" and provide "threat warnings from the DCI to alert senior policy makers of possible foreign terrorist attacks." (Compl. ¶ 46 & n.1). There is no basis to conclude that MAR, which does not even operate in the United States, would have knowledge of the information closely held by American intelligence agencies. *See Honickman*, 6 F.4th at 502 n.18 (citation omitted) (explaining that allegations of general awareness based on "'publicly available'" but unreported information "require[] the implausible inference that the defendant was aware of those facts even before the news media"). Nor are there allegations that this information was publicly available to MAR prior to the transactions at issue. Indeed, the hyperlink provided by Plaintiffs in the Complaint contradicts that this information would have been public, as it was declassified on December 2, 2016. (Compl. ¶ 46 n.1).[13]

Nor can Plaintiffs equate an SDGT or FTO designation to *Israel's* 2008 order banning "Qatar Charitable Society" and designating it as "a member of the Union of Good," because Plaintiffs fail to allege whether such designation and its meaning were plausibly known to MAR. (*See id.* ¶ 59). But even if known to MAR, one designation by a foreign country (using a different name than Qatar Charity) years before the alleged transactions at issue is not enough to render banking activity for that customer tantamount to terrorist activity; Plaintiffs' approach to designations from other nations other than SDGTs and FTOs would stretch the contours of anti-money laundering requirements. *Honickman*, 6 F.4th at 490, 493, 502 n.20 (noting "allegation

---

[13] For the same reason, any attempt to draw inferences from the contents of "Qatar Charity annual reports" is futile; Plaintiffs fail to plead those reports were publicly available. (*Id.* ¶ 131).

that Israel designated Al-Aqsa as a terrorist organization in 1998, without specifying whether and where this was made public, is also unavailing" while affirming dismissal of complaint for allegations of banking activity between 1999 and 2003).  Relatedly, the U.S. Department of the Treasury's designation of the Union of Good as an SDGT (Compl. ¶ 61) is unavailing without evidence that MAR had reason to believe such a designation applied to Qatar Charity—not Union of Good.  *O'Sullivan v. Deutsche Bank AG*, No. 17-cv-8709 (LTS) (GWG), 2019 WL 1409446, at *10 (S.D.N.Y. Mar. 28, 2019) (finding that allegations regarding Iran's status as a state sponsor of terrorism and the purpose of U.S. sanctions against Iran were insufficient to plausibly allege aiding and abetting liability claim); *Honickman*, 6 F.4th at 501-02.[14]

### b. Information Unavailable Until After the Transactions Cannot Impute Knowledge Upon MAR

Lacking allegations of general awareness before the alleged transactions, Plaintiffs instead allege red flags that postdate those alleged transactions—which ended no later than 2015 (Compl. ¶¶ 126, 139)—such as a UK Charity Commission report in 2017, Israeli criminal convictions of Qatar Charity staffers in 2017, an investigation of an affiliate's affiliate in late 2019, or the designation by certain Middle Eastern countries of Qatar Charity as a financial supporter of terrorism in June 2019.[15]  (*Id.* ¶¶ 67, 69, 78, 140-43).  But after-the-fact revelations cannot support a finding of knowledge before the transactions.  *See Honickman*, 6 F.4th at 501 (holding defendant bank had no general awareness at the time of the transactions because "[o]ne of the news articles on [bank customer] referenced in the complaint was dated . . . more than a year after the last relevant attack").  Here, Plaintiffs cannot point to contemporaneous "press conferences and news

---

[14] The allegation that Arab Bank and Banque du Caire declined to provide Qatar Charity financial services in the Palestinian Territories is undated.  (*Id.* ¶ 145).  It is also bereft of facts that indicate why they did so.  (*Id.* ¶ 147).  Moreover, the Complaint is clear that other peer financial institutions, such as the Bank of Palestine and the Islamic Bank in Ramallah, did transact with Qatar Charity during this time period.  (*Id.* ¶ 10).

