**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------- X

ANNE CHANA HENKIN, individually and as personal
representative of the ESTATE OF JUDAH HERZEL
HENKIN, *et al*.,

       Plaintiffs,

    -against-

QATAR CHARITY; QATAR NATIONAL BANK and
MASRAF AL RAYAN,

       Defendants.

-------------------------------------------------------------------- X

Case No. 1:21-cv-5716-AMD-VMS

ORAL ARGUMENT
REQUESTED

**PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW**
**IN OPPOSITION TO MOTIONS TO DISMISS OF DEFENDANTS**
**QATAR CHARITY, QATAR NATIONAL BANK AND MASRAF AL RAYAN**

James P. Bonner
Patrick L. Rocco
Susan M. Davies
Thomas M. Caroccia
FLEISCHMAN BONNER & ROCCO LLP
81 Main Street, Suite 515
White Plains, New York 10601
*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

THE RELEVANT FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      A.    The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

           1.    Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

           2.    Qatar Charity and the Bank Defendants . . . . . . . . . . . . . . . . . . . . . . . . 5

      B.    Hamas's Terrorism Campaign and Designation as a Terrorist Organization . . . . . 6

      C.    Qatar's Sponsorship of Hamas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      D.    Defendants' Conspiracy to Fund Hamas's Violence . . . . . . . . . . . . . . . . . . . 7

           1.    Qatar's Use of Qatar Charity to Fund Hamas . . . . . . . . . . . . . . . . . . . 7

           2.    The Bank Defendants' Critical Role
                in the Conspiracy to Fund Hamas . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      E.    All of the Defendants Knowingly Participated
         in the Conspiracy to Fund Hamas's Operations . . . . . . . . . . . . . . . . . . . . . 17

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

I.    PLAINTIFFS ADEQUATELY ALLEGE SECONDARY
    LIABILITY UNDER JASTA AGAINST ALL DEFENDANTS . . . . . . . . . . . . . . . . . . . . . . . 18

      A.    Plaintiffs State Valid Aiding and Abetting Claims Against All Defendants . . . . 19

           1.    Plaintiffs Plausibly Allege That Hamas Caused Their Injuries . . . . . . . . 19

           2.    Plaintiffs Plausibly Allege Defendants' General Awareness
                of Their Roles as Part of an Overall Illegal or Tortious Activity . . . . . . . 22

           2.    Plaintiffs Plausibly Allege the "Substantial
                Assistance" Factors Misstated by Defendants . . . . . . . . . . . . . . . . . . . 32

                a.    Nature of Act Encouraged or Assisted . . . . . . . . . . . . . . . . . . . 32

                b.    The Amount of Assistance Given by Defendants . . . . . . . . . . . . . 34

       c.     Defendants' Relationships to the Principal . . . . . . . . . . . . . . . . . 35

       d.     Defendants' States of Mind . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

       e.     Duration of the Assistance . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

B.     Plaintiffs Have Stated Valid Claims for
Conspiracy Liability Against All Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

       1.     Plaintiffs Have Alleged an Agreement Among Defendants, Qatar,
the Qatari Royal Family, and Hamas to Commit Terrorist Acts . . . . . . . 39

       2.     Plaintiffs Have Plausibly Alleged that
Defendants and Their Co-Conspirators Shared
a Common Goal of Committing Unlawful Acts . . . . . . . . . . . . . . . . . . . . 43

II.    PLAINTIFFS PLAUSIBLY ALLEGE A PRIMARY VIOLATION OF THE ATA . . . . . . . . . . . . . . 45

A.     Defendants' Provision of Money and Financial Services to
Hamas Was Itself Terrorism, as Defined by 18 U.S.C. § 2331 . . . . . . . . . . . . . 45

       1.     By Funding Hamas and Providing It with Extensive
Financial Services, Defendants Endangered Human Life . . . . . . . . . . . 45

       2.     Defendants' Provision of Funding and Financial Services
to Hamas Was Intended to Intimidate and Coerce . . . . . . . . . . . . . . . . 49

       3.     Defendants' Provision of Funding and Financial
Services to Hamas Proximately Caused Plaintiffs' Injuries . . . . . . . . . . 51

       4.     Defendants All Exhibited the Requisite *Mens Rea* . . . . . . . . . . . . . . . . . 56

III.   THE COURT SHOULD DENY DEFENDANTS' RULE 12(B)(5) MOTIONS . . . . . . . . . . . . . . . . 56

A.     Plaintiffs Have Made a *Prima Facie* Showing that Qatari
Law Does Not Prohibit Service Under Rule 4(f)(2)(C)(ii) . . . . . . . . . . . . . . . . . 56

B.     Alternatively, the Court Has Discretion
to Order Service Pursuant to Rule 4(f)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

IV.   THE COURT MAY EXERCISE PERSONAL JURISDICTION OVER EACH DEFENDANT . . . . . . . 60

A.     The Standards Governing Rule 12(b)(2) Motions . . . . . . . . . . . . . . . . . . . . . . . . 60

B.      Fed. R. Civ. P. 4(k)(2) Provides a Basis for
        Exercising Jurisdiction Over All Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

        1.      No Due Process Obstacle Exists to Exercising Personal
                Jurisdiction Under Rule 4(k)(2) Over Defendants Who Use
                the United States' Financial System to Transmit Funds to FTOs. . . . . . . 61

                a.      The Fundamental Jurisdictional Due Process Requirements . . . . 61

                b.      The *Licci* Decisions Dictate that Masraf's Use of
                        Its U.S. Correspondent Account to Funnel USD to
                        Qatar Charity Satisfies the Minimum Contacts Test  . . . . . . . . . . 64

                c.      Blackletter Agency Principles Dictate that Qatar
                        Charity's Use of Masraf's Correspondent Bank
                        Accounts to Funnel Money to the Palestinian
                        Territories Satisfies the Minimum Contacts Requirement . . . . . . 69

                d.      The Overt Acts Masraf Undertook in New
                        York to Further Defendants' Conspiracy Support
                        Exercising Jurisdiction Over Each Defendant . . . . . . . . . . . . . . . 74

        2.      The Due Process Reasonableness Factors Further Support the
                Court's Ability to Exercise Specific Jurisdiction Over Defendants . . . . . 71

C.      CPLR § 302(a) Provides an Alternative Statutory
        Basis for Personal Jurisdiction Over All Defendants . . . . . . . . . . . . . . . . . . . . . . 79

D.      If the Court Finds Plaintiffs' Jurisdictional Allegations Inconclusive,
        Plaintiffs Request the Opportunity to Conduct Jurisdictional Discovery . . . . . . . 84

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

-iii-

# TABLE OF AUTHORITIES

## Cases

*Adams v. Unione Mediterranea di Sicurta*,
  364 F.3d 646 (5th Cir. 2004) ................................................................... 61

*Al Rushaid v. Pictet & Cie*,
  28 N.Y.3d 316 (2016) ............................................................................. 79

*Alexander v. Porter*,
  2014 WL 7391683 (E.D.N.Y. Dec. 29, 2014) ........................................ 86

*Allianz Glob. Inv'rs GMBH v. Bank of Am. Corp.*,
  457 F. Supp. 3d 401 (S.D.N.Y. 2020) .............................................. 75, 76

*APWU v. Potter*,
  343 F.3d 619 (2d Cir. 2003) ................................................................... 85

*Aqua Shield Inc. v. Inter Pool Cover Team*,
  2007 WL 4326793 (E.D.N.Y. Dec. 7, 2007) .......................................... 61

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
  28 F.4th 343 (2d Cir. 2022) ................................................................... 12

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................... 20

*Astor Chocolate Corp. v. Elite Gold Ltd.*,
  510 F. Supp. 3d 108 (S.D.N.Y. 2020) .................................................... 61

*Atchley v. Astrazeneca UK Ltd.*,
  22 F.4th 204 (D.C. Cir. 2022) ......................................................... 62, 77

*Averbach ex rel. Averbach v. Cairo Amman Bank*,
  2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020) .......................................... 67

*Averbach v. Cairo Amman Bank*,
  2020 WL 486860 (S.D.N.Y. Jan. 21, 2020) ........................................... 67

*Ayyash v. Bank Al-Madina*,
  2006 WL 587342 (S.D.N.Y. Mar. 9, 2006) ....................................... 84, 85

iv

*Banco Ambrosiano, S.p.A. v. Artoc Bank & Tr., Ltd.*,
  62 N.Y.2d 65 (1984) ................................................................. 65

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
  171 F.3d 779 (2d Cir. 1999) .................................................... 83

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
  305 F.3d 120 (2d Cir. 2002) .................................................... 78

*Bank Markazi v. Peterson*,
  136 S. Ct. 1310 (2016) ............................................................ 77

*Bank of N.Y. Mellon Tr. Co., N.A. v. Morgan Stanley Mortg. Capital, Inc.*,
  821 F.3d 297 (2d Cir. 2016) ............................................... 70, 73

*Banque Worms v. BankAmerica Int'l*,
  77 N.Y.2d 362 (1991) .............................................................. 64

*Bartlett v. Société Générale De Banque Au Liban Sal*,
  2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020) ....................... 65, 66

*Berdeaux v. OneCoin Ltd.*,
  2021 WL 4267693 (S.D.N.Y. Sept. 20, 2021) ..................... *passim*

*Berkshire Bank v. Lloyds Banking Grp. PLC*,
  2022 WL 569819 (2d Cir. Feb. 25, 2022) ........................... *passim*

*Boim v. Holy Land Found. for Relief and Dev.*,
  549 F.3d 685 (7th Cir. 2008) ............................................ *passim*

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) ..................................................... 62, 63, 76, 77

*Cabrera v. Black & Veatch Special Projects Corps*,
  2021 WL 3508091 (D.D.C. July 30, 2021) ........................... 54, 67

*Charles Schwab Corp. v. Bank of Am. Corp.*,
  883 F.3d 68 (2d Cir. 2018) ................................................ *passim*

*Chloe v. Queen Bee of Beverly Hills, LLC*,
  616 F.3d 158 (2d Cir. 2010) .................................................... 63

*Cleveland v. Caplaw Enters.*,
  448 F.3d 518 (2d Cir. 2006) .................................................... 72

*Cmty. Fin. Grp. Inc. v. Stanbic Bank Ltd.*,
   2015 WL 4164763 (S.D.N.Y. July 10, 2015) ........................................................ 65

*Colon v. Twitter, Inc.*,
   14 F.4th 1213 (11th Cir. 2021) ............................................................................... 21

*Compañía De Inversiones Mercantiles, S.A. v.*
   *Grupo Cementos de Chihuahua S.A.B. de C.V.*,
   970 F.3d 1269 (10th Cir. 2020) ............................................................................... 61

*Copeland v. Twitter, Inc.*,
   352 F. Supp. 3d 965 (N.D. Cal. 2018) .................................................................... 22

*CutCo Indus. v. Naughton*,
   806 F.2d 361 (2d Cir. 1986) ........................................................................... 71, 80

*Dale v. Banque SCS Alliance S.A.*,
   2005 WL 2347853 (S.D.N.Y. Sept. 22, 2005) ........................................................ 81

*Daou v. BLC Bank, S.A.L.*,
   2021 WL 1338772 (S.D.N.Y. Apr. 9, 2021) ............................................................ 73

*Daventree Ltd. v. Republic of Azer.*,
   349 F. Supp. 2d 736 (S.D.N.Y. 2004) ..................................................................... 86

*Domingues v. Barton Chevrolet Cadillac*,
   2021 WL 637016 (S.D.N.Y. Feb. 17, 2021) ............................................................ 39

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*,
   722 F.3d 81 (2d Cir. 2013) ..................................................................................... 60

*Essex Universal Corp. v. Yates*,
   305 F.2d 572 (2d Cir. 1962) ................................................................................... 29

*Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*,
   495 F. Supp. 3d 144 (E.D.N.Y. 2020) .......................................................... 19, 24, 27

*Fed. Home Loan Mortg. Corp. v. Steinfeld*,
   1992 WL 428852 (E.D.N.Y. Dec. 30, 1992) ........................................................... 57

*Fields v. Twitter, Inc.*,
   881 F.3d 739 (9th Cir. 2018) ................................................................................... 53

*Flatow v. Islamic Republic of Iran*,
   999 F. Supp. 1 (D.D.C. 1998) ................................................................................. 77

*Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*,
  141 S. Ct. 1017 (2021) ......................................................................... 62, 63, 66, 67

*Freeman v. HSBC Holdings PLC*,
  2018 WL 3616845 (Jul. 27, 2018) ........................................................................ 43

*Freeman v. HSBC Holdings PLC*,
  413 F. Supp. 3d 67 (E.D.N.Y. 2019) ............................................... 41, 42, 43, 53, 81

*Gallop v. Cheney*,
  642 F.3d 364 (2d Cir. 2011).................................................................................. 40

*Gater Assets Ltd. v. AO Moldovagez*,
  2 F.4th 42 (2d Cir. 2021) ...................................................................................... 29

*Gen. Dynamics Land Sys., Inc. v. Cline*,
  540 U.S. 581 (2004).............................................................................................. 42

*Gentry v. Kaltner*,
  2020 WL 1467358 (S.D.N.Y. Mar. 25, 2020) ....................................................... 85

*Gill v. Arab Bank, PLC*,
  893 F. Supp. 2d 474 (E.D.N.Y. 2012) ....................................................... 51, 55, 67

*Gonzalez v. Google LLC*,
  2 F.4th 871 (9th Cir. 2021) ............................................................................ 22, 53

*Green v. H & R Block, Inc.*,
  735 A.2d 1039 (Md. 1999) ................................................................................... 72

*Grp. One Ltd. v. GTE GmbH*,
  523 F. Supp. 3d 323 (E.D.N.Y. 2021) .................................................................. 59

*Grove Press, Inc. v. Angleton*,
  649 F.2d 121 (2d Cir. 1981).................................................................................. 71

*GSS Grp. Ltd. v. Nat'l Port Auth. of Liber.*,
  822 F.3d 598 (D.C. Cir. 2016) .............................................................................. 29

*Gulf Coast Dev. Grp. v. Lebor*,
  2003 WL 22871914 (S.D.N.Y.  Dec. 4, 2003) ...................................................... 81

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983) ....................................................................... *passim*

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010)...................................................................................................... 28, 37

*Hollins v. U.S. Tennis Ass'n*,
    469 F. Supp. 2d 67 (E.D.N.Y. 2006) ....................................................................... 84

*Honickman v. BLOM Bank SAL*,
    6 F.4th 487 (2d Cir. 2021) ................................................................................. *passim*

*In re Chiquita Brands Int'l, Inc.*,
    284 F. Supp. 3d 1284 (S.D. Fla. Jan. 3, 2018) ....................................................... 55

*In re DDAVP Direct Purchaser Antitrust Litig.*,
    585 F.3d 677 (2d Cir. 2009)..................................................................................... 24

*In re Parmalat Sec. Litig.*,
    640 F. Supp. 2d 243, 252 (S.D.N.Y. 2009)............................................................. 69

*In re Platinum & Palladium Antitrust Litig.*,
    449 F. Supp. 3d 290 (S.D.N.Y. 2020)...................................................................... 75

*In re Terrorist Attacks on Sept. 11, 2001 (Al Rajhi)*,
    714 F.3d 118 (2d Cir. 2013)..................................................................................... 31

*In re Terrorist Attacks on Sept. 11, 2001*,
    349 F. Supp. 2d 765 (S.D.N.Y. 2005)...................................................................... 32

*In re Terrorist Attacks on Sept. 11, 2001*,
    714 F.3d 109 (2d Cir. 2013)..................................................................................... 66

*In re Trump Hotels Shareholder Derivative Litig.*,
    2000 WL 1371317 (S.D.N.Y. Sept. 21, 2000)......................................................... 29

*Indosuez Int'l Vin. B.V. v. Nat'l Reserve Bank*,
    98 N.Y.2d 238 (2002) .............................................................................................. 67

*Jain v. T & C Holding Inc.*,
    2011 WL 814659 (S.D.N.Y.  Mar. 3, 2011) ............................................................ 81

*Jerusalem NY Enters. LLC v. Huber Erectors & Hoisting, LLC*,
    2021 WL 5827934 (E.D.N.Y. Dec. 8, 2021) ........................................................... 86

*John Minder & Son, Inc. v. L.D. Schreiber Co.*,
    73 F. Supp. 477 (S.D.N.Y. 1947) ............................................................................ 70

*Kaplan v. Al Jazeera*,
    2011 WL 2314783 (S.D.N.Y. June 7, 2011) .................................................... 51, 56

*Kaplan v. Lebanese Canadian Bank, SAL*,
    405 F. Supp. 3d 525 (S.D.N.Y. 2019)............................................................. 44, 48

*Kaplan v. Lebanese Canadian Bank, SAL*,
    999 F.3d 842, 854 (2d Cir. 2021)................................................................. *passim*

*Kemper v. Deutsche Bank AG*,
    911 F.3d 383 (7th Cir. 2018) ......................................................... 48, 49, 50, 53

*Khodeir v. Sayyed*,
    348 F. Supp. 3d 330 (S.D.N.Y. 2018)................................................................. 72

*Kirschner v. KPMG LLP*,
    15 N.Y.3d 446 (2010) ......................................................................................... 70

*Kreutter v. McFadden Oil Corp.*,
    71 N.Y.2d 460 (1988) ................................................................................... 69, 70

*Leon v. Shmukler*,
    992 F. Supp. 2d 179 (E.D.N.Y. 2014) ........................................................... 84, 85

*Licci v. Lebanese Canadian Bank, SAL*,
    673 F.3d 50 (2d Cir. 2012)......................................................... 60, 61, 64, 79, 80

*Licci v. Lebanese Canadian Bank*,
    20 N.Y.3d 327 (2012) ............................................................. 64, 65, 70, 80, 81

*Licci v. Lebanese Canadian Bank*,
    732 F.3d 161 (2d Cir. 2013)....................................................................... *passim*

*Linde v. Arab Bank, PLC*,
    882 F.3d 314 (2d Cir. 2018)....................................................................... *passim*

*Maersk, Inc. v. Neewra, Inc.*,
    554 F. Supp. 2d 424 (S.D.N.Y. 2008)................................................................. 75

*Marine Midland Bank v. Miller*,
    664 F.2d 899, 904 (2d Cir. 1981)....................................................................... 57

*Mednik v. Specialized Loan Servicing, LLC*,
    2021 WL 707285 (E.D.N.Y. Feb. 23, 2021)....................................................... 86

ix

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
  84 F.3d 560 (2d Cir. 1996) ................................................................................ 78

*Miller v. Arab Bank*,
  372 F. Supp. 3d 33 (E.D.N.Y. 2019) ......................................................... *passim*

*Moran v. Household Int'l, Inc.*,
  490 A.2d 1059 (Del. Ch. 1985) ........................................................................ 29

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
  339 U.S. 306 (1950) ......................................................................................... 59

*N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*,
  266 F.3d 112 (2d Cir. 2001) ....................................................................... 69, 73

*NYKCool A.B. v. Pacific Int'l Servs.*,
  2013 WL 6799973 (S.D.N.Y. Dec. 20, 2013) .................................................. 57

*NYKCool A.B. v. Pacific Int'l Servs.*,
  2015 WL 998455 (S.D.N.Y. Mar. 5, 2015) ...................................................... 59

*O'Sullivan v. Deutsche Bank AG*,
  2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019) ............................................ 41, 44

*Ochoa v. J.B. Martin & Sons Farms*,
  287 F.3d 1182 (9th Cir. 2002) .................................................................... 63, 76

*Ofisi v. BNP Paribas, S.A.*,
  278 F. Supp. 3d 84 (D.D.C. 2017) ................................................................... 50

*Owens v. BNP Paribas, S.A.*,
  897 F.3d 266 (D.C. Cir. 2018) ......................................................................... 53

*Paroline v. United States*,
  572 U.S. 434 (2014) ......................................................................................... 51

*Pearson Educ. Inc. v. Doe 1*,
  2019 WL 6498305 (S.D.N.Y. Dec. 2, 2019) .................................................... 59

*PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*,
  530 F. Supp. 3d 301 (S.D.N.Y. 2021) ........................................................ 82, 83

*Polargrid LLC v. Videsh Sanchar Nigam Ltd.*,
  2006 WL 903184 (S.D.N.Y. Apr. 7, 2006) ....................................................... 57

*Rich v. Fox News Network LLC*,
2020 WL 6276026 (S.D.N.Y. Sept. 15, 2020) ........................................................ 81

*Rosenberg v. Lashkar-E Taiba*,
2017 WL 11647006 (E.D.N.Y. Mar. 21, 2017) ...................................................... 57

*Rothstein v. UBS AG*,
708 F.3d 82 (2d Cir. 2013) ................................................................ 37, 52, 53, 54

*Rudersdal v. Harris*,
2022 WL 263568 (S.D.N.Y. Jan 28, 2022) ........................................................... 75

*Sajimi v. City of New York*,
2011 WL 135004 (E.D.N.Y. Jan. 13, 2011) .......................................................... 58

*Schansman v. Sberbank of Russia PJSC*,
__ F. Supp. 3d __, 2021 WL 4482172 (S.D.N.Y. Sept. 30, 2021) ........................ 45, 46, 65, 66

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*,
22 F.4th 103 (2d Cir. 2021) ........................................................... 74, 75, 81, 82, 83

*Sea Trade Mar. Corp. v. Coutsodontis*,
2012 WL 3594288 (S.D.N.Y. Aug. 16, 2012) ...................................................... 75

*Siegel v. HSBC North America Holdings, Inc.*,
933 F.3d 217 (2d Cir. 2019) ............................................................................... 31

*Singer v. Bank of Palestine*,
2021 WL 4205176 (E.D.N.Y. Apr. 30, 2021) ................................................ 84, 85

*SL-x IP S.Á.R.L. v. Bank of Am. Corp.*,
2021 WL 4523711 (S.D.N.Y. Sept. 30, 2021) ..................................................... 76

*Social Enter. LLC v. Sociedad Agricola*,
2015 WL 13743436 (E.D.N.Y. Oct. 6, 2015) ...................................................... 57

*Spetner v. Palestine Inv. Bank*,
495 F. Supp. 3d 96 (E.D.N.Y. 2020) .................................................................. 68

*SPV OSUS, Ltd. v. UBS AG*,
882 F.3d 333, 344 (2d Cir. 2018) ....................................................................... 66

*Strauss v. Crédit Lyonnais, S.A.*,
925 F. Supp. 2d 414 (E.D.N.Y. 2013) ........................................................... 52, 66

*Strauss v. Crédit Lyonnais, S.A.*,
    175 F. Supp. 3d 3 (E.D.N.Y. 2016) ........................................................................ 67

*Suber v. VVP Servs., LLC*,
    2021 WL 4429237 (S.D.N.Y. Sept. 27, 2021) ...................................................... 81

*Tamam v. Fransabank SAL*,
    677 F. Supp. 2d 720 (S.D.N.Y. 2010) ............................................................ 70, 86

*Tescher v. Experian Info. Sols., Inc.*,
    2022 WL 564048 (S.D.N.Y. Feb. 23, 2022) ........................................................ 37

*Toppel v. Marriott Int'l, Inc.*,
    2006 WL 2466247 (S.D.N.Y. Aug. 24, 2006) ...................................................... 71

*Trueposition, Inc. v. Sunon, Inc.*,
    2006 WL 1686635 (E.D. Pa. June 14, 2006) ...................................................... 58

*U.S. Bank Nat'l Ass'n v. Bank of Am. Nat'l Ass'n*,
    916 F.3d 143 (2d Cir. 2019) ......................................................................... 62, 63

*Uebler v. Boss Media*,
    363 F. Supp. 2d 499 (E.D.N.Y. 2005) ................................................................. 85

*Unique Indus., Inc. v. Sui & Sons Int'l Trading Corp.*,
    2007 WL 3378256 (S.D.N.Y. Nov. 9, 2007) ....................................................... 85

*United States v. Alessi*,
    638 F.2d 466 (2d Cir. 1980) ................................................................................ 42

*United States v. El-Mezain*,
    664 F.3d 467 (5th Cir. 2011) ............................................................................... 66

*United States v. Friedman*,
    854 F.2d 535 (2d Cir. 1989) ................................................................................ 42

*United States v. Rooney*,
    866 F.2d 28 (2d Cir. 1989) .................................................................................. 42

*Universal Trading & Inv. Co. v. Tymoshenko*,
    2012 WL 6186471 (S.D.N.Y. Dec. 12, 2012) ..................................................... 73

*Vasquez v. H.K. & Shanghai Banking Corp.*,
    477 F. Supp. 3d 241 (S.D.N.Y. 2020) ................................................................. 72

*Vega v. Hastens Beds, Inc.*,
   339 F.R.D. 210 (S.D.N.Y. 2021) ................................................................ 59

*Volkart Bros., Inc. v. M/V "Palm Trader*,"
   1989 WL 34094 (S.D.N.Y. Apr. 6, 1989) .................................................. 69

*Walden v. Fiore*,
   571 U.S. 277 (2014) ................................................................................... 81

*Weiss v. Nat'l Westminster Bank PLC*,
   176 F. Supp. 3d 264 (E.D.N.Y. 2016) ........................................ 61, 63, 65, 67

*Weiss v. Nat'l Westminster Bank PLC*,
   278 F. Supp. 3d 636 (E.D.N.Y. Sept. 30, 2017) ....................................... 43

*Weiss v. Nat'l Westminster Bank PLC*,
   453 F. Supp. 2d 609 (E.D.N.Y. 2006) ....................................................... 54

*Weiss v. Nat'l Westminster Bank PLC*,
   768 F.3d 202 (2d Cir. 2014) ...................................................................... 28

*Zapata v. HSBC Holdings PLC*,
   414 F. Supp. 3d 342 (E.D.N.Y. 2019) ....................................................... 49

## Statutes

Justice Against State Sponsors of Terrorism Act ("JASTA"),
   Pub. L. No. 114222, 130 Stat. 852 (2016) ....................................... *passim*

18 U.S.C. § 2331 ........................................................................................ *passim*

18 U.S.C. § 2333(a) .......................................................................................... 51, 55

18 U.S.C. § 2333(d) ............................................................................ 3, 19, 38, 42, 43

N.Y. CPLR § 302(a)(1) ................................................................................ *passim*

N.Y. CPLR § 302(a)(2) ................................................................................ 82, 83, 84

N.Y. CPLR § 302(a)(3)(ii) ................................................................................ 68

## Rules

Fed. R. Civ. P. 4(f)(1) ....................................................................................... 59

Fed. R. Civ. P. 4(f)(2)(B) ................................................................................. 57

Fed. R. Civ. P. 4(f)(2)(C)(ii) ...................................................................... 56, 57

Fed. R. Civ. P. 4(f)(3) ................................................................................ 58, 59

Fed. R. Civ. P. 4(k)(2) ................................................... 60, 61, 75, 79, 83

Fed. R. Civ. P. 9(b) ............................................................................................. 23

Fed. R. Civ. P. 12(b)(2) ............................................................................. 60, 86

Fed. R. Civ. P. 12(b)(5) ............................................................................. 56, 57

## Other Authorities

RESTATEMENT 2D OF AGENCY (1958) .................................................... 71, 72

RESTATEMENT 3D OF AGENCY (2006) .................................................... 69, 72

4 Wright & Miller, *Federal Practice & Procedure,* §1068.1 (5th ed. 2019) .............................. 63

PRELIMINARY STATEMENT

Plaintiffs are the victims of the tragic, longstanding campaign of violence perpetrated by the militant Palestinian terrorist group Hamas, which the U.S. government has designated as a Foreign Terrorist Organization ("FTO"). This case involves two of the thousands of terrorist attacks that Hamas has launched in the past decades in pursuit of its stated objective of destroying Israel and its Jewish population. The attacks killed Eitam Henkin and Ari Fuld and imposed severe emotional injuries upon their loved ones, the Plaintiffs.

