UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ANNE CHANA HENKIN, *et al.*,

                              Plaintiffs,

        - against -

QATAR CHARITY, *et al*.,

                              Defendants.

21-cv-05716 (AMD) (VMS)


**REPLY BRIEF IN FURTHER SUPPORT OF**
**DEFENDANT MASRAF AL RAYAN'S MOTION TO DISMISS THE COMPLAINT**


PILLSBURY WINTHROP SHAW PITTMAN LLP
31 West 52nd Street
New York, NY 10019-6131
Tel.:   (212) 858-1000
Fax:    (212) 858-1500


May 17, 2022

4855-9028-1758

**TABLE OF CONTENTS**

**Contents**

PRELIMINARY STATEMENT ............................................................................................ 1

ARGUMENT ...................................................................................................................... 2

I.  PLAINTIFFS HAVE NO SECONDARY LIABILITY CLAIMS UNDER JASTA BECAUSE THEY FAIL TO PROPERLY PLEAD A CONSPIRACY AND GENERAL AWARENESS FOR AIDING AND ABETTING ............................................. 2

   A.  Plaintiffs Have No Conspiracy Claim .............................................................. 2

      1.  Plaintiffs Misstate the Law on Conspiracy ............................................. 2

      2.  Plaintiffs Fail to Properly Plead a Conspiracy with Anyone ...................... 5

   B.  Plaintiffs Do Not State a Claim for Aiding and Abetting Liability Under JASTA ......... 10

      1.  Plaintiffs Ignore the Second Circuit's Ruling in *Kaplan* on General Awareness ...... 10

      2.  The Complaint Fails to Plead Substantial Assistance ................................. 15

   C.  Plaintiffs Fail to Allege that Hamas "Committed, Planned or Authorized" the 2018 Attack, as Required for Secondary Liability .................................................... 16

II.  PLAINTIFFS DO NOT STATE A CLAIM FOR PRIMARY LIABILITY UNDER THE ATA ............................................................................................................. 17

   A.  Plaintiffs Mischaracterize *Miller* in an Unsuccessful Effort to Plead an Act of Terrorism ................................................................................................. 17

   B.  Plaintiffs Fail to Establish that MAR's Alleged Activity Was the Proximate Cause of Plaintiffs' Injuries ................................................................................ 19

III.  PLAINTIFFS FAIL TO ESTABLISH A *PRIMA FACIE* CASE OF PERSONAL JURISDICTION ............................................................................................. 22

   A.  Plaintiffs Fail to Demonstrate Basic Jurisdictional Requirements of Due Process and Minimum Contacts .............................................................................. 22

   B.  Conspiracy Jurisdiction Is Not Applicable to Plaintiffs' Claims as a Matter of Law ....... 24

   C.  Personal Jurisdiction over MAR Would Be Inconsistent with Due Process ................... 26

   D.  No Jurisdictional Discovery Is Warranted ...................................................... 26

IV.  PLAINTIFFS' DECLARATIONS AND EXHIBITS FAIL TO CURE THEIR LEGALLY DEFICIENT CLAIMS ...................................................................... 28

V.  PLAINTIFFS DID NOT PROPERLY EFFECTUATE SERVICE ........................................ 29

CONCLUSION .................................................................................................................. 30

i

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*Ansbacher, et al. v. Qatar Charity, et al.*,
  Jerusalem District Court, CC 21387-06-21, Nov. 10, 2021......................................26

*Aqua Shield, Inc. v. Inter Pool Cover Team*,
  No. 05-cv-4880 (CBA), 2007 WL 4326793 (E.D.N.Y. Dec. 7, 2007)....................25

*Asahi Metal Indus. Co. v. Super. Ct. of Cal.*,
  480 U.S. 102 (1987).................................................................................................26

*Astor Chocolate Corp. v. Elite Gold Ltd.*,
  510 F. Supp. 3d 108 (S.D.N.Y. 2020)....................................................................25

*Atuahene v. City of Hartford*,
  10 F. App'x 33 (2d Cir. 2001) ................................................................................10

*Averbach v. Cairo Amman Bank*,
  No. 19-cv-0004 (GHW) (KHP), 2020 WL 486860 (S.D.N.Y. Jan. 21, 2020),
  *report and recommendation adopted sub nom. Averbach ex rel. Averbach v.
  Cairo Amman Bank*, No. 19-cv-00004 (GHW), 2020 WL 1130733 (S.D.N.Y.
  Mar. 9, 2020)..............................................................................................15, 16

*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
  171 F.3d 779 (2d Cir. 1999).....................................................................................24

*Bartlett v. Société Générale de Banque Au Liban SAL*,
  No. 19-cv-00007 (CBA) (VMS), 2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020) .................18

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)..................................................................................................21

*Berdeaux v. OneCoin Ltd.*,
  No. 19-cv-4074 (VEC), 2021 WL 4267693 (S.D.N.Y. Sept. 20, 2021)...............10, 16, 23, 24

*Bernhardt v. Islamic Republic of Iran*,
  No. 18-cv-2739 (TJK), 2020 WL 6743066 (D.D.C. Nov. 16, 2020),
  *appeal filed*, No. 21-7018 (D.C. Cir. Feb. 26, 2021).............................................3, 4

*Cabrera v. Black & Veatch Special Projects Corps.*,
  No. 19-cv-3833 (EGS) (ZMF), 2021 WL 3508091 (D.D.C. July 30, 2021)..................20, 21

*Charles Schwab Corp. v. Bank of Am. Corp.*,
  883 F.3d 68 (2d Cir. 2018)........................................................................................26

4855-9028-1758

*In re Chiquita Brands Int'l, Inc.*,
  284 F. Supp. 3d 1284 (S.D. Fla. 2018) .................................................................21

*Cmty. Fin. Grp. v. Stanbic Bank Ltd.*,
  No. 14-cv-5216 (DLC), 2015 WL 4164763 (S.D.N.Y. July 10, 2015) ...................23

*Crosby v. Twitter, Inc.*,
  921 F.3d 617 (6th Cir. 2019) ................................................................................17

*In re Dental Supplies Antitrust Litig.*,
  No. 16-cv-696 (BMC) (GRB), 2017 WL 4217115 (E.D.N.Y. Sept. 20, 2017).....................24

*Essex Universal Corp. v. Yates*,
  305 F.2d 572 (2d Cir. 1962). (Opp. ) ..................................................................6, 7

*Force v. Qatar Charity*,
  No. 20-cv-2578 (BMC) (E.D.N.Y. Jan. 28, 2022)................................................10

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
  141 S. Ct. 1017 (2021)..........................................................................................22

*Freeman v. HSBC Holdings PLC*,
  413 F. Supp. 3d 67 (E.D.N.Y. 2019) ..................................................................3, 18

*Gen. Dynamics Land Sys., Inc. v. Cline*,
  540 U.S. 581 (2004)................................................................................................4

*Gill v. Arab Bank, PLC*,
  893 F. Supp. 2d 542 (E.D.N.Y. 2012) ...................................................................21

*GSS Grp. Ltd. v. Nat'l Port Auth. of Liberia*,
  822 F.3d 598 (D.C. Cir. 2016).................................................................................7

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983) ....................................................................... *passim*

*Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*,
  495 F. Supp. 3d 144 (E.D.N.Y. 2020), *appeal filed*, No. 21-513
  (2d Cir. Sept. 8, 2021)..........................................................................................14

*Holmes v. Air Line Pilots Ass'n, Int'l*,
  745 F. Supp. 2d 176 (N.D.N.Y. 2010) .....................................................................9

*Honickman v. BLOM Bank SAL*,
  6 F.4th 487 (2d Cir. 2021) ............................................................................. *passim*

*Jingrong v. Chinese Anti-Cult World All. Inc.*,
  16 F.4th 47 (2d Cir. 2021), *petition for cert. docketed*, No. 21-1429 (May 10, 2022)..............3

iii

*Kaplan v. Al Jazeera*
    No. 10-cv-5298, 2011 WL 2314783 (S.D.N.Y. June 7, 2011) .................................................19

*Kaplan v. Lebanese Canadian Bank, SAL,*
    999 F.3d 842 (2d Cir. 2021).................................................................................. *passim*

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL ("Licci II"),*
    673 F.3d 50 (2d Cir. 2012)...................................................................................27

*Licci v. Lebanese Canadian Bank, SAL ("Licci III"),*
    20 N.Y.3d 327 (2012) ....................................................................................27, 28

*Licci v. Lebanese Canadian Bank, SAL ("Licci IV"),*
    732 F.3d 161 (2d Cir. 2013)................................................................................27

*Linde v. Arab Bank, PLC,*
    882 F.3d 314 (2d Cir. 2018)..................................................................................8

*Miller v. Arab Bank, PLC,*
    372 F. Supp. 3d 33 (E.D.N.Y. 2019) ..............................................15, 16, 17, 18, 20

*Miranda v. S. Country Cent. Sch. Dist.,*
    461 F. Supp. 3d 17 (E.D.N.Y. 2020) .....................................................................10

*Motus, LLC v. CarData Consultants, Inc.,*
    23 F.4th 115 (1st Cir. 2022)................................................................................25

*O'Sullivan v. Deutsche Bank AG,*
    No. 17-cv-8709 (LTS) (GWG), 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019)...........3, 18, 20

*Rosenberg v. Lashkar-e-Taiba,*
    No. 10-cv-5381 (DLI) (CLP), 2017 WL 11647006 (E.D.N.Y. Mar. 31, 2017) .....................29

*Rudersal v. Harris,*
    No. 18-cv-11072 (GHW), 2022 WL 263568 (S.D.N.Y. Jan. 28, 2022)........................5, 25, 26

*Shi v. Le,*
    No. 21-cv-1361 (ARR) (CLP), 2022 WL 896963 (E.D.N.Y. Mar. 28, 2022)........................24

*Singer v. Bank of Palestine*
    No. 19-cv-006 (ENV) (RML), 2021 WL 4205176 (E.D.N.Y. Apr. 30, 2021).................26, 27

*Suber v. VVP Servs., LLC,*
    No. 20-cv-08177 (AJN), 2021 WL 4429237 (S.D.N.Y. Sept. 27, 2021) ..............................24

