UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANNE CHANA HENKIN, *et al*., <br><br> Plaintiffs, <br><br> v. <br><br> QATAR CHARITY, QATAR NATIONAL BANK, and MASRAF AL RAYAN, <br><br> Defendants. | No.  1:21-CV-5716-AMD-VMS |

**DEFENDANT QATAR CHARITY'S REPLY MEMORANDUM**
**IN FURTHER SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT**

**DLA PIPER LLP (US)**
John M. Hillebrecht
Kevin Walsh
Jessica Masella

1251 Avenue of the Americas
New York, New York 10020
Phone: (212) 335-4500
Email:    John.Hillebrecht@us.dlapiper.com
         Kevin.Walsh@us.dlapiper.com
         Jessica.Masella@us.dlapiper.com

*Counsel for Defendant Qatar Charity*

**May 17, 2022**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...........................................................................................1

ARGUMENT .....................................................................................................................3

I.      PLAINTIFFS FAIL TO MAKE THE REQUISITE PRIMA FACIE SHOWING
        FOR THIS COURT TO EXERCISE JURISDICTION OVER QATAR
        CHARITY ..............................................................................................................3

        A.      Rule 4(k)(2) Does Not Suffice to Confer Jurisdiction Over Qatar Charity
                Where Plaintiffs Fail to Establish a Prima Facie Case for its Application
                and Do Not Plead Any Contacts Between Qatar Charity and the U.S.
                Generally ....................................................................................................8

        B.      Qatar Charity is Not Subject to Personal Jurisdiction Under an Agency
                Theory ........................................................................................................10

        C.      Subjecting Qatar Charity to Personal Jurisdiction Pursuant to Plaintiffs'
                Proffered Conspiracy Theory Would Violate Due Process ....................12

        D.      New York's Long-Arm Statute Forecloses Exercising Personal
                Jurisdiction Over Qatar Charity ..............................................................15

        E.      The Due Process Reasonableness Factors Counsel Against Imposing
                Jurisdiction ...............................................................................................20

II.     PLAINTIFFS FAIL TO STATE ANY CLAIM FOR RELIEF .............................22

        A.      Counts III and IV Must Be Dismissed As Plaintiffs Fail to Plead a Primary
                Liability Claim ..........................................................................................22

                i.      Plaintiffs Fail to Plead that Qatar Charity Committed Any Act of
                        International Terrorism ..................................................................23

                ii.     Plaintiffs Fail to Plausibly Allege That Qatar Charity Proximately
                        Caused the Attacks ........................................................................25

        B.      Counts I and II Must Be Dismissed for Failure to Plausibly Plead a
                Secondary Liability Claim ........................................................................26

                i.      Plaintiffs Have Not Plausibly Alleged a JASTA Conspiracy Claim .........26

                ii.     Plaintiffs Have Not Plausibly Alleged a JASTA Aiding-And-
                        Abetting Claim ..............................................................................28

                        1.      Plaintiffs Have Not Plausibly Alleged General Awareness ...........28

                        2.      Plaintiffs Have Not Plausibly Alleged Knowing and
                                Substantial Assistance ...................................................30

III.    PLAINTIFFS FAILED TO PROPERLY EFFECT SERVICE OF PROCESS
        AND A REQUEST TO SERVE BY EMAIL DOES NOT CURE THE FAILURE .........31

IV.   PLAINTIFFS' REQUEST FOR JURISDICTIONAL DISCOVERY SHOULD
      BE REJECTED ................................................................................................................31

CONCLUSION ....................................................................................................................................31

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aqua Shield, Inc. v. Inter Pool Cover Team*,
    2007 WL 4326793 (E.D.N.Y. 2007)....................................................................9

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).....................................................................................22

*Astor Chocolate Corp. v. Elite Gold Ltd.*,
    510 F. Supp. 3d 108 (S.D.N.Y. 2020)..............................................................9

*Bartlett v. Societe Generale de Banque Au Liban SAL*,
    2020 WL 7089448 (E.D.N.Y. 2020)................................................................28

*Berdeaux v. OneCoin Ltd.*,
    2021 WL 4267693 (S.D.N.Y. Sept. 20, 2021).....................................11, 16, 20

*Chambers v. Time Warner Inc.*,
    282 F.3d 147 (2d Cir. 2002)...........................................................................23

*Charles Schwab Corp. v. Bank of Am. Corp.*,
    883 F.3d 68 (2d Cir. 2018).................................................................10, 13, 18

*Clean Coal Techs. v. Leidos, Inc.*,
    377 F. Supp. 3d 303 (S.D.N.Y. 2019).............................................................19

*Contant v. Bank of Am. Corp.*,
    385 F. Supp. 3d 284 (S.D.N.Y. 2019).............................................................20

*In re Dental Supplies Antitrust Litig.*,
    2017 WL 4217115 (E.D.N.Y. 2017)...............................................................13

*DISH Network, LLC. v. Kaczmarek*,
    2021 WL 4483470 (E.D.N.Y. June 24, 2021) ..................................................9

*In re Eur. Gov't Bonds Antitrust Litig.*,
    2022 WL 768680 (S.D.N.Y. Mar. 14, 2022) ..................................................15

*Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co., Ltd.*,
    609 F.3d 111 (2d Cir. 2010)...........................................................................12

*Fields v. Twitter, Inc.*,
    881 F.3d 739 (9th Cir. 2018) .........................................................................26

*Freeman v. HSBC Holdings PLC*,
    413 F. Supp. 3d 67 (E.D.N.Y. 2019) ....................................................18, 25, 26, 27

*Fuld v. Palestine Liberation Org.*,
    2022 WL 62088 (S.D.N.Y. Jan. 6, 2022) (appeal filed) .........................................21

*Gallop v. Cheney*,
    642 F.3d 364 (2d Cir. 2011) ................................................................................22

*Gill v. Arab Bank, PLC*,
    893 F. Supp. 2d 474 (E.D.N.Y. 2012) ..................................................................26

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) .......................................................................28, 30

*Hau Yin To v. HSBC Holdings, PLC*,
    700 F. App'x 66 (2d Cir. 2017) ............................................................................10

*Honickman v. BLOM Bank SAL*,
    6 F.4th 487 (2d Cir. 2021) .......................................................................29, 30, 31

*Honickman for Estate of Goldstein*,
    432 F. Supp. 3d 253 (E.D.N.Y. 2020) ..................................................................29

*Kaplan v. Lebanese Canadian Bank, SAL*,
    999 F.3d 842 (2d Cir. 2021) ................................................................................27

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013) ................................................................................20

*Linde v. Arab Bank, PLC*,
    882 F.3d 314 (2d Cir. 2018) .......................................................................25, 28, 30

*In re N. Sea Brent Crude Oil Futures Litig.*,
    2017 WL 2535731 (S.D.N.Y. 2017) .....................................................................18

*O'Sullivan v. Deutsche Bank AG*,
    2019 WL 1409446 (S.D.N.Y. 2019) .....................................................................27

*Owens v. BNP Paribas, S.A.*,
    897 F.3d 266 (D.C. Cir. 2018) .............................................................................26

*PharmacyChecker.com, LLC v. Nat'l Ass'n of Boards of Pharmacy*,
    530 F. Supp. 3d 301 (S.D.N.Y. 2021) ..................................................................18

*Pincione v. D'Alfonso*,
    506 F. App'x 22 (2d Cir. 2012) ............................................................................12

iv

*In re Platinum & Palladium Antitrust Litig.*,
    449 F. Supp. 3d 290 (S.D.N.Y. 2020) .............................................................13, 21

*QBE Americas, Inc. v. Allen*,
    2022 WL 889838 (S.D.N.Y. Mar. 25, 2022) (Rakoff, J.) .......................................17

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013) ...................................................................................26

*Rudersdal v. Harris*,
    2022 WL 263568 (S.D.N.Y. Jan. 28, 2022) .........................................................13

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*,
    22 F.4th 103 (2d Cir. 2021) .............................................................12, 14, 15, 17

*Siegel v. HSBC North America Holdings*,
    933 F.3d 217 (2d Cir. 2019) ............................................................................26, 30

*SK's Cosm. Boutique Inc. v. J.R. Silverberg Realty*,
    2020 WL 3451324 (S.D.N.Y. 2020) ......................................................................19

*Smartmatic USA Corp. v. Fox Corp.*,
    2022 WL 685407 (Sup. Ct. N.Y. Cnty. Mar. 08, 2022) ....................................17, 18

*Spetner v. Palestine Inv. Bank*,
    495 F. Supp. 3d 96 (E.D.N.Y. 2020) .......................................................4, 8, 11, 12

*In re SSA Bonds Antitrust Litig.*,
    420 F. Supp. 3d 219 (S.D.N.Y. 2019) ................................................................9, 19

*Strauss v. Credit Lyonnais, S.A.*, Pet. for Cert.
    2021 WL 4117377 (2021) ....................................................................................30

*Strauss v. Credit Lyonnais, S.A.*,
    379 F. Supp. 3d 148 (E.D.N.Y. 2019) ...................................................................24

*Suber v. VVP Servs., LLC*,
    2021 WL 4429237 (S.D.N.Y. Sept. 27, 2021) ......................................................17

*Universal Trading & Inv. Co. v. Tymoshenko*,
    2012 WL 6186471 (S.D.N.Y. 2012) ......................................................................16

*Vasquez v. Hong Kong and Shanghai Banking Corp., Ltd.*,
    477 F. Supp. 3d 241 (S.D.N.Y. 2020) ...............................................................11, 14

*Weiss v. Nat'l Westminster Bank PLC*,
    381 F. Supp. 3d 223 (E.D.N.Y. 2019) ...................................................................25

*Weiss v. Nat'l Westminster Bank PLC*,
   768 F.3d 202 (2d Cir. 2014)............................................................................4, 27

*Weiss v. National Westminster Bank PLC*, Pet. for Cert.
   2021 WL 4117187 (2021)............................................................................29, 30

*Zapata v. HSBC Holdings PLC*,
   414 F. Supp. 3d 342 (E.D.N.Y. 2019), *aff'd,* 825 F. App'x 55 (2d Cir. 2020)................25, 26

**Other Authorities**

CPLR 302(a)(1) ...........................................................................10, 13, 15, 17

CPLR 302(a)(2) ...........................................................................10, 13, 17, 19

CPLR 302(a)(3)(ii)..............................................................................16

Federal Rule of Civil Procedure 4(k)(2) ...................................................3, 8, 9, 10, 13

## PRELIMINARY STATEMENT

Plaintiffs' 87-page Omnibus Memorandum of Law does nothing to cure the deficiencies of a Complaint based entirely on wholly implausible allegations. These deficient allegations fail to state a claim. Nor do they constitute a *prima facie* showing that jurisdiction exists over Qatar Charity—an entity which has no contact whatsoever with this forum. Under the law previously cited to the Court, this case must be dismissed as to Qatar Charity.