[15] The information alleged as to 2019 is not only after the alleged transactions but also after the 2018 attack.

media interviews" or content from Hamas's own "official websites," "official television station," or "official radio station." *Kaplan*, 999 F.3d at 864 (internal quotation marks and citation omitted).

### c. Allegations of Control by Qatar Are a Red Herring

As a last resort, Plaintiffs try to meet their burden of "general awareness" by alleging that the Government of Qatar's alleged support for Hamas was well known and, thus, MAR "was knowingly complicit in financing Hamas." (*See* Compl. ¶ 147). Plaintiffs appear to base this conclusion on the allegation that Qatar "dominates" MAR, because "agents or instrumentalities of the Qatari government" have a minority ownership interest of, collectively, less than 28 percent in MAR, and because an unspecified number of those in Qatar's royal family "are or have served as members of" MAR's board of directors. (*Id.* ¶¶ 5-6, 74, 109). These vague, general, and conclusory allegations do not suffice for aiding and abetting liability; allegations about an entity's home country cannot be imputed to the entity based on the conclusory claim that one "dominates" the other. To follow Plaintiffs' argument to its natural conclusion, any entity based in Qatar with a member of Qatar's royal family on its board would be subject to liability for aiding and abetting terrorism. However, there is nothing nefarious about a bank being affiliated with its home country, or a member of its royal family serving on its board. *In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d 631, 656-57 (S.D.N.Y. 2018) (internal quotation marks and citation omitted) (holding that "[p]laintiffs' allegations fail to show that the charity organizations were alter-egos of Saudi Arabia" because such allegations were "conclusory" and "largely boilerplate").[16]

Finally, Plaintiffs undermine their own allegations by admitting that Qatar Charity "used

---

[16] Plaintiffs do not allege MAR is an organ or alter ego of Qatar because MAR would be entitled to foreign sovereign immunity. *See EM Ltd. v. Banco Cent. De La República Arg.*, 800 F.3d 78, 93 (2d Cir. 2015) (holding allegations did not support alter ego finding and noting that "[m]issing from plaintiffs' allegations are any claims that Argentina's appointment of board members then caused it to interfere in and dictate BCRA's daily business decisions"). Unable to allege facts to support an alter ego theory, Plaintiffs instead use the terms "dominates," "coopted," and "controls," (*see* Compl. ¶ 5), but offer no facts to support such alleged domination, coopting, or control.

26

4861-4762-9327

its accounts at [MAR] to solicit contributions from donors, purportedly for humanitarian purposes such as assisting Syrian refugees."   (Compl. ¶ 146); *Honickman*, 6 F.4th at 502 ("That organizations like the Three Customers maintained a 'cover' in public undermines the plausibility of Plaintiffs' theory that BLOM Bank understood these organizations' true nature and activities from the public record at the time.").  As a result, "there is a meaningful difference between the alleged functions" of Qatar Charity "and those of the customers in *Kaplan*," who "provided subsidies to the families of Hizbollah suicide bombers." *Id.* at 503 n.21; *see also Averbach*, 2020 WL 486860, at *13 ("Merely provid[ing] banking services to a Hamas-affiliated charity, does not satisfy JASTA's mens rea requirement.").[17]

## 2.   Plaintiffs Cannot Allege that MAR "Knowingly and Substantially" Assisted in the Principal Violation

With respect to the "aiding and abetting" requirement that the defendant "knowingly and substantially assist in the principal violation," Plaintiffs must allege that MAR "knowingly—and not innocently or inadvertently—gave assistance" to Hamas.  *Honickman*, 6 F.4th at 499-500 (quoting *Halberstam*, 705 F.2d at 477; *Kaplan*, 999 F.3d at 863-64) (internal quotation marks omitted).  Courts evaluate six factors that relate to "substantial assistance," all of which weigh against Plaintiffs.  *See Linde I*, 882 F.3d at 329.