While one would hope that Hamas's abhorrent conduct would soon starve them of funding, quite the opposite is true. The devotees to Hamas's radical, violent objectives include the government and Royal Family of Qatar, which controls each of the Defendants in this action—Qatar Charity, Masraf al Rayan Bank ("Masraf") and Qatar National Bank ("QNB") (collectively, "Defendants").

The Qatari government and Royal Family have long served as principal benefactors of Hamas and have provided it with billions of dollars in funding in recent years. By virtue of their controlling share ownership in Masraf and QNB (collectively, the "Bank Defendants"), Qatar and its Royal Family induced those banks to embark on a Qatar-led conspiracy to fund Hamas's operations through defendant Qatar Charity, which Qatar and its Royal Family also control.

The Bank Defendants agreed to participate in that conspiracy even though Qatar Charity has long served as a principal funder of Hamas and as a member of the Union of Good, a U.S. government-designated terrorist organization that exists to raise funds for Hamas. In 2008, because of Qatar Charity's membership in the Union of the Good and support for Hamas, Israel barred Qatar Charity from operating in the Palestinian Territories. Simultaneously, Israel announced to *all* financial institutions that providing services to Qatar Charity would produce potential criminal and civil liability, particularly to victims of terrorism.

That explicit announcement did not deter any Defendant from participating in the Qatar-led conspiracy to fund Hamas's operations through Qatar Charity. Rather, with the blessing of their controlling shareholders and regulator, the Bank Defendants passed millions of dollars earmarked for Hamas to Qatar Charity beginning no later than 2011.

The scope and purpose of Defendants' conspiracy is all the more remarkable because governments, regulators, the banking industry and the courts have long recognized that terrorist organizations rely heavily upon funding provided by purported "charities" that launder money for terrorist groups and their front organizations. As a result, banks universally employ "know-your-customer," due diligence, anti-money laundering, and counter-terrorism finance procedures to protect themselves from entanglements with terrorist organizations and their fronts.

The Bank Defendants blatantly violated those universally accepted banking norms. Because of Hamas's infamy, nobody doing business in the Middle East—least of all financial institutions—could remain ignorant of Hamas's existence and violent objectives. Nor could the Bank Defendants fail to recognize Qatar Charity's links to terror financing, particularly given Israel's very public designation and the Bank Defendants' access to Qatar Charity's financial records.

Yet, in response to Plaintiffs' Complaint, the two Bank Defendants feign surprise that Qatar Charity maintained any link to terrorist organizations. For its part, Qatar Charity manages to file a 35-page memorandum of law, supported by 596 pages of improper hearsay exhibits, without mentioning the 2017 criminal conviction of its Director in the West Bank, Judeh Jamal, for laundering funds through Masraf's New York correspondent banking account for use by the banned Qatar Charity in the Palestinian Territories.

Starting from their fictional premise of blind ignorance, Defendants unsuccessfully attempt to fashion a host of defenses to Plaintiffs' claims under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 *et seq.*, including the aiding-and-abetting and conspiracy claims enacted by the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114222, 130 Stat. 852 (2016).  But Plaintiffs' allegations negate all of those defenses at the pleading stage, where Defendants' denials of the Complaint's facts have no consequence.

First, Plaintiffs allege aiding-and-abetting and conspiracy claims under JASTA's 18 U.S.C. § 2333(d)(2).  Plaintiffs identify Qatar Charity as a principal fundraiser and front for Hamas.  Pursuant to the Qatar-led conspiracy, the Bank Defendants intentionally and substantially assisted Qatar Charity's efforts to provide Hamas with funding and other financial support.  The Bank Defendants accomplished that objective by offering Qatar Charity a full array of banking services, including savings accounts, wire transfers, and access to the U.S.-based correspondent banking accounts that permitted Qatar Charity to transact in the U.S. dollars ("USD") Hamas uses to run its operations.  QNB also recruited as customers a "Who's Who" list of Hamas terrorists living in exile in Qatar, including active members of Hamas's senior leadership, all of whom use their QNB accounts to fund Hamas's operations.

Moreover, the Bank Defendants provided those financial services to Qatar Charity with knowledge of its membership in the Union of Good and funding of Hamas's operations.  Thus, Defendants' actions created the danger of precisely what occurred here— Hamas used the funds provided to it to continue its violent operations.  These facts plead aiding-and-abetting and conspiracy claims under JASTA.

For similar reasons, Plaintiffs have adequately pled their ATA primary liability claims. Defendants advance a series of misguided challenges to that conclusion that Judge Cogan

3

rejected in *Miller v. Arab Bank*, and with good reason.  As the Court held in *Miller,* no doctrinal basis exists for treating the funding of an organization like Qatar Charity that serves as a front for FTOs differently than financing the FTOs themselves.  The Bank Defendants' funding of Qatar Charity therefore created a risk of the violence that injured Plaintiffs and killed their loved ones, and thus constitutes a proximate cause of their injuries.  Defendants' conduct—knowingly funding a front for Hamas—also both "endangered human life" and appeared to be intended "to coerce a civilian population" or influence a government's policies.  Lastly, Defendants' contentions that they lack the *mens rea* necessary to sustain the primary liability claim raises factual issues the Court cannot resolve in this context.

Defendants' other principal argument challenges the Court's ability to exercise personal jurisdiction over them.  Masraf's arguments again ignore Mr. Jamal's conviction for laundering USD through New York for the benefit of his banned employer, Qatar Charity.  The *Licci* cases dictate that those "correspondent banking" transactions suffice to establish jurisdiction over Masraf.  Since the transfers through New York were undertaken for Qatar Charity's benefit by its agent, Masraf, Qatar Charity is also subject to jurisdiction.  Lastly, in contrast to some older cases, three recent decisions from the Second Circuit have held that the in-forum actions of conspirators provide an adequate basis for exercising jurisdiction over their out-of-forum co-conspirators.  Thus, Masraf's New York correspondent banking transactions suffice to establish personal jurisdiction over all Defendants pursuant to these conspiracy principles.

<div align="center">THE RELEVANT FACTS</div>

A. **The Parties**

1. **Plaintiffs**

Plaintiffs are eighteen of the thousands of victims of Defendants' lengthy, material and

<div align="center">4</div>

ongoing support of the violent campaign that the U.S.-designated FTO Hamas has undertaken to terrorize individuals who reside in and visit Israel and the Palestinian Territories.  ¶¶ 2-16, 75, 104-15, 126-36, 146-54, 164-67, 168-226, 315, 320-24.[1]  Plaintiffs include the representatives of Eitam Henkin, who was killed on October 1, 2015 along with his wife after being shot by Hamas terrorists, and Ari Fuld, who was killed on September 16, 2018 when he was stabbed by a Hamas terrorist.  As the ATA contemplates, Mr. Henkin's and Mr. Fuld's closest family members also assert claims related to the injuries they suffered as a result of their murders.  ¶¶ 25-43, 324-52.

## 2.  Qatar Charity and the Bank Defendants

Qatar Charity is a Qatari organization well-known for funding terrorism throughout the Middle East and North Africa.  ¶¶ 44-60.  The Qatari government and Royal Family control Qatar Charity by virtue of the positions the Royal Family occupy in the organization (including the role of Chairman).  ¶¶ 5, 7, 70.

Masraf, a publicly held company headquartered in Doha, Qatar, is one of the world's largest Islamic banks.  ¶¶ 71-72.  The Qatari government and Royal Family control Masraf through their 28% ownership of the bank's stock, board memberships and the regulatory power that the Qatari government exerts over Masraf.  ¶¶ 73-74.

QNB is a Qatari bank headquartered in Doha.  ¶ 82.  The Qatari government and Royal Family control QNB by virtue of their 50% ownership of the company's stock, membership on the bank's board, and the regulatory authority that they exert over QNB.  ¶¶ 83-85.

---

[1]  References in the format "¶ __" are to Plaintiffs' Complaint filed on December 15, 2020 [ECF 1].

**B.  Hamas's Terrorism Campaign and Designation as a Terrorist Organization**

Hamas is a radical Islamist organization committed to destroying Israel by violent means.

¶¶ 88-90.  It pursues terrorism to induce Israel and U.S. to alter their policies.  ¶ 90.  For decades,

Hamas's violence has posed a constant threat to people in Israel and the Palestinian Territories,

including Americans.  ¶¶ 98-103.  The U.S. designated Hamas as an FTO in 1997 and has

maintained that designation ever since.  ¶ 101.[2]

**C.  Qatar's Sponsorship of Hamas**

Since at least 2006, Qatar has maintained an official state policy of supporting Hamas.

¶¶ 3, 110-115.  Over the past 15 years, the Qatari government and Royal Family have served as

Hamas's largest sponsors.  ¶¶ 110-22.  Between 2012 and 2018, Qatar officially provided Hamas

with over $1.1 billion in funding.  ¶ 115.

In response to Qatar's October 2012 pledge to provide $400 million to Hamas, 24

members of Congress wrote to the Qatari ambassador to the U.S., stating that Qatar's support of

"Hamas, a U.S.-designated [FTO] . . .  legitimizes, and bolsters an organization committed to

violence and hatred."  ¶ 112.  That criticism did not slow Qatar's support for Hamas.  For

example, a "secret" 2013 memo to a Royal Family member who served as Qatar's Prime

Minister and Foreign Minister revealed that Qatar's central bank had implemented his instruction

to pay $250 million directly to Hamas's leader, Khaled Mashal.  ¶ 114.

Because of Qatar's unwavering support of Hamas, the U.S. Department of the Treasury

---

[2] In October 2001, the U.S. also designated Hamas as a Specially Designated Global Terrorist
("SDGT") by means of Executive Order 13224.  *See* https://www.state.gov/executive-order-
13224/.  In January 1995, the U.S. designated Hamas as a Specially Designated Terrorist
("SDT") by means of Executive Order 12947, which targets terrorists who threaten to disrupt the
Middle East peace process. *See* https://home.treasury.gov/news/press-releases/sm761.

("Treasury") has identified Qatar as an especially "permissive jurisdiction" for terrorist financing and has emphasized that Qatar "has for many years openly financed Hamas." ¶ 116. Defendants' briefs ignore these facts, thus underscoring the impropriety of their efforts to contradict the Complaint's allegations.

Qatar's neighbors in the Middle East have also sanctioned it as a result of its terror financing. In 2017, Saudi Arabia, Bahrain, Egypt, and the United Arab Emirates ("UAE") cut ties with Qatar due to Doha's connections with, and support of, terrorist organizations. ¶ 118. Again, Defendants' efforts to rationalize those designations are inappropriate in this context.

Since 2012, Qatar has also promoted Hamas's violence by providing safe haven to convicted Hamas terrorists, including members of the organization's political leadership. ¶¶ 119-22. That arrangement has empowered Hamas to plan its terrorism unfettered by constraints a normal government would impose upon that illicit conduct.[3]

## D. **Defendants' Conspiracy to Fund Hamas's Violence**

### 1. **Qatar's Use of Qatar Charity to Fund Hamas**

Hamas requires significant funding to carry out its terrorism in Israel and the Palestinian Territories. ¶¶ 105-07. As governments, regulators, banking associations, and the courts have highlighted, Hamas employs a financing structure heavily dependent upon purported "charities," such as Qatar Charity. ¶¶ 5, 52, 61-65, 93-97, 106-07, 133. Those organizations raise money— often by emphasizing their charitable works—and then route a portion of the funds to terrorist

---

[3] The Hamas terrorists who have benefited from the safe haven that Qatar provides include: Khaled Mashal, the Chairman of Hamas's Politburo between 1996 and 2017; Ismail Haniyeh, who succeeded Mashal in the Chairman's position; and Yehia Sinwar and Rawhi Mushtaha, two founders of Hamas's military wing. ¶¶ 117-20.

and other operational uses.  ¶¶ 91-92, 97-99.  The supposed charities also aid Hamas by helping to identify and recruit potential terrorists.  ¶¶ 89-92, 95-97.

Hamas's violent and "charitable" wings operate seamlessly, with each working to support terrorist operations and to achieve the illegal objectives of the terrorist group as a whole.  ¶¶ 91-92.  Thus, even when Hamas and its "charitable" fronts undertake work for the public benefit, every dollar they collect promotes the terrorist organization's violence.  ¶¶ 91-97.  The charitable expenditures facilitate the fundraising efforts of Hamas and its fronts, and thereby generate the cash Hamas needs to acquire and maintain the weapons, explosives, transportation and recruitment services, training, and salaries that it uses to conduct its violent operations.  ¶¶ 96-97.  The positive public relations that the supposedly charitable expenditures create also heighten Hamas's standing in the Palestinian community, thus helping to recruit terrorist foot soldiers.  ¶ 97.

Consistent with that common pattern of using purportedly "charitable" funds to finance terrorism, the Qatari government and Royal Family exploited the control they exert over the three Defendants to induce their participation in a conspiracy to fund Hamas's operations.  ¶¶ 5-15, 73-75, 85, 125-27, 138.  Defendants have carried out that conspiracy through coordinated activity designed to pass money to Hamas in the guise of charitable contributions made by Qatar Charity and by providing banking services to Hamas terrorists who fund the organization through those accounts.  ¶¶ 8-16, 123-30, 172-95, 210-24.

The insurance regime that Hamas has implemented for its operatives and their family members also promotes Hamas's violence.  Qatar Charity's payments to Hamas's operatives and their family members included distributing thousands of anonymous debit cards known as "Sanabel Cards" that Qatar Charity obtained from the Bank of Palestine.  *See* ¶¶ 149-54.  The

Sanabel Card scheme allowed operatives to fund their personal financial needs while they planned terrorist attacks and to make the limited expenditures the attacks required, such as securing ammunition and purchasing gasoline.  ¶ 151.  The Sanabel Card scheme also provided insurance for terrorists and their family members if operatives were imprisoned, injured or killed.  ¶¶ 152-54.

While Qatar Charity cites a litany of irrelevant hearsay to portray itself as a benevolent actor, the U.S. government has recognized that Qatar Charity has long served as a principal sponsor of Hamas and other terrorist organizations, including al-Qaeda.  ¶¶ 46-60.  Indeed, in March 2008, the U.S. Interagency Intelligence Committee on Terrorism ("IICT") of the U.S. National Counterterrorism Center listed Qatar Charity (then known as Qatar Charitable Society) as a "priority III terrorism support entity (TSE)" because of its "intent and willingness" to support terrorist organizations that attack the U.S. and its interests.  ¶ 46; Declaration of James P. Bonner executed on May 3, 2022 ("Bonner Decl.") at Ex. 3.  Moreover, Congressional testimony has revealed that Qatar Charity's "charitable mission represented little more than an excuse to provide material support to terrorists."  ¶ 52.[4]

Contrary to its claim of benevolence, Qatar Charity's annual reports for 2013, 2014, and 2015 demonstrate that it transferred funds to, and carried out joint projects with, multiple fronts for terrorist organizations.  ¶ 131.  Qatar Charity's beneficiaries include the Elehssan Society, which Treasury designated "a charitable front for the Palestinian Islamic Jihad" ("PIJ") in 2005.

---

[4] Qatar Charity purports to challenge the provenance of these allegations, but those arguments must await trial.  In any event, contrary to Qatar Charity's characterizations, the U.S. government document that serves as the source of these allegations reveals that it originated from the U.S. Embassy in Doha and was shared with the Secretary of State, the U.S. Embassies and Missions in various countries, and Treasury.  Bonner Ex. 14.

¶¶ 131-32.  Treasury emphasized that: (a) "in addition to its use as a financial conduit, Elehssan is used by PIJ to recruit for its operational cadre"; (b) Elehssan opened a youth center "to support PIJ activity and conduct PIJ-related recruitment and training"; and (c) like other FTO fronts, Elehssan "masquerades as a charity, while actually helping to finance [PIJ's] acts of terror against the Israeli people and other innocents."  ¶¶ 132-33.[5]

Between March 2011 and September 2015, Qatar Charity also transferred at least $150,000 to the Hebron Islamic Charity Society, a Hamas front.  ¶¶ 128-29.  Long before then, Israel had outlawed that organization because it serves as an arm of Hamas.  ¶ 129.

Qatar Charity is also a member of the Union of Good, an umbrella organization of Hamas's largest fundraisers.  ¶¶ 7, 59-65.  In 2008, Israel banned Qatar Charity because of its membership in the Union of Good.  ¶ 59.  At the same time, Israel warned all financial institutions that providing support for Qatar Charity risked significant criminal and civil liability.  ¶ 60.  Unable to explain away these facts, Qatar Charity ignores them; its brief makes no mention of its Union of Good membership.

Just months after Israel identified Qatar Charity as a Union of Good member in 2008, Treasury designated the Union of Good an SDGT for its role in "facilitating financial transfers between a web of charitable organizations … and Hamas-controlled organizations in the West Bank and Gaza."  ¶¶ 61, 65.  Treasury highlighted that the Union of Good was "created by Hamas leadership to transfer funds to the terrorist organization" and emphasized that "the

---

[5] Qatar Charity attempt to obfuscate its support for Elehssan by quibbling with the English translation and spelling of the organization's Arabic name.  QC Br. at 32-33.  For present purposes, those denials have no effect.  ¶ 132; *Treasury Designates Charity Funneling Money to Palestinian Islamic Jihad*, U.S. Dep't of the Treasury (May 4, 2005), https://home.treasury.gov/news/press-releases/js2426.

primary purpose of [the Union of Good's] activity is to strengthen Hamas's political and military position in the West Bank and Gaza." ¶ 62. Treasury explained that the Union of Good accomplishes those objectives by: "(i) diverting charitable donations to support Hamas members and the families of terrorist operatives; and (ii) dispensing social welfare and other charitable services on behalf of Hamas." ¶ 62. That supposed "social welfare" includes making "martyr" payments to the families of terrorists killed or injured in the course of their crimes and making similar payments to the families of imprisoned terrorists. ¶ 63.

Qatar's neighbors have also recognized that Qatar Charity funds terrorism. Saudi Arabia, Bahrain, Egypt, and the UAE designated Qatar Charity a financial supporter of terrorism in June 2019. ¶ 69. While Defendants would also have the Court disregard these allegations (*see* QC Br. at 6 n.8), their efforts to spin these facts must also await trial.[6]

Given the damning nature of Plaintiffs' allegations, Qatar Charity must advance six pages into its purported statement of facts before it cites *any* fact in the Complaint, and then only in a vain effort to dispel it. *See* QC Br. at 6. Indeed, Qatar Charity's brief brims with "facts" drawn exclusively from hearsay sources that purport to explain its purely "charitable" focus. As Plaintiffs allege, however, Hamas's "charitable" affiliates do help the needy, but even that work serves Hamas's interests. ¶¶ 93-97. For present purposes, Qatar Charity is an FTO front and member of the Union of Good that intentionally finances Hamas's operations. The U.S., Israel, and Qatar Charity's neighbors have all recognized those facts.

---

[6] In 2017, the UK Charity Commission also issued a report noting Qatar Charity's connections to Hamas and the Muslim Brotherhood, another radical Islamist organization. ¶ 67. Rather than remedying the misconduct that the Commission highlighted, Qatar Charity attempted to divert regulators' attention by changing its UK branch's name to the Nectar Trust. ¶ 67.

Qatar Charity cannot justify ignoring the Complaint by referring to judicial notice principles. "When the court takes judicial notice of documents, it must rely on such documents only for the fact that the statement was made," not as truthful statements. *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 352 (2d Cir. 2022). If Qatar Charity had an actual interest in disclosing relevant facts, it would share its bank records, including documents concerning the transactions that produced the convictions of its most senior officials in the Palestinian Territories for their participation in the terror funding conspiracy Plaintiffs allege. ¶¶ 130, 139-43.

In any event, a jury will put little stock in the willingness of the U.S. government or the U.N. to work with Qatar Charity in certain circumstances. As Qatar Charity's brief reveals, it devotes considerable efforts to public relations and hiding its terror financing. But Defendants all possess non-public information that shows the charity's funding of Hamas. Moreover, both the U.S. government and the U.N. have acknowledged that their charitable arms' vetting requires improvement and risks funding terrorist organizations.[7] Similarly, recent U.S. government pronouncements regarding Qatar must be considered in light of the ongoing Middle East turmoil

---

[7] *See, e.g.,* https://www.devex.com/news/opinion-usaid-must-protect-the-integrity-of-its-humanitarian-aid-programs-100366 (editorial drafted by former chief of staff of USAID that acknowledges the need to improve the organization's vetting process to avoid aiding terrorism) (Bonner Ex. 4); https://www.devex.com/news/gao-report-usaid-partners-violated-antiterror-laws-in-west-bank-gaza-99552 (report concerning GAO's findings regarding violations of anti-terrorism regulations by USAID during the 2015-19 period) (Bonner Ex. 5); West Bank and Gaza Aid: Should Funding Resume, Increased Oversight of U.S. Government Accountability Office, Subawardee Compliance with USAID's Antiterrorism Policies and Procedures May Reduce Risks (March 2021) (Bonner Ex. 6); https://www.jpost.com/j-spot/zionist-watchdog-un-funds-millions-to-palestinian-groups-with-terror-ties-673753 (*Jerusalem Post* article noting watchdog group's findings regarding the use of U.N. funds to finance terrorist groups) (Bonner Ex. 7); https://jij.org/news/united-nations-funds-hamas/ (same) (Bonner Ex. 8).

and oil market disruptions associated with Russian war sanctions.  The U.S. government is now

enlisting even rogue states like Iran and Venezuela in efforts to combat rapid oil price increases.

*See* Bonner Ex. 2.  The hearsay, politically motivated statements Qatar Charity cites are also

years removed from Qatar's relevant conduct.

### 2.   The Bank Defendants' Critical Role in the Conspiracy to Fund Hamas

Qatar Charity requires financial institutions' assistance to transfer to the Palestinian

Territories and elsewhere the money Hamas requires to fund its operations.  Qatar's government

and Royal Family enlisted the Bank Defendants—both of which the government and Royal

Family control—to assist with serving Hamas's financial needs.  ¶¶ 5-7, 63, 85, 125.

From March 1, 2015 until September 7, 2015 alone, Qatar Charity used Masraf's services

to transfer over $28 million in donations from Qatar Charity in Doha to its two branches in the

Palestinian Territories.  ¶ 126.  Qatar Charity then transferred a substantial portion of those funds

to other supposed "charities" that served as fronts for Hamas.  ¶ 127.

Contrary to Defendants' claims, the services Masraf provided to Qatar Charity in

furtherance of Defendants' conspiracy tie this case to the U.S.  In particular, Masraf completed

international money transfers involving USD for Qatar Charity that passed through a

"correspondent" bank account that Masraf maintained in New York.  ¶¶ 5, 10, 24, 155-64.