*Tamam v. Fransabank Sal,*
    677 F. Supp. 2d 720 (S.D.N.Y. 2010)..................................................................27, 28

*In re Tenaris S.A. Sec. Litig.*,
 493 F. Supp. 3d 143 (E.D.N.Y. 2020) ....................................................................8

*Trueposition, Inc. v. Sunon, Inc.*,
 No. 05-cv-3023, 2006 WL 1686635 (E.D. Pa. June 14, 2006) ...........................29, 30

*U.S. Bank Nat'l Ass'n v. Bank of Am., N.A.*,
 916 F.3d 143 (2d Cir. 2019) ...............................................................................26

*Vasquez v. Hong Kong & Shanghai Banking Corp.*,
 477 F. Supp. 3d 241 (S.D.N.Y. 2020) ..................................................................23

*Webb v. Goord*,
 340 F.3d 105 (2d Cir. 2003) .................................................................................8

*Weiss v. Nat'l Westminster Bank PLC*,
 453 F. Supp. 2d 609 (E.D.N.Y. 2006) .............................................................20, 21

*Zapata v. HSBC Holdings, PLC*,
 414 F. Supp. 3d 342 (E.D.N.Y. 2019) .............................................................19, 20

Constitutions

United States Constitution ...........................................................................21, 25
 Due Process Clause ...........................................................................................21

Statutes and Codes

United States Code
 Justice Against Sponsors of Terrorism Act, § 2(b), 130 Stat. 852 ...........................4
 18 U.S.C. § 2333(a), *et seq.* .................................................................................1
 18 U.S.C. § 2333(d)(2) ...............................................................................1, 2, 16
 28 U.S.C. § 1602, *et seq.* ......................................................................................8

Qatari Civil & Commercial Procedures Law
 Article 10 (Law No. 13 of 1990, as amended by Law No. 7 of 1995) ....................29
 Article 11 (Law No. 13 of 1990) .........................................................................29

Rules and Regulations

Civil Procedure Law and Rules
 Section 302(a)(1) .........................................................................................23, 24
 Section 302(a)(2) ...............................................................................................24
 Section 302(a)(3)(ii) ....................................................................................23, 24

Federal Rules of Civil Procedure

Rule 4(f)(2)(C)(ii) ...............................................................................................30
Rule 4(k) .......................................................................................................25, 26
Rule 4(k)(2) ...............................................................................................5, 24, 25
Rule 12(b)(6) ...............................................................................................21, 28

4855-9028-1758

**PRELIMINARY STATEMENT**

In this action, Plaintiffs string together two attacks allegedly committed by Hamas, years apart—one in 2015 and one in 2018—and allege that Masraf Al Rayan ("MAR"), a foreign bank, is responsible for both attacks merely because it provided financial services to a customer, Qatar Charity, through transactions ending in 2015.  Fundamentally, the Complaint is legally deficient and implausible—even with the declarations and thirteen exhibits improperly filed to cure the legal deficiencies already identified by MAR in its Memorandum in Support of its Motion to Dismiss ("Motion" or "Mot.").

First, for secondary liability under the Justice Against Sponsors of Terrorism Act ("JASTA"), 18 U.S.C. § 2333(d)(2), *et seq*., Plaintiffs spin a baseless conspiracy theory that reaches the highest levels of a foreign government.  In doing so, Plaintiffs misstate the law on conspiracy and do not even *attempt* to plead facts implicating MAR in a conspiracy with Hamas, as required under JASTA.  Plaintiffs' aiding and abetting theory does not fare any better because Plaintiffs fail to plead facts sufficient to assert that MAR plausibly should have been aware that providing financial services to Qatar Charity was synonymous with providing support to Hamas to fund the 2015 and 2018 attacks.  Irrelevant allegations about Middle Eastern politics cannot fill the void left by Plaintiffs' failure to plead publicly available facts that provide any grounds to plausibly allege general awareness.  And of course, there is a three-year time gap between MAR's alleged activity and the 2018 attack which renders any allegations of causation implausible.

Second, Plaintiffs' primary liability claims under the Anti-Terrorism Act "(ATA"), 18 U.S.C. § 2333(a), *et seq.*, fail because (as courts have repeatedly explained, and Plaintiffs ignore) ordinary banking transactions—the most that Plaintiffs allege of MAR—are not acts of violence.

1

Nor could these ordinary financial transactions have been the proximate cause of the 2015 and 2018 Hamas attacks.

Nor have Plaintiffs pled sufficient allegations for a *prima facie* case of personal jurisdiction over MAR.  Plaintiffs fail to allege that MAR purposefully availed itself of the New York forum and that exercising personal jurisdiction would be consistent with due process.  In addition, Plaintiffs implicitly concede that several Plaintiffs lack standing, and they have yet to properly serve MAR.  For these reasons, Plaintiffs' claims must be dismissed.

## ARGUMENT

I.   **PLAINTIFFS HAVE NO SECONDARY LIABILITY CLAIMS UNDER JASTA BECAUSE THEY FAIL TO PROPERLY PLEAD A CONSPIRACY AND GENERAL AWARENESS FOR AIDING AND ABETTING**

A.   **Plaintiffs Have No Conspiracy Claim**

1.   **Plaintiffs Misstate the Law on Conspiracy**

As a threshold matter, Plaintiffs misstate the law.  Plaintiffs argue that MAR's interpretation of JASTA is unduly restrictive because JASTA was enacted to permit litigants "to sue entities 'that have provided material support, *directly or indirectly*' to [Foreign Terrorist Organizations]."  (Omnibus Memorandum of Law in Opposition to Motions to Dismiss of Defendants Qatar Charity, Qatar National Bank and Masraf Al Rayan ("Opposition" or "Opp.") at 41).  However, JASTA's text is clear:

> In an action under subsection (a) for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to *any person who aids and abets*, by knowingly providing substantial assistance, *or who conspires with the person* who committed such an act of international terrorism.

18 U.S.C. § 2333(d)(2) (emphasis added).

"When interpreting a statute, we begin with the text.  We must give effect to the text's plain meaning."  *Jingrong v. Chinese Anti-Cult World All. Inc.*, 16 F.4th 47, 57 (2d Cir. 2021), *petition for cert. docketed*, No. 21-1429 (May 10, 2022).  Here, as the Second Circuit has explained, the plain meaning is clear.  While "aiding-and-abetting claim[s]" are permissible under JASTA "where the defendant's acts aided and abetted the principal even where his relevant substantial assistance was given to an intermediary," conspiracy liability attaches under JASTA only where "a defendant" is "shown to have 'conspire[d] *with*' the principal" Foreign Terrorist Organization ("FTO"). *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 855 (2d Cir. 2021) (emphasis added).[1] The statute specifically provides that the conspiracy must be with "the person" who in fact committed the acts of terrorism.

The Second Circuit's interpretation of JASTA's liability provision is far from "myopic," as Plaintiffs put it, (Opp. at 41), and every court that has evaluated Plaintiffs' argument has rejected it.  *See Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 98 n.41 (E.D.N.Y. 2019) ("[T]he plain text of JASTA's *conspiracy* liability provisions requires that a defendant conspire directly with the person or entity that committed the act of international terrorism that injured the plaintiff."); *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2020 WL 6743066, at *7 (D.D.C. Nov. 16, 2020) ("JASTA liability exists only where 'the secondary tortfeasor conspired with the principal tortfeasor in committing such an act of international terrorism.'") (emphasis and internal quotation marks omitted) (quoting *O'Sullivan v. Deutsche Bank AG*, No. 17-cv-8709 (LTS) (GWG), 2019 WL 1409446, at *9 (S.D.N.Y. Mar. 28, 2019)), *appeal filed*, No. 21-7018 (D.C. Cir.

---

[1] Plaintiffs characterize this statement as "dicta" (Opp. at 64 n.22); however, the Second Circuit's invocation of conspiracy liability under JASTA as a point of comparison to aiding and abetting liability under JASTA was central to its analysis.  *Kaplan*, 999 F.3d at 855-56.  Moreover, even if the *Kaplan* panel's language at issue *were* dicta, Plaintiffs themselves cite an out-of-district case for dicta when it suits them.  (Opp. at 75).  Second Circuit dicta has precedential value too.

Feb. 26, 2021).  Plaintiffs do not cite a single authority that disagrees with these decisions, and none exists.

Plaintiffs argue that because JASTA was enacted to permit litigants "to sue entities 'that have provided material support, *directly or indirectly*' to FTOs," MAR's interpretation "limits the law to far less than its stated purpose."  (Opp. at 41).  However, Plaintiffs seek to obviate any practical distinction between aiding and abetting and conspiracy liability, leading to a result where two causes of action under the same statute would be largely redundant of one another.  (*Id.* at 39) (recognizing that "[t]he same facts that support Plaintiffs' aiding-and-abetting claim likewise evidence the existence of Defendants' conspiracy").[2]

Moreover, the "Findings and Purpose" section of JASTA cited by Plaintiffs also states that *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), "provides the proper legal framework" for how conspiracy liability "should function."  JASTA § 2(b), 130 Stat. 852.  As Plaintiffs acknowledge, "the two parties in *Halberstam* conspired directly."  (Opp. at 42).  The *Halberstam* court also held that courts "initially look to see if" the co-conspirators "are in contact with one another," and that "[m]utually supportive activity by parties *in contact with one another over a long period* suggests a common plan."  *Halberstam*, 705 F.2d at 481 (emphasis added).  Nothing in *Halberstam* contemplates liability for a co-conspirator who is *never* alleged to have conspired

---

[2] Plaintiffs cite a Supreme Court case interpreting the Age Discrimination in Employment Act for the proposition that courts should look to a statute's "findings and statements of objectives" to interpret a provision's plain meaning, (Opp. at 42); however, in that case, "[t]he very strength" of the lower courts' "consensus" in interpretation of the statute was "enough to rule out any serious claim of ambiguity" as to the statute's plain meaning. *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 593-94 (2004).  Here, not only is the statute unambiguous, but every court that has opined on the issue disagrees with Plaintiffs' interpretation; Plaintiffs cite inapposite *criminal* conspiracy cases instead.  (Opp. at 42).

with the principal nor to have been in contact with the principal.  Thus, based on the text and purpose of JASTA, Plaintiffs' conspiracy claim fails as a matter of law.[3]

### 2.      Plaintiffs Fail to Properly Plead a Conspiracy with Anyone

Setting aside Plaintiffs' misstatement of the law governing conspiracy liability under JASTA, Plaintiffs have failed to properly plead a plausible claim of conspiracy with anyone. Plaintiffs' conspiracy claim requires that they plausibly plead "an agreement to do an unlawful act or a lawful act in an unlawful manner." (Opp. at 38).  Plaintiffs cannot plead a conspiracy simply by labeling Defendants "co-conspirators" without pleading non-conclusory facts supporting an agreement.  Recognizing that their claims are deficient, they devote over fifteen pages of their Opposition to describing a conspiracy that they have not properly pled (nor could they).