As previously demonstrated, Qatar Charity has earned high praise from the U.S. government and leading international organizations as a reliable partner in providing humanitarian assistance to some of the world's neediest communities. (*See* Memorandum in Support of Qatar Charity's Motion to Dismiss ("MTD Mem.") at 2–6, 23–25). This renders Plaintiffs' allegations wholly implausible. And although Plaintiffs challenge the invocation of these good works as "hearsay," the exhibits attached to Qatar Charity's Motion to Dismiss were either (i) explicitly incorporated into the Complaint by Plaintiffs themselves or (ii) are reliable material in the public domain subject to judicial notice. (*See* MTD Mem. at 3 n.2). Moreover, the import of the statements contained in the documents that Qatar Charity has submitted to the Court lie largely in the fact that they were made. That high-ranking U.S. diplomats have publicly praised Qatar Charity as "one of the best organizations in the world" (Ex. 17; MTD Mem. at 25), that the U.S. Agency for International Development and the U.N. have spoken with pride of their numerous partnerships with the Charity (*e.g.*, Exs. 1, 2, 5, 6), and that Bill Gates has traveled to Doha to personally announce his foundation's partnership with the Charity (Ex. 27) are significant for purposes of this motion not because they are true (as they certainly are) but because it is preposterous to imagine that those statements would have been made if the entities making them—most pertinently, the U.S. government and State Department—had

information suggesting that Qatar Charity was knowingly assisting fronts for Hamas.[1]  These statements are thus highly relevant to the assessment that this Court must undertake in evaluating the plausibility of the Complaint's allegations.

The documents submitted by Qatar Charity to the Court include the Annual Reports incorporated into the Complaint by Plaintiffs.  In their Opposition, Plaintiffs continue to mischaracterize those Reports.  (*See* Opp. Mem. at 9, 25, 47 n.25).  Plaintiffs also rely heavily on the "confessions of the Director and staff of Qatar Charity's West Bank Branch" in Israeli criminal proceedings.  (Complaint ¶ 130; Opp. Mem. at 38).  Plaintiffs allege that those confessions "detail how Qatar Charity and Masraf laundered USD through the U.S."  (Opp. Mem. at 40).  But the confession and testimony we have been able to obtain, of Fadi Manassra, the Charity's staff accountant in Ramallah responsible for fund transfers, do nothing of the kind.[2]  While we have not been able to obtain the other referenced confessions, Manassra's confession and testimony completely refute Plaintiffs' allegations.  Crucially, these documents flatly contradict the central allegation upon which Plaintiffs seek to base their personal jurisdiction argument, that U.S. Dollars were transferred through a correspondent account in New York.

To the contrary, in both Manassra's confession (which appears in a signed, handwritten Arabic statement and a separate but substantially similar Hebrew statement) and trial testimony, summarized in more detail below, he describes the money flow to Qatar Charity's branch in the West Bank as follows: funds at the Masraf Al Rayan bank in Doha, in Euros, would be transferred to "Deutsche Bank in Germany" and then "transferred to the Bank of Palestine in

---

[1] References to "Ex." refer to exhibits attached to Qatar Charity's Memorandum in Support of its Motion to Dismiss. References to "Reply Ex." refer to additional exhibits attached to the declaration of Michael G. Lewis ("Lewis Declaration") in support of this brief, the majority of which are incorporated into the Complaint.
[2] There are several alternative translations of Manassra's name, as is the case for the other former employees of Qatar Charity apparently referenced in the Complaint, Juda Jamal and Najwan Awda.

Ramallah to Branch number 1213"; only once received by the Bank of Palestine would that bank "convert the bills from Euros to Dollars."  (Reply Ex. 1, Fadi Manassra Interrogation at 3:85 and 3:87).  Thus, one of the confessions that Plaintiffs repeatedly urge the Court to consider in support of personal jurisdiction actually makes explicit that there is absolutely no basis for jurisdiction here.

## ARGUMENT

### I.  PLAINTIFFS FAIL TO MAKE THE REQUISITE PRIMA FACIE SHOWING FOR THIS COURT TO EXERCISE JURISDICTION OVER QATAR CHARITY

Plaintiffs allege that jurisdiction over Qatar Charity is proper under both Federal Rule of Civil Procedure 4(k)(2) and New York's long-arm statute.  As support for each purported basis of jurisdiction, Plaintiffs rely heavily on two allegations: (i) that Qatar Charity has long been, and remains to this day, a member of the "Union of Good," a Specially Designated Global Terrorist ("SDGT") (*see* Opp. Mem. at 10–11, 25); and (ii) that the "confessions" of Charity staff members in the Palestinian Territories confirm that Masraf Al Rayan and the Charity "laundered USD through the U.S." for the benefit of Hamas (Opp. Mem. at 14, 40).  But just as the Plaintiffs mischaracterized the Charity's Annual Reports, these allegations—central to their theories of jurisdiction—are similarly misleading.[3]

Plaintiffs assert, for instance, that Qatar Charity is a member of the Union of Good and claim that the designation of the Union of Good as an SDGT by the U.S. Department of Treasury tarred the Charity with the same brush and placed the Bank Defendants on notice that the Charity was a bad actor.  Plaintiffs further contend that Masraf Al Rayan's alleged in-forum conduct between 2011 and 2015 (putatively through a New York correspondent bank which is

---

[3] Although Plaintiffs continue to argue that the Annual Reports "demonstrate that [the Charity] transferred funds to . . . multiple fronts for terrorist organizations" (Opp. Mem. at 9), those Reports—which are before the Court—say no such thing.  (*See* Exs. 22, 23, 24).

3

concededly not a co-conspirator) suffices to establish jurisdiction over all Defendants in New York.  But yet again, Plaintiffs' theory of jurisdiction rests entirely on misleading factual assertions.

The Charity does not dispute that the Court can take judicial notice of the fact that the U.S. Treasury Department designated the Union of Good as an SDGT—not, as Plaintiffs wrongly claim (*see* Opp. Mem. at 66), a Foreign Terrorist Organization ("FTO").[4]  But the Court should also take judicial notice of the fact that in that designation there is no mention of Qatar Charity, although there is reference to certain specific entities and individuals as well as reference to "several organizations previously designated" under an earlier Executive Order.[5] The Court must also take notice of the fact that the U.S. government has ***never*** designated Qatar Charity as an SDGT or FTO; to the contrary, the United States regularly works with the Charity and has repeatedly praised its good work.  (*See* MTD Mem. at 4–6, 23–25.)

Significantly, Qatar Charity definitively terminated any association with the Union of Good 13 years ago, within months of the U.S. designation.[6]  Thus, the Charity's minimal association with the Union of Good ended years before the inception of the purported conspiracy.[7]

---

[4] Because the Union of Good is an SDGT and not an FTO, it does not qualify as a "terrorist organization" for the purposes of § 2339B of the ATA.  *See, e.g.*, *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 209 (2d Cir. 2014).
[5]  *See* Reply Ex. 2, Treasury Designates the Union of Good, *U.S. Dep't of the Treasury* (Nov. 12, 2008), https://home.treasury.gov/news/press-releases/hp1267 (press release announcing U.S. Department of the Treasury's designation of the Union of Good under Executive Order 13224).
[6] Plaintiffs' theory of jurisdiction is premised on the conclusory allegation that Qatar Charity is a member of the Union of Good.  It serves as the primary basis for Plaintiffs' allegation that Qatar Charity was part of the purported conspiracy and that Qatar Charity has a connection to Hamas.  Attached to the Lewis Declaration as Reply Exhibit 3 is a letter dated April 2, 2009, by which Qatar Charity terminated its membership with the Union of Good shortly after its designation as an SDGT.  This letter is appropriately considered by the Court.  On a motion to dismiss based on lack of personal jurisdiction, a Court may consider "outside materials" such as the termination letter for the purpose of determining whether Plaintiffs have made the *prima facie* showing required of them to survive Qatar Charity's 12(b)(2) motion.  *Spetner v. Palestine Inv. Bank*, 495 F. Supp. 3d 96, 109 (E.D.N.Y. 2020).
[7] In reality, Qatar Charity never provided any funds to the Union of Good, never co-sponsored any events or programs, and never attended any Union of Good events.