**(1) Nature of act encouraged.**  Plaintiffs vaguely allege that MAR used its correspondent banking relationships to benefit Qatar Charity.  (Compl. ¶¶ 126, 164).  But no allegations demonstrate MAR's knowledge that specific funds would be received by Hamas or used to fund the attacks, let alone that MAR sought to encourage Hamas to engage in terrorist attacks.  *See Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 225 (2d Cir. 2019) ("The plaintiffs here have

---

[17] To establish general awareness, Plaintiffs must show not that Qatar Charity was intertwined with Hamas, but rather that it was "closely intertwined with Hamas's *violent terrorist activities*."  *Honickman*, 6 F.4th at 501 (emphasis added).  Here, given Qatar Charity's reputation as a charitable organization, there is no basis for such a finding.

4861-4762-9327

not plausibly alleged that HSBC encouraged the heinous November 9 Attacks or provided any funds to [the terrorist organization]."). While Plaintiffs allege that MAR's transfers to Qatar Charity led to the purchase of "anonymous debit cards known as 'Sanabel Cards,'" Plaintiffs' allegations improperly "lump" all defendants together. (Compl. ¶ 149).[18]

Plaintiffs do not attempt to plead that MAR had any specific knowledge as to what Qatar Charity was doing with its own money; as a result, the allegation that "distribution of Sanabel Cards permitted Defendants to encourage terrorism" is a legal conclusion bereft of facts to support application to MAR. (*Id.* ¶ 154). Any attempt to draw a parallel between Plaintiffs' Sanabel Card allegations and the allegations in *Miller* that "Hamas-affiliated organizations provided Arab Bank with detailed lists containing the names of the martyrs, their personal information, and the date and manner of their death, which often included bullets, bombs and assassinations" is futile. *Miller,* 372 F. Supp. 3d at 39. According to the Complaint, the Sanabel Cards were purchased from the Bank of Palestine, and Plaintiffs do not allege who distributed them. (Compl. ¶¶ 149-50).

**(2) Amount of assistance given by MAR.** While Plaintiffs do "not need to allege the funds actually went to Hamas," they do need to plead facts "that permit a reasonable inference that the defendant recognized the money it transferred to its customers would be received by the FTO." *Honickman*, 6 F.4th at 500 (internal quotation marks and citation omitted). Plaintiffs do not. The alleged assistance here is providing ordinary banking services to one customer, Qatar Charity, a legitimate organization, and the "amount and type of aid" pled is limited to otherwise legal

---

[18] As with other allegations, Plaintiffs' improper allegations about the purported "Sanabel Card scheme" fail to distinguish in any way between any of the Defendants, which is an independent basis for dismissal. (Compl. ¶¶ 149-54); *see also Berdeaux*, 2021 WL 4267693, at *7 ("Plaintiffs' complaint is riddled with instances of improper group pleading, in which they refer to actions taken by the 'Scott Group Defendants,' without distinguishing in the least among the four Defendants whom Plaintiffs[] have lashed together in their complaint."); *see also infra* § V.

4861-4762-9327

transactions. *Id.* (citation omitted).  In contrast, the defendant in *Kaplan* "gave the Customers special treatment, exempting them from submitting cash transaction slips" and from requirements "with respect to deposits in Lebanese Currency" for "more than $2.5 million a week." *Kaplan*, 999 F.3d at 850.  Plaintiffs fail to allege that MAR provided any special treatment to Qatar Charity.

**(3) MAR's presence or absence at the time of the tort.**  Plaintiffs do not allege that MAR or any of its representatives were present during the attacks.