Correspondent banks provide accounts that other financial institutions use to transfer

funds, often between different countries and currencies.  ¶¶ 157-60.  Maintaining a

correspondent account in the U.S. enables foreign banks to conduct transactions that require

conversions between USD and a local currency, all without establishing a U.S. physical

13

presence.  ¶¶ 158-60.[8]

One would not know from Defendants' briefs that the criminal convictions of Qatar Charity's most senior official in the West Bank confirm that Masraf used its correspondent accounts to pass USD through New York for the benefit of Qatar Charity and Hamas.  ¶ 130. According to the confession of Qatar Charity's Director in the West Bank, Qatar Charity solicited donations for Hamas and transferred those funds to its account at Masraf in Qatar. ¶ 130.  Masraf then transferred the funds denominated in USD through the correspondent account that Masraf maintained in New York to Qatar Charity's accounts at either the Bank of Palestine or Islamic Bank in the West Bank.  ¶ 130.  Masraf made those transfers although it and Qatar Charity knew that Israel had banned Qatar Charity because it funded Hamas.  ¶¶ 130, 135-36, 147, 319-23.

Once Masraf transferred those funds to the West Bank accounts, Qatar Charity's local branches distributed the money to entities controlled by Hamas, including other supposed charities.  ¶¶ 130.  In turn, those transferees used the Qatar Charity transfers to fund Hamas's operations, including terrorist attacks and the "welfare" programs that support Hamas's operatives and promote its violence.  ¶¶ 9-12, 96-97, 130.

Between 2009 and September 7, 2015 (when Israel shuttered Qatar Charity in the West Bank), Masraf used its correspondent bank accounts to move in excess of $3.5 million in USD and Euros between Qatar Charity's accounts at Masraf in Doha and the charity's accounts in the Palestinian Territories.  ¶ 130.  In addition, between 2011 and 2013, Qatar Charity moved

---

[8] With limited exceptions inapplicable here, USD wire transactions like those that Masraf conducted at Qatar Charity's direction *must* pass through a U.S.-based correspondent account. *See* Declaration of Patrick J. McArdle ("McArdle Decl.") at ¶¶ 8-14.

$25 million from Doha to the banned Qatar Charity entity operating in the Gaza Strip.  ¶ 130.

Like Masraf, QNB played a critical role in Defendants' conspiracy.  QNB maintained at least six accounts for Qatar Charity.  ¶¶ 14, 169-70.  Qatar Charity used those funds to finance Hamas's operations, including purported charities that Hamas controls.  ¶¶ 14, 171.  QNB also contributed directly to Qatar Charity despite the bank's knowledge of Qatar Charity's direct links to terrorism, including a November 2013 contribution of roughly $275,000 and a February 2020 contribution of roughly $550,000.  ¶¶ 225-26.

QNB also played a central role in Defendants' conspiracy by serving as the go-to bank for otherwise "unbankable" terrorists, including Hamas members convicted of murder and other terrorism offenses and individuals designated as terrorists by the U.S. and Israeli governments. ¶¶ 172-224.  QNB performed those services for Hamas leaders at the behest of Qatar, which permitted the terrorists to operate freely there.  ¶¶ 5-6, 15-16, 85-86, 173-75. 187-88, 193-94, 204, 207, 218, 222-23.

Multiple QNB account holders are convicted Hamas terrorists whom Israel released from jail in connection with a massive prisoner exchange that Hamas secured by kidnapping and then ransoming an Israeli soldier.  *See* ¶¶ 173-74, 187, 192, 215, 218, 223.  QNB's terrorist accountholders include: Husam Badran, the former leader of Hamas's military wing in the West Bank, who was convicted for orchestrating deadly terrorist attacks; Musa Dudin, a member of Hamas's politburo and a convicted Hamas terrorist; Ahlam Aref Ahmad Tamimi, one of the FBI's most-wanted terrorists because of her role in the August 9, 2001, Hamas suicide bombing of the Sbarro pizzeria in Jerusalem that killed 15 people; and Zaher Ali Musa Jibril, a convicted murderer and founder of Hamas's military wing whom Treasury has designated as an SDN.  *See* ¶¶ 178, 183-86, 190, 192-94, 210-12, 214-17.  All of those prominent terrorists used money from

15

their QNB accounts to fund Hamas.  ¶ 224.

QNB exhibited its support for its terrorist clientele by opening and maintaining accounts
for them in violation of its own policies and international banking standards designed to prevent
terror financing.  ¶¶ 227-315.  Indeed, QNB was so eager to curry favor with the Qatari
government that it allowed these convicted terrorists to register their accounts wholesale to a
single P.O. Box, rather than their own addresses.  ¶¶ 176, 191, 215, 218, 222-23.  Thus, while the
terrorists' infamy alone alerted QNB to their violence and prominent Hamas positions, the shared
address scheme highlights QNB's knowing participation in Defendants' conspiracy.  ¶¶ 174-77.

QNB claims that its extraordinary role as the preferred bank for convicted terrorists
merely constitutes "routine banking services" and notes that its terrorist customers were released
from prison (without mentioning the kidnapping and extortion that secured their premature
releases).  While those services apparently qualify as routine for QNB, they are irreconcilable
with the counter terror-financing standards that govern international banking.  *See* ¶¶ 227-315.

QNB also exhibited unbridled support for Hamas and advanced Defendants' conspiracy
by maintaining multiple accounts for Yousuf Abdulla Al-Qaradawi, a radical cleric who serves
as the Union of Good's Chairman.  ¶¶ 196-99, 208-09.  Al-Qaradawi used those accounts to fund
Hamas's operations.  ¶ 224.  His radicalism has extended to issuing religious rulings inciting
Muslims to join jihadist groups, to conduct attacks against U.S. forces, and to commit suicide
bombings.  ¶¶ 198.

To capitalize on Al-Qaradawi's role as a leading figure within Qatar's Muslim religious
community, QNB also appointed him to the bank's Sharia Supervisory Board.  ¶¶ 87, 200.  Thus,
QNB—which purports to abhor terrorism—has intentionally tied itself to a terror advocate who
heads an organization that serves as Hamas's principal fundraiser and who has encouraged his

many followers to commit violence.  ¶¶ 196-206.

**E.  All of the Defendants Knowingly Participated**
   **in the Conspiracy to Fund Hamas's Operations**

Defendants all understood their important roles in the Qatar-led conspiracy to fund
Hamas's operations.  ¶¶ 8-12, 108-09, 125-127, 130, 135, 155, 168-172, 224, 227, 314-15, 320-
23.  Given the universally recognized international standards requiring banks to perform due
diligence concerning their customers and to adopt policies to prevent terror financing, the Bank
Defendants could not have remained unaware that Israel had designated Qatar Charity a terrorist
organization because of its role in the Union of Good.  *See* ¶¶ 227-315.  QNB also
unquestionably knew of Al-Qaradawi's leadership of the Union of Good and its role in financing
Hamas as well as the murderous history of the bank's Hamas-affiliated customers.  *See* ¶¶ 172-
224.

Thus, Defendants knew throughout the conspiracy that Qatar, Qatar Charity, and the
Union of Good were funding Hamas through Qatar Charity.  ¶¶ 108-09, 136, 172-224, 227-315.
In addition, they understood the critical role that they played in the efforts of Qatar and the Royal
Family to finance Hamas's violence and its efforts to enhance its standing in the Palestinian
community through purported charitable work.  ¶¶ 5, 8-12, 108-09, 130, 224, 227.

The Bank Defendants' knowing participation in the conspiracy is also confirmed by their
failure to cut their ties to Qatar Charity after its second expulsion from Israel and its designation
as a terrorist organization by Qatar's Gulf neighbors.  Indeed, the Bank Defendants continue to
provide services to Qatar Charity, a known terrorist fundraiser, to this day.  ¶¶ 69, 75.

The controlling role that Qatar's Royal Family plays in the organizational structure of
each Defendant strengthens the inference that they knowingly participated in the conspiracy to

17

fund Hamas.  Given Qatar's autocratic government, the Bank Defendants could not perform

banking services for notorious terrorists and a well-known financier of terrorism like Qatar

Charity without the consent of their controlling shareholder and regulator.  ¶¶ 73-74, 83-84, 108,

116-22, 136.

Moreover, even before Israel shuttered Qatar Charity's operations in the Palestinian

Territories in 2015, other banks operating there (including Arab Bank and Banque du Caire) had

refused to provide services to Qatar Charity because of its terror funding.  *See* ¶¶ 144-45.  The

Bank Defendants had far greater access to information regarding Qatar Charity's links to

terrorism than those banks because of the Defendants' overlapping ownership and the extensive

financial services that the Bank Defendants provided to Qatar Charity.  *See* ¶¶ 5-7, 13, 73-75, 84-

85, 126-27, 130, 155-66, 169-71, 225-26.  Thus, the ability of other banks to ascertain Qatar

Charity's links to terrorism confirms that the Bank Defendants also understood Qatar Charity's

role in financing Hamas.  *See* ¶¶ 144-45.

<div align="center">

**ARGUMENT**

**I**

**PLAINTIFFS ADEQUATELY ALLEGE SECONDARY LIABILITY
UNDER JASTA AGAINST ALL DEFENDANTS**

</div>

In enacting JASTA, Congress emphasized that its purpose "is to provide civil litigants

with the ***broadest possible basis***, consistent with the Constitution of the United States, to seek

relief against persons, entities, and foreign countries, wherever acting and wherever they may be

found, that have provided material support, ***directly or indirectly***, to foreign organizations or

persons that engage in terrorist activities against the United States."  JASTA § 2(b) (emphases

added); *see also, e.g., Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, 495 F. Supp. 3d

144, 154 (E.D.N.Y. 2020) (Cogan, J.).  By knowingly providing financial services to further the

<div align="center">18</div>

fundraising efforts of Hamas, the Defendants engaged in precisely the type of conduct that

Congress intended JASTA to address—they conspired to further the interests of Hamas and

aided and abetted Hamas's acts of international terrorism.  *See* 18 U.S.C. § 2333(d); *Estate of*

*Henkin*, 495 F. Supp. 3d at 151 (denying bank's motion to dismiss where the complaint alleged

that the bank maintained "multiple bank accounts for a notorious Hamas operative, Hamas's

most prominent fundraiser in Turkey, and a key Hamas institution in Gaza," and that the bank

"understood that it was providing vital financial services to the terrorist organization

responsible" for the plaintiffs' deaths).

## A.  <u>Plaintiffs State Valid Aiding and Abetting Claims Against All Defendants</u>

Plaintiffs plausibly allege a JASTA claim by meeting the three elements for aiding-and-

abetting liability outlined in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), the decision

Congress identified as the prototype for such claims.  As summarized by the Second Circuit in

*Honickman v. BLOM Bank SAL*, 6 F.4th 487, 494 (2d Cir. 2021), those elements are:

> "(1) the party whom the defendant aids must perform a wrongful act that causes
> an injury" (the "aiding party who causes injury" element); "(2) the defendant must
> be ***generally aware*** of his role as part of an overall illegal or tortious activity at
> the time that he provides the assistance" (the "general awareness" element);
> "(3) the defendant must ***knowingly and substantially assist*** the principal
> violation" (the "substantial assistance" element).

(Quoting *Halberstam*, 705 F.2d at 477) (emphases in original).[9]

---

[9] Contrary to Qatar Charity's assertion, neither *Halberstam* nor *Linde v. Arab Bank, PLC*, 882
F.3d 314, 329 (2d Cir. 2018) holds that Plaintiffs must show that "the defendant and the principal
were 'one in spirit.'"  *See* QC Br. at 31.  *Halberstam* merely employed that phrase in explaining
that the defendant's state of mind is one of six factors courts consider in assessing "how much
encouragement or assistance is substantial enough" to constitute aiding and abetting.
*Halberstam,* 705 F.2d at 478, 484.  In any event, the Complaint leaves no doubt that Defendants
shared Qatar's objective of funding Hamas's operations.

Defendants' criticisms of Plaintiffs' allegations ignore the Second Circuit's admonition that the Court must determine "whether there is a permissible relevant inference from '***all*** of the facts alleged, taken collectively,' not whether an inference is permissible based on 'any individual allegation, scrutinized in isolation.'" *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021) (emphasis in original) (citations omitted). That permissive standard harmonizes with the rule that plaintiffs need only allege facts that, taken collectively, "'state a claim to relief that is plausible on its face.'" *Honickman*, 6 F.4th at 495 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) ("The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."). That standard precludes Defendants' efforts to ignore key allegations of the Complaint, while attacking others in isolation.

Moreover, "acts that are 'neutral standing alone … must be evaluated in the context of the enterprise they aided.'" *Kaplan*, 999 F.3d at 865 (quoting *Halberstam*, 705 F.2d at 488). Thus, what might constitute a "routine banking service" in another context amounts to material assistance where those services are provided amidst a decades-long "campaign of terrorist attacks against civilians." *Id.*

### 1. Plaintiffs Plausibly Allege That Hamas Caused Their Injuries

In challenging the "aiding the party who causes injury" element of Plaintiffs' aiding-and-abetting claim, Defendants knock down straw men while ignoring the Complaint's detailed allegations demonstrating that Hamas was responsible for each of the attacks. As Plaintiffs allege:

- "[T]he attack upon the Henkin family was carried out by a Hamas cell that planned the attack over a two-week period that included detailed efforts to obtain vehicles and arms." ¶ 326. During the terrorists' trials in Israel, each "admitted that they were

members of the Izz al-Din al-Qassam Brigades …, the military wing of Hamas, that they were Hamas operatives, and that Hamas had committed the attacks." ¶ 328. Leaving no doubt, Hamas "took official responsibility for the attack in publications on Hamas websites" which referred to the attack as a "'planned ambush' that took place 'near Itamar settlement' on October 1, 2015, and … produced 'two killed Zionist settlers.'" Those claims of responsibility were published alongside photos of the scene of the murder and the terrorists. ¶¶ 329-31. Hamas reaffirmed its responsibility on June 23, 2016, stating that the terrorists (who had just been sentenced to lifelong prison terms) "had carried out [the] Henkin attack on behalf of the Hamas organization." ¶ 332. Hamas also indirectly claimed responsibility on multiple occasions. ¶¶ 335-342. Based upon these Hamas admissions, various media organizations in the Palestinian Territories, elsewhere in the Middle East, the United States, and Israel also attributed the attack on the Henkins to Hamas. ¶¶ 343-45.

- Hamas also "acknowledged its responsibility" for the murder of Ari Fuld, praising the attack mere hours after it occurred. ¶ 351. It also released a video on the Al-Qassam Brigades' website that showed "photographs of [the terrorist] and a video of him fleeing the scene of the attack," and acknowledged that the terrorist was a Hamas agent in "captions proclaiming that Hamas's jihadist soldiers will continue their presence in the West Bank and will not leave." ¶ 352.

In light of these allegations, Defendants' claims that the attacks were too rudimentary to be attributable to Hamas (QNB Br. at 17, 24, 26, 34; QC Br. at 17), or were unconnected acts of terrorists acting alone (QNB Br. at 16 n.13; Masraf Br. at 1-2, 31-32; QC Br. at 7, 8, 31), at best raise factual disputes that cannot be resolved in their favor on a motion to dismiss, and must ultimately be decided by a jury.

Defendants' legal authorities provide no support for dismissing Plaintiffs' claims. *See* Masraf Br. at 31; QNB Br. at 16 n.13; QC Br. at 31. In contrast to this case, the plaintiffs in *Colon v. Twitter, Inc.*, 14 F.4th 1213, 1222 (11th Cir. 2021), made no allegations "that ISIS was aware of Mr. Mateen or knew beforehand about his planned attack on Pulse." They merely asserted that the perpetrator read ISIS-related content, and they "admit[ted] that [the perpetrator] was self-radicalized." *Id.* Similarly, in *Gonzalez* and *Copeland*, FTO operatives neither planned nor perpetrated the attacks, which took place thousands of miles from the FTOs' locations and

21

were committed by individuals with no demonstrable affiliation with the FTOs.  *See Gonzalez v. Google LLC*, 2 F.4th 871, 911 (9th Cir. 2021) (a U.S. citizen and his wife attacked Plaintiffs in California, and "Plaintiffs' allegations suggest[ed] only that ISIS approved of the shooting ***after*** learning it had occurred, not that it authorized the attack beforehand."); *Copeland v. Twitter, Inc.*, 352 F. Supp. 3d 965, 974-75 (N.D. Cal. 2018) (plaintiff whose family members were killed in France failed to make "plausible allegations that ***this*** attack was carried out by ISIS" because allegations that a FTO attempted to "'generally radicalize' individuals and promoted terrorist attacks similar to the one Bouhlel carried out are insufficient") (emphasis in original).

Thus, Plaintiffs' unambiguous allegations that Hamas was responsible for the attacks in question are more than adequate to survive a motion to dismiss.

### 2. Plaintiffs Plausibly Allege Defendants' General Awareness of Their Roles as Part of an Overall Illegal or Tortious Activity

Plaintiffs plausibly allege that all Defendants in this Qatar-led conspiracy were generally aware of their roles as part of overall illegal or tortious activity when they provided material assistance to Hamas.  In *Kaplan*, the Second Circuit clarified that "general awareness" is "less demanding than a requirement that [plaintiffs] show awareness."  999 F.3d at 863.  The plaintiff need only allege that the defendant was generally aware "that it was playing a role in unlawful activities from which the [terrorist attacks] were foreseeable."  *Id.* at 860-61; *accord, e.g., Honickman*, 6 F.4th at 496 ("The defendant need not be generally aware of its role in the specific act that caused the plaintiff's injury; instead, it must be generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was ***foreseeable***.") (emphasis in original).

22

Where, as here, financial institutions assist a terrorist organization through an FTO-affiliated customer, plaintiffs can satisfy the general awareness requirement by alleging: (1) the bank's awareness of its customer's "connections with [an FTO] before the relevant attacks," and (2) that the customer was sufficiently "intertwined with [the FTO's] violent terrorist activities that one can reasonably infer [the defendant] was generally aware of its role in unlawful activities from which the attacks were foreseeable while it was providing financial services to" the customer. *Honickman*, 6 F.4th at 501; *accord, e.g., Kaplan,* 999 F.3d at 860-61 ("The [complaint] satisfies the general awareness element because it plausibly alleges the Five Customers were so closely intertwined with Hezbollah's violent terrorist activities that one can reasonably infer that LCB was generally aware while it was providing banking services to those entities that it was playing a role in unlawful activities from which the rocket attacks were foreseeable."). Ultimately, "[w]hether a defendant's material support to an FTO suffices to establish general awareness is a fact-intensive inquiry." *Kaplan,* 999 F.3d at 860.

*Kaplan* emphasized that plaintiffs can rely on circumstantial evidence, including public information, at the pleading stage to allege general awareness. *Id.* at 864. Moreover, "[a] complaint is allowed to contain general allegations as to a defendant's knowledge, *see* Fed. R. Civ. P. 9(b), because a plaintiff realistically cannot be expected to plead a defendant's actual state of mind." *Id.*[10]

---

[10]  Courts may only rarely adjudicate fact-intensive scienter issues as matter of law at the motion to dismiss stage.  Indeed, the Second Circuit has instructed that courts should be "'lenient in allowing scienter issues to withstand [even] summary judgment based on fairly tenuous inferences,' because such issues are 'appropriate for resolution by the trier of fact.'"  *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 693 (2d Cir. 2009) (citation omitted); *accord, e.g., Linde*, 882 F.3d at 330 (court found itself "obliged to vacate and remand for a jury

23

In *Kaplan*, a variety of allegations, in combination, sufficed to permit the inference that the defendant bank (LCB) was generally aware of its role in a scheme to fund Hezbollah that rendered the attacks that injured the plaintiffs foreseeable.  *See Kaplan,* 999 F.3d at 865 (in assessing whether plaintiffs meet their pleading burden, the court must "consider all of the complaint's allegations, rather than considering each in isolation, and … accept as true all permissible inferences that could be drawn from the complaint as a whole").  While the Second Circuit acknowledged that the plaintiffs had not alleged that LCB "read or was aware of" various public information regarding the ties between Hezbollah and LCB's customers, the court nevertheless found that those statements bolstered the inference that LCB was generally aware of those ties.  *Id.* at 864-65; *accord, e.g., Estate of Henkin*, 495 F. Supp. 3d at 156 ("As a practical matter—absent discovery—terrorist victims and their families understandably do not have conclusive evidence that bank officials or compliance staff had actual knowledge of various red flags that could have apprised them of their customer's nefarious activities.").

In finding that the plaintiffs had pled LCB's general awareness, the Second Circuit also emphasized a number of circumstantial facts, which are closely paralleled here, that strengthened the required inference.  Specifically, the Second Circuit found that inference supported by allegations: "that Hizbollah has been a terrorist organization headquartered in Lebanon since 1982, that LCB was a Lebanese bank headquartered in Lebanon, that banking regulations require banks to know their customers, and that [the alleged Hizbollah supporters] were customers of LCB in Lebanon since at least 2003."  *Kaplan,* 999 F.3d at 865 ("The plausibility of the

---

to decide that question [of scienter]" and noted that "traditionally a jury resolves questions about a tortfeasor's state of mind") (citations omitted).

allegations as to LCB's knowledge of Hizbollah's terrorist activities and of the Customers'

affiliation with Hizbollah is sufficient to permit the inference that LCB was at least generally

aware that through its money-laundering banking services to the Customers, LCB was playing a

role in Hizbollah's terrorist activities.").

The Complaint sets forth all of the factors *Kaplan* found sufficient to allege LCB's

general awareness, plus far more compelling support than *Kaplan* presented for making that

inference.  Specifically, the Complaint alleges that:

- Qatar Charity is a member of the Union of Good, a U.S. government-designated terrorist organization that serves as Hamas's principal fundraising organization.  ¶¶ 7, 59, 61-65, 136.

- Hamas is famously committed to destroying Israel by violence and has been designated as a terrorist organization by the U.S. and Israel for decades.  ¶¶ 90, 99-103.

- Qatar Charity has a long and public history of supporting international terrorism dating back to its founding in 2002.  ¶¶ 44-60, 67-69.

- Qatar Charity has long maintained multiple accounts with each Bank Defendant.  The Bank Defendants provided Qatar Charity with a range of financial services, including international wire transfers that passed through the U.S., Qatar and the Palestinian Territories, among other jurisdictions.  ¶¶ 8-12, 24, 75, 125-130, 148, 155-156, 168-172, 224.

- Qatar Charity's annual reports disclosed that Qatar Charity transferred funds to, and carried out joint projects with, various fronts of terrorist organizations, including the Elehssan Society, which the U.S. Treasury designated as "a charitable front for the Palestinian Islamic Jihad" in 2005.  ¶¶ 131-33.

- In 2008, the U.S. Interagency Intelligence Committee on Terrorism (IICT) of the U.S. National Counterterrorism Center listed Qatar Charity (then known Qatar Charitable Society) as a "priority III terrorism support entity (TSE)." ¶¶ 46, 137.[11]

---

[11] The Bank Defendants highlight that the U.S. designation of Qatar Charity as a TSE was not public.  Of course, however, the U.S. government (as well as Israel and Qatar's Gulf neighbors) made that designation because of Qatar Charity's terror financing, and the Bank Defendants had access to non-public information regarding Qatar Charity's transactions and an obligation to uncover any links to terror financing.  Moreover, Israel's very public designation of Qatar

- In 2008, Israel banned Qatar Charity in the Palestinian Territories for financing Hamas terrorism and for its membership in the Union of Good, which the U.S. had designated a financier of terrorist organizations in 2008. ¶¶ 59-65. As a result, throughout the Defendants' conspiracy, Qatar Charity was operating illegally in the Palestinian Territories. ¶ 136.

- Simultaneously with banning Qatar Charity, Israel publicly broadcast an express warning to "all world banking and financial institutions" that might deal with Qatar Charity to "prepare accordingly and act with caution in order to avoid criminal sanctions and lawsuits by victims of terrorism." ¶ 60.

- Prior to Israel shutting down Qatar Charity's operations in the Palestinian Territories in 2015, other Middle East banks, including Arab Bank and Banque du Caire, had already refused to provide services to Qatar Charity because of its terror funding. ¶ 145.

- In June 2019, Saudi Arabia, Bahrain, Egypt, and the UAE designated Qatar Charity as a financial supporter of terrorism. ¶¶ 69.

- The Qatari government and the Qatari Royal Family have publicly supported Hamas terrorism for more than a decade by providing Hamas with more than $1 billion in funding and by extending safe haven to numerous notorious Hamas criminals. ¶¶ 3-4, 108-22, 182, 187, 193, 207, 209, 223.

- In October 2012, the Qatari government made a public pledge of $400 million to Hamas that "evoked widespread condemnation in the U.S. Congress" and protests by 24 members of Congress to the Qatari ambassador to the U.S. ¶¶ 4, 112.

- The U.S. Treasury Under Secretary for Terrorism and Financial Intelligence issued a press release in March 2014 noting that "Qatar has become such a permissive terrorist financing environment, that several major Qatar-based fundraisers act as local representatives for larger terrorist fundraising networks" there. ¶ 124.

- Because of Doha's connections with and support of terrorist organizations, Saudi Arabia, Bahrain, Egypt, and the UAE cut ties with Qatar on June 5, 2017. ¶ 68.

- The Qatari government and Royal Family effectively control the Bank Defendants through the ownership of their stock, the autocratic nature of the Qatari government, and Qatar's regulatory authority. ¶¶ 5-7, 70, 73-74, 83-85, 109, 138-43, 200-04, 207, 315(e).

---

Charity as a member of the Union of Good eliminated any doubt regarding whether Qatar Charity funded Hamas terrorism. ¶¶ 59-65.