### a.      The Time Gap Between the Alleged Transfers and the 2018 Injury Renders Plaintiffs' Allegations of a Conspiracy Implausible

Three years separate even the most recently dated alleged financial transaction and the 2018 attack that injured Plaintiffs.  (Compl. ¶ 33 (attack occurred on September 16, 2018); *id.* ¶ 104 (alleged conspiracy occurred "[f]rom at least 2011 through 2015"); *id.* ¶ 126 (alleged transfers occurred "[f]rom March 1, 2015 until September 7, 2015 alone"); *id.* ¶ 130(c) (alleged currency exchange transactions occurred "[b]etween 2009 and 2015")).  Plaintiffs even admit that Qatar Charity's relevant operations "ceased in July 2015," (*id.* ¶ 139), necessarily ceasing any alleged transfers to Hamas.

---

[3] Plaintiffs' conspiracy theory is central to their claims because Plaintiffs recognize that they must first properly plead a plausible claim of conspiracy under JASTA *before* this Court can properly exercise personal jurisdiction over Defendants; without conspiracy, there is no jurisdiction over them.  JASTA requires defendants to have conspired *with* an FTO to trigger conspiracy liability.  As discussed below, Plaintiffs assert personal jurisdiction over all Defendants under Rule 4(k)(2).  *See infra* § III.B.  However, "[i]f a federal statute contains a specific limitation on the exercise of jurisdiction that would preclude" Plaintiffs' conspiracy theory, then jurisdiction as to all of Plaintiffs' claims is unavailable because the "exercise of jurisdiction must be consistent with U.S. law." *Rudersal v. Harris*, No. 18-cv-11072 (GHW), 2022 WL 263568, at *11 (S.D.N.Y. Jan. 28, 2022); *see infra* § III.B. Here, JASTA expressly limits conspiracy liability to those conspiring with the FTO.

Nevertheless, Plaintiffs spin an implausible theory that a conspiracy can be inferred from alleged conduct occurring years before the terrorist acts that gave rise to Plaintiffs' injuries. It cannot. *See Halberstam*, 705 F.2d at 481 ("In sum, we expect that the relationships between the actors and between the actions (*e.g.*, the proximity in time and place of the acts, and the duration of the actors' joint activity) are relevant to inferring an agreement in a civil conspiracy action."). It is undisputed that MAR was nowhere near the attacks at issue. (Opp. at 32 n.16). Without any pled "proximity in time," and as a result, no "duration" of "joint activity" by MAR and its purported co-conspirators, Plaintiffs' theory of conspiracy with respect to the 2018 attack is implausible on its face. *Halberstam*, 705 F.2d at 481.

**b.      Plaintiffs Have Failed to Allege a Plausible Conspiracy with the State of Qatar**

Lack of proximity aside, Plaintiffs still have failed to plead a conspiracy with anyone with respect to either of the attacks at issue. Without basis, Plaintiffs aver that they have alleged "an agreement among the government of Qatar, the Qatari Royal Family, Hamas, and Defendants." (Opp. at 39). Plaintiffs continue to insist that Defendants' illegal conspiracy was orchestrated by the Qatari government, and that MAR's "dominat[ion] by Qatar and its Royal Family" and "control" by Qatar (*Id.* at 5, 13, 17, 26, 27, 39, 43, 50 n. 28) demonstrates the plausibility of this theory. However, no facts have been pled to support this legal conclusion.

First, Plaintiffs insist their allegations that the government owns 28% of MAR and has some unspecified number of board seats is sufficient, *per se*, to establish control. In support of this assertion, they cite *Essex Universal Corp. v. Yates*, 305 F.2d 572 (2d Cir. 1962). (Opp. at 29 n.14). *Essex*, however, is inapposite because it does not address any kind of control. Instead, *Essex* grappled with the issue of "whether a contract for the sale of 28.3 per cent of the stock of a corporation is, under New York law, invalid as against public policy solely because it includes a

clause giving the purchaser an option to require a majority of the existing directors to replace themselves." 305 F.2d at 573. Equally unavailing are Plaintiffs' citations to other cases dealing with the procedural requirements for derivative shareholder securities litigation under Delaware law; those cases are inapposite. (Opp. at 29 n.14). Similarly irrelevant is a D.C. Circuit case (Opp. at 29) where the government "ordered" an instrumentality to cancel a contract—a specific allegation of government action missing from the present case. *GSS Grp. Ltd. v. Nat'l Port Auth. of Liberia*, 822 F.3d 598, 606-07 (D.C. Cir. 2016). Regardless, the *GSS* complaint was dismissed because it lacked a plausible allegation of agency control, despite allegations that the government entity issued an order directing cancellation of a contract. *Id.* at 608. Here, all Plaintiffs do is plead that Qatar "coopted several institutions that it dominates and controls to funnel coveted U.S. dollars" to Hamas in secret, a conclusory allegation simply not at issue in the cases cited by Plaintiff. (Compl. ¶ 5).

Second, as pled, Plaintiffs' conspiracy theory is nonsensical. According to Plaintiffs, the government of Qatar's "integral role in the conspiracy" was "encouraging [Defendants'] behavior." (Opp. at 40). It is not clear what encouragement Defendants needed, especially if they were completely "dominated" and controlled by Qatar. (*See id.* at 50). Plaintiffs also fail to explain why it is plausible that Qatar would go to the trouble of orchestrating a vast conspiracy involving a myriad of co-conspirators to provide "a substantial portion" of "over $28 million" to "Hamas and supposed charities that it controlled," (Compl. ¶¶ 126-27), when Qatar was allegedly comfortable pledging publicly that it would provide Hamas with $400 million directly, (*id.* ¶ 112). Moreover, while expressly pleading that Qatar has "coopted," "dominates," and "controls" MAR, (*id.* ¶ 5), Plaintiffs disingenuously contend that despite these allegations, they do not allege an alter ego relationship, (Opp. at 29 n.14). Plaintiffs do so because alter ego allegations would result in

7

MAR being immune from suit under the Foreign Sovereign Immunities Act. 28 U.S.C. § 1602, *et seq.*; *see In re Tenaris S.A. Sec. Litig.*, 493 F. Supp. 3d 143, 156 (E.D.N.Y. 2020) (finding alter ego relationship where "Parent Defendants *dominated* the entire Techint Group") (emphasis added). This contradiction underscores why this alleged conspiracy with Qatar is not plausible.

### c. Plaintiffs Have Failed to Properly Plead an Agreement with Qatar Charity and Qatar National Bank

To properly allege MAR conspired with Qatar Charity and Qatar National Bank, Plaintiffs "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement." *Webb v. Goord*, 340 F.3d 105, 110-11 (2d Cir. 2003) (internal quotation marks and citations omitted). There are no non-conclusory allegations that MAR ever conspired with either or both of its co-defendants; Plaintiffs do not allege any conduct that evinces an agreement.

Plaintiffs allege only that MAR transferred funds for Qatar Charity. (*See, e.g.,* Compl. ¶ 130). The allegation that MAR "maintained a direct or indirect correspondent banking relationship with Bank of New York Mellon, and perhaps other U.S. banks" is not only vague, (*id.* ¶ 161), but also wholly unremarkable: the allegation that a foreign bank engaged in banking transactions with one of its customers is not a factual basis to support the existence of an illegal conspiracy. *See Linde v. Arab Bank, PLC*, 882 F.3d 314, 327 (2d Cir. 2018) (concluding that "providing routine financial services to members and associates of terrorist organizations is not so akin to providing a loaded gun to a child as to excuse the charging error here"). Indeed, every foreign bank would fall into this category.

In recognition of their lack of sufficient allegations against MAR, Plaintiffs repeatedly invoke the purported undated "criminal confessions of the Director and Staff of Qatar Charity's West Bank Branch, which detail how Qatar Charity and Masraf laundered USD through the U.S. to Qatar Charity's accounts in the West Bank." (Opp. at 40). However, Plaintiffs do not plead

any plausible allegations as to who confessed what, when, and under what circumstances.  (Compl. ¶ 130).[4]

While the allegations as to an agreement between MAR and Qatar Charity hinge on routine transactions, there are no non-conclusory allegations that MAR and QNB interacted at all.  The entirely disparate allegations against MAR and QNB only demonstrate that there was *not* a meeting of the minds between the Defendants.  While the only concrete allegation as to a time period against MAR is from 2015 (*e.g.*, *id.* ¶ 130(c)), Plaintiffs point out that the allegations against QNB include allegations from 2006 and 2012.  (Opp. at 36).  And nowhere do Plaintiffs allege that MAR and QNB were ever in contact with one another.  *See Halberstam*, 705 F.2d at 481 ("In sum, we expect that the relationship between the actors and between the actions (*e.g.*, the proximity in time and place of the acts, and the duration of the actors' joint activity) are relevant in inferring an agreement in a civil conspiracy action.").[5]

### d.      Plaintiffs Fail to Allege that MAR Conspired with an FTO

Plaintiffs also plead no facts to allege that MAR conspired with Hamas.  As the Motion explains, "*Nowhere* do Plaintiffs allege in a non-conclusory fashion that MAR entered into any agreement with Hamas."  (Mot. at 30) (emphasis added).  Plaintiffs concede as much, stating that "Qatar Charity maintain[ed] the direct link to Hamas," not either MAR or QNB.  (Opp. at 40).  As a result, Plaintiffs instead argue, incorrectly, that no such allegation is required.  *See supra* § I.A.1.