4

Plaintiffs also allege, without citation or any detail, that "confessions" obtained from certain former Charity employees support the conclusion that Masraf Al Rayan and the Charity laundered U.S. Dollars through New York for the benefit of Hamas.  (Complaint ¶ 130; Opp. Mem. at 14, 40).  Yet again, as with the Annual Reports and the Union of Good allegations, these claims are fundamentally misleading and not supported by the confessions and testimony of which we are aware.  For example, the confession made by Fadi Manassra utterly contradicts the Plaintiffs' claim that U.S. Dollars transited through New York.  Manassra was the Charity's staff accountant in Ramallah, responsible for (among other things) interacting with banks and "monitoring money transfers" (Reply Ex. 4, Sept. 1, 2017, Trial Testimony at 5:11) and "recording the movements of incoming and outgoing funds" (Reply Ex. 1 at 2:30).  When interrogated by Israeli authorities in 2015, this is what Manassra said about money transfers (based on a certified translation):

> The funds are at the Al-Riyyan Bank [sic] in Doha it is transferred [sic] to Deutsche Bank in Germany.  From there it is transferred to the Bank of Palestine in Ramallah to Branch Number 1213.  At the bank branch in Ramallah, we convert the bills from Euros to Dollars and this action is only done at the Bank of Palestine.  This is the Qatar Organization's policy for all branches around the world.

(Reply Ex. 1 at 3:85–89).  At his subsequent trial—where he testified as "Prosecution Witness Number 3," called by the Israeli prosecutors as a cooperative witness—Manassra confirmed that the money flowed from Doha through Deutsche Bank "in Germany" and thence to the Bank of Palestine.  The prosecutor then asked, "This money, how is it transferred?  In what currency?" to which Manassra replied, "Euro[s]."  (Reply Ex. 4 at 5:28–29).

Plaintiffs' representation to this Court that the referenced "confessions" "confirm that Masraf used its correspondent accounts to pass USD through New York for the benefit of Qatar Charity and Hamas" would thus appear to be a fiction made up out of whole cloth.  (Opp. Mem.

at 14).  The Israeli judicial proceedings referenced by Plaintiffs reflect guilty pleas concerning working for an organization deemed illegal by Israeli authorities.[8]  They do not represent convictions for providing financial support to Hamas.  Furthermore, as is not unusual, Israeli authorities were well aware of, and permitted, continued operations of the Charity, even though it was a "designated" entity.[9]  (Indeed, they have also permitted millions of dollars of Qatari government assistance, including for the payment of Hamas salaries).[10]

The transcript of the Manassra confession also rebuts Plaintiffs' allegations that Qatar Charity was nothing more than the fundraising arm of a murderous terrorist organization.  As Manassra testified, when called as a **prosecution** witness, the Charity "is only a social association that helps society's weaker populations, among them orphans, the poor, and people with special needs."  (Reply Ex. 4 at 5:2–3).  Its "purposes are humanitarian only.  Aid to all people regardless of religion or race."  (Reply Ex. 4 at 5:41).

As to the Plaintiffs' allegation that Sanabel cards "operated as a source of financing for Hamas" (Complaint ¶ 151), Manassra testified that it was nothing of the sort, but rather a wholly benign effort to help thousands of orphans.  He described "the conditions for registration" as simply that "the child's father died before age 10" and that proper paperwork (such as death and

---

[8] Reply Ex. 5, Case (Military Court of the West Bank) 6014/15 *Military Public Prosecution v. Najwan Mohammed Iman Hassan Awda* (Feb. 8, 2017) (Isr.) at 2 ("Defendant was convicted based upon her confession, with[in] the framework of the guilty plea agreement, that she was a member of the Qatar Charity organization, an illegal organization."); Reply Ex. 6, Case (Military Court of Appeals) 3189/15, *Juda Dib Ibrahim Jamal and Fadi Bahjat Abd el-Fateh Manassra v. Military Advocate General's Office*, (Dec. 30, 2015) (Isr.) at 1 ("The Qatar Association is an illegal association . . . [Juda Jamal and Fadi Manassra] . . . were indicted for membership in an illegal association, holding office in an illegal association, performing a service for an illegal association and bringing in enemy money."); Reply Ex. 7, Case (Military Court of Appeals) 2731/15 *Najwan Mohammed Iman Hassan Awda v. Military Prosecution* (Oct. 13, 2015) (Isr.) at 1 (same).
[9] Reply Ex. 8, Human Rights Watch, *Born Without Civil Rights*, HRW (Dec. 17, 2019) at 38 (despite the designation, Israel allowed Qatar Charity to deliver funding into Gaza in May 2019); *see also* MTD Mem. at 4 n.5 (discussing Qatar Charity's partnership with the U.N. to deliver supplies which "until recently have been prevented from entering by Israeli authorities").
[10] *See* MTD Mem. at 4 n.5.

birth certificates) were filed.  (Reply Ex. 1 at 3:62–63).  When at trial the Israeli prosecutor elicited testimony regarding these cards, there was no mention of Hamas, and no suggestion that the program had any purpose other than to assist "orphans who live with the mother."  (Reply Ex. 4 at 7:25).  More generally, under questioning by the prosecutor, Manassra testified— without contradiction or challenge—that "all the money we have transferred to charities helps orphans and people with special needs."  (Reply Ex. 4 at 7:41).

In assessing the plausibility of Plaintiffs' allegations, this Court must therefore weigh the false conclusions that Plaintiffs ask this Court to draw from the Israeli judicial proceedings against actual Israeli court proceedings they incorporate into the Complaint *and* Qatar Charity's standing in the world community, including in the U.S., where it enjoys a strong relationship with the U.S. government.[11]  This court should similarly discount Israel's 2008 designation of Qatar Charity as an "illegal" organization, upon which Plaintiffs also rely heavily, as this summary designation cannot be reconciled with Qatar Charity's worldwide charitable endeavors. That designation cannot bear the weight Plaintiffs put upon it.  Indeed, the very court proceedings in Israel upon which Plaintiffs rely demonstrate that Qatar Charity operated openly and that "the Israeli authorities [were] aware of [the Charity's] activities," including by dint of "correspondence with the Israeli Tax Authorities [and] the Israeli Ministry of the Economy." (*See* Reply Ex. 9, Notice filed in *Juda Jamal et al v. The Military Prosecution* at 1).  The Charity's staff therefore argued that the Israeli authorities' knowledge of their activities reflected the fact that the Charity had "returned to being legal."  (*See* Reply Ex. 9 at 1).  Nor does the designation of an entity in Israeli as "illegal" determine whether the United States will designate

---

[11] *See, e.g.*, MTD Mem. at 23–25.

it as a Foreign Terrorist Organization, which of course, the United States has not done in the case of Qatar Charity.[12]

In sum, the "confession" of the Qatar Charity staff member with direct responsibility for "monitoring money transfers"—which Plaintiffs have incorporated into the Complaint—establishes that funds flowed (in Euros *not* Dollars) from Doha to Germany (*not* New York) to the Bank of Palestine in Ramallah, where the bank "convert[ed] the bills from Euros to Dollars," a process which was "*only* done at the Bank of Palestine." (Reply Ex. 1 at 3:87–88 (emphasis added)). By relying on this confession, it would appear that Plaintiffs have made the case against themselves and have been hoist on their own petard.

**A.      Rule 4(k)(2) Does Not Suffice to Confer Jurisdiction Over Qatar Charity Where Plaintiffs Fail to Establish a *Prima Facie* Case for its Application and Do Not Plead Any Contacts Between Qatar Charity and the U.S. Generally**

Federal Rule of Civil Procedure 4(k)(2) cannot serve as a basis for establishing personal jurisdiction over Qatar Charity, as its application is limited to instances where "the defendant is not subject to jurisdiction in any state's courts of general jurisdiction." (Opp. Mem. at 60 (quoting Fed. R. Civ. P. 4(k)(2)); *see also* MTD Mem. at 19 n.13). In fact, Plaintiffs have pleaded precisely the opposite—alleging that Qatar Charity *is* subject to personal jurisdiction in New York. (Complaint ¶¶ 22–24).

Having reviewed the Charity's moving brief, Plaintiffs now claim that "the defendant[s] [are] not subject to jurisdiction in any state's court of general jurisdiction." (Opp. Mem. at 60). But this conclusory assertion is not enough, as Plaintiffs have the burden of pleading each element of personal jurisdiction. *See* Opp. Mem. at 60 n.32; *Spetner*, 495 F. Supp. 3d at 109 (plaintiffs "must include an averment of facts that, if credited by the ultimate trier of fact, would

---

[12] *See* Reply Ex. 10, U.S. Dep't of State, *Designated Foreign Terrorist Organizations*, https://www.state.gov/foreign-terrorist-organizations/.

suffice to establish jurisdiction over the defendant") (quoting *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013)).

Plaintiffs' citations to out-of-circuit case law for the proposition that Qatar Charity must "identify [another] state where Plaintiffs can bring their claims" (Opp. Mem. at 60) are plainly inapposite. Here in the Second Circuit, "***plaintiffs*** bear [the] burden of certifying that to their knowledge, the defendant is not subject to suit in the courts of general jurisdiction of any state." *In re SSA Bonds Antitrust Litig.*, 420 F. Supp. 3d 219, 240 (S.D.N.Y. 2019) (emphasis added) (citation and quotation marks omitted).[13] "Because the Plaintiffs in the instant case have not certified that the [foreign defendants] are not subject to general jurisdiction in another state, they have not met all of the elements of Rule 4(k)(2)." *In re SSA Bonds Antitrust Litig*., 420 F. Supp. 3d at 240. Rule 4(k)(2)'s three elements are conjunctive, so Plaintiffs' failure to satisfy the second element alone precludes jurisdiction.