**(4) MAR's relation to the principal.**  Conclusory allegations aside (*see, e.g.*, Compl. ¶ 370), Plaintiffs fail to allege MAR had a relationship with Hamas.  *See Siegel*, 933 F.3d at 225 ("On the fourth factor—defendant's relation to the principal—the plaintiffs do not plead any non-conclusory allegations that HSBC had any relationship with [the terrorist organization].").  As previously noted, Plaintiffs seek to impose liability upon MAR, yet all they have alleged is that MAR was a distant link in a chain of financial transactions which allegedly ended with a customer distributing funds to its local branches which then distributed unidentified funds to Hamas or "supposed charities" who were "affiliated" with Hamas.  (Compl. ¶¶ 10-11, 146).  This link is too "attenuated" to allege MAR had a relationship with Hamas.  *Honickman*, 6 F.4th at 501.

**(5) MAR's "state of mind."**  Plaintiffs have not alleged, in non-conclusory fashion, that MAR "knowingly or intentionally supported [Hamas]" in any manner, or that "[MAR] knowingly assumed a role" in the FTOs' terrorist activities.  *See Siegel*, 933 F.3d at 225.  Focusing on acts done in MAR's ordinary course of business, Plaintiffs' allegations fail to support any inference of MAR's actual knowledge of the attacks.  *See supra* § IV.A.1; *see also supra* § III.C.

**(6) The period of assistance.**  As discussed above, the Complaint does not allege any facts to plead that MAR continued providing services to Qatar Charity after 2015, and even alleges that Qatar Charity's relevant operations "ceased" in 2015.  (Compl. ¶¶ 126, 139); *see also Siegel*, 933

29

F.3d at 224-25 (holding that JASTA claim is "foreclose[d]" where "HSBC ceased doing business with" the customer at issue "ten months before the" attacks at issue). Thus, all six *Halberstam* factors support that Plaintiffs have failed to plead that MAR knowingly provided "substantial assistance" to Hamas. *See Siegel*, 933 F.3d at 225.

### B. Plaintiffs Fail to Allege that MAR Knowingly Entered into an Agreement to Support Conspiracy Liability Under 18 U.S.C. § 2333(d)

For conspiracy liability under JASTA (the Second Cause of Action), Plaintiffs must allege: (1) an agreement between two or more persons; (2) to participate in an unlawful act; (3) an injury caused by an unlawful overt act performed by a party to the agreement; (4) which overt act was in furtherance of the common scheme. *See O'Sullivan*, 2019 WL 1409446, at *9. Unlike for aiding and abetting liability, which does not require the defendant to give "substantial assistance to the *principal*," for conspiracy liability, MAR must "be shown to have conspired *with* the principal." *Kaplan*, 999 F.3d at 855 (internal quotation marks and brackets omitted) (emphasis added).

Accordingly, "fatal to Plaintiffs' claim for conspiracy liability is their failure to sufficiently allege any unlawful agreement between" MAR and Hamas (or the individual terrorist who committed the 2018 attack). *Kaplan v. Lebanese Canadian Bank, SAL*, 405 F. Supp. 3d 525, 534 (S.D.N.Y. 2019), *vacated and remanded on other grounds*, 999 F.3d 842 (2d Cir. 2021). Nowhere do Plaintiffs allege in a non-conclusory fashion that MAR entered into any agreement with Hamas. *See O'Sullivan*, 2019 WL 1409446, at *9 ("[E]ven accepting that Defendants knew generally about the purpose of U.S. sanctions, Plaintiffs' allegations do not demonstrate that Defendants entered into any agreements with the FTOs that committed the attacks at issue."). Moreover, MAR's "alleged provision of material support to [Qatar Charity] is so far removed from the acts of terrorism that injured Plaintiffs that the Court cannot infer that Defendants shared the common goal of committing an act of international terrorism." *Id.* Thus, Plaintiffs' conspiracy claims fail.