- The Qatari government and Royal Family used that influence and control to induce the Bank Defendants to join a conspiracy to fund Hamas through Qatar Charity, another entity subject to the control of Qatar and the Royal Family. ¶¶ 5-7, 70, 73-74, 83-85, 109, 138-43, 200-04, 207, 315(e).

- QNB placed the notorious head of a U.S.-designated terrorist organization, the Union of Good, on its Sharia Supervisory Board and provided banking services to him despite his leadership role in a known terrorist organization.  ¶¶ 87, 196-209.

- QNB opened accounts for more than 20 convicted Hamas murderers and terrorists whom Israel released from prison early in a prisoner exchange arranged to save the life of a kidnapped Israeli soldier, including a terrorist on the FBI's most wanted list.  ¶¶ 172-224.  Several of those convicted Hamas terrorists continued their leadership roles with Hamas post-release, including responsibilities for directing terror attacks.  Those Hamas members also provided financing to Hamas through their QNB accounts.  ¶¶ 188-89, 194, 205-07, 224.

- International banking standards and the Bank Defendants' own policies required them to perform due diligence regarding their customers.  ¶¶ 227-313.  Qatar Charity's well-documented role as a fundraising front for Hamas's terrorism could not have escaped the required analysis of its accounts with the Bank Defendants.  ¶¶ 315-23.

These allegations undeniably outline each Defendant's general awareness of its participation in "overall illegal or tortious activity."  Defendants' contrary contentions largely hinge on procedurally inappropriate factual arguments that Qatar Charity is not what Israel, Qatar's Gulf neighbors, the U.S. IICT, and, most importantly for present purposes, the Complaint say it is—a front for Hamas.  *See* pp. 7-13, *supra*.[12]

---

[12] Contrary to Defendants' claims, they are not relieved "of [aiding-and-abetting] liability . . . simply because the terrorist organization intentionally raised funds through an intermediary, an alter ego, or a mere front to engage in violence."  *Estate of Henkin*, 495 F. Supp. 3d at 158; *see also, e.g., Kaplan*, 999 F.3d at 855 (JASTA "simply says the defendant must have given 'substantial assistance'" to an act of international terrorism, not substantial assistance to the principal engaging in an act of international terrorism – *i.e.*, for aiding and abetting liability to attach under JASTA, a defendant's substantial assistance may be "indirect").  Similarly, Defendants' arguments that their conduct is too remote from the attacks that killed Mr. Henkin and Mr. Fuld ignore that they "may be liable under the ATA for aiding and abetting the organization behind the attacks, not only the 'triggerman' or suicide bomber."  *Miller v. Arab*

The Bank Defendants exaggerate Plaintiffs' pleading burden by arguing that, notwithstanding its notorious ties to terrorists, Qatar Charity was insufficiently "intertwined" with Hamas for its violence to be a foreseeable result of the Bank Defendants' material assistance. As *Honickman* found, customers "do not themselves need to be 'engaged in ... violent or terrorist acts'" to satisfy that requirement. *Honickman*, 6 F.4th at 499 n.15 (citation omitted).

*Kaplan* illustrates this point. There, LCB's "Five Customers" were a putative charity (the "Martyrs Foundation" or "Shahid"), two corporations, and two of their officers. *Kaplan*, 999 F.3d at 849-50. None of the Five Customers had a direct role in any attack. *Id.* Nevertheless, the plaintiffs demonstrated LCB's general awareness by alleging the Five Customers' connections to Hezbollah and its status as a terrorist organization. *Id*. at 864-65.[13]

---

*Bank*, 372 F. Supp. 3d 33, 48 (E.D.N.Y. 2019); *see also id.* at 46 ("Allegations that a defendant provided money to terrorist organizations, or transferred money that was given to terrorist organizations, strengthens the inference that plaintiff's injuries were proximately caused by a defendant's conduct under the ATA.").

[13] Citing no authority, QNB erroneously claims that Plaintiffs fail to establish the purportedly required link between Qatar Charity and Hamas's "violent terrorist activities" because Plaintiffs do not allege that funding went to Hamas's military wings, as opposed to their humanitarian components. QNB Br. at 23-24. That contention ignores that JASTA proscribes providing "material support, ***directly or indirectly***, to foreign [terrorist] organizations…." JASTA § 2(b) (emphasis added). Plaintiffs need not allege that specific funds played a role in their attacks or that those funds were delivered to a particular segment of the FTO. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 31 (2010) ("Money is fungible, and "[w]hen foreign terrorist organizations that have a dual structure raise funds, they highlight the civilian and humanitarian ends to which such moneys could be put."); *Honickman*, 6 F.4th at 499 ("substantial assistance to the actual injury-causing act—here, Hamas's attacks—is unnecessary"); *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 205 (2d Cir. 2014) ("*Weiss II*") (the ATA requires only that defendant supports a terrorist organization not that it aided the "terrorist activities of the terrorist organization"); *Miller*, 372 F. Supp. 3d at 48 (defendants "may be liable under the ATA for aiding and abetting the organization behind the attacks, not only the individual 'triggerman' or suicide bomber").

The Bank Defendants advance a number of additional general awareness arguments that hinge on impermissible challenges to the veracity of Plaintiffs' allegations. Masraf claims that Qatar and the Royal Family could not have controlled Masraf because they "only" held 28% of its stock. Masraf Br. at 26. As a practical matter, that percentage of stock ownership—standing alone—would suffice to establish control for pleading purposes.[14] But here, the Royal Family wields further power at Masraf by holding multiple positions on the bank's board. ¶ 68. Moreover, the autocratic Qatari government's regulatory power over the Bank Defendants augments Qatar's control over them, particularly because Treasury identified Qatar as "an especially 'permissive' jurisdiction for terror financing." ¶¶ 116, 124; *see e.g.*, *GSS Grp. Ltd. v. Nat'l Port Auth. of Liber.*, 822 F.3d 598, 606 (D.C. Cir. 2016) ("[A] government can wield power not only as [a] shareholder but also as [a] regulator.").

QNB tries to distance itself from Hamas by claiming that the convicted terrorists who maintain QNB accounts committed their murders and other terrorist activity decades ago, as if that mattered. QNB Br. at 20-21. In fact, the Complaint alleges that QNB's lineup of convicted Hamas terrorist customers continued their crucial roles in planning Hamas terrorism ***while they maintained their accounts at QNB***. *See, e.g.,* ¶¶ 188-89, 194. Plaintiffs further allege that

---

[14] *See e.g., Essex Universal Corp. v. Yates*, 305 F.2d 572, 579 (2d Cir. 1962) (28.3% shareholder "almost certain to have share control as a practical matter"); *In re Trump Hotels Shareholder Derivative Litig.*, 2000 WL 1371317, at *7 (S.D.N.Y. Sept. 21, 2000) (Delaware courts have found "substantial minority interests, ranging from 20% to 40% sufficient to grant the holder working control" of a company); *Moran v. Household Int'l, Inc.*, 490 A.2d 1059, 1080 (Del. Ch. 1985) (20% ownership recognized as threshold for measuring control). In their reply papers in a related case, Defendants rely on an inapposite case, *Gater Assets Ltd. v. AO Moldovagez*, 2 F.4th 42, 58 (2d Cir. 2021), to argue that Plaintiffs' allegations of Qatari control are unavailing. *Gater*, however, dealt with the entirely different issue of whether the plaintiff had made the extremely demanding showing that the defendant was the "alter ego" of Moldova under the Foreign Sovereign Immunities Act. *Id.* at 55-61. As the foregoing cases demonstrate, control may exist absent any suggestion that two entities qualify as alter egos.

those Hamas terrorists used their QNB accounts "to finance Hamas terrorist activities in Israel." ¶ 224.

QNB also feigns surprise regarding the ties of its Sharia Supervisory Board member, Yousuf Abdulla Al-Qaradawi, to the Union of Good.  Given Al-Qaradawi's radical public support for terrorism (¶¶ 197-198, 205-06), the unambiguous allegations that he served as Chairman of the Union of Good (¶¶ 15, 87, 196, 208), and QNB's obligation to vet its policy makers and account holders (¶ 230), a jury will have to resolve this argument.

The Bank Defendants also pretend that Qatar Charity is not the same organization as Qatar Charitable Society, which Israel banned in 2008, and that Qatar Charity's pre-2008 activities have no bearing on the general awareness requirement.  *See, e.g.,* Masraf Br. at 22-23. As the criminal convictions of Qatar Charity's senior officials show, the slight name change altered nothing regarding Qatar Charity's activities, and it remained a banned entity in the Palestinian Territories throughout the relevant period.  ¶¶ 45, 59-60, 136, 138-43.  The Bank Defendants' awareness of Qatar Charity's role in financing terrorism is also supported by their decision to continue providing services to Qatar Charity even after Israel shuttered its operations and Qatar's Gulf neighbors designated Qatar Charity a supporter of terrorism.  *See* ¶¶ 69, 75, 226.

Ultimately, Defendants' general awareness arguments rely on their vain efforts to equate this case to the inapposite *Honickman*.  For example, *Honickman* noted that the complaint alleged only that "certain leaders of Hamas were board members of the Three Customers [of the bank] but d[id] not aver that this was public knowledge during the relevant period."  *Honickman,* 6 F.4th at 502.  In stark contrast, here notorious Hamas criminals *themselves* were QNB

30

customers, and QNB not only held accounts for the leader of a U.S.-designated SDGT but placed

that terrorist on the bank's Sharia Supervisory Board.  ¶¶ 87, 196, 199-200.

Moreover, in *Honickman*, the bank's customer, also the Union of Good, was not

designated as a terrorist organization until *after* the attack that harmed Plaintiffs.  6 F.4th at 501-

02.  Here, Israel publicly designated Qatar Charity as a terrorist financer of Hamas in 2008, well

*before* the relevant attack.  ¶¶ 59-60, 320.  The plaintiffs in *Honickman* also alleged that Israel

designated a customer as a terrorist organization in 1998 "without specifying whether and where

this was made public."  *Honickman*, 6 F.4th at 502 n.20.  In contrast, here, Plaintiffs allege that

Israel's 2008 ban of Qatar Charity was publicly broadcast to "all world banking and financial

institutions," who were "expressly warned" to deal with Qatar Charity at their peril.  ¶¶ 59-60.

Lastly, neither *Honickman* nor any case on which Defendants rely involved the web of

factors that Plaintiffs allege to bolster the inference that Defendants were generally aware of their

role in financing Hamas's operations.[15]  In combination, these factors leave no doubt that

---

[15] *In Siegel v. HSBC North America Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019), the plaintiffs
alleged that defendant HSBC was liable for attacks by al-Qaeda in Iraq ("AQI") on a hotel in
Jordan because HSBC engaged in financial transactions with Al Rajhi Bank ("ARB"), which, in
turn, had customers who allegedly provided material support to AQI.  The *Siegel* Court noted:
"To be sure, the plaintiffs did allege that HSBC provided hundreds of millions of dollars to ARB,
but they did not advance any non-conclusory allegation that AQI received any of those funds or
that HSBC knew or intended that AQI would receive the funds."  *Id.* at 225.  While the *Siegel*
plaintiffs had alleged that HSBC knew that some of "ARB's banking activities are linked to
terrorists," they failed to plausibly allege that HSBC was actually used by ARB (knowingly or
unwittingly) to provide *any* funds to AQI.  *Id.* at 224-25.  Here, by contrast, the Bank
Defendants' customers were either Hamas operatives themselves, or Qatar Charity, which had
been publicly designated as a funder of Hamas terrorism prior to Defendants' tortious conduct.
The pre-JASTA decision in *In re Terrorist Attacks on Sept. 11, 2001 (Al Rajhi)*, 714 F.3d 118
(2d Cir. 2013) had no reason to consider the general awareness issue.  There, the *Al Rajhi*
plaintiffs pled that the defendant bank, ARB, maintained accounts for certain charitable
organizations; that the banks knew (or should have known) that the charitable organizations
supported terrorism and terrorist organizations, including Al Qaeda; and that the charitable
organizations transmitted material support to Al Qaeda.  But the Court held that plaintiffs had

31

Plaintiffs have adequately alleged the general awareness element of their aiding-and-abetting claim.

### 3. Plaintiffs Plausibly Allege the "Substantial Assistance" Factors Misstated by Defendants

Six *Halberstam* factors determine whether Plaintiffs have adequately alleged the substantial assistance element of an aiding-and-abetting claim: "(1) the nature of the act encouraged or assisted, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance." *Kaplan,* 999 F.3d at 852 (quoting *Linde,* 882 F.3d at 329). As the Second Circuit has emphasized, "No factor is dispositive; the weight accorded to each is determined on a case-by-case basis." *Honickman,* 6 F.4th at 500.[16] Here, the *Halberstam* analysis yields the unmistakable conclusion that Plaintiffs have adequately alleged the substantial assistance element of their claim.

#### a. Nature of Act Encouraged or Assisted

Because Defendants cannot dispute that financial services or, in Qatar Charity's case, direct assistance provided to an FTO or its affiliates is "important to the nature of the injury-causing act," *Honickman*, 6 F.4th at 500, the Bank Defendants attempt to sanitize their conduct under the rubric of "routine banking services." The Second Circuit has recognized, however, that "whether a defendant bank's 'financial services to [an FTO or its affiliates should or] should

---

failed to make non-conclusory allegations that the accounts ARB allegedly held for those charitable organizations were ever in fact used to transmit funds to Al Qaeda. *See In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 833 (S.D.N.Y. 2005), *aff'd*, 714 F.3d 118 (2d Cir. 2013). In contrast, here the Director and Staff of Qatar Charity confessed to transferring money from Qatar Charity's accounts to Hamas's affiliates. ¶ 130. Qatar Charity's membership in the Union of Good also confirms Plaintiffs' allegations that Qatar Charity used its funds to finance Hamas, as Israel determined.

[16] Plaintiffs do not allege that Defendants were present at the time of the torts at issue here.

not be viewed as routine' is a 'question[ ] of fact for a jury to decide.'" *Kaplan,* 999 F.3d at 858

(quoting *Linde*, 882 F.3d at 327).  Thus, this supposed defense cannot justify the dismissal of

Plaintiffs' claims at the pleading stage.

In any event, *knowingly* financing a terrorist organization is not exempt from JASTA

liability because the defendant provided the support in a purportedly "routine" manner.  As in

*Halberstam,* where the defendant's services "as banker, bookkeeper, recordkeeper, and

secretary" were "neutral standing alone," 705 F.2d at 487, 488, the relevant issue is not the

abstract nature of the assistance.  Rather, courts consider whether the services assisted a tortious

or illegal *enterprise* and whether violence is a foreseeable risk of that enterprise.  *Id.* at 488-89.[17]

In any event, the services Defendants provided here were anything but routine.  QNB

provided accounts and banking services to several notorious Hamas criminals, including a

terrorist on the FBI's most wanted list and the head of a U.S.-designated terrorist organization.

¶¶ 82, 174-225.  QNB also opened those accounts in a most irregular way, allowing 20 convicted

Hamas criminals to use the same P.O. Box as the address for their separate accounts.  ¶¶ 176-78,

191, 215, 218, 223.

Both Bank Defendants also provided services to Qatar Charity despite knowing that:

(a) it had compiled a long and public history of supporting international terrorism (¶¶ 44-59,

314-15); and (b) Israel had banned Qatar Charity from the Palestinian Territories and designated

it as a financier of Hamas terrorism by means of a public announcement specifically directed to

---

[17] The *Kaplan* Court noted that *Linde* only addressed whether routine services might be
insufficient to a *primary* liability claim that "the defendant *itself* committed an act of
terrorism"—not to a JASTA aiding-and-abetting claim.  *Kaplan*, 999 F.3d at 858 (quoting *Linde,*
882 F.3d at 327).

financial institutions (¶¶ 59-60, 136).  Nonetheless, Masraf transferred funds to the Palestinian

Territories to permit Qatar Charity to support Hamas.  ¶¶ 7, 126-30, 320-23.

These facts demonstrate that "the nature of the act encouraged or assisted" factor

supports finding that each Defendant provided substantial assistance to Hamas.

b.   The Amount of Assistance Given by Defendants

The "amount of assistance" factor also favors finding that all Defendants provided Hamas

with substantial assistance because each played an important role in providing millions of dollars

to Hamas.  *See, e.g.,* ¶¶ 7, 23-24, 126, 130, 322-23.  Moreover, Hamas terrorists used the

accounts QNB maintained for them to finance Hamas's terrorist activities (¶ 16, 226), and Qatar

Charity used accounts at both Masraf and QNB for the same purpose (¶¶ 5-6, 13-16, 130, 164-

65, 169-71).  The Bank Defendants' assistance assumed outsized importance because Qatar

Charity serves as a key fundraising source for Hamas (¶¶ 71-72, 133, 137), and Masraf and QNB

were among the small number of banks (and perhaps the only ones) willing to provide Qatar

Charity with access to the USD that terrorist groups covet because of the dollar's status as a

universally accepted currency.  ¶¶ 5-6, 10-11, 23, 130, 162-65.

Contrary to Defendants' contentions, the Complaint also leaves no doubt that these funds

reached Hamas and its operatives.  The strength of Plaintiffs' direct allegations that these funds

benefited Hamas is bolstered by their allegations concerning the Qatar-led conspiracy to fund

those organizations.  *See* Point I.B.  Moreover, the Complaint outlines the ease with which

Defendants could serve Hamas's financial needs from Qatar, which the U.S. has identified as an

especially "permissive jurisdiction" for terrorist financing.  ¶¶ 116, 124.

In combination, these facts dictate that the "amount of assistance" factor also strongly

supports concluding that Plaintiffs have adequately alleged the substantial assistance element of

34

their aiding-and-abetting claim.  *See Honickman*, 6 F.4th at 500 (courts credit allegations that

defendants passed funds to FTOs where the "allegations … permit a reasonable inference that the

defendant recognized the money it transferred to its customers would be received by the FTO").

     c.   <u>Defendants' Relationships to the Principal</u>

"[A] direct relationship between the defendant and the FTO is not required to satisfy this

factor."  *Id.* at 501.  Nonetheless, QNB did maintain a direct relationship with Hamas by

providing accounts and services to: (a) notorious convicted Hamas terrorists who used their QNB

accounts to support Hamas's terrorist activities from Qatar (¶¶ 172-224); and (b) the head of the

Union of Good, a U.S.-designated SDGT that served as a principal fundraiser for Hamas (¶¶ 61-

65, 196).  Qatar Charity's membership in the Union of Good—widely publicized by Israel in

2008—also tied it directly to Hamas.

All Defendants also maintained a close connection with Hamas through their

participation in the Qatar-led conspiracy to fund Hamas and their efforts to pass funds through

the Bank Defendants to Qatar Charity, a member of the Union of Good.  Finally, the sanctions

against Qatar Charity for terror financing and the admissions of its West Bank Director and Staff

concerning the organization's use of its Masraf accounts to finance terrorism dispel any doubt

that Defendants maintained substantial ties to Hamas.[18]

---

[18] QNB provides no authority for its claim that Plaintiffs must link the Hamas criminals to which
QNB provided banking services to the actual attacks that harmed Plaintiffs.  QNB Br. at 35.  No
such requirement exists.  *See Kaplan*, 999 F.3d at 855 (rejecting bank defendant's argument that
the complaint was insufficient because it did not allege that any of the bank's customers
themselves engaged in an act of international terrorism and finding that JASTA "simply says the
defendant must have given 'substantial assistance'" to a terrorist organization, not the terrorist
who committed an attack); *Honickman*, 6 F.4th at 499, n.15 (the bank's customers "do not
themselves need to be 'engaged in . . . violent or terrorist acts'"); *Miller*, 372 F. Supp. 3d at 48
(defendant "may be liable under the ATA for aiding and abetting the organization behind the
attacks, not only the individual 'triggerman' or suicide bomber").

d.   Defendants' States of Mind

*Kaplan* rejected the argument that a "plaintiff must prove the defendant's intent to further terrorist activity" to establish an aiding-and-abetting claim.  999 F.3d at 858.  Instead, "a plaintiff *may* introduce evidence of intent in order to prove other elements of the aiding-and-abetting claim; but a plaintiff is not required to plead evidence, and an absence of proof of intent is not fatal to the aiding-and-abetting claim because intent is not itself a *Halberstam* element."  *Id.* at 860 (citation omitted).

Nevertheless, the Complaint sets forth a detailed factual basis for inferring that all Defendants acted with intent to further the Qatar-led terror financing conspiracy.  *See* pp. 17-18; Point I.B., *supra.*  Qatar Charity knew it was a member of the Union of Good, and Israel's designation, among other factors, apprised Bank Defendants of that fact.  As a result, the state of mind factor also supports finding that Plaintiffs have adequately alleged substantial assistance.

e.   Duration of the Assistance

Plaintiffs have alleged that the Defendants' scheme to fund Hamas extended over several years.  *See* ¶ 104 ("From at least 2011 through 2015, Hamas knowingly, willfully, and unlawfully combined, conspired, confederated and agreed with Defendants to commit numerous acts of international terrorism . . ."); ¶ 170 (Qatar Charity's QNB accounts were opened in 2006 and 2012); ¶¶ 182, 190, 214 (the convicted Hamas terrorists opened their accounts at QNB no later than August 2015); ¶ 199 (the leader of the Union of Good opened his QNB account in 2006).

In challenging the adequacy of Plaintiffs' substantial assistance allegations, Qatar Charity erroneously claims that Plaintiffs must also show that its actions were "integral" to or played a "major part in prompting" the terrorist acts at issue.  QC Br. at 28.  The Second Circuit's recent

decisions in *Kaplan* and *Honickman* contain no such requirement.  Nor does *Linde*, the case

Qatar Charity purports to quote as the basis for imposing this requirement.  *See id.*; *see also*

*Linde*, 882 F.3d at 329 ("What the jury did have to find was that, in providing such services, the

bank was 'generally aware' that it was thereby playing *a 'role'* in Hamas's violent or life-

endangering activities.") (emphasis added); *Miller*, 372 F. Supp. 3d at 46 (the payment need only

be a "substantial factor in the sequence of responsible causation and whose injury was

reasonably foreseeable or anticipated as a natural consequence" of the defendants' scheme)

(quoting *Rothstein v. UBS AG*, 708 F.3d 82, 92 (2d Cir. 2013)).

In a misguided attempt to challenge the veracity of Plaintiffs' allegations at the pleading

stage, Qatar Charity highlights its supposedly stellar works.  *See, e.g.,* QC Br. at 25 (asserting

that Plaintiffs' allegations that Qatar Charity financed terrorism are "false and flatly belied by the

public record").  Obviously, Qatar Charity cannot rely on hearsay news reports to contradict

Plaintiffs' allegations at the motion to dismiss stage (or ever).  *E.g., Tescher v. Experian Info.*

*Sols., Inc.*, 2022 WL 564048, at *4 (S.D.N.Y. Feb. 23, 2022) ("The Court cannot wade into fact

and credibility determinations on a motion to dismiss by considering a hearsay document that

was not mentioned in, referenced in, relied upon in bringing, or actually integral to the …

Complaint.").  In any event, Congress, the courts and the Executive Branch have emphasized that

charitable front organizations frequently perform legitimate philanthropic work while

simultaneously funding terrorism.  *See, e.g., Holder,* 561 U.S. at 30-31 ("Investigators have

revealed how terrorist groups systematically conceal their activities behind charitable, social, and

political fronts.  Indeed, some designated [FTOs] use social and political components to recruit

personnel to carry out terrorist operations, and to provide support to criminal terrorists and their families in aid of such operations.") (internal quotations and citations omitted).[19]

At present, all that matters is that Qatar Charity's laudatory self-assessment is irreconcilable with the Complaint's *detailed*, *non-conclusory* allegations. Those allegations outline Qatar Charity's membership in the Union of Good and financing of Hamas. The support for those facts includes Israel's explicit designation of Qatar Charity as a terrorist organization, the criminal confessions of the Director and Staff of Qatar Charity's West Bank Branch, and the conclusions reached by the U.S. government and Qatar's Gulf neighbors. *See* pp. 7-13, *supra*. Cherry-picked examples of Qatar Charity's "humanitarian efforts" cannot negate those allegations in connection with a motion to dismiss.

For all of the foregoing reasons, Plaintiffs have plausible alleged that all three Defendants aided and abetted Hamas prior to the attacks that resulted in Plaintiffs' injuries and are therefore liable to Plaintiffs under JASTA § 2333(d).

**B. Plaintiffs Have Stated Valid Claims for Conspiracy Liability Against All Defendants**

Plaintiffs have also adequately alleged a JASTA conspiracy claim by showing "an agreement to do an unlawful act or a lawful act in an unlawful manner; an overt act in furtherance of the agreement by someone participating in it; and injury caused by the act." *Halberstam*, 705 F.2d at 487.[20]

---

[19] For similar reasons, the court should reject the Bank Defendants' claims that Qatar Charity's humanitarian work undermines Plaintiffs' allegations that the Bank Defendants were generally aware of Qatar Charity's terror financing. For the reasons Plaintiffs describe above, the Bank Defendants were well aware that Qatar Charity mixed its philanthropy with a healthy dose of support for Hamas. *See* pp. 9-11, 17-18, *supra*.