---

[4] *See* Reply Brief in Support of Qatar Charity's Motion to Dismiss.  A review of the exhibits filed by Qatar Charity demonstrates that there are contradictions that undermine Plaintiffs' allegations; as a result, the Court need not credit them.  If documents "contradict the allegations of the [] complaint, the documents control and this Court need not accept as true the allegations in the [] complaint."  *Holmes v. Air Line Pilots Ass'n, Int'l*, 745 F. Supp. 2d 176, 193-94 (N.D.N.Y. 2010) (internal quotation marks and citations omitted).

[5] Plaintiffs incorrectly assert that MAR has "waived arguments" as to "overt act" and "causation."  (Opp. at 38 n. 20).  The "overt act" requirement is coextensive with the "substantial assistance" and 'international act of terrorism' prongs of JASTA and ATA liability, respectively, and MAR argues that Plaintiffs fail to plead causation as part of its arguments as to ATA liability and personal jurisdiction.  (*See* Mot. §§ IV.A.2., III.A.-B., I.A.2.).

9

### e.   Plaintiffs Impermissibly Engage in Group Pleading

Plaintiffs also make no attempt to adhere to *Berdeaux*'s admonition against "impermissible group pleading"; Plaintiffs' Complaint is "riddled" with allegations that lump Defendants together. *See Berdeaux v. OneCoin Ltd.*, No. 19-cv-4074 (VEC), 2021 WL 4267693, at *7, *11 (S.D.N.Y. Sept. 20, 2021); (Mot. at 28 n.19).  "Where a complaint lumps defendants together in each claim and provides no factual basis to distinguish their conduct, it fails to satisfy the minimum pleading standard." *Miranda v. S. Country Cent. Sch. Dist.*, 461 F. Supp. 3d 17, 31 (E.D.N.Y. 2020) (citing *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001)).  Here, Plaintiffs repeatedly lump the Defendants together.  (*See, e.g.*, Compl. ¶ 8 ("Pursuant to their unlawful conspiracy, the Defendants and their co-conspirators provided material support and resources to Hamas . . . ."); *see also, e.g.*, *id.* ¶¶ 104, 109, 149-54, 324).  Because Plaintiffs repeatedly fail to plead "factual allegations to distinguish" MAR's purportedly unlawful conduct, the Complaint should be dismissed as to MAR.  *Miranda*, 461 F. Supp. 3d at 31.[6]

### B.   Plaintiffs Do Not State a Claim for Aiding and Abetting Liability Under JASTA

Plaintiffs fail to plausibly state a claim for aiding and abetting liability under JASTA because the Complaint fails to plead facts as to both general awareness and substantial assistance.

### 1.   Plaintiffs Ignore the Second Circuit's Ruling in *Kaplan* on General Awareness

Plaintiffs relist their allegations of purported general awareness, (Opp. at 25-27), but those allegations remain deficient.  For example, MAR's Motion detailed why allegations of public knowledge *after* the transactions at issue cannot be used to support a finding of general awareness,

---

[6] A similar issue exists in another ATA action currently pending before Judge Cogan.  *See* Transcript of Hearing at 24:12-15, *Force v. Qatar Charity*, No. 20-cv-2578 (BMC) (E.D.N.Y. Jan. 28, 2022) ("[L]ooking at this complaint, it does seem to me that there's a lot of lumping together of defendants who might have behaved very differently.").

which Plaintiffs do not address (Mot. at 25-26); even so, Plaintiffs include such allegations on their list. (Opp. at 26). Nor do Plaintiffs explain why allegations as to *Qatar's* support of terrorism can be imputed to Defendants for purposes of general awareness. (Mot. at 26-28). Plaintiffs argue that "these factors leave no doubt" as to general awareness "[i]n combination," (Opp. 31), citing *Honickman*, but simply combining their disparate insufficient allegations does not transform them into a single sufficient allegation. Plaintiffs assert that they plead "far more compelling support than *Kaplan*" for an inference of general awareness. (*Id.* at 25). Plaintiffs are incorrect.

Unlike Plaintiffs' allegations, the defendant in *Kaplan* "gave the customers special treatment, exempting them from submitting cash transaction slips" and gave them "exemptions with respect to deposits" for "more than $2.5 million a week." 999 F.3d at 850. Plaintiffs completely ignore these allegations, which were integral to the *Kaplan* decision. Moreover, as Plaintiffs highlight, the FTO at issue in *Kaplan* was famously headquartered in the same country as the defendant and had been publicly and repeatedly engaging in terrorist attacks, which provided context for the court's finding of general awareness. (Opp. at 24); *Kaplan*, 999 F.3d at 865. Plaintiffs' allegations as to general awareness in *Kaplan* included numerous *public* statements by Hizbollah *itself* that identified the customers as "integral parts of Hizbollah" prior to the attacks at issue, "the circumstances in which the statements were made," and "the other specific media in which they were made." *Kaplan*, 999 F.3d at 864.

Worse, Plaintiffs mischaracterize the customers at issue in *Kaplan* as "a putative charity[,] . . . two corporations, and two of their officers." (Opp. at 28). No customer in *Kaplan* is described as a charity; one customer provided funding to terrorists and their families and was described in passing (in a news article cited in the complaint) as providing "charitable funds" to *suicide bombers*, an allegation that supported a finding of general awareness. *Kaplan*, 999 F.3d at 849-

11

51.   The Second Circuit drew a contrast between "the plaintiffs' theory" in *Kaplan* that the "customers provided subsidies to the families of Hizbollah suicide bombers" and "permitted the laundering of money in violation of regulatory restrictions meant to hinder the ability of FTOs to carry out terrorist attacks" with the plaintiffs' theory in *Honickman* that the customers supported "Hamas's social welfare program" and "supported orphans in Palestinian refugee camps." *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 503 n.21 (2d Cir. 2021) (citation omitted).   It is disingenuous at best to claim that Plaintiffs' allegations against MAR more closely resemble the former rather than the latter.

Plaintiffs similarly mischaracterize *Honickman*.[7]   There, as here, "[t]he limited public sources Plaintiffs cite pale in comparison to the detailed, numerous sources that sufficed in *Kaplan*."   *Id.* at 502.   Critically, the court held that the allegation that the customers at issue in *Honickman* "maintained a 'cover' in public undermines the plausibility of Plaintiffs' theory that BLOM Bank understood those organizations' true nature and activities from the public record at the time."   *Id.*   That holding flies in the face of Plaintiffs' assertion here that "the court should reject the Bank Defendants' claims that Qatar Charity's humanitarian work undermines Plaintiffs' allegations" of general awareness.   (Opp. at 38 n.19).   Plaintiffs characterize MAR as "pretend[ing] that Qatar Charity is not the same organization as Qatar Charitable Society," (*id.* at 30), but it is

---

[7] Plaintiffs misstate the pleading requirement articulated in *Honickman* by conflating the concepts of close intertwinement with terrorist activities and the terrorist activities themselves.   (Opp. at 28).   *Honickman* established that the general awareness standard is whether plaintiffs have plausibly alleged that the bank's customers "were so closely intertwined" with an FTO's "violent terrorist activities that one can reasonably infer that" the bank "was generally aware while it was providing banking services to [that] entit[y] that it was playing a role in unlawful activities from which [the FTO's] attacks were foreseeable."   *Honickman*, 6 F.4th at 499 (citation omitted).   The standard is exactly that:   whether the bank customer is "intertwined" with the terrorist activities of the FTO to infer the bank's general awareness.

Plaintiffs who explain the name change was to maintain a "cover" (as in *Honickman*), specifically in response to the notoriety received "under its prior name."[8]  (Compl. ¶ 45).

In opposition, Plaintiffs appear to centralize the allegations as to general awareness on two alleged facts:  Israel's ban of members of Union of Good in 2008, (*see id.* ¶ 59), and purported confessions by employees of Qatar Charity at unspecified times, (*id.* ¶ 130).  Neither demonstrates with any plausibility that MAR was generally aware of any alleged relationship between Qatar Charity and Hamas.  As to the undated confessions, as pled, they do not sufficiently allege general awareness as to MAR.  Purportedly, MAR "arranged for currency exchange transactions" of Qatar Charity funds "through Bank of New York Mellon in New York."  (*Id.* ¶ 130(c)-(d)).  There is nothing pled to indicate that the Qatar Charity employees confessed MAR had any awareness as to the *purpose* of these transfers, or knowledge of any purported Qatar Charity affiliation with a terrorist group at any particular time, much less prior to any of the alleged transactions.  And no other aspect of this so-called confession implicates MAR, rendering the confession allegation probative of nothing.  Further, given that Plaintiffs do not plead any information as to the date, declarant, substance, or context of these purported "confessions," the confessions are not plausible as information available to MAR that would render it generally aware of Qatar Charity's alleged relationship with Hamas.