In addition, Plaintiffs have also failed to satisfy the third requirement of Rule 4(k)(2), because they "make no specific allegations of contacts with other states or the [U.S.] generally." They cannot do so—because there are no such contacts. *DISH Network, LLC. v. Kaczmarek*, 2021 WL 4483470, at *8 (E.D.N.Y. June 24, 2021); *report and recommendation adopted in relevant part*, 2021 WL 4485870 (E.D.N.Y. Sept. 30, 2021); *cf. In re SSA Bonds Antitrust Litig*., 420 F. Supp. 3d at 240 (Rule 4(k)(2) "requires (1) that the defendant have sufficient minimum contacts with the [U.S.] in general, rather than any particular state and (2) that the exercise of jurisdiction is reasonable") (quoting *Porina v. Marward Shipping Co., Ltd.*, 521 F.3d 122, 127 (2d Cir. 2008)).

---

[13] *See also Astor Chocolate Corp. v. Elite Gold Ltd*., 510 F. Supp. 3d 108, 125 (S.D.N.Y. 2020) ("In this Circuit, to meet the second requirement of Rule 4(k)(2), ***plaintiffs*** need to certify that, to their knowledge, the foreign defendant is not subject to jurisdiction in any other state.") (citation omitted) (emphasis added); *Aqua Shield, Inc. v. Inter Pool Cover Team*, 2007 WL 4326793, at *8 (E.D.N.Y. 2007) (same).

9

## B.    Qatar Charity is Not Subject to Personal Jurisdiction Under an Agency Theory

Plaintiffs' argument that Qatar Charity is subject to personal jurisdiction under Rule 4(k)(2) and New York's CPLR Section 302(a)(1)–(2) pursuant to an agency theory (Opp. Mem. at 68–73, 79–84) also fails because the Complaint lacks the necessary factual allegations that either Masraf Al Rayan or its alleged correspondent bank acted in an agency capacity for Qatar Charity.  Indeed, there are no direct allegations at all that Masraf Al Rayan acted as the Charity's agent.  While there may be jurisdiction over a principal "based on the acts of an agent where 'the alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal,'" that is certainly not the case here.  *See Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 85 (2d Cir. 2018) (*Schwab I*) (quoting *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122 (2d Cir. 1981)); *see also* Opp. Mem. at 69 (citing *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988)).

To plead agency for jurisdictional purposes, a plaintiff "must allege the actual exercise of control, based on the 'realities of the relationship.'"  *Hau Yin To v. HSBC Holdings, PLC*, 700 F. App'x 66, 68 (2d Cir. 2017) (quoting *CutCo Industries, Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986)).  Plaintiffs do not plausibly allege that Qatar Charity had any knowledge of or control over Masraf Al Rayan's alleged use of a correspondent account in New York.[14]

---

[14] Plaintiffs are also wrong in arguing that the alleged transfers "could only be effectuated through a U.S. correspondent bank."  (Opp. Mem. at 70).  As was the case in *Tamam v. Fransabank SAL*, "[u]nderlying Plaintiffs' argument is the faulty assumption that U.S. dollars can only be obtained in the [U.S.]," when, in fact, financial institutions can readily obtain U.S. Dollars abroad from foreign banks.  677 F. Supp. 2d 720, 729 (S.D.N.Y. 2010).  Plaintiffs seek to confuse the issue by submitting the declaration of Patrick J. McArdle ("McArdle Decl.").  But McArdle concedes he lacks any personal knowledge of the transfers alleged here.  He relies instead on personal experience unrelated to this case and three complaints filed by Plaintiffs' counsel in this and two unrelated cases, and fails to specify which of his opinions are derived from assuming as true the pleadings in this case.  (*See, e.g.*, McArdle Decl. ¶¶ 1, 15).  The Court should afford no weight to the McArdle Declaration, as it merely recounts how foreign banks "ordinarily" handle U.S. Dollar transactions (McArdle Decl. ¶ 14) and parrots the Complaint's conclusory allegations (*see, e.g.*, McArdle Decl. ¶ 16 ("The Complaints' description of these interbank transactions is consistent with the manner in which a transaction involving U.S. dollars would *typically* operate.") (emphasis added)).  And, of course, the confession of the Qatar

10

Again, and crucially, Plaintiffs do not, and cannot, plausibly allege that Qatar Charity even knew that its funds would pass through New York.  Instead, Plaintiffs allege in their Complaint that Masraf Al Rayan transferred Qatar Charity funds denominated in U.S. Dollars through a correspondent account (Complaint ¶¶ 10, 130) and now conclusorily and inaccurately assert in their Opposition that such transfers "must have" gone through New York.  But, the confession of Manassra, upon which Plaintiffs rely, makes explicit that funds were routinely converted into U.S. Dollars in Ramallah—"and this action is *only* done at the Bank of Palestine." (Reply Ex. 1 at 3:87–88 (emphasis added)).

Furthermore, as numerous cases make crystal clear, the allegation that Dollar-denominated funds "must have" transited through a U.S.-based correspondent bank fail to establish that Masraf Al Rayan was Qatar Charity's agent for jurisdictional purposes.  *See Spetner*, 495 F. Supp. 3d at 112 (defendant "may have expected, or even known for a fact, that [Arab Jordan Investment Bank] would need to settle the wire transfers in New York; but knowing and expecting are not the same as directing and controlling"); *Berdeaux v. OneCoin Ltd.*, 2021 WL 4267693, at *12 n.25 (S.D.N.Y. Sept. 20, 2021) (the "nature of correspondent banking renders largely nonsensical any attempt to base jurisdiction against the individual Defendants on wire transfers of funds moving through a New York correspondent account" because "[a]bsent unusual circumstances, an individual bank customer would have no reason to direct its foreign bank to use a New York-based correspondent account for a transaction that, such as those at issue here, has no other connection to New York"); *Vasquez v. Hong Kong and Shanghai Banking Corp., Ltd.*, 477 F. Supp. 3d 241, 259 (S.D.N.Y. 2020) ("there is no evidence

---

Charity accountant with responsibility for fund transfers—which Plaintiffs expressly incorporated into the Complaint—fully contradicts McArdle's rank speculation and generalization.  (*See* Reply Ex. 1 at 3:88 (conversion to U.S. Dollars "is only done at the Bank of Palestine")).

that [defendant] directed the funds to be deposited or controlled the route of the plaintiffs' funds through the correspondent account").

Merely arguing that Masraf Al Rayan was Qatar Charity's agent, moreover, does not make it so. *Pincione v. D'Alfonso*, 506 F. App'x 22, 24 (2d Cir. 2012) ("allegations concerning [non-party's] agency were entirely conclusory and thus inadequate"). Plaintiffs cannot and do not plausibly allege the consent, knowledge, and control required on the part of Qatar Charity to establish an agency relationship. Furthermore, even if Masraf Al Rayan was Qatar Charity's agent—which it plainly was not—Plaintiffs' putative chain of agency breaks irreparably at the purported link between Masraf Al Rayan and its correspondent bank, because it is well-recognized, in the words of the Second Circuit, that "an intermediary bank is the legal agent of neither the originator nor the intended beneficiary." *Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co., Ltd.*, 609 F.3d 111, 121 (2d Cir. 2010) (citing N.Y. U.C.C. § 4–A–212).[15] Plaintiffs would have the Court ignore this black letter law. That it cannot do.

### C. Subjecting Qatar Charity to Personal Jurisdiction Pursuant to Plaintiffs' Proffered Conspiracy Theory Would Violate Due Process

Plaintiffs cannot establish conspiracy jurisdiction based on the alleged acts of Masraf Al Rayan's correspondent bank in New York, which Plaintiffs concede is not a co-conspirator. (*See* Opp. Mem. at 83). Plaintiffs' conspiracy theory is distinct from the agency theory discussed above, but equally deficient. The Second Circuit has explained that, for the purposes of due process, "a defendant purposefully avails itself of the laws of a forum when it or its co-conspirator undertakes an overt act in furtherance of the conspiracy in the forum." *Schwab*

---

[15] *See also Spetner*, 495 F. Supp. 3d at 110, 111 ("[a] correspondent bank relationship, standing alone, does not create an agency relationship"; "That critical element of control is not present in the garden-variety correspondent banking relationship alleged here.") (internal citation omitted).

*Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 109–10 (2d Cir. 2021) (*Schwab II*); *see also Schwab I*, 883 F.3d at 87.[16]

Many courts have opined that this is a dubious theory at best, in plain tension with pertinent Supreme Court precedent.  *See, e.g.*, *Rudersdal v. Harris*, 2022 WL 263568, at *10 (S.D.N.Y. Jan. 28, 2022); *In re Platinum & Palladium Antitrust Litig.*, 449 F. Supp. 3d 290, 326 (S.D.N.Y. 2020); *In re Dental Supplies Antitrust Litig.*, 2017 WL 4217115, at *7 (E.D.N.Y. 2017).  But Plaintiffs would have this Court launch this suspect theory into uncharted waters, predicating the theory here not on the in-forum acts of a co-conspirator (none of which are alleged) but on the in-forum acts of an entity concededly ***not*** alleged to be a co-conspirator (the supposed correspondent bank).  This is a brazen bridge too far.  We know of no cases applying *Schwab I's* conspiracy standard that support such a radical expansion of personal jurisdiction, and the Court should reject Plaintiffs' request to be the first.