4861-4762-9327

**C.     Plaintiffs Fail to Plausibly Allege that an FTO "Committed, Planned or Authorized" the 2018 Attack**

For both attacks in 2015 and 2018, Plaintiffs have failed to allege facts sufficient for aiding and abetting liability or conspiracy liability under JASTA because they fail to allege general awareness, substantial assistance, or an agreement with a terrorist entity.  Further, with respect to the 2018 attack, Plaintiffs also fail to plead the threshold requirement under JASTA that Plaintiffs' injuries must be caused by an act of international terrorism that was "committed, planned, or authorized" by "an organization that had been designated as [an FTO]."  18 U.S.C. § 2333(d)(2). Allegations of acts of terrorism by terrorists who were allegedly *inspired* or *praised* afterwards by an FTO, but were not planned attacks by an FTO, are not sufficient.  *See Gonzalez v. Google LLC*, 2 F.4th 871, 911 (9th Cir. 2021) ("It is undisputed that Farook and Malik planned and carried out the mass killing, but the Clayborn Plaintiffs' allegations suggest only that ISIS approved of the shooting *after* learning it had occurred, not that it authorized the attack beforehand."); *see also Copeland v. Twitter, Inc.*, 352 F. Supp. 3d 965, 975 (N.D. Cal. 2018) ("Absent evidence that ISIS itself planned or carried out the attack, facts that ISIS sought to 'generally radicalize' individuals and promoted terrorist[] attacks similar to the one [the individual attacker] carried out are insufficient.").

Here, Hamas only praised the 2018 attack afterward; Plaintiffs do not plead that an FTO "committed, planned, or authorized" the attack because they fail to allege that Hamas funded, coordinated, directed, or even knew about it beforehand.  (*See* Compl. ¶¶ 347, 349, 351-52); *see also supra* § III.[19]  Instead, while Hamas is an FTO, Plaintiffs' allegations establish that the

---

[19] The 2015 attack against Eitam Simon Henkin is alleged to have been planned by Hamas.  (*See, e.g.*, Compl. ¶¶ 326-28, 331).  As noted above, however, there are no facts alleged from which MAR would have known that correspondent banking activity for Qatar Charity would rendered it foreseeable to MAR that those funds would end up with Hamas. Thus, even if Plaintiffs sufficiently allege that Hamas committed, planned, or authorized the 2015 attack, they fail to plead the requirements for both the ATA and JASTA as to both attacks.  *See supra* §§ III, IV.A.-B.

4861-4762-9327

principal perpetrator of the 2018 attack was *not* Hamas but rather an individual who appeared to act alone, targeting a specific Plaintiff and not as part of an elaborate attack coordinated, organized, or funded by Hamas, or that Hamas knew of the attack beforehand.  (*See, e.g.*, *id.* ¶ 349 ("Jabarin specifically targeted an English speaker for his attack.  Before the attack against Fuld, Jabarin twice asked a worker . . . whether she or others . . . spoke English."); *id.* ¶ 351 ("Hamas has acknowledged its responsibility for the Fuld murder.  A few hours after the murder, Hamas praised the attack."); *id.* ¶ 352 ("Hamas also took responsibility for the attack by releasing a video on the Al-Qassam Brigades' official website."); *see also Colon v. Twitter, Inc.*, 14 F.4th 1213, 1222 (11th Cir. 2021) ("[T]here is nothing in the complaint to suggest that ISIS was aware of Mr. Mateen or knew beforehand about his planned attack . . . .  [T]he plaintiffs never once claim that Mr. Mateen was in contact with ISIS prior to the shooting, or that ISIS was involved in committing, planning or authorizing the attack, or that ISIS knew about the attack beforehand.").[20]  Thus, Plaintiffs' claims must be dismissed.