[20] Defendants argue only that Plaintiffs have not alleged an agreement to commit an unlawful act. Thus, they have waived arguments as to the other conspiracy elements, an overt act and causation. *Domingues v. Barton Chevrolet Cadillac*, 2021 WL 637016, at *8 (S.D.N.Y. Feb. 17,

### 1. Plaintiffs Have Alleged an Agreement Among Defendants, Qatar, the Qatari Royal Family, and Hamas to Commit Terrorist Acts

The Complaint clearly and plausibly alleges an agreement among the government of Qatar, the Qatari Royal Family, Hamas, and Defendants to finance Hamas's operations. *See, e.g.,* ¶¶ 104, 125, 130. In connection with that conspiracy, the Bank Defendants agreed to provide financial services to Qatar Charity, which acted as a front for Hamas.

The same facts that support Plaintiffs' aiding-and-abetting claim likewise evidence the existence of Defendants' conspiracy. Qatar and its Royal Family exerted control over each Defendant, thus facilitating their ability to coordinate Defendants' support for Hamas. ¶¶ 5-7, 73-75, 83-85, 125, 130(e). Qatar's status as Hamas's biggest benefactor and Israel's designation of Qatar Charity as a member of the Union of Good confirm that Qatar and Qatar Charity shared the objective of funding Hamas. ¶¶ 115, 136-43.

The Israeli designation also demonstrates that Masraf and QNB shared the same objective. ¶¶ 59-60, 136, 320. Otherwise, they would not have violated universally accepted banking standards and risked the potential civil and criminal liability that Israel very publicly highlighted by serving the banking needs of a designated financier of terrorism for more than a decade after that designation. ¶¶ 59, 136, 227-323. QNB's willingness to serve as a one-stop-shop for the financial needs of murderers and a cleric who advocated suicide bombings and other forms of violence further confirms that it shared the objectives of Defendants' conspiracy. ¶¶ 172-224. Likewise, QNB's astonishing decision to name that cleric to a significant position at

---

2021) (considering unraised arguments waived where defendants argued only certain elements of a claim).

the bank dispels all doubts regarding its willingness to embrace the purveyors of terror.  ¶¶ 87, 200.

Each Defendant also played an integral role in the conspiracy, with Qatar Charity maintaining the direct link to Hamas and the Bank Defendants providing invaluable access to services that included processing USD transactions that few, if any, banks would risk performing for a member of the Union of Good.  ¶¶ 8-12, 126-27, 130.  In the background, Qatar enabled all of that illicit behavior by—consistent with its longstanding role as Hamas's largest funder—encouraging the behavior that Israel and Qatar's Gulf neighbors sanctioned.  ¶¶ 2-12, 59, 68-69, 136.

The Complaint belies Defendants' efforts to characterize the conspiracy allegations as "conclusory."  The existence of the conspiracy is confirmed by the criminal confessions of the Director and Staff of Qatar Charity's West Bank Branch, which detail how Qatar Charity and Masraf laundered USD through the U.S. to Qatar Charity's accounts in the West Bank.  ¶ 130. Other allegations are based upon statements from Israeli security agencies, publicly available Treasury designations, State Department reports, and statements by counterterrorism officials, among other sources.[21]  ¶¶ 46-52, 59-66, 98-103, 112-14, 116-17, 123-25, 130-34, 141, 189, 203, 205, 212, 216.

---

[21]  Both the content of Plaintiffs' allegations and their sources distinguish this case from *Gallop v. Cheney*, 642 F.3d 364, 368-89 (2d Cir. 2011).  *Gallop* involved implausible claims lacking in any factual support that U.S. government officials intentionally caused the September 11 attacks to advance their political interests and conceal their misallocation of funds to the Department of Defense.  That far-fetched "conspiracy theory" finds no parallels here.

These detailed allegations distinguish this case from *O'Sullivan v. Deutsche Bank AG*, 2019 WL 1409446, at *9 (S.D.N.Y. Mar. 28, 2019), where the court refused to infer that the violation of Iranian sanctions by European banks sufficed to establish a conspiracy between the banks and various Iranian entities.  Unlike this case, the *O'Sullivan* plaintiffs alleged "no facts from which the Court can infer that Defendants knew that the financial services they provided to various Iranian entities would be directed towards FTOs."  *Id.*  In contrast, no doubt exists here that Defendants recognized Qatar Charity's membership in the Union of Good and, thus, its status as a leading funder of Hamas.

Because Plaintiffs have alleged that Defendants conspired with Hamas, Defendants' myopic reading of JASTA to require a *direct* agreement with Hamas provides no basis for dismissing the conspiracy claim.  In any event, Defendants' interpretation of JASTA's conspiracy provision limits the law to far less than its stated purpose of "provid[ing] civil litigants with the *broadest possible basis*" to sue entities "that have provided material support, *directly or indirectly*" to FTOs.  JASTA § 2(b), 130 Stat. 852 (emphasis added).

Notably, no binding authority exists for a direct agreement requirement.  In *Freeman v. HSBC Holdings PLC*, which QNB cites, the court acknowledged "Congress's apparent intent to provide liability for actions that indirectly assist in the commission of acts of terrorism."  413 F. Supp. 3d 67, 98 n.41 (E.D.N.Y. 2019) ("*Freeman II*").  Despite that Congressional intent, the court concluded that "the plain text of JASTA's *conspiracy* liability provision requires that a defendant conspire directly with the person or entity that committed the act of international terrorism that injured the plaintiff."  *Id.* (emphasis in original).[22]

---

[22] Masraf and Qatar Charity also cite to dicta in the Second Circuit's *Kaplan* decision (which only addressed aiding-and-abetting claims) even though the court expressed no view regarding

But nowhere in JASTA's conspiracy provision (18 U.S.C. § 2333(d)(2)) did Congress employ the word "directly." Because Congress's clearly expressed intent is consistent with the plain text of § 2333(d)(2), JASTA does not require a direct agreement between the defendant and the FTO for civil liability to attach to any member of the conspiracy. *See Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 589-90 (2004) (employing a statute's "findings and statements of objectives" to provide context to its plain meaning).

Although the two parties in *Halberstam* conspired directly, the opinion never suggests that JASTA imposes a direct conspiracy requirement. Indeed, even in the criminal context, parties to a conspiracy need not "conspire directly with every other member of it or be aware of all acts committed in furtherance of the conspiracy, *or even know every other member*." *United States v. Rooney*, 866 F.2d 28, 32 (2d Cir. 1989) (emphasis added) (quoting *United States v. Friedman*, 854 F.2d 535, 562 (2d Cir. 1989) and *United States v. Alessi*, 638 F.2d 466, 473 (2d Cir. 1980)).

Similarly, Qatar Charity's claim (QC Br. at 29-30) that Plaintiffs must allege an agreement or direct contact between Defendants and the *individual terrorists involved in an attack* finds no support in JASTA or case law. *See Freeman II,* 413 F. Supp. 3d at 97 n.38 (concluding that "a defendant may be liable under § 2333(d) even if it did not directly conspire with 'the specific individual representative of the [FTO] who'" actually injured a plaintiff) (quoting *Freeman v. HSBC Holdings PLC*, 2018 WL 3616845, at *17 (Jul. 27, 2018), *rejected*

_____

whether JASTA required a direct conspiracy between a defendant and a principal. *Kaplan* merely noted that "JASTA states that to be liable for conspiracy a defendant would have to be shown to have 'conspire[d] with' the principal…." 999 F.3d at 855. The court expressed no view regarding whether, in contrast to the rules generally applicable to conspiracies, only a direct agreement could satisfy that standard.

*by*, *Freeman II,* 413 F. Supp. 3d at 67).[23]  Qatar Charity's reading of JASTA would defeat the entire purpose of a law aimed at FTOs, many of which Congress expressly acknowledged "act[] through affiliated groups or entities" in order to avoid detection and the attendant consequences. JASTA § 2(a)(3).

## 2. Plaintiffs Have Plausibly Alleged that Defendants and Their Co-Conspirators Shared a Common Goal of Committing Unlawful Acts

The foregoing discussion also demonstrates that Defendants shared the common goal of funding Hamas.  As a member of the Union of Good, Qatar Charity's primary purpose is to accomplish that objective.  ¶¶ 59-65.  The Bank Defendants were well aware that they were facilitating Qatar Charity's funding of Hamas.  ¶¶ 5-7, 59-60, 108-15.  The risks of civil and criminal liability that the Bank Defendants assumed by providing financial services to a banned entity and their continued willingness to maintain accounts for Qatar Charity leave no doubt regarding their adoption of the conspiracy's objective.  ¶¶ 59-60, 126-30, 168-71, 224-26. Moreover, the control that Qatar and the Royal Family exerted over each Defendant lends further strength to the inference that Defendants acted in a coordinated fashion to accomplish a shared objective.  ¶¶ 5-7, 73-75, 85, 125, 130(e).  Further, the Sanabel Card scheme, in which the Bank Defendants funded Qatar Charity's purchase and provision of anonymous debit cards to Hamas

---

[23]  Qatar Charity misreads *Weiss v. Nat'l Westminster Bank PLC*, 278 F. Supp. 3d 636, 648 (E.D.N.Y. Sept. 30, 2017) ("*Weiss IV*") as supporting this assertion.  The *Weiss IV* court merely emphasized that JASTA provides that the defendant must "conspire[] with the person who committed [the] act of international terrorism," as opposed to a person who planned or authorized that act.  *Id.* at 650.  *Weiss IV* never suggests that the "person" the defendant conspires with must be the individual terrorist.  Hamas qualifies as a "person" under the plain language of 18 U.S.C. § 2333(d)(1).  *See Freeman II*, 413 F. Supp. 3d at 97 ("JASTA's inclusion of societies and associations within its definition of 'person' clearly indicates that the 'person' committing an act of terrorism need not be the literal triggerman.").

operatives, functioned both as funding for Hamas's terror attacks and insurance in the event operatives were injured, imprisoned, or killed.  ¶¶ 148-54.  For pleading purposes, these allegations easily suffice to show Defendants' agreement to engage in unlawful conduct.

Contrary to the Bank Defendants' argument, nothing about their conduct is "'so far removed from the acts of terrorism that injured Plaintiffs that the Court cannot infer that Defendants shared the common goal of committing an act of international terrorism.'"  Masraf Br. at 30 (quoting *O'Sullivan*, 2019 WL 1409446, at *9); *see also* QNB Br. at 30 (quoting *Kaplan v. Lebanese Canadian Bank, SAL*, 405 F. Supp. 3d 525, 534 (S.D.N.Y. 2019)).  On the contrary, the Second Circuit has recognized that, in the context of ATA claims brought against financial institutions providing banking services for charitable front organizations, "wire transfers are a part of the principal wrong at which the plaintiffs' lawsuit is directed."  *Licci v. Lebanese Canadian Bank,* 732 F.3d 161, 170 (2d Cir. 2013) ("*Licci III*").

Plaintiffs' conspiracy allegations are far more detailed than the allegations considered in the district court opinion in *Kaplan*, a case that was reversed on appeal, albeit with respect to the plaintiffs' aiding-and-abetting claim.  Given that the Second Circuit disagreed with the *Kaplan* district court's characterization of the very allegations QNB cites, that opinion is not persuasive authority for anything.  *Compare Kaplan*, 405 F. Supp. 3d at 534 (dismissing claim because plaintiffs "provided no factual support for their claim that … the Five Customers were affiliated with Hizbollah") *with Kaplan,* 999 F.3d at 860-61.

## II

### Plaintiffs Plausibly Allege a Primary Violation of the ATA

As Defendants correctly note, under the ATA, an act of international terrorism must (1) involve violence or endanger human life; (2) violate federal or state criminal law if

committed in the United States; (3) appear to be intended to intimidate or "coerce a civilian population" or to "influence the policy [or the conduct] of a government by intimidation[,]" "coercion[,]" "mass destruction, assassination, or kidnapping"; and (4) occur primarily outside the United States or transcend national boundaries. *See e.g.,* Masraf Br. at 13 (citing 18 U.S.C. § 2331(1)). Plaintiffs' allegations satisfy all of those requirements.

## A. Defendants' Provision of Money and Financial Services to Hamas Was Itself Terrorism, as Defined by 18 U.S.C. § 2331

Each Defendant mistakenly argues that 18 U.S.C. § 2331(1) only provides relief against the direct perpetrators of terrorist attacks. *See* QNB Br. at 32; QC Br. at 19-20; Masraf Br. at 13-14. Because courts have continually rejected that nonsensical contention, which would render the ATA a dead letter, Plaintiffs have adequately alleged that Defendants committed the "act of international terrorism" the direct liability claim requires.

### 1. By Funding Hamas and Providing it with Extensive Financial Services, Defendants Endangered Human Life

The Complaint alleges that Qatar Charity directly provided funding to Hamas. Indeed, as a member of the Union of Good, funding Hamas's operations was Qatar Charity's principal purpose. ¶¶ 7, 59-65, 136. In *Miller,* Judge Cogan held that providing direct support to terrorists and terrorist organizations can constitute an act of international terrorism. *See* 372 F. Supp. 3d at 45 (citing, *inter alia*, Judge Posner's "persuasive opinion" in *Boim v. Holy Land Found. for Relief and Dev.*, 549 F.3d 685, 694 (7th Cir. 2008)). In *Schansman v. Sberbank of Russia PJSC*, __ F. Supp. 3d __, 2021 WL 4482172, at *6 (S.D.N.Y. Sept. 30, 2021), the court adopted Judge Cogan's reasoning in *Miller*.

45

In large part, Qatar Charity contests the adequacy of Plaintiffs' allegations with respect to this element of their claim by challenging the Complaint's veracity. Those arguments must await discovery and a procedural setting that permits efforts to dispel Plaintiffs' allegations.

The Bank Defendants provided financial services and several bank accounts to Qatar Charity, a known terrorist front that was financing Hamas in the Palestinian Territories, including by implementing a "martyr" insurance scheme for terrorists killed or injured in attacks. *See* ¶¶ 10, 14-16, 59-65, 130, 148-154. The Bank Defendants performed those services although Israel had publicly banned Qatar Charity in 2008 for its unlawful sponsorship of terrorism and its membership in the Union of Good. ¶¶ 59, 137. In addition, the Bank Defendants: provided funds for the purchase of anonymous Sanabel debit cards that Qatar Charity used to finance Hamas's operations and to fund payments to Hamas operatives, including supposed "martyrs" (¶¶ 126-30, 149-54); performed financial services for notorious convicted Hamas leaders who used their accounts at QNB to further Hamas's terror operations (¶¶ 172-195, 210-224); and provided an account for the leader of a U.S.-designated terrorist organization, the Union of Good. ¶¶ 196.[24]

---

[24] QNB maintained accounts for at least 20 Hamas terrorists freed from Israeli prisons in exchange for the release of Hamas-held hostages (¶¶ 173-75). Those terrorists included: (1) Ahlam Aref Ahmad Tamimi, whom the FBI placed on its most wanted list for, *inter alia*, her role in the Sbarro Pizzeria bombing in Jerusalem that killed 15 people and injured scores (¶¶ 210-13); (2) Husam Badran, the Hamas Politburo Spokesperson and former leader of Hamas's military wing in the West Bank, who continues to advocate for Palestinian terrorism and to fund and direct Hamas terror cells (¶¶ 178-89); (3) Musa Dudin, a member of the Hamas Politburo, who maintains Hamas's "prisoner portfolio" and determines which imprisoned Hamas operatives to insist Israel release in exchange for Hamas freeing kidnapped civilians and IDF soldiers, or for returning the remains of IDF soldiers killed by terrorists to the soldiers' families (¶¶ 190-95); (4) Zaher Ali Musa Jibril, a U.S. government-designated terrorist who helped found Hamas's military wing in the West Bank and who continues to run Hamas's financial operations (¶¶ 214-17); (5) Hisham Hijaz, who has offered a $20,000 martyr payment to the family of

In addition, Qatar Charity used its accounts at Masraf and QNB to provide financial support to Hamas terrorism in the Palestinian Territories, a fact confirmed by the criminal confessions of Qatar Charity's West Bank Director and Staff.  ¶¶ 8-12, 125, 130, 225-26.[25] These facts belie the Bank Defendants' efforts to characterize Qatar Charity as "an alleged intermediary with no clear ties to terror."  Masraf Br. at 14.

In *Miller,* Judge Cogan concluded that Arab Bank's participation in a martyr payment scheme and account maintenance for individual Hamas operatives satisfied the "endanger human life" prong of ATA primary liability.  The court reasoned:

> Arab Bank's administration of the Insurance Scheme was dangerous to human life under 18 U.S.C. § 2331(1)(A) because, by rewarding acts of terrorism, [Arab Bank] incentivized prospective "martyrs" to commit acts of violence and enhanced Hamas's reputation among potential recruits.  Arab Bank further enhanced terrorists' ability to conduct acts of violence by routing payments and maintaining accounts for terrorists and terrorist organizations.

*Miller*, 372 F. Supp. 3d at 45.

Here, the Bank Defendants provided the same types of services that Judge Cogan found sufficient in *Miller* to plead the ATA's primary liability requirements.  As Judge Cogan held in *Miller,* directing money to Hamas and providing financial services to its operatives and front organizations, just "'like giving a loaded gun to a child (which also is not a violent act), is an "act dangerous to human life" under the ATA.'"  *Id.* at 45 (quoting *Boim,* 549 F.3d at 690).  The financial services, no less than bullets, enable Hamas to carry out its deadly operations.  *Id.*;

---

anyone carrying out a suicide bombing in Israel (¶ 220); and (6) other terrorists collectively responsible for killing scores of victims (¶¶ 218-21).

[25] Plaintiffs also allege that: the U.S. IICT listed Qatar Charity (then known as Qatar Charitable Society) as a "priority III terrorism support entity (TSE)" (¶ 46); and Qatar Charity's local branches in the Palestinian Territories distributed funds to Hamas and its affiliates, as corroborated by Qatar Charity's annual reports for 2013, 2014, and 2015 (¶¶ 128-29, 131-32).

*accord Linde*, 882 F.3d at 327 (remanding for a jury to determine whether "Arab Bank's financial services … constitute acts of international terrorism supporting ATA liability").

At a minimum, whether or not the financial services the Bank Defendants provided to Qatar Charity qualify as non-actionable "routine" services "'raises questions of fact for a jury to decide'" and cannot be determined adversely to Plaintiffs in the current procedural context. *Miller*, 372 F. Supp. 3d at 44-45, 46 (quoting *Linde*, 882 F.3d at 327). Accordingly, Plaintiffs' have sufficiently alleged that the Bank Defendants' actions were "dangerous" within the meaning of 18 U.S.C. § 2331(1)(A).[26]

Qatar Charity and QNB cite *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 390 (7th Cir. 2018), presumably as a counterpoint to *Miller* and its reliance upon the Seventh Circuit's *Boim* opinion. But the distinction the Seventh Circuit drew between *Kemper* and *Boim* demonstrates that *Kemper* does not support dismissing Plaintiffs' claims. This case, like *Boim,* "dealt with direct donations to a known terrorist organization." *Kemper,* 911 F.3d at 390. In contrast, *Kemper* involved "business with companies and countries that have significant legitimate operations," specifically, the entire government of Iran. *Id.*[27]

---

[26] QNB misplaces its reliance upon the District Court's decision in *Kaplan. See* QNB Br. at 32-34. The detailed allegations of the Kaplan complaint that QNB sets forth in its memorandum of law received only superficial analysis by the court. *See* 405 F. Supp. 3d at 532 ("Defendant's alleged misconduct was providing wire transfer and other financial services to … Five Customers … affiliated with Hizbollah."). Accordingly, *Kaplan* is not persuasive authority, particularly because the Second Circuit vacated the decision by means of an opinion that adopted very different views of the plaintiffs' allegations than the district court opinion.

[27] Defendants' reliance on *Zapata v. HSBC Holdings PLC*, 414 F. Supp. 3d 342 (E.D.N.Y. 2019) (Garaufis, J.) to argue that Plaintiffs have failed to "establish[] any direct causal link between" Qatar Charity's alleged fund transfers and the attacks that injured Plaintiffs is also unavailing. QC Br. at 26, 28; Masraf Br. at 15-16. In *Zapata*, this Court acknowledged that "giving money to terrorist organizations definitely enables them to commit additional acts of terrorism," whereas the drug cartel defendants at issue in *Zapata* were "not purely terrorist organizations"

This case more closely parallels *Miller* than *Kemper*.  As part of their conspiracy to support Hamas: Qatar Charity (itself a notorious front for FTOs) made direct payments to Hamas; Masraf helped Qatar Charity, an Israel-designated sponsor of Hamas, move money into Hamas-controlled territory in which Qatar Charity was banned from operating; and QNB provided financial services directly to Hamas's criminal leadership.  ¶¶ 7-16, 44-60, 124-43, 168-224.

### 2.  Defendants' Provision of Funding and Financial Services to Hamas Was Intended to Intimidate and Coerce

As explained by Judge Cogan in *Miller*, the "intended to intimidate and coerce" prong of ATA liability is satisfied where, as here, a defendant knowingly provides support to a violent terrorist organization "like Hamas," or even to an organization substantially likely to engage in terrorism:

> In [*Boim*,] Judge Posner explained that a defendant who provides financial support to an organization like Hamas who "knew the aims and activities of the organization" would "by augmenting Hamas's resources ... enable Hamas to kill or wound, or try to kill, or conspire to kill more people in Israel."  "And given such foreseeable consequences, such donations would appear to be intended to intimidate or coerce a civilian population or to affect the conduct of a government by assassination, as required by section 2331(1)" of the ATA.  Even if one does not know the organization engages in terrorism, liability is appropriate when one "is deliberately indifferent to whether it does or not, meaning that one knows there is a substantial probability that the organization engages in terrorism but one does not care."

372 F. Supp. 3d at 45 (quoting *Boim*, 549 F.3d at 694).

---

and "laundering the money that the Cartels independently accumulate is an act of a fundamentally different sort from giving terrorist organizations money that they do not already have."  *Id*. at 358.

Defendants' conduct closely parallels the actions the Court found sufficient to allege the "intended to intimidate and coerce" prong of an ATA claim in *Miller.* Qatar Charity raised funds for Hamas and then passed that money directly to that terrorist organization. ¶¶ 7, 10-12, 126-130. Moreover, Plaintiffs allege that Masraf and QNB "knew that by allowing Qatar Charity to use accounts at the banks to funnel money to Hamas, the banks were joining a conspiracy intended to commit acts of international terrorism, including the murder of Americans in Israel." ¶ 378. Defendants intended that the conduct they undertook in furtherance of the conspiracy would improve Hamas's ability to carry out terrorist attacks. ¶¶ 7-12, 111, 126-32, 137, 145, 151-53, 179.

Those facts again distinguish this case from *Kemper*, where the court found that Deutsche Bank intended to increase its profits by offering sanctions-busting services at "premium prices." *Kemper*, 911 F.3d at 390, 394. In contrast, here, as in *Miller*, Defendants demonstrated their intention to further Hamas's violent agenda by providing "financial support to an organization like Hamas." *See Miller*, 372 F. Supp. 3d at 45. As in *Miller*, violence, not profits motivated Defendants. Plaintiffs' claims therefore meet the requirements of 18 U.S.C. § 2331(1)(B).[28]

---

[28] The decision in *Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84 (D.D.C. 2017) is inapposite. *Ofisi* held that the plaintiffs had made no specific allegation that the defendant bank knew of its customer's connection to the FTO al Qaeda prior to providing financial services. *Id*. at 101. In contrast, Israel specifically warned the Bank Defendants of Qatar Charity's role in funding terrorism **before** they provided financial services. Moreover, because the Bank Defendants and Qatar Charity were all dominated by Qatar and its Royal Family, who openly supported Hamas, Qatar Charity's notorious link to Hamas could not have escaped the banks' knowledge. Likewise, the decision in *Kaplan v. Al Jazeera* has no relevance to this matter. 2011 WL 2314783, at *5-6 (S.D.N.Y. June 7, 2011) (plaintiffs failed to establish that news organization exhibited an intention to coerce or intimidate where the complaint did not assert the defendant

3.  **Defendants' Provision of Funding and Financial Services
    to Hamas Proximately Caused Plaintiffs' Injuries**

Masraf repackages the "but for" causation argument that *Miller* rejected by suggesting

that Plaintiffs must show that Defendants' conduct was necessary for the attacks at issue to prove

causation under 18 U.S.C. § 2331.  Masraf Br. at 15-18; *see Miller*, 372 F. Supp. 3d at 46.

While Qatar Charity and QNB acknowledge that the proper standard is proximate

causation, they nonetheless appear to argue that Plaintiffs must connect specific dollars

transferred as part of Defendants' conspiracy to the specific attack.  QC Br. at 26-28, QNB Br. at

34-35.  As *Miller* explained, that proposed causation standard makes no sense in the context of

an ATA claim:

> [A] showing that defendant's conduct was the "'[b]ut for' cause [of plaintiff's
> injuries] cannot be required in the section 2333(a) context." *Gill v. Arab Bank,
> PLC*, 893 F. Supp. 2d 474, 507 (E.D.N.Y. 2012).  Requiring a showing of but-for
> causation would eviscerate Section 2333(a) of the ATA because money is
> fungible. *Linde*, 882 F.3d at 324.  "Even if an ATA plaintiff could show that a
> particular dollar was used in furtherance of a particular attack – a requirement
> rejected by this Court – that plaintiff still could never prove that absent the
> defendant's providing that dollar, a group like Hamas would not have made up the
> shortfall from elsewhere." *Id*.