Finally, Plaintiffs cite Israel's order banning members of Union of Good with remarkable frequency, (*see, e.g.*, Opp. at 1, 10, 26, 31, 35, 36, 39, 40, 46); however, Plaintiffs greatly overstate the import of a single designation in a single foreign country in which MAR does not operate.  For

---

[8] In further recognition of the Complaint's deficiencies, Plaintiffs assert for the first time that "Defendants all possess non-public information that shows the charity's funding of Hamas."  (Opp. at 12; *see also id.* at 25 n.11).  This conclusory allegation, whether in the Complaint or in the Opposition, is irrelevant; Plaintiffs must allege proper plausible facts to proceed beyond the pleading stage.  Similarly, the allegation that non-defendant banks "refused to provide services to Qatar Charity" is unsupported by any alleged facts from which it can be inferred that such refusal was "because of its terror funding" as Plaintiffs now claim for the first time.  (*Id.* at 26).

example, Israel did not stop Qatar Charity from operating in the Palestinian Territories for seven more years—until 2015.  (Compl. ¶ 139).  Plaintiffs seek to equate the provision of routine financial services, to an entity listed under an alias on a press release seven years prior in another country, with material support of terrorism.  To hold it is plausible that MAR was generally aware that it was participating in unlawful activities from which terrorist attacks were foreseeable on the basis of such flimsy allegations would erase any threshold for aiding and abetting liability.  A finding of general awareness cannot depend on a single foreign country's policy changes; Plaintiffs must demonstrate that information as to Qatar Charity's alleged affiliation with Hamas was "ubiquitous."  *Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, 495 F. Supp. 3d 144, 160 (E.D.N.Y. 2020), *appeal filed*, No. 21-513 (2d Cir. Sept. 8, 2021); *see Honickman*, 6 F.4th at 502 n.18 ("Plaintiffs argue that 'the publicly available evidence [in the complaint] was largely available before or during the relevant period or discussed facts that were previously knowable.' . . . However, 'publicly available' evidence is not the same as public sources such as media articles. The latter, depending on their substance, plausibly suggest a defendant's knowledge which can be confirmed during discovery, whereas the former requires the implausible inference that the defendant was aware of those facts even before the news media.").  Union of Good itself was a customer in *Honickman*, and even though Israel "designated" it in 2002 as "part of the Hamas organization," the Second Circuit held JASTA liability still did not attach because "Plaintiffs failed to plausibly allege BLOM Bank was aware [its] [c]ustomers were related to Hamas."  *Honickman*, 6 F.4th at 492 n.6, 503.  As a result, JASTA liability should not attach to MAR either.[9]

---

[9] Plaintiffs' allegations as to MAR's *mens rea* are insufficient as to all four of their causes of action for the same reasons as the general awareness inquiry:  Plaintiffs fail to make non-conclusory allegations that MAR knew of any alleged connection between Qatar Charity and terrorist organizations.  (*See* Opp. at 36; *see also* Mot. § IV.A.1).

### 2.     The Complaint Fails to Plead Substantial Assistance

Not only do Plaintiffs fail to allege facts from which general awareness can be inferred, they also fail to plead that MAR substantially assisted Hamas.  Courts evaluate six factors relating to substantial assistance, and, as established in the Motion, Plaintiffs' claims fail as to each.  (*See* Mot. § IV.A.2).  The Complaint contains no non-conclusory allegations that MAR did anything other than execute ordinary financial transactions, and Plaintiffs continue to reassert only conclusory arguments in the Opposition.  (Opp. at 34-38).

Emblematic of Plaintiffs' Opposition is its contention that "the services Defendants provided here were anything but routine," with respect to the "nature of the act encouraged" factor. (Opp. at 33).  As to MAR, however, Plaintiffs do not assert any allegations beyond routine banking services. (*Id.*); *see Averbach v. Cairo Amman Bank*, No. 19-cv-0004 (GHW) (KHP), 2020 WL 486860, at *16 (S.D.N.Y. Jan. 21, 2020) (dismissing claim where "Plaintiffs have not pleaded that CAB had any type of relationship other than an arms-length business relationship with the Account Holders and have pleaded no relationship at all to Hamas except through the Account Holders."), *report and recommendation adopted sub nom. Averbach ex rel. Averbach v. Cairo Amman Bank*, No. 19-cv-00004 (GHW), 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020).  Each of the cases cited by Plaintiffs requires the defendant to have allegedly done more.  In *Kaplan*, where, for example, the bank granted "special exceptions" to its customers, "Plaintiffs plainly did not allege that LCB's provision of banking services to the Customers was 'routine.'"  999 F.3d at 858.  In *Halberstam*, the defendant "performed [her] services in an unusual way under unusual circumstances for a long period of time."  *Halberstam*, 705 F.2d at 487; *see also Miller v. Arab Bank, PLC*, 372 F. Supp.

3d 33, 48 (E.D.N.Y. 2019) (denying motion to dismiss because Plaintiffs pled Arab Bank's services were "unusual," consistent with *Halberstam*).[10]

Plaintiffs attempt the same ploy with regard to the "duration of assistance" prong of the "substantial assistance test."   The Opposition attempts to demonstrate that "the Defendants' scheme to fund Hamas extended over several years," but makes no effort to cite concrete facts as to MAR in support of that allegation.  (Opp. at 36); *cf. Averbach*, 2020 WL 486860, at *17 (noting allegation that defendant maintained "accounts for Hamas-affiliated organizations from 1999-2004," but that "the fund transfers through the correspondent bank accounts took place over a much shorter period of time," as "[t]he longest duration of assistance for any one of the Account Holders was a year").  Moreover, as to the 2018 attack, Plaintiffs plead no alleged misconduct as to MAR *after* 2015 (Compl. ¶¶ 104, 130(c), 139).  Thus, according to the Complaint, MAR provided no assistance whatsoever, substantial or not, for the three years preceding the 2018 attack.  For that reason, the "duration of the assistance" prong fails.

**C.     Plaintiffs Fail to Allege that Hamas "Committed, Planned or Authorized" the 2018 Attack, as Required for Secondary Liability**

In addition to Plaintiffs' failure to allege sufficient facts for aiding and abetting liability or conspiracy under JASTA as to both attacks, Plaintiffs have failed to plead the threshold requirement that the alleged terrorist act at issue was "committed, planned or authorized" by an FTO with respect to the 2018 attack.  18 U.S.C. § 2333(d)(2).  Plaintiffs argue that they have pled that the 2018 attack was committed, planned or authorized by Hamas because Hamas "acknowledged its responsibility" for it "*after* it occurred."   (Opp. at 21) (emphasis added).

---

[10] Plaintiffs attempt to bolster their conclusory theory with allegations about "Sanabel Cards" that "Qatar Charity obtained from the Bank of Palestine." (Opp. at 8).  But Qatar Charity's alleged use of its own funds to purchase debit cards from a non-defendant unimplicated in the alleged conspiracy and distribute them to unnamed individuals does not implicate MAR at all, and Plaintiffs' labeling of it as "Defendants' Sanabel Card scheme" is improper and conclusory group pleading. (*See, e.g.*, Compl. ¶ 152); *see Berdeaux*, 2021 WL 4267693, at *2, *7 (dismissing complaint that was "riddled with instances of improper group pleading"); *supra* § I.A.2.e.

16

However, the fact that "ISIS claimed responsibility for the Pulse Night Club shooting did not compel a finding that ISIS "committed, planned, or authorized" it. *Crosby v. Twitter, Inc.*, 921 F.3d 617, 619, 626 (6th Cir. 2019) (citation omitted).  And while Plaintiffs characterize their allegations by pointing to their pleadings as "unambiguous" in asserting the alleged terrorists at issue were members of Hamas, that is all they do:  Plaintiffs' characterization of individuals as "Hamas agent[s]," without more than after-the-fact praise and claim of membership, is conclusory. (Opp. at 21); *cf. Crosby*, 921 F.3d at 621 (holding that allegations were insufficient where plaintiffs alleged that "[a]fter the attack, ISIS praised Mateen and announced that the Pulse Night Club shooting 'was carried out by an Islamic State fighter'").  Plaintiffs plead no facts from which it can be inferred that the individual terrorists at issue were actually acting pursuant to Hamas's control or authorization (*see* Compl. ¶¶ 346-50 (alleging no involvement of Hamas before attack, other than conclusory allegation that individual was a "Hamas terrorist")), and thus, fail to plead that Hamas or PIJ committed, planned, or authorized the alleged attacks at issue.

## II.      PLAINTIFFS DO NOT STATE A CLAIM FOR PRIMARY LIABILITY UNDER THE ATA

Plaintiffs' primary liability claims are similarly defective because they fail to allege any facts that would support an act of terrorism, an intent to intimidate or coerce, or an inference of proximate cause as required by the ATA.

### A.      Plaintiffs Mischaracterize *Miller* in an Unsuccessful Effort to Plead an Act of Terrorism

In alleging that MAR's conduct constituted "acts of terrorism," Plaintiffs repeatedly compare their allegations to those in *Miller*, asserting that "the Bank Defendants provided the same types of services that Judge Cogan found sufficient in *Miller* to plead the ATA's primary liability requirements."  (Opp. at 47).  Plaintiffs' attempt to equate MAR's routine financial transactions with the scheme detailed in *Miller* mischaracterizes both the Complaint and *Miller*.

17

The allegations in *Miller* involved "a terrorist insurance scheme" in which Arab Bank was provided "with detailed lists containing the names of the martyrs, their personal information, and the date and manner of their death, which often included bullets, bombs, and assassinations." 372 F. Supp. 3d at 39. "[A]n Arab Bank employee *called a terrorist to inform him* that, because the terrorist was injured and hospitalized, he was eligible for $1,330" and personally met with him to give "him a check for that amount." *Id.* at 40 (emphasis added). The plaintiffs in *Miller* pled that the scheme "incentivized terrorists to commit acts of violence to receive the benefits" and "helped Hamas gather support." *Id.* In short, "Arab Bank provided banking services 'in an unusual way under unusual circumstances.'" *Id.* at 48 (quoting *Halberstam*, 705 F.2d at 487). Indeed, bank employees were alleged to be active participants in a scheme to compensate terrorists.