The absence of in-forum acts undertaken by ***any*** alleged co-conspirator places the present case in stark contrast with the cases that Plaintiffs claim, wrongly, are analogous.  (*See* Opp. Mem. at 74–76 (citing, *e.g.*, *Berkshire Bank v. Lloyds Banking Grp. plc*, 2022 WL 569819, at *3 (2d Cir. Feb. 25, 2022) ("purported conspiracy participants located in New York who took steps there to advance the conspiracy"); *Schwab II*, 22 F.4th at 125 ("co-conspirators who were based in the [U.S.]"); *In re Platinum & Palladium Antitrust Litig.*, 449 F. Supp. 3d at 325–26 ("United-States-based co-conspirators"); *Allianz Glob. Inv'rs GMBH v. Bank of Am. Corp.*, 457 F. Supp. 3d 401, 412 (S.D.N.Y. 2020) ("coconspirators were based in, and acting out of, New York"))).[17]

---

[16] *Schwab I* concerns constitutional limitations on the conspiracy theory of jurisdiction.  Those limitations are applicable to Plaintiffs' agency theories under both Rule 4(k)(2) and New York's long-arm statute.  As discussed in Section I.D., *infra*, New York's long-arm statute itself further limits the application of conspiracy jurisdiction under CPLR 302(a)(1)–(2).

[17] In addition to being inapposite, the summary order in *Berkshire Bank* does not bind this Court as it has "no precedential effect."  Second Circuit Local Rule 32.1.1(a).

Those cases bear no relationship whatsoever even to the conclusory allegations advanced by Plaintiffs.  There are no putative "United-States-based co-conspirators" alleged here.  As to Qatar Charity, the allegations are, remarkably enough, nothing more than the following:

- Qatar Charity, a Qatar entity with no alleged contacts of any kind with the U.S., attempted to send funds from its own accounts in Doha to other of its own accounts in the Palestinian Territories, taking no action in the U.S. or directed towards the U.S.;

- The Qatari bank it used for this transfer, also with no physical presence of any kind in the U.S., allegedly effectuated that Qatar-to-Palestine transfer through the U.S., utilizing a New York correspondent bank;

- The routing decision to utilize a New York correspondent was not necessary;

- Qatar Charity is not plausibly alleged to have had knowledge of this decision, and hence is obviously not alleged to have exercised any control; and

- The putative correspondent bank is *not* alleged to be a co-conspirator and is not an agent as a matter of law (and certainly not an agent of Qatar Charity itself, which is not plausibly alleged to have had any knowledge of the existence of the supposed correspondent bank and not alleged to have exercised any control or direction).

We submit that the mere recitation of those factual allegations is sufficient to refute the conspiracy jurisdiction allegations.  And that conclusion holds even without referencing the confession of Manassra, expressly incorporated into the Complaint, which states clearly that transfers from Doha transited through Germany in Euros and were only converted to Dollars in Ramallah.  (Reply Ex. 1 at 3:85–88).

Asserting personal jurisdiction over Qatar Charity would also violate *Schwab II*'s instruction that a "conspiracy theory [cannot] get off the ground if [the] defendant w[as] altogether blindsided by its co-conspirator's contacts with the forum."  22 F.4th at 125.  Courts considering the relationship between foreign and domestic banks "have discounted the use of a correspondent account that is essentially adventitious—*i.e.*, that was not even defendant's doing—as not reflecting a deliberate act."  *Vasquez*, 477 F. Supp. 3d at 258 (collecting cases) (quotation marks and citation omitted).  Here, Qatar Charity, a banking *customer*, is even further

14

removed than its bank from any purposeful availment of the forum.  Plaintiffs do not plausibly

allege that Qatar Charity knew that Masraf Al Rayan had a correspondent account in the U.S.,

nor that Qatar Charity knew that transfers between its accounts in Qatar and the Palestinian

Territories might pass through the U.S.  The alleged "conspiratorial contacts" (which involve in-

forum conduct only by a bank *not* alleged to be a co-conspirator) are therefore not remotely the

kind of "contacts" that would support the conclusion that Qatar Charity "'should reasonably

[have] anticipate[d] being haled into court' in the forum as a result of them." *Schwab II*, 22

F.4th at 125 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

### D.   New York's Long-Arm Statute Forecloses Exercising Personal Jurisdiction Over Qatar Charity

Qatar Charity is not subject to personal jurisdiction under Section 302 of New York's

long-arm statute, which "is more restrictive than the Fourteenth Amendment's Due Process

Clause." *In re Eur. Gov't Bonds Antitrust Litig.*, 2022 WL 768680, at *8 (S.D.N.Y. Mar. 14,

2022).  Section 302(a)(1) stipulates that "a court may exercise personal jurisdiction over any

non-domiciliary . . . who in person or through an agent . . . transacts any business within the

state."  CPLR 302(a)(1).  Since Plaintiffs do not, and cannot, allege that Qatar Charity itself

transacted any business in New York, to satisfy Section 302(a)(1) they must allege that Qatar

Charity conducted business in New York through an agent.  As discussed above in Section I.B.,

*supra*, Plaintiffs fail to adequately allege an agency theory for jurisdictional purposes.

Furthermore, with respect to Section 302(a)(1) specifically, there is "no

authority . . . standing for the principle that a non-domiciliary individual defendant may be

subject to specific jurisdiction in New York under Section 302(a)(1) because the non-domiciliary

moved money between foreign bank accounts, with the transfer passing through New York via a

correspondent account." *Berdeaux*, 2021 WL 4267693, at *12.[18]  That is because "[a]bsent unusual circumstances, an individual bank customer would have no reason to direct its foreign bank to use a New York-based correspondent account for a transaction that, such as those at issue here, has no other connection to New York."  2021 WL 4267693, at *12 n.25; *accord Universal Trading & Inv. Co. v. Tymoshenko*, 2012 WL 6186471, at *3 (S.D.N.Y. 2012).

In *Berdeaux*, the plaintiff alleged "hundreds of transactions" that purportedly flowed through New York accounts, including one $30 million transaction as to which the defendant emailed himself a copy of the wire instructions—thus making explicit his knowledge that the funds would be processed through New York.  *Berdeaux*, 2021 WL 4267693, at *3–4.  That knowledge was deemed insufficient.  "None of that is anywhere close to sufficient to show that [the defendant] transacted business in New York."  2021 WL 4267693, at *11; *cf. id.* at *12 (these allegations are "insufficient as a matter of law").

Here, Plaintiffs allege that Masraf Al Rayan transferred funds from Qatar Charity's account in Qatar to its account in the Palestinian Territories, and that the funds passed through New York on the way.  (Complaint ¶¶ 10, 130).  Again, and crucially, Plaintiffs do not plausibly allege that Qatar Charity knew its funds passed through New York on the way from Qatar to the Palestinian Territories.  Indeed, as set forth in detail above, the confession of the Qatar Charity

---

[18] Plaintiffs grossly mischaracterize *Berdeaux* in a failed attempt to distinguish it.  Plaintiffs contend "*Berdeaux* involved only one wire transfer not initiated by any defendant."  (Opp. Mem. at 67).  In reality, while the court held that "Plaintiffs allege adequately only a single transaction," the *Berdeaux* complaint alleged "the Scott Group **Defendants** used shell companies and bank accounts all over the world to launder more than $400 million in criminal proceeds" and that defendant Bank of New York Mellon "enabled the 'Scott Group' to launder more than $300 million in fraud proceeds by serving as correspondent bank for **hundreds of transactions**."  *Berdeaux*, 2021 WL 4267693, at *3, 11 n.21, 16 (emphasis added).  Next, Plaintiffs assert *Berdeaux* is inapposite because the *Berdeaux* plaintiffs "disclaimed all bases for personal jurisdiction other than CPLR 302(a)(3)(ii), which is not at issue here."  (Opp. Mem. at 67).  But the *Berdeaux* court made clear that it "assess[ed] . . . Defendants' amenability to jurisdiction under multiple prongs of New York's long-arm statute," **including** Sections 302(a)(1)–(2), even though "Plaintiffs . . . abandoned all bases for personal jurisdiction other than CPLR 302(a)(3)(ii)."  *Berdeaux*, 2021 WL 4267693, at *8.

16

staff accountant responsible for bank transfers upon which Plaintiffs rely discusses not Dollar-denominated transfers that cleared in the U.S., but rather Euro-denominated transfers that cleared through a German bank and were "only" converted to Dollars at the Bank of Palestine in Ramallah.  (Reply Ex. 1 at 3:85–88).

Furthermore, as explained in Qatar Charity's Opening Brief (MTD Mem. at 15), Plaintiffs' argument that conspiracy jurisdiction is applicable under Section 302(a)(1) is flat wrong.  *See, e.g.*, *Suber v. VVP Servs., LLC*, 2021 WL 4429237, at *6 (S.D.N.Y. Sept. 27, 2021) ("the conspiracy theory of jurisdiction is not available under section 302(a)(1)").

Similarly wrong is Plaintiffs' argument that Qatar Charity's cited authorities "did not survive *Schwab I*, *Schwab II* and *Berkshire Bank*, all of which attributed the in-forum acts of co-conspirators to each other."  (Opp. Mem. at 82).  First, and critically, even after the Second Circuit issued those opinions, a New York state court reaffirmed that "[t]he conspiracy theory of jurisdiction is not available under section 302(a)(1)."  *Smartmatic USA Corp. v. Fox Corp.*, 2022 WL 685407, at *26 (Sup. Ct. N.Y. Cnty. Mar. 08, 2022).  A recent S.D.N.Y. decision has underscored the same, explaining that it "makes sense that civil conspiracy*,* a creature of tort law, could form a basis for CPLR 302(a)(2) jurisdiction, since that subsection concerns <u>tortious</u> acts in New York, whereas civil conspiracy would ***not*** establish jurisdiction under CPLR 302(a)(1), since that subsection concerns business transactions within the state."  *QBE Americas, Inc. v. Allen*, 2022 WL 889838, at *5 (S.D.N.Y. Mar. 25, 2022) (Rakoff, J.) (second emphasis added).  Second, neither *Schwab I*, nor *Schwab II*, nor *Berkshire Bank* held—or even implied—that conspiracy jurisdiction is available ***under Section 302(a)(1)***.  In fact, not one of those cases had anything to do with that statutory basis and hence, unsurprisingly, not one stands remotely for the proposition for which Plaintiffs cite them.