## V.     JURISDICTIONAL DISCOVERY IS NOT WARRANTED

Plaintiffs' failure to meet basic threshold pleading requirements for every claim, compounded by personal jurisdiction and service deficiencies, warrants dismissal with prejudice.  Plaintiffs should not be permitted to attempt to rehabilitate their defective claims through jurisdictional discovery because Plaintiffs have failed to make a *prima facie* showing of jurisdiction.  *Tamam*, 677 F. Supp. 2d at 733 (citation omitted).  Because Plaintiffs' allegations are so deficient, jurisdictional discovery would essentially amount to a fishing expedition.  "[A] court is not obligated to subject a foreign corporation to discovery where the allegations of jurisdictional

---

[20] In *Fuld v. Palestinian Liberation Organization*, a subset of Fuld Plaintiffs allege, via different counsel, that the Palestinian Liberation Organization was responsible for this attack.  *See* Amended Compl. ¶ 98, 20-cv-03374 (JMF), 2022 WL 62088 (S.D.N.Y. Jan. 6, 2022), *appeal docketed*, No. 22-76 (2d Cir. Jan. 13, 2022).

4861-4762-9327

facts fail to state a basis for the exercise of jurisdiction or where a plaintiff's proposed discovery, if granted, would not uncover facts sufficient to sustain jurisdiction." *Jerusalem NY Enters. LLC v. Huber Erectors & Hoisting, LLC*, No. 21-cv-376 (MKB), 2021 WL 5827934, at *7-8 (E.D.N.Y. Dec. 8, 2021) (internal quotation marks, ellipsis, and citations omitted) (dismissing claim for lack of personal jurisdiction and denying request for jurisdictional discovery).

The court in *Tamam*, for example, held that jurisdictional discovery "would be futile" because the plaintiffs had "already set forth the role New York correspondent accounts played in this case—they exchanged foreign currency for U.S. dollars on behalf of Lebanese banks," which, "[c]onsidering the very nature of correspondent accounts," was "the only role they could play." *Tamam*, 677 F. Supp. 2d at 733-34. Here, discovery cannot cure the Complaint's deficiencies. Plaintiffs' allegations are too attenuated, and even if they are fully credited, all Plaintiffs have alleged are conclusory allegations of "maintaining" "indirect" or "direct" correspondent banking, *see supra* § I.A.1, and discovery would not cure this deficiency because Plaintiffs have not pled enough to establish knowledge, a component of the nexus inquiry, *see supra* § I.A.2; *see also supra* § IV.A.1. Moreover, the lack of temporal proximity between the alleged transactions and the 2018 attack is not dependent on discovery. *Mednik v. Specialized Loan Serving, LLC*, No. 20-cv-427 (MKB), 2021 WL 707285, at *8-9 (E.D.N.Y. Feb. 23, 2021) (finding jurisdictional discovery improper where plaintiff "need[ed] new jurisdictional theories, not more evidence substantiating the theories she has already advanced"). In short, Plaintiffs have not made a "sufficient start toward establishing jurisdiction"; the Complaint instead "contain[s] the kind of conclusory non-fact-specific jurisdictional allegations that the Second Circuit found did not require jurisdictional discovery." *Alexander v. Porter*, No. 13-cv-6834 (SLT) (JO), 2014 WL 7391683, at *5-6 (E.D.N.Y. Dec. 29, 2014) (internal quotation marks omitted) (dismissing case for lack of

personal jurisdiction and denying request for jurisdictional discovery).

Moreover, Plaintiffs have asserted that their allegations depend upon a finding that the Qatari government "spearheaded" a conspiracy "to commit terrorism" and that the "Qatari government . . . controls each" Defendant.  (ECF No. 52 at 1) (explaining that cases cited by Defendants involving "financial institutions and their customers" are "inapposite" because of Plaintiffs' allegations about the Qatari government).  These allegations are not only conclusory and implausible, but also unsupported by any alleged facts.  *See supra* § IV.A.1.  Plaintiffs' theory of conspiracy would require the court to allow Plaintiffs to serve discovery on a foreign entity about its relationship with a foreign sovereign without first meeting their threshold burden to state a claim for relief.  Moreover, despite Plaintiffs' allegations, Qatar is not designated by the United States as an SDGT or an FTO; instead, the United States designated Qatar a "major non-NATO ally," which is a "powerful symbol of the close relationship the United States shares" with Qatar.[21] Jurisdictional discovery "need not be granted to permit a fishing expedition for jurisdictional facts."  *Mednik*, 2021 WL 707285, at *8 (internal quotation marks and citations omitted).