> In such circumstances "the requirement of proving causation is relaxed because
> otherwise there would be a wrong and an injury but no remedy because the court
> would be unable to determine which wrongdoer inflicted the injury." *Boim*, 549
> F.3d at 697.  *See also Paroline v. United States*, 572 U.S. 434, 452 (2014) ("[I]t
> would be anomalous to turn away a person harmed by the combined acts of many
> wrongdoers simply because none of those wrongdoers alone caused the harm ...").

*Miller*, 372 F. Supp. 3d at 46; *accord, e.g., Strauss v. Crédit Lyonnais, S.A.*, 925 F. Supp. 2d 414,

433-34 (E.D.N.Y. 2013) ("*Strauss I*") (requiring ATA plaintiffs to trace payments to specific

attacks "would be impossible and would make the ATA practically dead letter").

---

"even knew that it was providing anything to Hezbollah," particularly because the news coverage
served a legitimate public purpose) (*cited in* Masraf Br. at 15).

As the Court held in *Miller,* the proximate causation standard requires that Plaintiffs allege that Defendants' conduct was a "substantial factor in the sequence of responsible causation and whose injury was reasonably foreseeable or anticipated as a natural consequence." *Miller*, 372 F. Supp. 3d at 46. "Allegations that a defendant provided money to terrorist organizations, or transferred money that was given to terrorist organizations, strengthens the inference that" Defendants' conduct caused the Plaintiffs' injuries. *Id.* (citing *Rothstein*, 708 F.3d at 97).

In finding the proximate cause requirement satisfied in *Miller*, the Court emphasized that Arab Bank "maintained accounts for terrorist organizations, and routed payments to terrorist organizations, which further enhanced their ability to fund and commit acts of terrorism." *Id.* As a result, the Court held that, "[i]n light of the *nature of . . . Hamas, and other entities that Arab Bank provided these services to*, it was reasonably foreseeable that Defendant's conduct would lead to plaintiffs' injuries." *Id.* (emphasis added).

That holding compels a finding that Plaintiffs have adequately alleged proximate causation. Like Arab Bank, Defendants provided financial services that enhanced Hamas's ability to carry out attacks like the ones that harmed Plaintiffs. As in *Miller*, therefore, Defendants proximately caused Plaintiffs' injuries because Defendants' conduct was a "substantial factor in the sequence of responsible causation," and Plaintiffs' injuries were "reasonably foreseeable or anticipated as a natural consequence" of those illicit actions. *Id.*; *see* ¶¶ 8-12, 23, 125-30.[29]

---

[29] Defendants mistakenly cite *Kemper, Freeman II*, and *Owens v. BNP Paribas, S.A.*, 897 F.3d 266 (D.C. Cir. 2018) as support for their argument that Plaintiffs must show a more direct link between Defendants' misconduct and the terrorist attacks that harmed them. Those cases are inapposite because they involved alleged support for a state sponsor of terrorism, not a terrorist

Defendants claim their wrongful conduct is too remote from the Fuld attack to satisfy the ATA's proximate cause requirement.  Specifically, they argue that three years passed between their acts of terror financing and the Hamas murder of Mr. Fuld.  *See, e.g.*, Masraf Br. at 9; QC Br. at 15; QNB Br. at 35.

That argument ignores that Plaintiffs have alleged that Defendants' knowing support of Hamas occurred before, during, and after both attacks that injured Plaintiffs.  *See* ¶ 75 (Masraf "provided Qatar Charity with financial services throughout the time relevant to Plaintiffs' claims … [and] continues to provide those services to Qatar Charity to this day"); ¶ 175 (QNB opened accounts for numerous Hamas terrorists in July and August of 2015); ¶ 224 (those Hamas terrorist accounts "were used to finance Hamas terrorist activities in Israel"); ¶ 69 (Qatar Charity's financing of Hamas terrorism continued at least through June 2019, when "Saudi Arabia, Bahrain, Egypt and the UAE designated Qatar Charity as a financial supporter of terrorism").

Even assuming for the sake of argument that there was a three-year gap between Defendants' conduct and the Fuld attack, courts have declined to conclude as a matter of law at

---

organization.  *See Kemper*, 911 F.3d at 393 ("When one of the links on a causal chain is a sovereign state, the need for facts specifically connecting a defendant's actions to the ultimate terrorist attack is especially acute."); *Freeman II*, 413 F. Supp. 3d at 89 ("This case is distinguishable from cases where the defendant banks were alleged to have dealt directly with an FTO or a known FTO fundraiser or front organization."); *Owens,* 897 F.3d at 276 (when an intermediary is a sovereign state with "many legitimate agencies, operations, and programs to fund," the need for additional allegations supporting" the "substantiality" of the connection between defendant's act and the terrorist attack is "all the more acute") (citation omitted).  Similarly, both *Fields v. Twitter, Inc.*, 881 F.3d 739, 744 (9th Cir. 2018) and *Gonzalez*, 335 F. Supp. 3d at 1178-79, are inapposite because they reject the Second Circuit's *Rothstein* proximate cause standard in favor of a more onerous Ninth Circuit test demanding a "*direct* relationship" between plaintiffs' injuries and defendants' acts.  (Emphasis added).

the motion to dismiss stage that a specific payment's temporal proximity to an attack could not

satisfy the causation requirement. *Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609,

632 (E.D.N.Y. 2006) ("*Weiss I*") (finding plaintiffs sufficiently alleged proximate cause of

terrorist attacks despite a two-year gap between funding and the attack, "given the fungible

nature of money and the fact that it is difficult to say when the particular dollar given to a

terrorist is actually used"). Instead, as noted above, Plaintiffs need only allege that the payment

was a "substantial factor in the sequence of responsible causation" and that their injuries were

"reasonably foreseeable or anticipated as a natural consequence" of Defendants' scheme. *Miller*,

372 F. Supp. 3d at 46 (quoting *Rothstein*, 708 F.3d at 92).

Defendants' reliance on *Cabrera v. Black & Veatch Special Projects Corps*, 2021 WL

3508091, at *24 (D.D.C. July 30, 2021)) is unavailing. There, the magistrate judge

recommended a finding that payments ranging from 8 to 14 years before an attack—far greater

than any gap involved here—were too "remote" to support proximate causation. *Id.* at *24.

More importantly, *Cabrera* treated temporal distance not as an absolute bar to causation,

but rather as an element of foreseeability. 2021 WL 3508091, at *23-24. Masraf quotes

*Cabrera* to argue that it could not have foreseen "being haled into court" in New York for

Hamas's 2018 murders as a result of transfers Masraf made in 2015. Masraf Br. at 9, 17. As an

initial matter, foreseeability relates to a plaintiff's injury, not to a defendant's ability to predict

litigation.

In any event, the foreseeability issue raises a factual question the court cannot resolve as

a matter of law in this context. In 2015, Masraf transferred funds for Qatar Charity into an

account in the Palestinian Territories, a jurisdiction in which Qatar Charity had been banned

from operating because of its fundraising for Hamas terrorism. ¶¶ 126, 130, 136. By that time,

Hamas had committed countless acts of violence of nearly every variety over the span of multiple decades.  Those facts are irreconcilable with the notion that Defendants could not have foreseen that ongoing violence would result from their efforts to prop up Hamas by funding its operations and putting in place a system to provide financial services for its fundraising front and senior operatives.

Defendants cite *Gill,* 893 F. Supp. 2d at 474, for the proposition that "[t]emporal and factual issues will often be crucial . . . in proximate cause inquiries pursuant to section 2333(a)." QNB Br. at 35.  The *Gill* court, however, was explaining why it ***denied*** the defendant bank's motion to dismiss in light of allegations very similar to those at issue here.  *See* 893 F. Supp. 2d at 486-87, 507, 523.  Ultimately, *Gill* concluded that the fact-intensive causation issue, including any temporal questions, would have to be explored after discovery.  *Id.* at 522-23; *see also id.* at 481 (causation presents "a congery of complex, interrelated vectors," including "the amount and character of the aid allegedly provided, and its timing").

Defendants also cite *In re Chiquita Brands Int'l, Inc*., 284 F. Supp. 3d 1284, 1313 (S.D. Fla. Jan. 3, 2018) for the proposition that "[t]he greater the time between the payments and the attack, the more attenuated the foreseeability of the attack, and the weaker the likelihood that the support played a significant role in facilitating the attack[]."  Masraf Br. at 17.  Again, however, the *Chiquita* court was explaining why it ***denied*** the defendant's motion (this time for summary judgment) although that case involved a more attenuated causal chain than this one.  284 F. Supp. 3d at 1317-18 (jury question existed concerning whether the defendant's payments of $32,000 annually in protection money over a 9-year period to the FARC terrorist organization, which generated annual revenues of up to $100 million, in the banana-growing zones of

Colombia proximately caused the plaintiffs' injuries in terrorist attacks perpetrated by FARC in

distant areas of Colombia).[30]

### 4.   Defendants All Exhibited the Requisite *Mens Rea*

For the reasons discussed in Point I.A.3.d., Defendants' challenges to Plaintiffs' *mens rea*

allegations cannot justify the dismissal of Plaintiffs' claims at the pleading stage.


### III

### THE COURT SHOULD DENY DEFENDANTS' RULE 12(B)(5) MOTIONS

## A.  Plaintiffs Have Made a *Prima Facie* Showing that Qatari Law Does Not Prohibit Service Under Rule 4(f)(2)(C)(ii)

All three Defendants challenge the sufficiency of service although they have received the

summonses and Complaint and know that service pursuant to letters rogatory, which has been in

process for over a year, will ultimately moot their challenges.  *See* Bonner Decl. at ¶¶ 10-11.  All

three Defendants also challenge the sufficiency of Plaintiffs' ***proofs of service*** based on the

erroneous assertion that Plaintiffs must demonstrate that the individuals who signed for the

FedEx packages were authorized to accept personal service of process on behalf of Defendants.

*See* QNB Br. at 6; Masraf Br. at 11, 12 (citing *Rosenberg v. Lashkar-E Taiba*, 2017 WL

11647006, at *4 (E.D.N.Y. Mar. 21, 2017) (a case concerning motions for ***default*** judgments));

QC Br. at 35 (adopting QNB's and Masraf's arguments).

---

[30] Masraf's reliance on *Kaplan v. Al Jazeera*, 2011 WL 2314783 (S.D.N.Y. June 7, 2011) for the proposition that "Plaintiffs [cannot] satisfy the requisite intent requirement by imputing Qatar's alleged support of Hamas to [Masraf] by conclusorily alleging close ties between [Masraf] and the Qatari government" is also unavailing.  The lack of *any* link between the alleged wrongful conduct and plaintiff's injuries in *Kaplan* readily distinguish that case from the circumstances here.  *Id.* at *5-6 (plaintiffs claimed defendant news broadcaster aired locations of rocket attacks in Israel that helped Hezbollah to better aim subsequent rockets but failed to allege "facts suggesting that Defendant's broadcasts were used by Hezbollah to better target their rockets … [or that] Hezbollah viewed Defendant's broadcasts").

Defendants obviously have not defaulted, and their receipt of Plaintiffs' process is incontrovertible. Service effected outside of the United States under Rule 4(f)(2) can be proved by any "evidence satisfying the court that the summons and complaint were delivered to the addressee." Fed. R. Civ. P. 4(f)(2)(B). In this case, the evidence that all three Defendants have appeared in and defended this action meets that standard. *See, e.g., NYKCool A.B. v. Pacific Int'l Servs.*, 2013 WL 6799973, at *8 (S.D.N.Y. Dec. 20, 2013) (FedEx waybill that did not contain a recipient's signature was sufficient evidence of delivery to defaulting defendant).

To survive Defendants' Rule 12(b)(5) motion, in the absence of a full-blown evidentiary hearing, Plaintiffs need only make a *prima facie* showing that service by the Clerk of Court in accordance with Rule 4(f)(2)(C)(ii) is not "prohibited" by Qatari law. *See, e.g., Fed. Home Loan Mortg. Corp. v. Steinfeld*, 1992 WL 428852, at *2 (E.D.N.Y. Dec. 30, 1992) (citing *Marine Midland Bank v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)). "Courts interpreting [Rule 4(f)(2)(C)(ii)] have concluded that 'prohibited' in this context means that the foreign country's law ***expressly prohibits*** the method, not merely that it does not recognize or provide for it." *Social Enter. LLC v. Sociedad Agricola*, 2015 WL 13743436, at *3 (E.D.N.Y. Oct. 6, 2015) (emphasis added); *see also, e.g., Polargrid LLC v. Videsh Sanchar Nigam Ltd.*, 2006 WL 903184, at *2 (S.D.N.Y. Apr. 7, 2006) ("[A] method of service specified in [Rule 4(f)(2)(C)(ii)] is acceptable so long as [it] does not actually ***violate*** the law of the country where service is attempted."). Masraf's argument that the Complaint should be dismissed "for failure to comply with … Qatari law"—specifically, Article 10 of the Qatari Civil and Commercial Procedure Law (Law No. 13 of 1990), which specifies who may receive a summons on behalf of a corporation— has no bearing on the issue here, which is whether Qatari law ***expressly prohibits*** service by a form of mail that requires a signed receipt.

57

Neither Plaintiffs nor Defendants have uncovered any such provision of Qatari law, and no U.S. court has ever decided that service by a form of mail requiring signed receipt is forbidden by Qatari law. *See* Bonner Decl. at ¶ 12. The "country specific" guidance for Qatar published in the U.S. Department of State's online Judicial Assistance database does not indicate that service of process by mail is prohibited in Qatar (*cf., e.g.*, Switzerland and Germany). *See* Bonner Ex. 9. And the Qatari Civil and Commercial Procedures Law expressly authorizes courts—albeit Qatari courts—to deliver process to any person inside ***or outside of*** Qatar "by registered mail or any other appropriate means." *See* Bonner Ex. 10 at Art. 11.[31] A similar provision in the Taiwan Code of Civil Procedure was among the evidence that convinced the U.S. District Court for the Eastern District of Pennsylvania that service by registered mail was not "expressly prohibited" under Taiwanese law. *See Trueposition, Inc. v. Sunon, Inc.*, 2006 WL 1686635, at *5 (E.D. Pa. June 14, 2006).

**B.   Alternatively, the Court Has Discretion to Order Service Pursuant to Rule 4(f)(3)**

Even if the Court finds that Plaintiffs have not made out a *prima facie* case of sufficient service, it "is not required to[] dismiss the action … [and] may grant leave to allow the [P]laintiff[s] to cure the insufficiency." *Sajimi v. City of New York*, 2011 WL 135004, at *3 (E.D.N.Y. Jan. 13, 2011). In that event, Plaintiffs will seek leave to move for an order under Rule 4(f)(3) directing service of process on the Defendants by e-mails sent to their respective counsel of record in this action. *See, e.g., Vega v. Hastens Beds, Inc.*, 339 F.R.D. 210, 222 (S.D.N.Y. 2021) (granting leave to serve Swedish defendants via email sent to their counsel of

---

[31] As in the United States, the term "registered mail" in Qatar refers to a form of "postal service which allows sender proof of mailing upon request and a signed proof of delivery upon delivery." *See* https://qatarpost.qa//FAQs (last visited May 3, 2022).

record); *NYKCool A.B. v. Pacific Int'l Servs., Inc.*, 2015 WL 998455, at *3-5 (S.D.N.Y. Mar. 5, 2015) (overruling objections to Magistrate's order authorizing service on attorneys who appeared in the action to challenge service and personal jurisdiction on behalf of foreign defendant).

"Service of process under Rule 4(f)(3) is neither a last resort nor extraordinary relief." *Grp. One Ltd. v. GTE GmbH*, 523 F. Supp. 3d 323, 341 (E.D.N.Y. 2021) (internal quotation omitted). It is "committed to the sound discretion of the district court … so long as the ordered means of service (1) is not prohibited by international agreement; and (2) comports with constitutional notions of due process." *Id.* at 342 (internal quotations omitted). "The Due Process Clause requires that the alternative means of service be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Id.* at 344 (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 31 (1950)). "Email service has … repeatedly been found by courts to meet the requirements of due process." *Pearson Educ. Inc. v. Doe 1*, 2019 WL 6498305 at *3 (S.D.N.Y. Dec. 2, 2019). Moreover, "it is not necessary to exhaust or demonstrate the impossibility of service under Rule 4(f)(1)-(2) before resorting to service under Rule 4(f)(3)." *NYKCool A.B.*, 2015 WL 998455, at *3.

Plaintiffs will ultimately succeed in completing the letters rogatory service that has been much delayed as a result of pandemic-related issues impacting that process. In the meantime, the Court should put to rest Defendants' pointless challenges to the sufficiency of the service that indisputably apprised them of this action.

<center>IV</center>

<center>THE COURT MAY EXERCISE PERSONAL JURISDICTION OVER EACH DEFENDANT</center>

**A.  The Standards Governing Rule 12(b)(2) Motions**

To defeat a motion to dismiss on personal jurisdiction grounds, plaintiffs need only

"'make a *prima facie* showing that jurisdiction exists.'"  *Licci v. Lebanese Canadian Bank, SAL*,

673 F.3d 50, 59 (2d Cir. 2012) ("*Licci I*") (citation omitted).  Plaintiffs satisfy that requirement

by making "'an averment of facts that, if credited by the ultimate trier of fact, would suffice to

establish jurisdiction over the defendant.'"  *Id.* at 59 (citation omitted).  The Court must

"'constru[e] all pleadings and affidavits in the light most favorable to the plaintiff[s] and

resolv[e] all doubts in the plaintiff[s'] favor.'"  *Id.* (citation omitted).  That permissive standard

controls in the absence of jurisdictional discovery and "'a full-blown evidentiary hearing,'" and

"'notwithstanding any controverting presentation' by defendant."  *Dorchester Fin. Sec., Inc. v.*

*Banco BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013) (citations omitted).

**B.  Fed. R. Civ. P. 4(k)(2) Provides a Basis for Exercising Jurisdiction Over All Defendants**

Defendants' assumption that Plaintiffs must satisfy the New York long-arm statute

(CPLR § 302) disregards Fed. R. Civ. P. 4(k)(2).  *See* ¶ 22.  That Rule provides for jurisdiction

where: (a) plaintiffs assert federal claims; (b) "the defendant is not subject to jurisdiction in any

state's courts of general jurisdiction;" and (c) "exercising jurisdiction is consistent with the

United States Constitution and laws."  Fed. R. Civ. P. 4(k)(2).  Plaintiffs satisfy Rule 4(k)(2)'s

first two elements because: (a) they assert federal claims; and (b) Defendants identify no other

state where Plaintiffs can bring their claims.[32]  Moreover, as Plaintiffs demonstrate below,

exercising personal jurisdiction over all Defendants complies with due process.

---

[32] *See, e.g., Compañía De Inversiones Mercantiles, S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*, 970 F.3d 1269, 1284 (10th Cir. 2020) (adopting "the approach endorsed by the Fifth,

<center>60</center>

1. **No Due Process Obstacle Exists to Exercising Personal Jurisdiction Under Rule 4(k)(2) Over Defendants Who Use the United States' Financial System to Transmit Funds to FTOs**

   a. The Fundamental Jurisdictional Due Process Requirements

Courts frequently divide the due process analysis into two components: the "'minimum contacts' inquiry and the 'reasonableness' inquiry." *Licci I,* 673 F.3d at 60.[33]  Other cases break that inquiry into three parts: (1) whether the defendant "'purposefully availed itself of the privilege of conducting activities within the forum State or … purposefully directed its conduct into the forum State'"; (2) whether "'the plaintiff's claim … arise[s] out of or relate[s] to the defendant's forum conduct'"; and (3) whether exercising jurisdiction is "'reasonable under the circumstances.'" *U.S. Bank Nat'l Ass'n v. Bank of Am. Nat'l Ass'n*, 916 F.3d 143, 150 (2d Cir.

---

Seventh, Ninth, Eleventh, District of Columbia, and Federal Circuits," which require defendants to show that they are subject to personal jurisdiction in another state to defeat jurisdiction under Rule 4(k)(2)); *Adams v. Unione Mediterranea di Sicurta*, 364 F.3d 646, 651 (5th Cir. 2004) (agreeing with the Seventh Circuit's view that, "so long as a defendant does not concede to jurisdiction in another state, a court may use 4(k)(2) to confer jurisdiction").  While minority authority exists that requires plaintiffs to disclaim the ability to satisfy any state's long-arm statute to invoke Rule 4(k)(2), most recent decisions reject that view as inefficient and contrary to the rule's text.  Given the liberal rules governing amendments and alternative pleading, refusing to consider Rule 4(k)(2) because Plaintiffs have also alleged jurisdiction under the New York long-arm statute would promote inefficiency.  Fifteen years ago, in *Aqua Shield Inc. v. Inter Pool Cover Team*, 2007 WL 4326793 (E.D.N.Y. Dec. 7, 2007), this Court applied the minority view requiring plaintiffs to certify that a defendant was not amenable to jurisdiction in any state.  The Court acknowledged, however, that the Second Circuit had yet to decide the issue, and allowed the plaintiff to submit a certification after hearing defendant's motion to dismiss.  *Astor Chocolate Corp. v. Elite Gold Ltd*., 510 F. Supp. 3d 108 (S.D.N.Y. 2020), cited by Defendants, also applied the minority view, while noting that, unlike here, the defendant had conceded facts that suggested that the defendant was amenable to jurisdiction in California so that plaintiff's ability to submit a Rule 4(k)(2) certification "seems unlikely."  *Id*. at 135.

[33] In cases where Rule 4(k)(2) provides the basis for jurisdiction, the due process analysis arises under the Fifth Amendment and focuses on the defendant's contacts with the U.S. as a whole, not any individual state.  *See, e.g., Weiss v. Nat'l Westminster Bank PLC,* 176 F. Supp. 3d 264, 285 (E.D.N.Y. 2016) ("*Weiss III*").

2019) (citation omitted); *accord, e.g., Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 141

S. Ct. 1017, 1024-25 (2021) (specific jurisdiction exists where a defendant "take[s] 'some act by

which [it] purposefully avails itself of the privilege of conducting activities within the forum

State'" and the plaintiffs' claim "'arise[s] out of or relate[s] to the defendant's contacts' with the

forum") (citations omitted); *Licci III,* 732 F.3d at 170 (the minimum contacts test hinges on

whether "'the defendant purposefully availed itself of the privilege of doing business in the

forum and could foresee being haled into court there'") (citation omitted).

The Supreme Court recently emphasized the disjunctive nature of the "arise out of or

relate to" requirement. *Ford Motor,* 141 S. Ct. at 1026. Thus, in-forum conduct need not have a

causal relationship to the plaintiff's claim. *Id.* ("[Defendant's] causation-only approach finds no

support in this Court's requirement of a 'connection' between a plaintiff's suit and a defendant's

activities."). In other words, Plaintiffs need not show that their "claim[s] came about because of

the [D]efendant's in-state conduct." *Id.* Moreover, "'the forum contacts need not themselves be

unlawful.'" *Atchley v. Astrazeneca UK Ltd.*, 22 F.4th 204, 234 (D.C. Cir. 2022) (quoting *Ford

Motor*, 141 S. Ct. at 1026).

As the "minimum contacts" formulation suggests, due process does not demand extensive

connections between a defendant and the forum. Even a single, low-dollar-amount connection to

the forum may provide the requisite contacts with respect to claims involving extensive

misconduct elsewhere. *E.g., Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 n.18 (1985)

("So long as it creates a 'substantial connection' with the forum, even a single act can support

jurisdiction.") (citation omitted).[34] Moreover, where—as here—Congress has adopted a statute

---

[34] The case law highlighting that jurisdiction may be based upon a single in-forum act
demonstrates the insignificance of Defendants' arguments that they undertook much of their

that implicates "especially weighty or uniquely federal concerns," that factor favors exercising

personal jurisdiction.  4 Wright & Miller, *Federal Practice & Procedure,* §1068.1 (5th ed. 2019).

When the minimum contacts test is satisfied, "jurisdiction is favored," and defendants can

negate that preference only by making "'a compelling case that the presence of some other

considerations would render jurisdiction unreasonable.'"  *Chloe v. Queen Bee of Beverly Hills,*

*LLC,* 616 F.3d 158, 165 (2d Cir. 2010) (quoting *Burger King,* 471 U.S. at 477).  Moreover,

where the reasonableness factors strongly favor exercising jurisdiction, courts demand a lesser

showing with respect to the minimum contacts prong.[35]  Factors relevant to the reasonableness

inquiry include: (1) any burdens that proceeding in the forum will impose on defendants; (2) the

forum's interests; (3) plaintiffs' interests in securing relief; (4) the judicial system's interest in

promoting efficient claim resolution; and (5) other jurisdictions' interests in furthering beneficial

social policies.  *E.g., U.S. Bank*, 916 F.3d at 151 n.5; *Chloe,* 616 F.3d at 164-65.

    b.  The *Licci* Decisions Dictate that Masraf's Use of Its U.S. Correspondent
           Account to Funnel USD to Qatar Charity Satisfies the Minimum Contacts Test

Three appellate *Licci* decisions (collectively, "*Licci*") demonstrate that Masraf satisfied

the minimum contacts requirement by using its New York-based correspondent banking account

---

misconduct abroad.  *See, e.g., Ford Motor*, 141 S. Ct. at 1029 (the fact that "the plaintiffs' claims
would be just the same" without any in-forum conduct lacked jurisdictional significance); *Weiss
III,* 176 F. Supp. 3d at 279 (due process satisfied although "the New York Transfers represent
only a subset of the total transfers Defendant made to the Charities on behalf of Interpal" because
the transfers "constitute part of Defendant's alleged support of Hamas and its terrorist activities,
including the attacks in which Plaintiffs were injured").