In contrast, here, Plaintiffs all but concede that the allegations as to MAR concern routine financial transactions. (Opp. at 33) (lumping Defendants together to show services at issue were "anything but routine," without specifying any action taken by MAR); *see also supra* § I.A.2.e. *Miller* acknowledged that "routine financial services," even to "members and associates of terrorist organizations," do not meet the "definition of international terrorism under the ATA." 372 F. Supp. 3d at 44-45 (citation omitted). Several cases in the Second Circuit, which Plaintiffs do not even attempt to distinguish, have held that "providing wire transfer and other financial services" is "not an act which is 'violent or dangerous to human life' as contemplated by the ATA." *Bartlett v. Société Générale de Banque Au Liban SAL*, No. 19-cv-00007 (CBA) (VMS), 2020 WL 7089448, at *8 (E.D.N.Y. Nov. 25, 2020) (citation omitted); *see also Freeman*, 413 F. Supp. 3d at 91 (explaining that, "[g]iven the many legitimate activities [the customers] engage in, the mere act of providing financial services to them cannot be violent or dangerous," even when "non-routine"); *O'Sullivan*, 2019 WL 1409446, at *8 ("The Complaint does not allege plausibly that the provision

18

of banking services, which are not inherently violent or dangerous, can be considered as acts dangerous to human life . . . .").  Similarly, routine financial transactions do not evince an objective intent to intimidate citizens or influence a government.  (Mot. at 13-15).[11]

**B.      Plaintiffs Fail to Establish that MAR's Alleged Activity Was the Proximate Cause of Plaintiffs' Injuries**

Under the ATA, Plaintiffs must allege proximate causation, or, a "sufficiently direct relationship between the conduct in question and the injuries for which recovery is sought." *Zapata v. HSBC Holdings, PLC*, 414 F. Supp. 3d 342, 356 (E.D.N.Y. 2019) (citations omitted); (*see* Mot. at 15).  Here, Plaintiffs cannot do so.  "[P]roximate cause under ATA requires inquiry into foreseeability, directness, and the substantiality of the defendant's conduct."  *Zapata*, 414 F. Supp. 3d at 356 (internal quotation marks and citations omitted).   Here, Plaintiffs fail to demonstrate how their claims—which situate MAR in a long chain of alleged links and do not allege MAR participated or funded the attacks either directly or indirectly—could have caused the attacks.  (*See* Mot. at 16-17).

In particular, Plaintiffs fail to engage with *Zapata*, which dismissed ATA claims for failure to plead proximate cause.  (*See* Opp. at 48 n.27 (relegating the entirety of Plaintiffs' discussion of *Zapata* to a footnote and calling its applicability here "unavailing")); *Zapata*, 414 F. Supp. 3d at 358.  Plaintiffs fail to distinguish how their allegations differ at all from those in *Zapata*, in which the defendant bank's customers were cartels that had "abundant cash resources" (like Hamas (*e.g.*, Compl. ¶ 112)) and did not have to pass through the defendant bank in order to allegedly fund the

---

[11] Contrary to Plaintiffs' assertion that the decision in *Kaplan v. Al Jazeera* "has no relevance to this matter," (Opp. at 50 n.28), the plaintiffs in that case "failed to allege any facts suggesting that Defendant broadcast news of the Hezbollah Rocket Barrage with the intention of assisting Hezbollah."  No. 10-cv-5298, 2011 WL 2314783, at *5 (S.D.N.Y. June 7, 2011).  Similarly, here, Plaintiffs have alleged no non-conclusory facts suggesting that MAR had an objective intent to intimidate citizens or influence a government.  (*See* Mot. § III.A.).

4855-9028-1758

acts of violence (like Hamas, which can obtain money on its own apart from the alleged transactions with MAR (*see id.* ¶¶ 110, 112, 114)).  *Zapata*, 414 F. Supp. 3d at 356.

Moreover, as in *Zapata*, if Plaintiffs' theory of causation "were . . . enough to sustain a claim," then courts would be required to hold banks liable for all FTO violence.  *See id.* at 357.  The allegations here are only that MAR engaged in ordinary banking activity.  In contrast, in *Miller*, the defendant bank employees actually handed money to terrorists, unlike MAR, for whom "the factual allegations delineating relationships between those services and the terrorist attacks at issue are so attenuated."  *O'Sullivan*, 2019 WL 1409446, at *8.  In a futile attempt to distinguish their threadbare allegations, Plaintiffs attempt to raise a question of fact by pointing to allegations in the Complaint that MAR transferred funds for Qatar Charity into an account in the Palestinian Territories, where Qatar Charity had been banned. (Opp. at 54-55). As discussed *supra* § I.B.1. and in the Motion (Mot. § IV.A.1.), Plaintiffs have failed to plead sufficient allegations from which the Court could infer that MAR should have foreseen that transferring funds for Qatar Charity would have resulted in Qatar Charity's local branches allegedly funding the attack that injured Plaintiffs; Plaintiffs are merely attempting to repackage their deficient JASTA claims.

Plaintiffs' causation arguments are all the more unavailing because of the gap in time between the alleged transactions and the 2018 attack.  Plaintiffs assert that the gap in *Cabrera* was greater than the gap here.  (Opp. at 54); *see Cabrera v. Black & Veatch Special Projects Corps.*, No. 19-cv-3833 (EGS) (ZMF), 2021 WL 3508091 (D.D.C. July 30, 2021).  But Plaintiffs acknowledge that *Cabrera* establishes temporal distance as "an element of foreseeability," even at the pleading stage.  (Opp. at 54).[12]  Contrary to Plaintiffs' misreading of *Weiss v. Nat'l Westminster*

---

[12] Plaintiffs also take issue with MAR's use of *Cabrera* to argue that it could not "foresee being haled into court" in New York, claiming that "foreseeability relates to a plaintiff's injury, not to a defendant's ability to predict litigation." (Opp. at 54).  However, Plaintiffs must plead both.  *See generally Cabrera*, 2021 WL 3508091.  First, as a matter of

*Bank PLC*, 453 F. Supp. 2d 609, 632 (E.D.N.Y. 2006), no court has held that Plaintiffs need not demonstrate temporal proximity at the motion to dismiss stage, and Plaintiffs cite none.[13]  Nor do Plaintiffs cite any cases in which a claim under the ATA for an injury *three years* after any alleged misconduct was found to plausibly plead causation.[14]

Plaintiffs attempt to downplay the temporal gap by asserting that MAR "ignore[s]" Plaintiffs' allegations that "Defendants' knowing support of Hamas occurred before, during, and after both attacks that injured Plaintiffs."  (Opp. at 53).  In support, Plaintiffs cite only one, wholly conclusory allegation against MAR, (Compl. ¶ 75 (alleging "[MAR] provided Qatar Charity with financial services throughout the time relevant to Plaintiffs' claims" and [MAR] "continues to provide those services to Qatar Charity to this day")), which fails to meet *Twombly*'s plausibility standard—that is, those allegations must be "plausible" on their face and more than "speculative," (*see* Mot. at 17); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

---

proximate causation under the ATA, they must plead that their injuries were foreseeable, *id.* at *20 ("To survive a motion to dismiss on this issue, plaintiffs must plausibly allege . . . that [their] injuries were reasonably foreseeable or anticipated as a natural consequence of the defendant's conduct."), and second, as a matter of personal jurisdiction under the Due Process Clause of the U.S. Constitution, "that a defendant should reasonably anticipate being haled into court there," *id.* at *13 (internal quotation marks and citation omitted).

[13] Likewise, Plaintiffs attempt to distinguish *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542 (E.D.N.Y. 2012), by asserting that the foreseeability issue is "fact-intensive" and should be "explored after discovery," (Opp. at 55), but Plaintiffs have alleged no relevant facts to establish foreseeability.  Moreover, the decision under Rule 12(b)(6) in *Gill* was published less than a month before the summary judgment decision dismissing Plaintiffs' claims for lack of foreseeability, and the decisions were "designed to be read with, and as part of," one another.  *Gill*, 893 F. Supp. 2d at 547.  The *Gill* plaintiffs' inability to offer "evidence [the transfers] were in close temporal proximity to the" terrorist attacks at issue, *id.* at 563, only underscores that Plaintiffs here have pled claims for which discovery would be futile with regard to temporal proximity.  Plaintiffs have yet to argue otherwise, even though their claims involve a three-year temporal gap.

[14] Plaintiffs' attempt to rely on *In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284 (S.D. Fla. 2018) is misplaced. (Opp. at 55).  As Plaintiffs rightly note, the court in *In re Chiquita* explained that "foreseeability" is "more attenuated" for ATA claims "[t]he greater the time between the payments and the attack." *In re Chiquita*, 284 F. Supp. at 1313. The fact that some payments at issue in that case "continu[ed] up through *and during* the time of the FARC's kidnapping and killing of Plaintiff's family members" only highlights how comparatively attenuated Plaintiffs' claims are.  *Id.* at 1317 (emphasis added).

4855-9028-1758

III.    **PLAINTIFFS FAIL TO ESTABLISH A *PRIMA FACIE* CASE OF PERSONAL JURISDICTION**

    A.    **Plaintiffs Fail to Demonstrate Basic Jurisdictional Requirements of Due Process and Minimum Contacts**

Plaintiffs fail to allege that MAR has sufficient minimum contacts with New York. Contrary to Plaintiffs' argument that MAR "intentionally availed itself of the protections that New York law provides to banking institutions," all but one of the paragraphs Plaintiffs cite in support of this assertion in their Opposition fail to even *mention* New York.  (*See* Opp. at 64-65 (citing Compl. ¶¶ 75, 126, 130)).[15]  The only one that does is the barebones allegation that "[b]etween 2009 and 2015, [MAR] arranged for currency exchange transactions that involved converting in excess of $3.5 million in USD and Euros held by Qatar Charity in Doha into Israeli shekels and moving those funds to Qatar Charity in the Palestinian Territories," and that "[t]he USD used in connection with those transactions passed through Bank of New York Mellon in New York." (Compl. ¶ 132(c)-(d)).  Plaintiffs' Opposition ignores the fact that these allegations may only amount to a *de minimis* amount of dollars passing through New York (as they fail to identify the amount or frequency of those funds that were actually U.S. dollars, not Euros), as well as the implausibility of using correspondent banking in New York to ultimately obtain Israeli shekels. (Mot. at 5).[16]

Moreover, even if the Court credits the statements that MAR offers its clients U.S. dollar services and that it uses Citibank, NA as its correspondent or agent to complete international

---

[15] Elsewhere in the Complaint, Plaintiffs' allegations with respect to New York offer no factual predicate for their assertion that MAR chose the New York forum, (*e.g.*, Compl. ¶ 161), and simply state legal conclusions, (*e.g.*, *id.* ¶ 23 ("Specifically, in furtherance of their conspiracy, Qatar Charity and Masraf Al Rayan, . . . knowingly accessed and utilized the banking system in the United States to transmit funds to Hamas and effectuated U.S. dollar-denominated funds transfers on behalf of Qatar Charity through the Bank of New York Mellon in New York.")).