17

Plaintiffs also cite two outlier opinions for the proposition that "Defendants err when they suggest that conspiracy principles are inapplicable to jurisdiction under § 302(a)(1)."  (Opp. Mem. at 81 n.52).  Both cases are unsupported and unpersuasive.  In *Rich v. Fox News Network LLC*, a Report and Recommendation never ultimately adopted, the Magistrate Judge held that "personal jurisdiction over [defendant] based on Plaintiffs' conspiracy . . . claim is proper under Section 302(a)(1)."  2020 WL 6276026, at *6 (S.D.N.Y. 2020).  However, *Rich* cites no authority to support that proposition and cites *Schwab I* for the applicable standard.  *Rich*, 2020 WL 6276026, at *6 (citing *Schwab I*, 883 F.3d at 87).  That is erroneous because, as noted above and as Judge Karas explained in a subsequent case, *Schwab I* "determined the personal jurisdiction of a federal court in California" and "California's long-arm statute is more capacious than New York's."  *PharmacyChecker.com, LLC v. Nat'l Ass'n of Boards of Pharmacy*, 530 F. Supp. 3d 301, 325 n.9 (S.D.N.Y. 2021).

Plaintiffs only other citation is similarly unavailing.  It is true that in *Freeman*, the Court held that "under this long-arm statute . . . 'activities of a co-conspirator may be imputed to an out-of-state tortfeasor for jurisdictional purposes under an agency rational[e].'"  *Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 79 (E.D.N.Y. 2019) (quoting *In re N. Sea Brent Crude Oil Futures Litig.*, 2017 WL 2535731, at *9 (S.D.N.Y. 2017)).  But *Sea Brent*, the case quoted by *Freeman*, does not support that proposition or even mention Section 302(a)(1); to the contrary, it held that New York's long-arm statute had no application to the case.  2017 WL 2535731, at *11 n.12.  And while it is true that other provisions of New York's long-arm statute (inapplicable here, as discussed below) encompass conspiracy jurisdiction, the law is pellucidly clear that conspiracy jurisdiction "is not available under section 302(a)(1)."  *Smartmatic*, 2022

18

WL 685407, at *26.  Hence, for the reasons discussed above, Qatar Charity is not subject to

Section 302(a)(1) jurisdiction under a primary theory, an agency theory, or a conspiracy theory.

Qatar Charity is also not subject to personal jurisdiction under Section 302(a)(2).  That

provision stipulates that "a court may exercise personal jurisdiction over any non-

domiciliary . . . who in person or through an agent . . . ***commits a tortious act within the state***."

CPLR 302(a)(2) (emphasis added).  As we pointed out previously (MTD Mem. at 11), Section

302(a)(2) "is read narrowly and requires physical commission of the tortious act in New York."

*Clean Coal Techs. v. Leidos, Inc.*, 377 F. Supp. 3d 303, 314 (S.D.N.Y. 2019).  Plaintiffs do not

allege that any tortious conduct occurred in New York and neither Qatar Charity ***nor any alleged***

***co-conspirator*** was ever physically present in New York.[19]  Thus, Section 302(a)(2) has nothing

to do with this case.  *See SK's Cosm. Boutique Inc. v. J.R. Silverberg Realty*, 2020 WL 3451324,

at *4 (S.D.N.Y. 2020) (no jurisdiction under Section 302(a)(2) where "the situs of the injury

was" out of state); *In re SSA Bonds Antitrust Litig.*, 420 F. Supp. at 234 (302(a)(2) (jurisdiction

requires "a tortious act within New York State committed by Defendants or their alleged co-

conspirators in furtherance of the conspiracy").

Conspiracy jurisdiction under Section 302(a)(2) is similarly unavailing.  The Second

Circuit recently clarified that:

> To establish conspiracy-based personal jurisdiction pursuant to New York's long
> arm statute, a plaintiff must—after making a *prima facie* showing of a conspiracy—
> plausibly allege that: "(a) the defendant had an awareness of the effects in New
> York of its activity; (b) the activity of the co-conspirators in New York was to the
> benefit of the out-of-state conspirators; and (c) ***the co-conspirators acting in New***

---

[19] Plaintiffs argue they satisfied this element "because the correspondent bank acted on Masraf's behalf and pursuant to its instructions."  (Opp. Mem. at 83).  That argument fails because Plaintiffs do not identify any "tortious act within New York State committed by" Masraf's correspondent bank, *In re SSA Bonds Antitrust Litig.*, 420 F. Supp. 3d 219, 234 (S.D.N.Y. 2019), and Plaintiffs concede Masraf's correspondent bank "did not participate in Defendants' conspiracy" (Opp. Mem. at 83).

> ***York acted at the direction or under the control, or at the request of or on behalf of the out-of-state defendant***."

*Berkshire Bank*, 2022 WL 569819, at *3 (quoting *Lawati v. Montague Morgan Slade Ltd*., 961

N.Y.S.2d 5, 7 (1st Dep't 2013)) (emphasis added).  And as *Berkshire Bank*, Plaintiffs' favorite

case, makes clear, the "third element can be established by, for example, a ***co-conspirator being***

***'aware of the torts being committed by . . . defendants in New York*.**'"  *Berkshire Bank*, 2022

WL 569819, at *3 (quoting *Lawati*, 961 N.Y.S.2d at 8) (emphasis added).

Plaintiffs do not contest that they have failed to allege Qatar Charity's knowledge of any

supposed contact with New York, and instead argue that "what matters is *Masraf's* knowledge

that it was using its New York correspondent account when it conducted the USD transactions."

(*See* Opp. Mem. at 73) (emphasis in original).  But the Complaint lacks any allegation that Qatar

Charity requested Masraf Al Rayan to utilize a correspondent bank in New York.  Nor does the

Complaint plausibly allege that Qatar Charity was even aware of Masraf Al Rayan's

correspondent account.  Plaintiffs now wrongly argue that "what matters is Masraf's

knowledge."  (Opp. Mem. at 73).  That claim is, under governing law, clearly insufficient to

plead the third element of conspiracy jurisdiction against Qatar Charity.[20]

## E.   The Due Process Reasonableness Factors Counsel Against Imposing Jurisdiction

Even in a case—decidedly unlike this one–where there are adequate allegations that "a

defendant has purposefully directed its activities at the forum state, it may still defeat jurisdiction

on due process grounds."  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161,

---

[20] *See, e.g., Berdeaux*, 2021 WL 4267693, at *15 n.28 ("Plaintiffs' allegations fall woefully short, as they do not plead facts demonstrating that [the foreign defendants] had any knowledge of the New York acts of any alleged co-conspirators."); *Contant v. Bank of Am. Corp*., 385 F. Supp. 3d 284, 295 (S.D.N.Y. 2019) (the Complaint "does not specifically allege that [the foreign defendants] engaged in suit-related conduct aimed at or taking place in New York" or "connect these defendants' participation in the conspiracy to New York in some other way—for example, by alleging facts to show that they were aware of their co-conspirators' in-forum overt acts").

173 (2d Cir. 2013).  Here, due process considerations counsel against exercising jurisdiction because none of the Defendants (especially Qatar Charity) has *any* presence in the U.S. and *all* of their alleged activity took place abroad.  This is especially so in the case of Qatar Charity.

The reasonableness inquiry primarily concerns "the burden on the defendant."  *In re Platinum*, 449 F. Supp. 3d at 327 (internal quotation marks and citation omitted).  It goes without saying that litigating this case in the Eastern District of New York would impose an enormous burden on Qatar Charity.  Qatar Charity does not have an office in New York (or the United States) and is not otherwise physically present in the forum.  None of Qatar Charity's relevant records or knowledgeable witnesses are located in New York.  Moreover, the forum lacks any compelling interest in retaining this litigation because none of the Plaintiffs are New York residents and no alleged injury was suffered here.  It would therefore be unreasonable to assert personal jurisdiction over Qatar Charity in this case.

Plaintiffs contend the "Defendants' discussion of the reasonableness factor" failed to address "Congress' recent pronouncements regarding the need to subject entities that provide material assistance to terrorists to jurisdiction in the American courts."  (Opp. Mem. at 77).  But of course, it is self-evident that Congress lacks authority to deprive ATA defendants of due process protections.  Judge Furman debunked similar arguments in a recent ATA decision, explaining that "Congress cannot, consistent with the Constitution, simply decree that any conduct, without regard for its connections to the United States generally or to litigation in the United States specifically, signals a party's intent to submit to the jurisdiction of a United States court."  *Fuld v. Palestine Liberation Org.*, 2022 WL 62088, at *1 (S.D.N.Y. Jan. 6, 2022) (appeal filed).  Plaintiffs' argument to the contrary is meritless.

21

II.     **PLAINTIFFS FAIL TO STATE ANY CLAIM FOR RELIEF**

A.      **Counts III and IV Must Be Dismissed As Plaintiffs Fail to Plead a Primary Liability Claim**

To survive dismissal, Plaintiffs "must provide the grounds upon which [their] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  This requires that Plaintiffs assert well-pleaded allegations that state a plausible claim for relief, rather than simply "tender[ing] naked assertions devoid of further factual enhancement."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks and citation omitted).