Finally, "[t]he pleading standard set forth in Rule 8 of the Federal Rules of Civil Procedure is not satisfied by lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct."  *Milton v. Wazed*, No. 16-cv-4542 (MKB) (JO), 2018 WL 2074179, at *7 n.16 (E.D.N.Y. Mar. 30, 2018) (internal quotation marks and citations omitted) (dismissing complaint).  Yet Plaintiffs "lump" all three Defendants together, sometimes with non-parties, without "specification of any particular activities by any particular defendant."  *Id.* (internal

---

[21] *See* U.S. Department of Defense, *'Major Non-NATO Ally' Designation Will Enhance U.S., Qatar Relationship*, Jan. 31, 2022, https://www.defense.gov/News/News-Stories/Article/Article/2917336/major-non-nato-ally-designation-will-enhance-us-qatar-relationship/.  The designation was announced on January 31, 2022, when the two nations' leaders discussed shared interests including "countering terrorism."  *Id.*; *see also Boyer Works USA, LLC v. Rubik's Brand Ltd.*, No. 21-cv-7468 (AKH), 2022 WL 355398, at *6 (S.D.N.Y. Feb. 7, 2022) ("On a Rule 12(b)(2) motion, the court may look beyond the four corners of the complaint and consider materials outside of the pleadings . . . .").

quotation marks and citations omitted); (*see, e.g.*, Compl. ¶¶ 8, 104, 109, 149-54, 324). Plaintiffs cannot argue that "because such facts would be peculiarly within the knowledge of the defendants" it should be entitled to jurisdictional or merits discovery; their "inability to offer more than speculation" as to Defendants' conduct "underscores, rather than cures, the deficiency in the Complaint." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 114 (2d Cir. 2009).

Due to the Complaint's paltry allegations as to the merits of their claims, personal jurisdiction, and service, subjecting MAR to jurisdictional discovery is improper.[22]

## **CONCLUSION**

For the foregoing reasons, Defendant MAR respectfully requests that the Court dismiss Plaintiffs' Complaint in its entirety, with prejudice.

Dated: March 18, 2022
New York, New York

PILLSBURY WINTHROP SHAW PITTMAN LLP

By: /s/ Carolina A. Fornos
    Carolina A. Fornos
    Pillsbury Winthrop Shaw Pittman LLP
    31 West 52nd Street
    New York, NY 10019-6131
    Tel.:  (212) 858-1000
    Fax:  (212) 858-1500

    Aryeh L. Kaplan (*pro hac vice*)
    Markenzy Lapointe (*pro hac vice*)
    Pillsbury Winthrop Shaw Pittman LLP
    600 Brickell Avenue, Suite 3100
    Miami, FL 33131
    Tel.:  (786) 913-4900
    Fax:  (786) 913-4901
    *Counsel for Defendant Masraf Al Rayan*

---

[22] While Plaintiffs' counsel represented to Your Honor that Judge Cogan was "amenable" to jurisdictional discovery at the parties' pre-motion conference, (Feb. 16, 2022 Tr. at 8:23-9:12), Judge Cogan stayed discovery at the pre-motion conference and ruled that it would be stayed through briefing on Defendants' motions to dismiss upon receipt of those motions. *Force v. Qatar Charity*, No. 20-cv-02578 (E.D.N.Y. Mar. 2, 2022) (order continuing stay of discovery); *see also* Transcript of Pre-Motion Conference at 33:17-18, *Force v. Qatar Charity*, No. 20-cv-02578 (E.D.N.Y. Jan. 28, 2022).

4861-4762-9327