[35] *E.g., Burger King*, 471 U.S. at 477 ("These considerations sometimes serve to establish the
reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise
be required."); *accord, e.g., Ochoa v. J.B. Martin & Sons Farms,* 287 F.3d 1182, 1188 n.2 (9th
Cir. 2002) ("Jurisdiction may be established with a lesser showing of minimum contacts 'if
considerations of reasonableness dictate.'") (citation omitted).

to process transactions at the direction of Qatar Charity.  *See Licci I,* 673 F.3d at 59-74; *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 334-41 (2012) ("*Licci II*"); *Licci III,* 732 F.3d at 168-89.  The *Licci* plaintiffs' ATA claims related to injuries suffered in rocket attacks launched into Israel by the Hezbollah terrorist organization.  *See, e.g., Licci II,* 20 N.Y.3d at 330.  The plaintiffs alleged that a Lebanese bank (LCB) materially assisted Hezbollah by processing wire transfers through LCB's New York correspondent account to a supposed charity that was a Hezbollah front.  *Licci III,* 732 F.3d at 165-66.  The Second Circuit concluded that the use of LCB's New York correspondent account to conduct "dozens" of wire transfers that "totaled several million dollars" satisfied the minimum contacts test.  *Id.* at 171.

Masraf's conduct closely parallels LCB's actions in *Licci*.  Like LCB, Masraf maintained a correspondent account through which it passed USD for the benefit of an FTO.  ¶¶ 10, 155-65.[36]  Masraf engaged in that conduct over the course of multiple years and its transactions involved millions of USD and Euros.  ¶¶ 126, 130.  Thus, like LCB, Masraf did not provide its New York currency exchange and wire transfer capabilities to Qatar Charity "'once or twice by mistake.'"  *Licci III*, 732 F.3d at 168 (quoting *Licci II,* 20 N.Y.3d at 340).  Rather, it intentionally availed itself of the protections that New York law provides to banking institutions by engaging in repeated, sizable transactions over the course of multiple years that were integral to the

---

[36] As a practical matter, Defendants could not conduct those transactions without passing funds through correspondent banks in the U.S., which participate in virtually all large wire transfers of USD.  *See, e.g., Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 370 (1991) (large-value transfers of USD must pass through the U.S., and New York banking enterprises participate in nearly all such transactions); Bonner Ex. 11 (Amicus Brief of Institute of International Bankers *et al*. in *Strauss v. Credit Lyonnais*, No. 19-865 (L) (2d Cir.) at 12 ("Dollar-denominated payments, wherever they originate and wherever their ultimate destination, generally 'clear' in the United States, through a U.S. bank.")); McArdle Decl. at ¶¶ 6-14.

Defendants' scheme to finance Hamas.  ¶¶ 75, 126, 130.[37]  Those facts permit the Court to exercise personal jurisdiction over Masraf.  *Licci III,* 732 F.3d at 173 (LCB's "repeated use of [its] correspondent account—and hence New York's banking system—as an instrument to achieve the wrong complained of in this suit satisfies the minimum contacts component of the due process inquiry"); *Banco Ambrosiano, S.p.A. v. Artoc Bank & Tr., Ltd.*, 62 N.Y.2d 65, 69, 72-73 (1984) (three transactions passing through defendant's correspondent account, plus prior use of that account for other transactions, constituted doing business in New York and satisfied due process although the defendant's correspondent account was its sole New York connection).

*Licci III's* holding that LCB's "wire transfers are a part of the principal wrong at which the plaintiffs' lawsuit is directed" (732 F.3d at 170) defeats the argument by Masraf and Qatar Charity that USD transfers through New York for the benefit of a member of the Union of Good lack a sufficient connection to Plaintiffs' claims.  Masraf Br. at 7-9; QC Br. at 16-17.[38]  Likewise, *Ford Motor* defeats Qatar Charity's contention that jurisdiction lies only where in-forum conduct constitutes a proximate cause of plaintiffs' injuries.  *Ford Motor,* 141 S. Ct. at

---

[37] These facts distinguish this case from *Cmty. Fin. Grp. Inc. v. Stanbic Bank Ltd.*, 2015 WL 4164763, at *4-5 (S.D.N.Y. July 10, 2015), because the plaintiff identified only a single wire transaction that passed through the state and the defendant, unlike Masraf, played no role in initiating that transaction.

[38] *Accord, e.g., Schansman*, 2021 WL 4482172, at *5 (allegations that terrorist organization "raised millions of dollars through fundraising, some of which were transferred using [the defendant banks'] services" satisfied minimum contacts requirement); *Bartlett v. Société Générale De Banque Au Liban Sal*, 2020 WL 7089448, at *6 (E.D.N.Y. Nov. 25, 2020) (allegations that "Defendant MEAB Bank … moved millions of dollars through its correspondent bank accounts—'knowing that it was . . . laundering narcotics trafficking proceeds on behalf of Hezbollah's [fundraising arm]'" satisfied minimum contacts test); *Weiss III*, 176 F. Supp. 3d at 286 (minimum contacts satisfied "where the New York Transfers are among the allegedly unlawful financial services Defendant provided to Interpal for which Plaintiffs seek redress in this action").

1026; *see* QC Br. at 17-18 (citing *SPV OSUS, Ltd. v. UBS AG*, 882 F.3d 333, 344 (2d Cir. 2018)).[39]

The Complaint also belies Defendants' claim that Plaintiffs do not allege that Qatar Charity passed funds to Hamas. *Compare* QC Br. at 18 *with* ¶¶ 5-16, 128-30, 155-64. In any event, particularly pre-discovery, Plaintiffs need not show that Qatar Charity passed funds to other FTOs because Qatar Charity is itself a front for Hamas and a member of the Union of Good—both designated FTOs. ¶¶ 7, 59, 61, 90, 101. Passing dollars to a terrorist organization's fundraisers and "charitable fronts" is no different for purposes of the ATA than providing the funds to the terrorist organization itself.[40] Defendants' proposed rule would frustrate Congress' intention by empowering terrorists' enablers to escape jurisdiction and liability merely by using middlemen. As Plaintiffs explain in Point I.A.2., Masraf's related contention that it was unaware that it was processing payments for a Hamas front organization (Masraf Br. at 10) also ignores the Complaint's allegations. *See* ¶¶ 5-8, 75-81, 227-323.

Defendants re-package the "causation only" jurisdiction theory that the Supreme Court rejected in *Ford Motor* when they argue that the New York transactions lack a sufficient

---

[39] Qatar Charity also cites *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 109 (2d Cir. 2013), but that opinion does not discuss any personal jurisdiction issues. *See* QC Br. at 18.

[40] *See, e.g., Schansman*, 2021 WL 4482172, at *5 ("Defendants' support of the DPR through fundraisers or other intermediaries does not foreclose a finding of personal jurisdiction over Defendants as Plaintiffs allege facts to support that Defendants knew they were supporting the DPR when they completed transfers for fundraisers supporting the DPR."); *Bartlett*, 2020 WL 7089448, at *9 n.7 ("But courts have recognized that FTOs can operate through affiliates and front groups, and that to aid such front groups is to aid the FTO.") (citing *United States v. El-Mezain*, 664 F.3d 467, 489 (5th Cir. 2011) (affirming ATA conviction for donating to non-FTO entities under Hamas's control)); *Strauss I*, 925 F. Supp. 2d at 434-35, 442 (ATA liability could attach where "a reasonable jury could find that the [non-FTO charities] are operating as [designated-FTO] front groups").

temporal relationship to Plaintiffs' claims. *See* 141 S. Ct. at 1026-27. To establish their claims, Plaintiffs will prove the existence of the longstanding conspiracy to pass funds to Qatar Charity and Hamas. *See* Point I.B. Passing USD through New York for Qatar Charity unquestionably evidences that conspiracy. Thus, Plaintiffs' claims "relate to" the evidence of that conspiracy, particularly given *Ford Motor's* broad interpretation of that due process requirement. *See, e.g., Ford Motor,* 141 S. Ct. at 1026-27; *Licci* III, 732 F.3d at 168-69 (jurisdiction exists where any element of a plaintiff's claim links that cause of action to the jurisdiction). Even putting aside the weight these transfers add to Plaintiffs' conspiracy allegations, the decisions Defendants cite support finding that the 3 year gap between the last Masraf transfer and Mr. Fuld's death (September 2015 to September 2018) does not defeat jurisdiction.[41]

All Defendants have misplaced the heavy emphasis they place upon the clearly inapposite *Berdeaux v. OneCoin Ltd.*, 2021 WL 4267693 (S.D.N.Y. Sept. 20, 2021). *See* Masraf Br. at 6-7; QC Br. at 10-11, 13-14, 14 n.11, 15, 17. The *Berdeaux* plaintiffs explicitly disclaimed all bases for personal jurisdiction other than CPLR 302(a)(3)(ii), which is not at issue here. *Id.* at *8. In addition, *Berdeaux* involved only one wire transfer not initiated by any defendant. *Id.* at *10-11.

---

[41] *Strauss v. Crédit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 20 (E.D.N.Y. 2016) (jurisdiction supported by five transfers totaling $205,000, one of which preceded the first attack by four years and the last attack by seven years although those transfers represented only 1.8% of the transactions that the plaintiffs relied upon to prove their claims); *Weiss III*, 176 F. Supp. 3d at 280 (transfers supporting jurisdiction included transactions that preceded the attacks that injured the plaintiffs by six to eight years); *Averbach v. Cairo Amman Bank,* 2020 WL 486860, at *6 (S.D.N.Y. Jan. 21, 2020) (favorably citing *Indosuez Int'l Finance B.V. v. National Reserve Bank*, 98 N.Y.2d 238, 246-47 (2002) as standing for the proposition that due process is satisfied where a defendant's "course of dealing involved only six New York-based banking transactions in a period of less than two years"), report and recommendation adopted *sub nom. Averbach ex rel. Averbach v. Cairo Amman Bank*, 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020). Masraf also cites *Cabrera* although that decision made no reference to temporal issues in discussing personal jurisdiction; and *Gill*, 893 F. Supp. 2d at 563, which makes no mention of personal jurisdiction.

The court's general remarks regarding correspondent banking as a basis for personal jurisdiction under the CPLR were thus made in a totally inapposite legal and factual context. Moreover, the court's comment that basing personal jurisdiction on a bank customer's use of a New York correspondent account would be "'nonsensical'" (*see* QC Br. at 10, 13 (quoting *Berdeaux*, 2021 WL 4267693, at *12 n.25)) was pure *dicta* made without the benefit of evidence or allegations regarding the essential role New York banks play in effectuating sizable USD transfers. *See* note 37, *supra*. The plaintiffs also provided no briefing or argument regarding the agency theory of jurisdiction. *See* Point IV.B.1.c., *infra*. Thus, the weak reed of ill-informed *Berdeaux dicta* provides no basis for ignoring the controlling *Licci* decisions.

Masraf and Qatar Charity also misplaces their reliance upon *Spetner v. Palestine Inv. Bank*, 495 F. Supp. 3d 96, 110 (E.D.N.Y. 2020). *See* Masraf Br. at 3; QC Br. at 14-15. *Spetner* began its analysis by observing that, if the defendant had "maintained and used its own correspondent bank account in New York for the relevant transactions," "jurisdiction would lie." *Id.* at 110. *Spetner* thus firmly supports finding that the Court can exercise jurisdiction over Masraf. In addition, the *Spetner* plaintiffs did not allege that the defendant participated in a conspiracy with the bank that actually had employed its correspondent bank to pass wires through New York—as Qatar Charity and QNB did here. *See id.* at 113. *Spetner* is therefore inapposite.

    c.   Blackletter Agency Principles Dictate that Qatar Charity's Use
of Masraf's Correspondent Bank Accounts to Funnel Money
<u>to the Palestinian Territories Satisfies the Minimum Contacts Requirement</u>

Qatar Charity's jurisdictional arguments ignore its agency relationships with Masraf and Masraf's New York correspondent bank, as well as blackletter law attributing agents' and sub-agents' actions to principals for jurisdictional purposes to the same extent the law permits

attribution in other contexts. *See, e.g., Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467

(1988) (agent's actions confer CPLR § 302(a)(1) jurisdiction over out-of-state defendants when

the agent "engage[s] in purposeful activities in this State … for the benefit of and with the

knowledge and consent of" defendants that "exercised some control over" the agent); *Volkart*

*Bros., Inc. v. M/V "Palm Trader*," 1989 WL 34094, at *3 (S.D.N.Y. Apr. 6, 1989) (following

*Kreutter* and finding personal jurisdiction under CPLR § 302(a)(1) based on in-state activities of

sub-agent because the fact that an agent "directed [a sub-agent] to transact the business does not

break the direct linkage of those activities to [the out-of-state principal]").

   Under New York law, "an agency relationship 'results from a manifestation of consent by

one person to another that the other shall act on his behalf and subject to his control, and the

consent by the other to act.'" *N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112,

122 (2d Cir. 2001) (citation omitted). "According to traditional agency principles, an agent may

appoint subagents to perform the tasks or functions the agent has agreed to perform for the

principal. As the Restatement describes it, '[t]he relationship between a subagent and the

appointing agent and between the subagent and the appointing agent's principal are relationships

of agency.'" *In re Parmalat Sec. Litig*., 640 F. Supp. 2d 243, 252 (S.D.N.Y. 2009) (quoting

RESTATEMENT 3D OF AGENCY § 3.15(1) (2006)). The knowledge that an agent or sub-agent

acquires, and the conduct it undertakes while acting within the scope of its agency, are fully

attributable to the principal. *See, e.g., Bank of N.Y. Mellon Tr. Co., N.A. v. Morgan Stanley*

*Mortg. Capital, Inc.*, 821 F.3d 297, 318 (2d Cir. 2016) ("'[A] fundamental principle that has

informed the law of agency and corporations for centuries' is that 'the acts of agents, and the

knowledge they acquire while acting within the scope of their authority are presumptively

imputed to their principals.'") (quoting *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 465 (2010));

*John Minder & Son, Inc. v. L.D. Schreiber Co.*, 73 F. Supp. 477, 478 (S.D.N.Y. 1947) (same rule with respect to imputing knowledge of sub-agents to principals).

In the personal jurisdiction context, courts apply agency principles flexibly, and the "[p]laintiff need not establish a formal agency relationship between defendants and" the entity that acted in New York. *Kreutter*, 71 N.Y.2d at 467. Hence, the in-forum agent for jurisdictional purposes need not be the out-of-state defendants' fiduciary. *Id*.

Qatar Charity ignores fundamental agency law principles when it asserts that it can escape personal jurisdiction because it did not direct Masraf to route USD transfers through a New York correspondent bank. *See* QC Br. at 10, 14-15, 17 (citing *Berdeaux*, 2021 WL 4267693, at *12, 12 n.25—a case that does not address agency law). Critically, Qatar Charity instructed its agent, Masraf, to make certain USD transfers that could only be effectuated through a U.S. correspondent bank. *See supra* note 24; ¶¶ 5-13, 130.[42] On that basis, Masraf had authority to appoint a U.S. correspondent bank as Qatar Charity's subagent because "the proper conduct of the principal's [*i.e.*, Qatar Charity's] business in the contemplated matter reasonably

---

[42] Qatar Charity miscites *Licci II* for the proposition that Masraf could have completed Qatar Charity's USD transactions without passing funds through a U.S. correspondent account. *See* QC Br. at 12. In so doing Qatar Charity ignores language that clearly indicates the Court was speaking hypothetically: "***it may be*** that LCB could have routed the dollar transactions … elsewhere." 20 N.Y.3d at 340 (emphasis added). Elsewhere, *Licci II* noted "the widespread use of correspondent accounts … in New York to facilitate the flow of money worldwide" (*id.* at 338), which is what occurred here. Likewise, the pre-*Licci* decision in *Tamam v. Fransabank SAL*, 677 F. Supp. 2d 720, 720 (S.D.N.Y. 2010), provides no basis for dismissing Plaintiffs' claims. *Tamam* does not identify any way in which Qatar Charity could move millions of dollars from an account in Doha to a different bank in the West Bank without passing those funds through the U.S.

require[d] the employment of other agents."  RESTATEMENT 2D OF AGENCY § 79(b) (1958).[43]  In

any event, Qatar Charity cannot challenge the existence of Masraf's authority to appoint a U.S.

correspondent bank as subagent, or its own agency relationship with that correspondent bank, in

the current procedural context.  *See, e.g., Toppel v. Marriott Int'l, Inc.*, 2006 WL 2466247, at *7

(S.D.N.Y. Aug. 24, 2006) ("[W]here 'the circumstances raise the possibility of a principal-agent

relationship but no written authority of the agent has been proven, questions of agency and of its

nature and scope are questions of fact to be submitted to the jury.'") (citation omitted).  The

conduct of Masraf and its New York correspondent bank therefore suffices to establish

jurisdiction over the principal, Qatar Charity.[44]

Qatar Charity's assertion that it did not control the behind-the-scenes mechanics of how

its agent and subagent transferred USD on its behalf disregards agency law attributing agents'

conduct to their principals as long as the principals exercise "'some control'" over the agent.

*CutCo Indus. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986) (quoting *Grove Press, Inc. v.

Angleton*, 649 F.2d 121, 122 (2d Cir. 1981)).  "[T]he control asserted [by the principal] need not

'include control at every moment; its exercise may be very attenuated and, as where the principal

is physically absent, may be ineffective.'"  *Cleveland v. Caplaw Enters*., 448 F.3d 518, 522 (2d

Cir. 2006) (quoting RESTATEMENT 2D OF AGENCY § 14 cmt. a).[45]

---

[43] Masraf was also authorized to appoint a correspondent bank as subagent because Masraf is "in a business in which it is customary to employ other agents for the performance of such acts." RESTATEMENT 2D OF AGENCY § 79(b); McArdle Decl. at ¶¶ 8-14.

[44] *See, e.g., Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 85 (2d Cir. 2018) ("*Schwab I*") ("[W]here we have found personal jurisdiction based on an agent's contacts, we have never suggested that due process requires something more than New York law.").

[45] *See also, e.g., Khodeir v. Sayyed*, 348 F. Supp. 3d 330, 345 (S.D.N.Y. 2018) (it is irrelevant to the existence of an agency relationship that the principal "claims he gave no direction to [the agent]" because "'[t]o the extent the parties have created a relationship of agency . . . the

Qatar Charity misplaces its reliance on *Berdeaux's* dicta that a defendant's awareness that one wire transfer passed through a New York correspondent account did not confer jurisdiction under CPLR § 302(a)(1) "'[a]bsent allegations that [the defendant] ***directed*** the funds to be deposited or ***controlled*** the route of the plaintiffs' funds [*i.e.*, the single wire transfer] through the correspondent account."  QC Br. at 14 (quoting 2021 WL 4267693, at *12, and adding emphasis).  The plaintiffs in *Berdeaux* raised no agency arguments.  In any event, the defendant did not originate the wire transfer at issue and, therefore, played no role in causing it to be processed through New York.  *Id*. at 24.  By contrast, Qatar Charity originated multiple USD transfers that Masraf, at Qatar Charity's direction, processed through New York.[46]

---

principal has a power of control even if the principal has previously agreed with the agent that the principal will not give interim instructions to the agent or will not otherwise interfere in the agent's exercise of discretion'") (quoting RESTATEMENT 3D OF AGENCY § 1.01, cmt. f)); *Green v. H & R Block, Inc.*, 735 A.2d 1039, 1051 (Md. 1999) ("The control a principal exercises over its agent is not defined rigidly to mean control over the minutia of the agent's actions" and the "control may be very attenuated with respect to the details."); RESTATEMENT 3D OF AGENCY, § 1.01 ("[A] person may be an agent although the principal lacks the right to control the full range of the agent's activities, how the agent uses time, or the agent's exercise of professional judgment.").

[46] Other decisions Qatar Charity cites are inapposite for similar reasons.  For example, *Vasquez v. H.K. & Shanghai Banking Corp.*, 477 F. Supp. 3d 241 (S.D.N.Y. 2020), did not even address due process issues or a terrorist organization with severely limited options for conducting USD transactions.  Rather, *Vasquez* found personal jurisdiction lacking under CPLR 302(a)(1) because three isolated transfers totaling $104,000, unlike the multi-year, multi-million-dollar scheme Plaintiffs have alleged, did not evidence purposeful availment of the protections of New York law.  477 F. Supp. 3d at 257-58.  Other cases Defendants cite involved a similarly small number of transactions even though the plaintiffs had complete access to the relevant facts.  *See, e.g., Daou v. BLC Bank, S.A.L.*, 2021 WL 1338772, at *8 (S.D.N.Y. Apr. 9, 2021) (plaintiffs identified only four transactions that *they* initiated that were not connected to the plaintiffs' claims).  In *Universal Trading & Inv. Co. v. Tymoshenko*, the court held that a bank's use of a correspondent account did not justify exercising jurisdiction over a customer because of "the lack of clear precedent on this issue and the policy rationale in favor of not extending jurisdiction."  2012 WL 6186471, at *3 (S.D.N.Y. Dec. 12, 2012).  In contrast to *Tymoshenko*, which involved a private financial dispute, Congress has expressly emphasized the importance of providing an American forum to terrorism victims.  JASTA § 2(a)(6); *see* pp. 77-

Qatar Charity also has the law backwards when it claims that its purported ignorance of the mechanics of Masraf's correspondent account suggests that Masraf was not acting for Qatar Charity's benefit and at its direction.  An agency relationship exists when the principal knows that the agent is acting on the principal's behalf.  *See, e.g., N.Y. Marine*, 266 F.3d at 122.  Once the agency relationship exists, the agent's knowledge is attributed to the principal.  *E.g., Bank of N.Y. Mellon,* 821 F.3d at 318.  Hence, what matters is *Masraf's* knowledge that it was using its New York correspondent account when it conducted the USD transactions.  Because those actions fell squarely within the scope of Masraf's duties as Qatar Charity's agent, New York law attributes those acts, and the knowledge associated with them, to Qatar Charity.  *E.g., id.*

In any event, what Qatar Charity knew raises questions of fact the court cannot resolve in this context.  Qatar Charity's claimed institutional ignorance of the role U.S. banks play in effectuating USD transfers is not plausible in light of the criminal confession of its Director, Judeh Jamal, who admitted that he knew Qatar Charity was passing funds through New York. ¶ 130.[47]

---

78, *infra*.  Moreover, *Tymoshenko* did not consider the agency principles applicable to customers' use of their banks' correspondent accounts.

[47] Qatar Charity's claim is also irreconcilable with its global operations and substantial financial wherewithal.  Qatar Charity reported over $500 million worth of income from donations and investments in 2020, operates in 58 countries, and has 34 international field offices.  *See* Bonner Decl. at ¶ 16, Ex. 1, and Ex. 12 at 5.  Its "significant accounting policies" include rules for reporting in Qatari Riyals—its "functional currency"—the value of transactions, assets and liabilities denominated in other currencies.  *See* Bonner Ex. 12 at 9-10.  A sizable multi-national institution like Qatar Charity knows how international wire transfers operate.

d.  The Overt Acts Masraf Undertook in New York to Further Defendants'
    Conspiracy Support Exercising Jurisdiction Over Each Defendant

Contrary to Defendants' assertions, conspiracy principles provide an adequate basis for

concluding that all three Defendants' contacts with New York satisfy the minimum contacts

requirement.  As the Second Circuit explained in *Berkshire Bank v. Lloyds Banking Grp. PLC*,

2022 WL 569819, at *2 (2d Cir. Feb. 25, 2022), "A defendant can purposefully avail itself of the

forum by creating the requisite minimum contacts through actions of a third party such as a co-

conspirator because '[m]uch like an agent who operates on behalf of, and for the benefit of, its

principal, a co-conspirator who undertakes action in furtherance of the conspiracy essentially

operates on behalf of, and for the benefit of, each member of the conspiracy." (quoting *Schwab*

*Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 122 (2d Cir. 2021)

(*Schwab II*")).

*Schwab II* rejected the argument that conspiracy jurisdiction "'requires a relationship of

direction, control, and supervision before a co-conspirator's forum contacts may be imputed to

absent defendants for jurisdictional purposes.'"  *Schwab II*, 22 F.4th at 122; *accord, e.g.,*

*Berkshire Bank*, 2022 WL 569819, at *2.  Rather, as the Second Circuit held in *Schwab I*,

conspiracy principles support personal jurisdiction where a plaintiff alleges "that (1) a conspiracy

existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in

furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to

jurisdiction in that state."  *Schwab I*, 883 F.3d at 87; *accord, e.g., Schwab II*, 22 F.4th at 122.

As Plaintiffs demonstrate in Point I.B., their allegations satisfy that pleading standard.

Even standing alone, therefore, the conspiracy principles the Second Circuit outlined in the

*Schwab* decisions and *Berkshire Bank* dictate that the conduct of all three Defendants satisfies

the due process minimum contacts test.  *See Schwab I,* 883 F.3d at 86-87; *Schwab II,* 22 F.4th at

122-25; *Berkshire Bank*, 2022 WL 569819, at *2-4; *Rudersdal v. Harris*, 2022 WL 263568, at *1

(S.D.N.Y. Jan 28, 2022) ("[A]s dicta, the Court concludes that a plaintiff may plead personal

jurisdiction under Rule 4(k)(2) using a theory of conspiracy jurisdiction because the Second

Circuit has expressly held that conspiracy jurisdiction is consistent with Constitutional Due

Process….") (citing *Schwab I*).