[16] The temporal gap between alleged conduct relating to New York and the 2018 attack that injured Plaintiffs further highlights the implausibility of Plaintiffs' jurisdictional claims.  Plaintiffs fail to demonstrate how the alleged transfers in 2015 (which are routine banking transactions, even as alleged) "relate" to Plaintiffs' injuries three years later.  *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024-25 (2021).

4855-9028-1758

payments using CHIPS, (McArdle Decl. ¶ 19),[17] Plaintiffs still make no effort to allege how MAR *chose* New York as a forum.  (*See* Mot. at 6).  *See Cmty. Fin. Grp. v. Stanbic Bank Ltd.*, No. 14-cv-5216 (DLC), 2015 WL 4164763, at *4-5 (S.D.N.Y. July 10, 2015) (dismissing complaint for lack of personal jurisdiction and finding that plaintiffs alleged "only one connection between this case and New York," which was not purposeful).  Plaintiffs make much of their argument that U.S. dollar transactions must pass through a U.S. correspondent account (*see* Opp. at 14 n.8, 64 n.36), but acknowledge the limitations of this logical leap by noting that U.S. correspondent banks "participate in *virtually* all large wire transfers of USD" and that those transactions "*generally* 'clear' in the United States, through a U.S. bank," failing to plead purposeful availment.  (Opp. at 61 n.36) (emphases added); *see also Vasquez v. Hong Kong & Shanghai Banking Corp.*, 477 F. Supp. 3d 241, 259 (S.D.N.Y. 2020) (dismissing complaint because "there is no evidence that [defendant] directed the funds to be deposited or controlled the route of the plaintiffs' funds through the correspondent account").

Plaintiffs also mischaracterize *Berdeaux* as "inapposite."  (Opp. at 67).  In *Berdeaux*, the court held that the plaintiffs' allegations were insufficient under 302(a)(1) where they alleged contact with New York in the form of a wire transfer of $30 million through a correspondent account located in New York.  2021 WL 4267693, at *10.  Likewise, Plaintiffs' allegations here are insufficient when all they allege is conclusory and vague contact with the New York forum through an alleged $3.5 million's worth of "currency exchange transactions" for which MAR "arranged," which allegedly passed through a New York bank.  (Compl. ¶ 132(c)-(d)).[18]

---

[17] The Complaint does not allege that MAR's correspondent bank was Citibank, NA; rather, it alleges that MAR "maintained a direct or indirect correspondent banking relationship with Bank of New York Mellon, and perhaps other U.S. banks."  (Compl. ¶ 161).

[18] Moreover, Plaintiffs' assertion that *Berdeaux* is inapplicable because plaintiffs there "disclaimed all bases for personal jurisdiction other than CPLR 302(a)(3)(ii)," (Opp. at 67), is not accurate; the court explained that it was

**B.      Conspiracy Jurisdiction Is Not Applicable to Plaintiffs' Claims as a Matter of Law**

Plaintiffs allege jurisdiction under New York's long-arm statute, N.Y. C.P.L.R. § 302(a)(1), over MAR based on MAR's alleged correspondent banking activity.  (Compl. ¶¶ 22-23, 161-63).  As noted above, and in the Motion, (*see* Mot. § I), Plaintiffs' allegations are insufficient to allege personal jurisdiction over MAR using New York's long-arm statute. However, even if they were not, Plaintiffs have a problem: they must also allege jurisdiction over Qatar Charity and Qatar National Bank under New York's long-arm statute, but courts have held that § 302(a)(1) is inapplicable to a conspiracy theory of jurisdiction.  *See, e.g.*, *Suber v. VVP Servs., LLC*, No. 20-cv-08177 (AJN), 2021 WL 4429237, at *6 (S.D.N.Y. Sept. 27, 2021) ("[T]he conspiracy theory of jurisdiction is not available under section 302(a)(1) . . . ."); *QBE Ams., Inc. v. Allen*, Nos. 22-cv-756 (JSR), 22-cv-757 (JSR), 2022 WL 889838, at *5 (S.D.N.Y. Mar. 25, 2022) ("[C]ivil conspiracy would not establish jurisdiction under CPLR 302(a)(1) . . . ."); *see also In re Dental Supplies Antitrust Litig.*, No. 16-cv-696 (BMC) (GRB), 2017 WL 4217115, at *7 (E.D.N.Y. Sept. 20, 2017) ("[T]here is no doctrinal support for 'conspiracy jurisdiction[]'" under New York's long-arm statute).[19]  As a result, Plaintiffs have shifted arguments, now prioritizing their jurisdictional argument under Rule 4(k)(2) of the Federal Rules of Civil Procedure.  (Opp. at 84 (describing the New York long-arm statute as the "alternative basis for exercising jurisdiction")).  However, Plaintiffs' Rule 4(k)(2) argument fares no better.

---

deciding the issue under CPLR 302(a)(1) as well.  *Berdeaux*, 2021 WL 4267693, at *8-9 ("[T]o avoid resting its decision on Plaintiffs' abandonment, the Court's analysis extends beyond Section 302(a)(3)(ii).").

[19] Despite Plaintiffs' best efforts, (Opp. at 82-84), jurisdiction under C.P.L.R. § 302(a)(2) is unavailable altogether because, as Plaintiffs acknowledge, (*id.* at 83), the Second Circuit has held that "a defendant's physical presence in New York is a prerequisite to jurisdiction under § 302(a)(2)."  *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 790 (2d Cir. 1999); *see also Shi v. Le*, No. 21-cv-1361 (ARR) (CLP), 2022 WL 896963, at *2 n.2 (E.D.N.Y. Mar. 28, 2022) (applying *Bank Brussels*).  Plaintiffs plead no such physical presence, and their assertion that § 302(a)(2)'s requirements are "satisfied here even though Masraf's agent did not participate in Defendants' conspiracy" is wholly unsupported and without merit.  (Opp. at 83).

As a threshold matter, Rule 4(k)(2) is inapplicable because Plaintiffs fail to show that Defendants are not subject to jurisdiction in any U.S. state and that exercising jurisdiction would be consistent with the U.S. Constitution and laws.  Plaintiffs represent that they cite the "most recent decisions" to argue that Plaintiffs do not need to certify that no states have jurisdiction over any of the Defendants to assert their claims, (Opp. at 60 n.32), but they cite no authority from within the Second Circuit.  *Cf. Aqua Shield, Inc. v. Inter Pool Cover Team*, No. 05-cv-4880 (CBA), 2007 WL 4326793, at *8 (E.D.N.Y. Dec. 7, 2007) (internal quotation marks and citation omitted) ("[T]he plaintiff must certify that, based on the information that is readily available to the plaintiff and his counsel, the defendant is not subject to suit in the courts of general jurisdiction of any state."); *Astor Chocolate Corp. v. Elite Gold Ltd.*, 510 F. Supp. 3d 108, 125 (S.D.N.Y. 2020) (collecting cases) ("In this Circuit, to meet the second requirement of Rule 4(k)(2), plaintiffs need to certify that, to their knowledge, the foreign defendant is not subject to jurisdiction in any other state.").[20]  Plaintiffs also ignore the *most* recent decision on Rule 4(k)(2), which held that "certification is a necessary component of the showing that the plaintiff must make" under Rule 4(k)(2).  *Motus, LLC v. CarData Consultants, Inc.*, 23 F.4th 115, 127 (1st Cir. 2022).  Instead of making this certification, Plaintiffs argue the opposite: that they "have also alleged jurisdiction under the New York long-arm statute."  (Opp. at 60 n.32).

Next, even if Plaintiffs made the requisite certification, Rule 4(k) "preclude[s] the use of a conspiracy theory of jurisdiction" when such a theory would be plainly inconsistent with the "federal statute," at issue.  *Rudersal*, 2022 WL 263568, at *11.  Here, JASTA "contains a specific limitation" that requires the defendant at issue to have allegedly conspired "with" the FTO at issue.

---

[20] In addition to being out-of-Circuit, neither case cited by Plaintiffs is more recent than *Astor*.  (Opp. at 60 n.32). Plaintiffs attempt to distinguish both *Aqua Shield* and *Astor* by asserting that they "applied the minority view," but these arguments are unavailing.  (*Id.*).  In the Second Circuit, *Aqua Shield* and *Astor* represent not only the majority view but the *only* view.

*Id.*; *see supra* § I.  As a result, a conspiracy theory of jurisdiction under Rule 4(k) is inapplicable to Plaintiffs' Complaint altogether.

Finally, Plaintiffs' claim of personal jurisdiction under a conspiracy theory fails because their Complaint is devoid of non-conclusory allegations that (1) a conspiracy existed, (2) that MAR participated in the alleged conspiracy, or (3) that any alleged co-conspirator took overt acts in furtherance of the conspiracy.  *See Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018); *supra* § I.A.  To the extent Plaintiffs lump Defendants together in their jurisdictional allegations, (*see, e.g.*, Compl. ¶ 22), Plaintiffs' pleadings are impermissible and should be dismissed on that basis.  *See supra* § I.A.2.e.

### C.     Personal Jurisdiction over MAR Would Be Inconsistent with Due Process

Plaintiffs ignore a lawsuit in Israel filed against MAR and nine other defendants arising out of the same alleged events, which renders Israel a suitable forum.  *See Ansbacher, et al. v. Qatar Charity, et al.*, Jerusalem District Court, CC 21387-06-21, Nov. 10, 2021; (Mot. at 11).  By Plaintiffs' own argument, "other jurisdictions' interests in furthering beneficial social policies" are relevant in the reasonableness inquiry.  (Opp. at 63) (citing *U.S. Bank Nat'l Ass'n v. Bank of Am., N.A.*, 916 F.3d 143, 151 n.5 (2d Cir. 2019)); *see also Asahi Metal Indus. Co. v. Super. Ct. of Cal.*, 480 U.S. 102, 115 (1987) (internal quotation marks and citation omitted) (explaining that reasonableness inquiry involving foreign defendant required considering "the procedural and substantive policies of other nations whose interests are affected by the assertion of jurisdiction" by a U.S. state, and admonishing that "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field").