At no point do Plaintiffs allege—because they cannot—that Qatar Charity itself or any of its employees were involved in the attacks alleged in the Complaint (the "Attacks").  Instead, Plaintiffs' theory of primary liability rests entirely on the Defendants' purported provision of financial aid to almost entirely unnamed charitable organizations that are alleged, without any specificity, to be "fronts" for Hamas.  Aside from these wholly implausible inferences about the Charity's purported connection to unnamed entities, there is nothing that plausibly connects Qatar Charity's conduct to Hamas, much less to the Attacks at issue here.

Plaintiffs, in opposing the Defendants' motions to dismiss, now assert for the first time that Qatar Charity is ***itself*** an FTO-affiliated front for Hamas.  (*See* Opp. Mem. at 4).  A theory so plainly baseless—that the U.S. would choose to partner with a "terrorist front" and praise it as "one of the best organizations in the world" strains credulity to the breaking point—is the sort of fantasy that the Second Circuit has held is insufficient to plead a plausible claim for relief.  *See, e.g.*, *Gallop*, 642 F.3d at 368 ("A court may dismiss a claim as 'factually frivolous' if the

22

sufficiently well-pleaded facts are 'clearly baseless'—that is, if they are 'fanciful,' 'fantastic,' or 'delusional.'") (quoting *Denton v. Hernandez*, 504 U.S. 25, 32–33 (1992)).

    **i.**       **Plaintiffs Fail to Plead that Qatar Charity Committed Any Act of International Terrorism**

This Court has more than adequate grounds to reject the characterization of Qatar Charity as a "front organization" as a "factually frivolous" claim that is "clearly baseless."  In fact, the Plaintiffs' core allegations against Qatar Charity—that it is a notorious supporter of terrorism that has been designated as such by the U.S. (*e.g.*, Complaint ¶¶ 10, 46)—are demonstrably false when the public record available to the Court, including the absence of any U.S. designation and the very public praise of the Charity by U.S. government officials, is considered.  The documents of which Qatar Charity has asked this Court to take judicial notice are plainly susceptible of such notice because they are explicitly incorporated into the Complaint by Plaintiffs themselves or are reliable material in the public domain subject to judicial notice.  (*See* MTD Mem. at 3 n.2).  Nor are these documents hearsay:  Qatar Charity has not asked this Court to consider them for their truth, but rather for the fact that the statements contained in these documents were made (by, among others, the President of the United States, the Secretary of State and other senior diplomats, ranking U.N. officials, and Bill Gates).  (MTD Mem. at 2–6, 23–25).  Furthermore, the Court **can** consider as true Qatar Charity's Annual Reports and the "confession" of a former Qatar Charity employee in Israeli juridical proceedings, because these documents were explicitly incorporated into the Complaint by Plaintiffs.  (MTD Mem. at 21–24; Complaint ¶¶ 130–131).[21]

---

[21] *See Chambers v. Time Warner Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("a court may consider documents attached to the complaint as an exhibit or incorporated in it by reference . . . matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.") (citation omitted).

Here, the Court has a wealth of material properly before it from which it may evaluate the implausibility of Plaintiffs' allegations—including material cited by the Plaintiffs themselves for the false proposition that Qatar Charity financed Hamas.  Relying on the Charity's Annual Reports, for instance, Plaintiffs allege that from 2013 through 2015, Qatar Charity "carried out joint projects" with "various Hamas fronts."  (Complaint ¶ 131).  But the reports say nothing of the sort.  They make no mention of Hamas, nor do they reference violence or terrorism.  What the Annual Reports instead reflect, as discussed in Qatar Charity's moving papers (*see* MTD Mem. at 21–24), is abundant reference to the Charity's good works.

At least one of the "confessions" upon which Plaintiffs rely throughout their Opposition (that of Manassra) is similarly replete with evidence of the Charity's good works.  That confession reflects not what Plaintiffs claim, but is instead wholly consistent with the Annual Reports and the statements of the U.S. government in explaining that the Charity focuses on "support[ing] needy families [and] orphans," providing "Ramadan holiday meals to needy families," and "small projects like raising sheep."  (Reply Ex. 1 at 2:58, 2:60, and 2:59).  As the Israeli prosecutor elicited at trial from Manassra, called as a cooperative witness, the Charity's purposes are "humanitarian only," including aid "to all people regardless of religion or race." (Reply Ex. 4 at 5:41).  Those statements (incorporated into the Complaint by Plaintiffs) make no mention of Hamas, no mention of "front organizations," and no mention of Dollar transfers through New York.

Nor do Plaintiffs' allegations plead any "international act of terrorism" undertaken by Qatar Charity that might support their primary liability claim.  *See, e.g.*, *Strauss v. Credit Lyonnais, S.A.*, 379 F. Supp. 3d 148 (E.D.N.Y. 2019) (mere provision of banking services which were earmarked for ostensibly charitable purposes was not apparently intended to intimidate or

24

coerce civilian population, influence government policy, or affect government conduct by mass

destruction, assassination, or kidnapping); *Weiss v. Nat'l Westminster Bank PLC*, 381 F. Supp.

3d 223 (E.D.N.Y. 2019) (mere provision of banking services not identified as being for any

violent or terroristic purpose was not apparently intended to intimidate or coerce civilian

population, influence government policy, or affect government conduct by mass destruction,

assassination, or kidnapping); *Freeman*, 413 F. Supp. 3d at 83 (banks did not engage in any acts

of international terrorism by providing financial services to various Iranian banks, airlines,

shipping and oil companies, all of whom had significant legitimate operations and were not

merely fundraising fronts for terrorist organizations); *Zapata v. HSBC Holdings PLC*, 414 F.

Supp. 3d 342 (E.D.N.Y. 2019), *aff'd,* 825 F. App'x 55 (2d Cir. 2020) (failure to plausibly allege

intent to intimidate civilians or influence a government where to an objective observer, conduct

appeared motivated by economics or greed).  And the Plaintiffs' contention that the Complaint

satisfactorily pleads facts that might support a *prima facie* claim is belied by their own citations

to cases involving detailed allegations of ***direct contacts*** between a defendant and an

FTO.  (Opp. Mem. at 47–48 (citing *Linde v. Arab Bank, PLC*, 882 F.3d 314, 327 (2d Cir. 2018)

(transmission of funds to terrorist organizations) and *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d

33, 45 (E.D.N.Y. 2019) (allegations that defendant provided monetary transfers and financial

services directly to Hamas)).  Absent conduct satisfying the ATA's statutorily-prescribed

definitions of what constitutes terrorism, Plaintiffs' claims must fail.

####        ii.        Plaintiffs Fail to Plausibly Allege That Qatar Charity Proximately Caused the Attacks

Plaintiffs' primary liability claims similarly fail because they have not plausibly alleged

that Qatar Charity proximately caused their injuries.  Establishing proximate cause requires that

Plaintiffs "plausibly allege that the defendant's actions were a 'substantial factor in the sequence

of responsible causation' leading to the plaintiff's injury and that the plaintiff's injuries were

'reasonably foreseeable' or 'anticipated as a natural consequence' of those actions." *Freeman*,

413 F. Supp. 3d at 84 (citing *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013)).

Merely alleging, as Plaintiffs repeatedly do, that a defendant enhanced an FTO's abilities

is thus insufficient to state a claim. *See Fields v. Twitter, Inc.*, 881 F.3d 739, 749–50 (9th Cir.

2018); *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 522 (E.D.N.Y. 2012). What is missing here

—and necessary—is the articulation of a connection between Qatar Charity and the Attacks that

is something more than the threadbare and totally conclusory allegations of the Complaint. This

absence forecloses any possible finding of proximate cause. *See, e.g.*, *Owens v. BNP Paribas,

S.A.*, 897 F.3d 266, 276 (D.C. Cir. 2018) (allegations that the funds were transmitted "directly to

al Qaeda" who used the funds "to carry out the embassy bombings" were "conclusory allegations

that do not meet *Twombly*'s plausibility standard") (citing *Rothstein*, 708 F.3d at 97); *see also

Siegel v. HSBC North America Holdings*, 933 F.3d 217, 225 (2d Cir. 2019).[22]

**B.    Counts I and II Must Be Dismissed for Failure to Plausibly Plead a
        Secondary Liability Claim**

**i.    Plaintiffs Have Not Plausibly Alleged a JASTA Conspiracy Claim**

As established in Qatar Charity's opening brief (MTD Mem. at 29–30), Plaintiffs have

not plausibly alleged a conspiracy claim under JASTA, as they have failed to allege the facts

required to satisfy the elements of such a claim, namely: "(1) an agreement between two or more

persons; (2) to participate in an [act of international terrorism]; (3) an injury caused by an

unlawful overt act performed by one of the parties to the agreement; [and] (4) which overt act was

---

[22] *See also Zapata*, 414 F. Supp. 3d at 356–57 (no direct relationship between subsidiaries of foreign investment bank's money laundering for cartels and the acts of violence perpetrated against them, for purposes of proximate cause where victims did not allege that the cartels required laundered money to carry out specific acts of violence); *Rothstein*, 708 F.3d at 91–92.

done pursuant to and in furtherance of the common scheme." *O'Sullivan v. Deutsche Bank AG*, 2019 WL 1409446, at *9 (S.D.N.Y. 2019) (quotations and citation omitted).[23]

Plaintiffs now argue that they need not show a conspiracy between ***all*** parties.  (Opp. Mem. at 42).  But this claim is entirely beside the point, because they have failed to show a conspiracy between ***any*** parties—and in particular, they have failed to show a conspiracy with the alleged principal, *i.e.*, Hamas—which is necessary to plead a conspiracy.  *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 855 (2d Cir. 2021) ("JASTA states that to be liable for conspiracy a defendant would have to be shown to have 'conspir[ed] with' the principal.").  In an apparent attempt to remedy this failure, Plaintiffs spend much of their Opposition discussing the Union of Good.  (Opp. Mem. at 10–11, 17, 25–26, 35–38).  However, as discussed previously, *see supra* Section I, Plaintiffs' allegation that Qatar Charity was a member of the Union of Good at the time of the Attacks, and that it remains a member today (Opp. Mem. at 10–11, 25), is demonstrably false.  Moreover, it is Hamas—not the Union of Good—that is alleged to be responsible for the Attacks.  And notably, the Union of Good is an SDGT—not an FTO—and it is therefore not a terrorist organization as defined by § 2339B of the ATA.  *See, e.g.*, *Weiss*, 768 F.3d at 209 n.7;[24] *see also supra* n.4.