　　In contesting the adequacy of Plaintiffs' conspiracy allegations, Defendants overstate the

specificity the *Schwab* decisions and *Berkshire* demand.  Courts have recognized that, "[w]hen

considering whether plaintiffs have made a *prima facie* showing [that a conspiracy existed],

'great leeway should be allowed the pleader, since by the nature of the conspiracy, the details

may not be readily known at the time of the pleading.'"  *Sea Trade Mar. Corp. v. Coutsodontis*,

2012 WL 3594288, at *7 (S.D.N.Y. Aug. 16, 2012) (quoting *Maersk, Inc. v. Neewra, Inc.*, 554 F.

Supp. 2d 424, 458 (S.D.N.Y. 2008)).  Recent cases from this Circuit applying the *Schwab*

decisions and that permissive pleading standard illustrate that Plaintiffs' allegations more than

suffice to establish personal jurisdiction over all Defendants based upon conspiracy principles.

*See, e.g., In re Platinum & Palladium Antitrust Litig.*, 449 F. Supp. 3d 290, 325 (S.D.N.Y. 2020)

(foreign participants in alleged price-fixing conspiracy had sufficient minimum contacts based

on plausible inference that they used non-public client order information provided by U.S.-based

co-conspirators to fix global prices of platinum and palladium); *Allianz Glob. Inv'rs GMBH v.*

*Bank of Am. Corp.*, 457 F. Supp. 3d 401, 412 (S.D.N.Y. 2020) (French participant in alleged

conspiracy to manipulate foreign exchange market had sufficient minimum contacts based on

inference that it knew co-conspirators were based in New York)[48]; *SL-x IP S.Á.R.L. v. Bank of Am. Corp.*, 2021 WL 4523711, at *6-7 (S.D.N.Y. Sept. 30, 2021) (UK entity alleged to have engaged in a conspiracy to boycott a potential competitor had sufficient minimum contacts through its U.S.-based board member and agent who was a key player in the conspiracy).

Contrary to Qatar Charity's effort to portray itself as a benevolent actor and the Bank Defendants' claims that they merely provide "routine banking services," Plaintiffs' allegations that Defendants conspired to fund Hamas are substantiated by—among other facts—criminal convictions, the unabashed support for Hamas provided by the Qatari government and Royal Family, and QNB's lengthy "Who's Who" list of Hamas terrorist clientele.  ¶¶ 3-4, 87, 108-22, 126-30, 172-224.  Those allegations easily provide a *prima facie* basis for concluding that Defendants participated in the conspiracy Plaintiffs allege.  *See* Point I.B., *supra*.

## 2. The Due Process Reasonableness Factors Further Support the Court's Ability to Exercise Specific Jurisdiction Over Defendants

The second step of the due process analysis—the reasonableness inquiry—also fully supports exercising jurisdiction over Defendants.  In fact, the reasonableness factors weigh so heavily in Plaintiffs' favor that subjecting Defendants to jurisdiction would be appropriate "upon a lesser showing of minimum contact than would otherwise be required."  *Burger King*, 471 U.S. at 477; *accord, e.g., Ochoa,* 287 F.3d at 1188 n.2.

---

[48] QNB notes that *Allianz* found that the plaintiffs had failed to allege a basis for exercising personal jurisdiction over two defendants.  *See* QNB Br. at 12.  Importantly, however, *Allianz* considered a *post-discovery* complaint.  *See* 457 F. Supp. 3d at 411, 413.  Even after that discovery, the plaintiffs did not allege any facts that suggested that two defendants participated in the price-fixing communications the second amended complaint attributed to other defendants.

Glaringly absent from Defendants' discussion of the reasonableness factor is any mention of Congress' recent pronouncements regarding the need to subject entities that provide material assistance to terrorists to jurisdiction in the American courts.  JASTA emphasizes that Congress adopted the statute to provide victims of terrorism with "with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States."  JASTA § 2(b).  Consistent with that intent, Congress also emphasized that entities that provide material support to terrorists "necessarily direct their conduct at the United States, and should reasonably anticipate being brought to court in the United States to answer for such activities."  JASTA § 2(a)(6).  Those Congressional pronouncements regarding foreign policy matters uniquely within Congress' provenance are entitled to substantial deference and find no parallel in any decision Defendants cite.[49]

Particularly given Congress' unambiguous direction in JASTA, each due process reasonableness factor strongly supports exercising jurisdiction over Defendants.  (1) None of the well-financed Defendants, all of which operate internationally, has articulated a cognizable

---

[49] *See, e.g., Atchley*, 22 F.4th at 234 (highlighting JASTA § 2(a)(6) in concluding that personal jurisdiction existed over foreign companies in an ATA action); *Flatow v. Islamic Republic of Iran,* 999 F. Supp. 1, 22 (D.D.C. 1998) (citing *Burger King* in noting that, in the terrorism context, a lesser showing of minimum contacts may be required because "some areas were so committed to the political branches, such as foreign policy, that a statute implementing that policy could significantly lower the threshold of constitutional requirements, so long as there existed other processes to protect the defendant's interests"); *see also, e.g., Bank Markazi v. Peterson*, 578 U.S. 212, 234-35 (2016) (emphasizing the broad discretion that Congress possesses when exercising "authority regarding foreign affairs" and the importance of providing deference to Congress in that sphere).

burden it will face by proceeding in the U.S., where they all elected to route their wire transfers.[50] (2) The U.S. maintains a substantial interest in preventing the use of its currency and banking system to pass money to FTOs and in punishing entities that surreptitiously attempt to attain that objective.  (3) Plaintiffs possess weighty interests in obtaining relief for their injuries and justice for Mr. Henkin and Mr. Fuld.  (4) Defendants identify no obstacle to resolving this action efficiently in the U.S.  (5) The U.S. and its allies share strong interests in preventing terror financing.  *See, e.g., Licci III*, 732 F.3d at 173-74 (jurisdiction was reasonable although LCB maintained no New York presence because of the substantial interests that the plaintiffs has in vindicating their rights and that New York had in preventing the use of its banking system for terror financing).

Accordingly, Defendants cannot establish that any burden or other factor qualifies this case as an "'exceptional situation' where exercise of jurisdiction is unreasonable even though minimum contacts are present." *Bank Brussels,* 305 F.3d at 130.  Indeed, Defendants cite only one inapposite decision that found exercising jurisdiction unreasonable although a defendant's contacts satisfied the minimum contacts requirement.  *See Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 573-74 (2d Cir. 1996) (dismissing claims asserted in Vermont by a New York corporation against a company headquartered in Pennsylvania on reasonableness grounds where: the claims related to defective construction materials used on a Florida building; no party engaged in any case-related conduct in Vermont; and the plaintiff filed suit there exclusively to benefit from a more permissive statute of limitations).

---

[50] *See, e.g., Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129-30 (2d Cir. 2002) ("[T]he conveniences of modern communication and transportation ease what would have been a serious burden a few decades ago.") (citation omitted).

## C.  CPLR § 302(a) Provides an Alternative Statutory
##     Basis for Personal Jurisdiction Over All Defendants

While Rule 4(k)(2) eliminates the need for Plaintiffs to make a *prima facie* showing that New York's long-arm statute supports jurisdiction over Defendants, the due process standard and CPLR § 302(a)(1)'s specific jurisdiction test closely parallel one another.  In practice, research has uncovered no cases finding the minimum contacts requirement satisfied without also finding jurisdiction was proper under § 302(a)(1).  Indeed, courts have noted that, in some circumstances, the due process standard could be more restrictive than § 302(a)(1).  *See, e.g., Licci III,* 732 F.3d at 170 (noting that although "personal jurisdiction permitted under the long-arm statute may theoretically be prohibited under due process analysis, we would expect such cases to be rare" and that the Court could find "no such decisions in this Circuit").  The Second Circuit has also held that, like the due process standard, "New York courts do not mandate a showing of control or direction to establish conspiracy-based personal jurisdiction" under § 302.  *Berkshire Bank,* 2022 WL 569819, at *3.

Courts may exercise jurisdiction under § 302(a)(1) when a defendant, "in person or through an agent," "transacts any business within the state or contracts anywhere to supply goods or services in the state," and the plaintiff's cause of action arises from that activity.  CPLR § 302(a)(1); *see also, e.g., Licci III,* 732 F.3d at 166, 169.  Because the quality, not the quantity, of New York-based activity governs the transacting business test, "[a] single act within New York will, in the proper case, satisfy the requirements of section 302(a)(1)."  *Licci I,* 673 F.3d at 62.  The Court of Appeals' decision in *Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 323 n.4 (2016), emphasizes this principle.  Thus, contrary to Masraf's contention, *Al Rushaid* can hardly be seen as support for dismissing Plaintiffs' claims.  *Id.*

79

A non-domiciliary "transacts business" under § 302(a)(1) when it "'purposefully avails [itself] of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws …'" *CutCo*, 806 F.2d at 365 (citation omitted).  Importantly, "[a] defendant need not physically enter New York State in order to transact business, 'so long as the defendant's activities here were purposeful.'" *Licci I*, 673 F.3d at 61 (citation omitted).

Section 302(a)(1)'s "arising from" or "nexus" requirement is met when "'there is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York.'" *Id.* at 66.  As is true of the due process standard, the nexus inquiry "is relatively permissive" and "causation is not required." *Licci II,* 20 N.Y.3d at 339.  Thus, Plaintiffs need only show that their claims are not "completely unmoored from" the relevant transactions, and jurisdiction exists "over those claims in some way arguably connected to the transaction[s]." *Id.* at 339-40; *accord, e.g., Licci* III, 732 F.3d at 168-69 (§ 302(a)(1) "'does not require that every element of the cause of action pleaded must be related to the New York contacts; rather, where at least one element arises from the New York contacts, the relationship between the business transaction and the claim asserted supports specific jurisdiction under the statute.'") (quoting *Licci II*, 20 N.Y.3d at 341).

Because the due process and § 302(a)(1) tests largely duplicate each other, the same facts that negate Defendants' supposed due process defense also defeat their contention that Plaintiffs fail to allege a basis for jurisdiction under § 302(a)(1).  *See Licci III,* 732 F.3d at 168-69 (exercising jurisdiction was appropriate under § 302(a)(1) in an ATA case related to Hezbollah bombings of civilians because the plaintiffs' claims arose out of the defendant's forum contacts where it used a correspondent account in New York to process transactions "not 'once or twice

80

by mistake'" because the repeated use of the account "'indicate[d] desirability and a lack of coincidence'") (quoting *Licci II*, 20 N.Y.3d at 340).[51]

Defendants err when they suggest that conspiracy principles are inapplicable to jurisdiction under § 302(a)(1).[52]  QNB relies on the inapposite *Berdeaux* case for this proposition, even though the *Berdeaux* plaintiffs "expressly disclaimed reliance on conspiracy jurisdiction."  2021 WL 4267693, at *8; *see* QNB Br. at 9.  In addition to its many distinguishing qualities (*see* pp. 68, 70, 72, *supra*), *Berdeaux* never mentions *Schwab I* and pre-dates *Schwab II* and *Berkshire.  See also Suber v. VVP Servs., LLC*, 2021 WL 4429237, at *6 (S.D.N.Y. Sept. 27, 2021) (rejecting conspiracy jurisdiction under CPLR § 302(a)(1) without mentioning *Schwab*) (cited in QC Br. at 15, 15 n.10 and QNB Br. at 7, 9).

The cases rejecting conspiracy jurisdiction under the long-arm statute or due process clause largely reasoned that *Walden v. Fiore*, 571 U.S. 277, 285 (2014) dictated that result by

---

[51]  *Accord, e.g., Jain v. T & C Holding Inc.*, 2011 WL 814659, at *5 (S.D.N.Y.  Mar. 3, 2011) ("Plaintiffs also have asserted sufficient allegations to allow for the exercise of long-arm jurisdiction over [a Japanese resident] as they have alleged, among other things, that [she] maintained a New York bank account and that significant portions of the payment for the shares 'which are the basis of this lawsuit were transferred to that account.'") (citation omitted); *Dale v. Banque SCS Alliance S.A.*, 2005 WL 2347853, at *3-4 (S.D.N.Y. Sept. 22, 2005) (exercising jurisdiction pursuant to § 302(a)(1) where Swiss bank utilized correspondent bank accounts located in New York to launder money a third party stole from the plaintiffs); *Gulf Coast Dev. Grp. v. Lebor*, 2003 WL 22871914, at *4 (S.D.N.Y.  Dec. 4, 2003) (jurisdiction proper under § 302(a)(1) where plaintiffs "alleged that [Israeli resident defendant] maintained a New York bank account and that significant portions of the funds which are the basis of this lawsuit were transferred to that account").

[52] *Rich v. Fox News Network LLC*, 2020 WL 6276026, at *6 (S.D.N.Y. Sept. 15, 2020) ("Moreover, personal jurisdiction over Butowsky based on Plaintiffs' conspiracy to commit IIED claim is proper under Section 302(a)(1)."); *Freeman II*, 413 F. Supp. 3d at 80 ("Accordingly, the Court finds that, at the pleading stage, Plaintiffs have met their burden to establish specific jurisdiction over Bank Saderat for claims arising from the alleged conspiracy in this action under New York CPLR § 302(a)(1).").

counseling that personal jurisdiction arises from "the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there."  Those decisions did not survive *Schwab I*, *Schwab II* and *Berkshire Bank*, all of which attributed the in-forum acts of co-conspirators to each other.

Even if Defendants were correct with respect to § 302(a)(1), however, the Second Circuit has now unambiguously ruled that another prong of the long-arm statute—CPLR § 302(a)(2)—provides for conspiracy jurisdiction.  *Berkshire Bank*, 2022 WL 569819, at *3.[53]  As in *Berkshire Bank,* Plaintiffs "have sufficiently alleged that certain co-conspirators acted as agents of their co-conspirators in New York and took steps in furtherance of the alleged conspiracy at the request of or on behalf of their co-conspirators."  *Id.; see* Point I.B.  As in *Berkshire Bank*, therefore, Plaintiffs "allegations satisfy the requirements of personal jurisdiction both under principles of due process and under New York's long-arm statute."  *Berkshire Bank*, 2022 WL 569819, at *4.

In any event, as Defendants' own authorities illustrate, showing that § 302 imposes a higher burden upon Plaintiffs than the minimum contacts test does not serve Defendants' interests.  *See* QNB Br. at 10-11 (citing *PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*, 530 F. Supp. 3d 301, 325 n.9 (S.D.N.Y. 2021)).  In dicta, *PharmacyChecker* did distinguish jurisdiction under CPLR § 302(a)(2) from what the court characterized as *Schwab I's* "permissive" and "capacious" minimum contacts test for conspiracy jurisdiction.  *See id.*  The

---

[53] Under § 302(a)(2), jurisdiction lies where a "non-domiciliary … in person or through an agent commits a tortious act within the state."  The torts at issue in *Berkshire Bank* included "fraud and conspiracy-based claims under New York law."  *Berkshire Bank*, 2022 WL 569819, at *1.  Here, Plaintiffs' personal injury claims are also tortious in nature.

court also noted that the constitutional standard for jurisdiction does not require in-forum conduct by each defendant.  *Id.*

In light of Plaintiffs' ability to base jurisdiction upon Rule 4(k)(2), a "permissive" and "capacious" constitutional minimum contacts test hardly serves QNB's interests.  In any event, both *Berkshire Bank* and *Schwab II* held that conspiracy jurisdiction harmonizes with the rule attributing the in-forum acts of an agent to a principal who does not act in the jurisdiction. *Berkshire Bank*, 2022 WL 569819, at *2 (quoting *Schwab II*, 22 F.4th at 122).  Thus, *Berkshire Bank* expressly rejected the rule *PharmacyChecker* discussed and that QNB advocates.  *See Berkshire Bank*, 2022 WL 569819, at *3-4 (rejecting argument that § 302(a)(2) required more than the *Schwab I* test for conspiracy jurisdiction).

Defendants do cite decisions holding that "physical presence" is required to impose jurisdiction under § 302(a)(2).  *See, e.g.,* QC Br. at 11.  In that regard, the Second Circuit has noted that the original Practice Commentary to § 302 stated that jurisdiction would not lie under § 302(a)(2) "'if a New Jersey domiciliary were to lob a bazooka shell across the Hudson River at Grant's Tomb.'"  *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 790 (2d Cir. 1999) (citation omitted).  But neither that illustration nor any decision Qatar Charity cites involved conduct undertaken in New York by an agent acting at the direction of a defendant (here, Masraf's correspondent bank).  The language of § 302(a)(2) requires only that an "agent" "commits a tortious act within the state."  That requirement is satisfied here even though Masraf's agent did not participate in Defendants' conspiracy because the correspondent bank acted on Masraf's behalf and pursuant to its instructions.

Thus, although Plaintiffs' ability to employ conspiracy jurisdiction to satisfy § 302(a)(1) or § 302(a)(2) is not outcome determinative here, the long-arm statute provides an alternative basis for exercising jurisdiction over all three Defendants.

**D.  If the Court Finds Plaintiffs' Jurisdictional Allegations Inconclusive, Plaintiffs Request the Opportunity to Conduct Jurisdictional Discovery**

Defendants devote much of their briefs to criticizing Plaintiffs for their inability to itemize details regarding transactions Defendants have hidden from scrutiny.  In his criminal plea, however, Qatar Charity's Mr. Jamal admitted that the charity conducted the types of transfers through Masraf's correspondent bank account in New York that the *Licci* courts deemed sufficient to support personal jurisdiction.  *See* ¶ 130.

Thus, even if the Court concludes that Plaintiffs must offer more detailed proof concerning Defendants' secret financial transactions, the Court should permit Plaintiffs to conduct the discovery necessary to uncover those hidden jurisdictional facts.  As the court emphasized in *Singer v. Bank of Palestine*, 2021 WL 4205176 (E.D.N.Y. Apr. 30, 2021), "'it is well settled under Second Circuit law that, even where plaintiff has not made a *prima facie* showing of personal jurisdiction, a court may still order discovery, in its discretion, when it concludes that the plaintiff may be able to establish jurisdiction if given the opportunity to develop a full factual record.'"  *Id*. at \*7 (quoting *Leon v. Shmukler*, 992 F. Supp. 2d 179, 194 (E.D.N.Y. 2014)).  Courts authorize jurisdictional discovery "where a 'plaintiff has made a threshold showing that there is some basis for the assertion of jurisdiction.'"  *Id.* (quoting *Ayyash v. Bank Al-Madina*, 2006 WL 587342, at \*5 (S.D.N.Y. Mar. 9, 2006)).[54]  In weighing whether to

---

[54] *Accord, e.g., Hollins v. U.S. Tennis Ass'n*, 469 F. Supp. 2d 67, 70-71 (E.D.N.Y. 2006) ("[D]istrict courts in this Circuit have ordered jurisdictional discovery where plaintiff made less

permit discovery, courts "'should take care to give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction.'"  *Id.* at *7 (quoting *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003)).

In *Singer,* the court authorized discovery to permit the plaintiffs to seek additional evidence relevant to jurisdiction where they alleged that the defendant bank "used correspondent bank accounts in New York to issue large volumes of payments in U.S. dollars to organizations affiliated with Hamas" and that the defendant "knowingly assisted Hamas … by providing financial services and facilitating these dollar transfers." *Id.*  Because Plaintiffs' Complaint makes similar, albeit more detailed, allegations, the Court should permit Plaintiffs the opportunity to conduct discovery to the extent the Court harbors any doubts regarding the sufficiency of those allegations.[55]

Because facts concerning Defendants' USD transactions and whether Qatar and its Royal Family control Defendants unquestionably bear on the jurisdiction issue, the cases Defendants cite provide no basis for denying Plaintiffs the opportunity to discover that evidence.  Masraf's primary authority is a pre-*Licci* case that hinged on the now overruled proposition that passing

---

than a *prima facie* showing but 'made a sufficient start toward establishing personal jurisdiction.'") (quoting *Uebler v. Boss Media*, 363 F. Supp. 2d 499, 506-07 (E.D.N.Y. 2005)).

[55] *See also, e.g., Gentry v. Kaltner*, 2020 WL 1467358, at *8 (S.D.N.Y. Mar. 25, 2020) (even where "'serious questions'" exist regarding a plaintiff's ability to "allege[] sufficient facts to make out a *prima facie* case for personal jurisdiction," the court may permit discovery if the plaintiff "'makes a threshold showing of jurisdiction and establishes that its position is not frivolous'") (quoting *Unique Indus., Inc. v. Sui & Sons Int'l Trading Corp.*, 2007 WL 3378256, at *7 (S.D.N.Y. Nov. 9, 2007)); *Leon*, 992 F. Supp. 2d at 194-96 (permitting discovery where the plaintiffs' claims were "sufficient to articulate a colorable basis for personal jurisdiction, which could be established with further development of the factual record"); *Ayyash*, 2006 WL 587342, at *4-6 (permitting jurisdictional discovery fell within the court's "considerable discretion" where the complaint alleged use of the U.S. banking system to perpetrate a conspiracy and to distance certain defendants from that conspiracy).

money through a correspondent account for a terrorist organization cannot support exercising jurisdiction in a case arising from terrorist attacks. *Tamam*, 677 F. Supp. 2d at 729-30.[56] Masraf's remaining decisions involved plaintiffs that could not, as a matter of law, establish jurisdiction under any scenario or that failed to identify any reason why discovery would yield relevant evidence.[57]  The only case QNB adds to Masraf's citations—*Daventree Ltd. v. Republic of Azer.*, 349 F. Supp. 2d 736, 765 (S.D.N.Y. 2004)—***authorized*** jurisdictional discovery where the requested evidence could conceivably provide a basis for exercising jurisdiction.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that Defendants' motions to dismiss be denied in their entirety.  In the alternative, Plaintiffs request that the Court: (1) reserve its decision on Defendants' Rule 12(b)(2) motions pending discovery and an evidentiary hearing regarding personal jurisdiction; and/or (2) order that service of process via

---

[56] *Tamam* is further distinguishable because the court held that the plaintiffs' allegations negated their suggestion that the defendant had passed USD through its correspondent bank account.  *Id*. at 729-30.

[57] *See Jerusalem NY Enters. LLC v. Huber Erectors & Hoisting, LLC,* 2021 WL 5827934, at *6-7 (E.D.N.Y. Dec. 8, 2021) (no fact the plaintiff could discover would have supported jurisdiction where the sole proffered basis for jurisdiction was the claim that plaintiff suffered an injury in New York, but, as a matter of law, the plaintiff was harmed in Ohio); *Mednik v. Specialized Loan Servicing, LLC*, 2021 WL 707285, at *9 (E.D.N.Y. Feb. 23, 2021) (denying discovery both because evidence plaintiff sought was in her control and the facts she proposed to discover could not provide a basis for jurisdiction); *Alexander v. Porter*, 2014 WL 7391683, at *6 (E.D.N.Y. Dec. 29, 2014) (plaintiff failed to identify any fact suggesting that a Georgia resident had conducted any business in New York).

email sent to Defendants' counsel of record in this action shall constitute good and sufficient

service.

Dated: May 3, 2022

**FLEISCHMAN BONNER & ROCCO LLP**

By:  /s/ James P. Bonner
James P. Bonner (jbonner@fbrllp.com)
Patrick L. Rocco (procco@fbrllp.com)
Susan M. Davies (sdavies@fbrllp.com)
Thomas M. Caroccia (tcaroccia@fbrllp.com)
81 Main Street, Suite 515
White Plains, NY  10601
Telephone:  646-337-1426

**PERLES LAW FIRM PC**
Steven R. Perles (*not admitted in E.D.N.Y.*)
Joshua K. Perles (*not admitted in E.D.N.Y.*)
1050 Connecticut Ave. NW, Suite 500
Washington, DC  20036
Telephone:  202-955-9055

**HEIDEMAN NUDELMAN & KALIK, P.C.**
Richard D. Heideman
Noel J. Nudelman
Tracy Reichman Kalik
5335 Wisconsin Avenue, NW
Washington, DC  20015
Telephone:  202-463-1818

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on May 3, 2022 pursuant to Fed. R. Civ. P. 5(b)(2)(E), I

caused the foregoing *Plaintiffs' Omnibus Memorandum of Law in Opposition to*

*Motions to Dismiss of Defendants Qatar Charity, Qatar National Bank and Masraf*

*al Rayan* to be served on each of the following counsel of record by electronic

means, in accordance with such counsels' prior written consent:

Brittany Grace Norfleet at Brittany.Norfleet@ropesgray.com
Douglas H. Hallward-Driemeier at Douglas.Hallward-Driemeier@ropesgray.com
Mary Brust at Mary.Brust@ropesgray.com
Michael G. McGovern at Michael.McGovern@ropesgray.com
*Counsel for Defendant National Bank*


Jessica A. Masella at Jessica.Masella@dlapiper.com
John M. Hillebrecht at John.Hillebrecht@dlapiper.com
Kevin Walsh at Kevin.Walsh@dlapiper.com
Michael George Lewis at Michael.Lewis@dlapiper.com
*Counsel for Defendant Qatar Charity*


Aryeh Kaplan at Aryeh.Kaplan@pillsburylaw.com
Carolina A. Fornos at Carolina.Fornos@pillsburylaw.com
Markenzy Lapointe at Markenzy.Lapointe@pillsburylaw.com
*Counsel for Defendant Masraf Al Rayan*

Dated:  May 3, 2022

By: _____
           Thomas Caroccia