### D.     No Jurisdictional Discovery Is Warranted

Plaintiffs are not entitled to jurisdictional discovery.  Plaintiffs' reliance on *Singer v. Bank of Palestine* is misplaced because the allegations in that case were drastically different from—and

4855-9028-1758

far more detailed than—the ones here. For example, the *Singer* plaintiffs alleged the defendant

maintained accounts for two customers, each of whom was a Specially Designated Global Terrorist

("SDGT"), as well as five customers that were "critical part[s] of Hamas's civilian infrastructure,"

one of which was also an SDGT.  No. 19-cv-006 (ENV) (RML), 2021 WL 4205176, at *2-3

(E.D.N.Y. Apr. 30, 2021).  Jurisdictional discovery was warranted because the plaintiffs had

"pleaded facts which could support a colorable claim of jurisdiction." *Id.* at *7.  In addition,

plaintiffs came "closest to identifying a New York connection" with allegations that two of the

defendant bank's customers (both SDGTs) maintained U.S. dollar-denominated accounts with the

defendant bank, that one of those customers received multiple transfers from the United States

through the bank's New York correspondent account, and that the other customer "appear[ed] to

be under the direct control of Hamas founder Ibrahim al-Yazuri," and that it "made multiple

transfers from the U.S. to [its U.S.-dollar denominated] account in Gaza."  *Id.* at *6 (internal

quotation marks omitted) (quoting plaintiffs' complaint).[21]  In comparison, Plaintiffs have alleged

nothing similar here: they have not alleged that MAR's customer was an SDGT (nor can they) that

maintained a U.S. dollar-denominated account with MAR, or that it was under the control of

Hamas.

Contrary to Plaintiffs' assertions, the *Licci* decisions[22] did not overrule *Tamam*.[23]  *Tamam*

does not stand for the proposition that passing money through a correspondent account for a

---

[21] The *Singer* plaintiffs also alleged that the defendant bank had maintained its account for that customer at least seven years after that customer was designated an SDGT.  *Id.* at *2.  Plaintiffs come nowhere close to alleging anything similar with respect to MAR's alleged maintenance of an account for Qatar Charity.

[22] *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL ("Licci II")*, 673 F.3d 50 (2d Cir. 2012); *Licci v. Lebanese Canadian Bank, SAL ("Licci III")*, 20 N.Y.3d 327 (2012); *Licci v. Lebanese Canadian Bank, SAL ("Licci IV")*, 732 F.3d 161 (2d Cir. 2013).

[23] The only point of law in *Tamam* that *Licci III* clarified was the nexus requirement, which requires "a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former," *Licci III*, 20 N.Y.3d at 339, as opposed to *Tamam*'s requirement that the transaction be "at the very root" of the claims, *Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720, 728-29 (S.D.N.Y. 2010) (internal quotation marks and citation

4855-9028-1758

terrorist organization cannot support exercising jurisdiction in a case arising from terrorist attacks, (*see* Opp. at 85-86); instead, the allegations in *Tamam* were simply not sufficient to establish jurisdiction because the plaintiffs had not alleged an "actual transfer of money through New York" to link defendants' correspondent accounts to terrorist operations. *Tamam*, 677 F. Supp. 2d at 727.

## IV.   PLAINTIFFS' DECLARATIONS AND EXHIBITS FAIL TO CURE THEIR LEGALLY DEFICIENT CLAIMS

Plaintiffs submit two declarations and thirteen exhibits in support of their Opposition. (*See* ECF Nos. 62-63.1 (Bonner Decl., McArdle Decl., and accompanying exhibits)). However, at the motion to dismiss stage, it is the pleadings that are the basis for dismissal, not the Plaintiffs' briefing. *See Honickman*, 6 F.4th at 502 n.19 (quotations omitted) (declining to take into account plaintiffs' factual assertions made in briefing and at oral argument, which were not made in the complaint itself, because a "Rule 12(b)(6) motion tests the adequacy of the complaint . . . not the briefs") (internal quotation marks and citations omitted, ellipses in original). In sum, these submissions cannot cure the Complaint's deficiencies. Moreover, even if the Court considers the McArdle Declaration, which Plaintiffs offer in an attempt to repair their insufficient jurisdictional allegations, it is wholly speculative because it makes inferences out of whole cloth and not based on properly pled allegations in the Complaint. (*See, e.g.*, McArdle Decl. ¶ 18 ("With Masraf Al Rayan Bank initiating the U.S. dollar-denominated transfers for Qatar Charity as discussed in the Complaints, these funds were *almost certainly* settled and cleared in the U.S. (New York) . . . .") (emphasis added);[24] *id.* ¶ 19 ("[I]t is *logical* that Masraf Al Rayan also understood that the U.S.

---

omitted). Plaintiffs also attempt to distinguish *Tamam* by arguing that, there, "the court held that the plaintiffs' allegations negated their suggestion that the defendant had passed USD through its correspondent bank account," (Opp. at 86 n.56), but Plaintiffs' own allegations are insufficient to support personal jurisdiction based on MAR's alleged correspondent banking. For example, Plaintiffs fail to meet the pleading standard articulated in *Licci III*; that is, they fail to allege "a relatedness between the transaction and the legal claim." 20 N.Y.3d at 339. This insufficiency is especially stark given the three-year time gap between the alleged transactions and the 2018 attack.

[24] This statement is also not correct. The Complaint does not allege that MAR initiated the alleged transfers.

dollar transfers conducted on behalf of its clients would pass through the U.S. as a matter of process.") (emphasis added)).  Regardless, the McArdle Declaration stands for nothing more than the fact that MAR offers U.S.-dollar denominated services and has a U.S. correspondent bank. (*See id.*)  As explained *supra* § III.A., simply alleging that MAR has a U.S. correspondent bank is insufficient to establish personal jurisdiction over MAR, nor does it satisfy the requirement that such correspondent bank activity have a nexus to the wrongful conduct alleged.  (*See also* Mot. at § I).

## V.      PLAINTIFFS DID NOT PROPERLY EFFECTUATE SERVICE

Plaintiffs have failed to establish that service by private courier is not prohibited by Qatari law, ignoring the Qatari law's plain meaning.  Plaintiffs, again, cite to Article 11 of the Qatari Civil & Commercial Procedures Law (Law No. 13 of 1990), in stating that Qatari law authorizes courts to deliver process "by registered mail."  (Opp. at 58) (citing Bonner Decl. ¶ 14 & Ex. 10); (*see also* ECF No. 52 at 4) (quotations omitted).  Plaintiffs attempt to avoid the fact that Article 10 of the Qatari Civil & Commercial Procedures Law—which governs service on a corporation,[25] unlike Article 11, which governs service on an individual person—applies by saying that it "has no bearing on the issue" of whether Qatari law expressly prohibits service by registered mail. (Opp. at 57).  But Article 10 still governs because it applies to service upon MAR, a corporation, and Plaintiffs have yet to allege how they have complied with Article 10.

Instead, Plaintiffs rely on a declaration by counsel, not any expert in Qatari law, to attempt to show the absence of any prohibition of service of process by mail under Qatari law.  (Opp. at 58) (citing Bonner Decl. ¶ 12 & Exs. 9-10).  In *Trueposition, Inc. v. Sunon, Inc.*, No. 05-cv-3023,

---

[25] *See* Article 10 of the Qatari Civil & Commercial Procedures Law (Law No. 13 of 1990, as amended by Law No. 7 of 1995).  Plaintiffs also decline to cite any authority to distinguish *Rosenberg*.  *See Rosenberg v. Lashkar-e-Taiba*, No. 10-cv-5381 (DLI) (CLP), 2017 WL 11647006 (E.D.N.Y. Mar. 31, 2017); (Opp. at 56).

4855-9028-1758

2006 WL 1686635, at *3-6 (E.D. Pa. June 14, 2006), upon which Plaintiffs rely even though it is not binding authority, the court relied on a declaration by a *foreign* lawyer that service by registered mail is a method of service regularly made in the foreign country under that country's laws, State Department guidance that service in the foreign country can be effected by international registered mail, and other cases in which courts found that the foreign country's law did not prohibit service of process by registered mail—none of which have been submitted by Plaintiffs here.[26]

Finally, Plaintiffs provide no compelling reason for this Court to order alternative service pending service of process through letters rogatory.  (Opp. at 58-59).  Plaintiffs have conceded that service through letters rogatory "is appropriate here" and necessary to enforce any judgment (ECF Nos. 14 at 3, 52 at 4), and that service has not yet occurred. (Opp. at 56, 59); (Bonner Decl. ¶¶ 10-11).[27]

## CONCLUSION

For the foregoing reasons, Defendant MAR respectfully renews its request that the Court dismiss Plaintiffs' Complaint in its entirety, with prejudice.

Dated: May 17, 2022
     New York, New York          PILLSBURY WINTHROP SHAW PITTMAN LLP

                                   By: */s/ Carolina A. Fornos*
                                       Carolina A. Fornos
                                       Pillsbury Winthrop Shaw Pittman LLP
                                       31 West 52nd Street
                                       New York, NY 10019-6131
                                       Tel.:   (212) 858-1000
                                       Fax:   (212) 858-1500

---

[26] Plaintiffs argue that service under Rule 4(f)(2)(C)(ii) is "prohibited" when the foreign country's law "expressly prohibits" the method of service, and "not merely that [the law] does not recognize or provide for it." (Opp. at 57) (internal quotation marks and citation omitted).  Again, Plaintiffs have not offered any facts showing that Qatari law does not expressly prohibit service by registered mail. (*See* Mot. at 12).

[27] Plaintiffs' argument that service can be "proved" because MAR has "appeared in and defended this action" and therefore MAR's argument is "pointless" fails to engage with the relevant law and would incentivize defendants to avoid appearing in lawsuits filed against them.  (Opp. at 57, 59).  Moreover, counsel for MAR has expressly reserved its rights and filed limited notices of appearances expressly highlighting this issue.  (*See* ECF Nos. 23, 31, 32).

4855-9028-1758

Aryeh L. Kaplan (*pro hac vice*)
Markenzy Lapointe (*pro hac vice*)
Pillsbury Winthrop Shaw Pittman LLP
600 Brickell Avenue, Suite 3100
Miami, FL 33131
Tel.:    (786) 913-4900
Fax:    (786) 913-4901
*Counsel for Defendant Masraf Al Rayan*

4855-9028-1758