---

[23] Plaintiffs' claim that Qatar Charity has waived any argument as to certain of these elements is silly.  (Opp. Mem. at 38 n.20).  Qatar Charity plainly stated in its Motion to Dismiss that a conspiracy requires the four elements, set out once again above, and that the "Complaint does not clear any of these hurdles."  (MTD Mem. at 29).

[24] Contrary to Plaintiffs' assertions that Qatar Charity has misread *Weiss* (Opp. Mem. at 43 n.23), Qatar Charity accurately and literally quoted this case in its opening brief.  (MTD Mem. at 29).  Indeed, Plaintiffs apparently agree (Opp. Mem. at 43 n.23) that "§ 2333(d) does not create liability against a person who aids and abets or conspires with the person who merely authorized (rather than committed) the terrorist act."  *Weiss*, 278 F. Supp. 3d at 650.  This reading is supported by *Freeman*.  413 F. Supp. 3d at 97 (lack of allegations that defendants "***directly*** conspired with Hezbollah or the [Islamic Revolutionary Guard Corps]" were fatal to secondary liability claims under § 2333(d)(2) (emphasis added)).  Plaintiffs' Complaint contains no non-conclusory allegations that Qatar Charity ***directly*** conspired with Hamas.

### ii. Plaintiffs Have Not Plausibly Alleged a JASTA Aiding-And-Abetting Claim

Plaintiffs have also failed to plausibly allege that Qatar Charity was "generally aware of [its] role as part of an overall illegal or tortious activity at the time that [it] provide[d] the assistance" or that it "knowingly and substantially assist[ed] the principal violation" as required to allege a JASTA aiding-and-abetting claim. *Linde*, 882 F.3d at 329 (quoting *Halberstam v. Welch*, 705 F.2d 472, 487 (D.C. Cir. 1983)).  This failure is fatal to their claims.

### 1. *Plaintiffs Have Not Plausibly Alleged General Awareness*

To demonstrate general awareness, Plaintiffs must show that the defendant not only ***knew*** of the principal's involvement in committing acts of "international terrorism," but also that the defendant and the principal were "one in spirit." *Halberstam*, 705 F.2d at 484; *Linde*, 882 F.3d at 329 n.10.  Plaintiffs have made no plausible allegation that Hamas and Qatar Charity were "'one in spirit' with the tortfeasor, such that its conduct 'evidences a deliberate long-term intention to participate in an ongoing illicit enterprise.'" *See Bartlett v. Societe Generale de Banque Au Liban SAL*, 2020 WL 7089448, at *14 (E.D.N.Y. 2020) (quoting *Halberstam*, 705 F.2d at 484, 488).  Indeed, it is quite the opposite as evidenced by Qatar Charity's good works.

 The evidence of those works, as documented in the materials incorporated into the Complaint and the allegation that Qatar Charity worked with alleged "front organizations" that concededly were performing charitable and humanitarian works in the Palestinian Territories (*see* Complaint ¶ 93), is fatal to the Complaint.  As discussed in our opening brief (*see* MTD Mem. at 33–34), in this Circuit caselaw makes clear that the fact that the Charity's funds were concededly used for actual charitable and humanitarian works creates an insurmountable barrier to Plaintiffs' claims.  This is so because, as held in *Honickman*, giving money to charitable organizations—even charitable organizations that engage in good works at the behest of an FTO

to, for example, "procure political support for Hamas in the refugee camps"—is insufficient to "cure the absence of any plausible allegation that [the defendant] was aware it was assuming a role in Hamas'[s] violent or life-endangering activities." *Honickman for Estate of Goldstein*, 432 F. Supp. 3d 253, 266 (E.D.N.Y. 2020) (collecting cases); *cf. Honickman v. BLOM Bank SAL*, 6 F.4th 487, 502 n.21 (2d Cir. 2021) (noting the "meaningful difference" between supporting Hamas-affiliated groups doing charitable works in the refugee camps and supporting groups directly engaged in terrorist attacks). Plaintiffs repeatedly cite to out-of-circuit decisions for precisely this reason; under the caselaw in this Circuit, the Complaint must be dismissed. (*See* MTD Mem. at 33–34).

That this is so has been repeatedly acknowledged by lead counsel for the Plaintiffs in other ATA litigations. In the Petition for a Writ of Certiorari in the *Weiss* case, Plaintiffs' counsel here stated the following:

> Under the Second Circuit's rule, the ample evidence that NatWest knowingly transferred funds for and to Hamas-controlled entities was deemed insufficient even to create a jury question regarding aiding and abetting [under JASTA] because: petitioners conceded that the 13 Charities also "performed charitable work"; there was "no evidence that the charities funded terrorist attacks or recruited persons to carry out such attacks"; and "Interpal did not indicate to NatWest that the transfers were for any terroristic purpose."

*See* Pet. for Cert. in *Weiss v. National Westminster Bank PLC*, 2021 WL 4117187, at *20 (2021) (citations omitted). As counsel also summarized the governing law, somewhat derisively, "In effect, the Second Circuit recognizes a humanitarian charity exception to aiding and abetting liability." 2021 WL 4117187, at *2.

Plaintiffs ask this Court to draw inferences that Qatar Charity, by allegedly partnering with (unnamed) "front" organizations in certain (unspecified) charitable and humanitarian projects was actually generally aware that it was aiding and playing a role in violent terrorist

activities.  But as Plaintiffs' counsel has acknowledged in that same petition, "The Second Circuit does not permit such an inference . . . when the donations were nominally [*sic*] charitable."  2021 WL 4117187, at *28; *see also* Pet. for Cert. in *Strauss v. Credit Lyonnais, S.A.*, 2021 WL 4117377, at * 23 (2021) (also discussing Second Circuit's "charity exception to JASTA liability").  In other words, Plaintiffs' counsel has acknowledged in other litigations that Qatar Charity's argument here correctly states controlling Second Circuit law.  This Court should rule accordingly.

> **2.**    ***Plaintiffs Have Not Plausibly Alleged Knowing and Substantial Assistance***

Plaintiffs also fail to plausibly allege that Qatar Charity "knowingly and substantially assist[ed] the principal violation."  *Linde*, 882 F.3d at 329 (quoting *Halberstam*, 705 F.2d at 487).  Such a failure is grounds for dismissal.  *Siegel*, 933 F.3d at 225.  The *Halberstam* framework provides six factors for determining "how much encouragement or assistance is substantial enough."  705 F.2d at 478.  Although Plaintiffs walk through the six factors in their Opposition, their discussion is almost entirely silent as to Qatar Charity.  (*See* Opp. Mem. at 32–38).  The limited claims made as to Qatar Charity, including that "Qatar Charity knew it was a member of the Union of Good" (which Plaintiffs claim to be evidence of Qatar Charity's state of mind) fail to satisfy the *Halberstam* factors.  (*See* Opp. Mem. at 36).  If anything, Qatar Charity's decisive severance of its association with the Union of Good following its designation in 2008, *see supra* Section I, demonstrates Qatar Charity's clear intention not to be affiliated with that entity.  Indeed, the situation here is analogous to *Honickman*, where the Union of Good itself was a customer of the bank defendant.  In that case, even though Israel "designat[ed]" the Union in 2002, *Honickman*, 6 F.4th at 493 n.6, the Second Circuit held liability did not attach because

30

"Plaintiffs failed to plausibly allege BLOM Bank was aware [its] [c]ustomers were related to Hamas." *Honickman*, 6 F.4th at 503.

## III.   PLAINTIFFS FAILED TO PROPERLY EFFECT SERVICE OF PROCESS AND A REQUEST TO SERVE BY EMAIL DOES NOT CURE THE FAILURE

The attempted service here was improper for the reasons articulated by Masraf Al Rayan in Section V of its Reply Brief in Further Support of its Motion to Dismiss ("Masraf's Reply"). We adopt those arguments.

## IV.   PLAINTIFFS' REQUEST FOR JURISDICTIONAL DISCOVERY SHOULD BE REJECTED

Plaintiffs prematurely request jurisdictional discovery in their Opposition.  (*See* Opp. Mem. at 84–86).  The Court should deny Plaintiffs' request for the reasons articulated in Section III(D) of Masraf's Reply, which Qatar Charity adopts and incorporates by reference.  In the event Qatar Charity's Motion to Dismiss is not granted with prejudice, and Plaintiffs at that time file a Motion for Jurisdictional Discovery in a manner consistent with this Court's Rules, Qatar Charity reserves the right to raise all further available objections.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss the Complaint in its entirety.

31

Dated: May 17, 2022
   New York, New York

Respectfully submitted,

**DLA PIPER LLP (US)**

By:  <u>*/s/ John Hillebrecht*</u>
    John M. Hillebrecht
    Kevin Walsh
    Jessica Masella


1251 Avenue of the Americas
New York, New York 10020
Phone: (212) 335-4500
Email: John.Hillebrecht@us.dlapiper.com
    Kevin.Walsh@us.dlapiper.com
    Jessica.Masella@us.dlapiper.com

*Counsel for Defendant Qatar Charity*