**FLEISCHMAN BONNER & ROCCO LLP**
ATTORNEYS AT LAW

81 MAIN STREET • SUITE 515 • WHITE PLAINS • NEW YORK • 10601
TEL: 908-516-2066 • FAX: 908-516-2049 • WEB: WWW.FBRLLP.COM

EMAIL: JBonner@fbrllp.com

March 23, 2023

**Via ECF**

Honorable Ann M. Donnelly
United States District Judge
U.S. District Court, Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York  11201

**Re:** *Henkin, et al. v. Qatar Charity, et al.*, 1:21-cv-05716-AMD-VMS

Dear Judge Donnelly:

I write on behalf of Plaintiffs in response to: (1) the Court's invitation to submit post-argument letters; and (2) Mr. Hillebrecht's March 17 letter submitting a copy of Judge Garaufis's March 16, 2023 decision granting, without prejudice, Defendants' motions to dismiss *Przewozman v. Qatar Charity*, 20-cv-6088-NGG-TAM for lack of personal jurisdiction [ECF 83-1].

***Freeman v. HSBC Holdings PLC*, 57 F.4th 66 (2d Cir. Jan. 5, 2023)**

In their briefs and again at argument, Defendants repeatedly asserted that Plaintiffs could demonstrate a *prima facie* case of conspiracy-based personal jurisdiction and state claims for conspiracy liability under JASTA only by alleging that each Defendant directly conspired with Hamas, or even with the particular terrorists who carried out the attacks that killed Eitan Henkin and Ari Fuld.  The Second Circuit's recent *Freeman* decision squarely rejected those arguments. *See* 57 F.4th at 77 (defendants' purported "direct agreement" requirement is "unsupported by the text and structure of JASTA and runs counter to basic principles of conspiracy liability").  As the Second Circuit held, "under well-settled principles of conspiracy law, '[t]here is no requirement that each member of a conspiracy conspire directly with every other member of it, or be aware of all acts committed in furtherance of the conspiracy, or even know every other member.'" *Id.* at 78 (quoting *United States v. Rooney*, 866 F.2d 28, 32 (2d Cir. 1989)).

The Second Circuit did, however, affirm dismissal of the JASTA conspiracy claim because the *Freeman* plaintiffs failed to allege plausibly that:  (a) the defendant banks conspired, even indirectly, with a terrorist organization; (b) the defendants and the terrorist groups that killed and injured plaintiffs were engaged in a common pursuit; or (c) the plaintiffs were injured by overt acts in furtherance of the conspiracy.  *See* 57 F.4th at 79-82 (quoting and citing *Halberstam v. Welch*, 705 F.2d 472, 477, 478, 480, 481, 482, 484-85, 486, 487, 489 (D.C. Cir. 1983)).

In contrast, here Plaintiffs allege a single-minded conspiracy intended to fund Hamas terrorism that was directed by the Qatari government and Royal Family, which control all of the Defendants.  The Qatari government and Royal Family have long served as the principal supporters and funders of Hamas.  They employed the control that they exercised over Defendants to cause them to engage in illicit banking transactions designed to fund Hamas terrorism through Qatar Charity, an entity Israel barred from operating in the Palestinian Territories as a result of its membership in the Union of Good, a designated terrorist organization devoted to Hamas fundraising.  *See* Complaint [ECF 1] at ¶¶ 3-7, 44, 59-60, 73-74, 83-85, 108-122, 125.

Honorable Ann M. Donnelly
March 23, 2023
Page 2

In contrast to *Freeman*, where the plaintiffs alleged that the defendant banks conspired to pad their profits by evading Iranian sanctions, here Plaintiffs do not allege that Defendants pursued their illicit conduct simply to serve their own, or Qatar's, financial interests. Rather, Plaintiffs allege that "Defendants conspired with each other, Hamas, the government of Qatar and others to bring about acts of international terrorism against Americans in Israel." *Id.* at ¶ 370. *See also id.* at ¶¶ 2, 5, 8, 18, 104, 155, 166. To accomplish that nefarious purpose, Defendants operated in defiance of Israeli law and international banking standards and despite an explicit Israeli government warning that transferring funds to Qatar Charity in the Palestinian Territories could expose banks to liability to the victims of Hamas terrorism. *See id.* at ¶¶ 59-60, 138-39, 144-45, 168-315. Moreover, Plaintiffs allege that Hamas committed the terrorist acts that injured Plaintiffs in furtherance of Defendants' conspiracy. *See id.* at ¶¶ 324-52. Thus, unlike in *Freeman*, the attacks that injured Plaintiffs were overt acts in furtherance of Defendants' conspiracy to enable Hamas to engage in violent acts of terrorism directed at U.S. citizens.

**_Przewozman v. Qatar Charity_, 20-cv-6088, slip op. (E.D.N.Y. March 16, 2023)**

In *Przewozman*, Judge Garaufis held that the conduct alleged did not satisfy the due process "minimum contacts" test for personal jurisdiction or the "arising from" prong of CPLR Section 302(a)(1). *See Przewozman*, slip. op. at 27, 31-32. In both respects, Judge Garaufis's reasoning focused on the approximately four-year time gap between the last alleged use of defendant Masraf al Rayan's ("Masraf") New York correspondent account and the terrorist attack that injured the *Przewozman* plaintiffs. For purposes of the due process analysis under Rule 4(k)(2), Judge Garaufis concluded that the temporal gap precluded "a causal link between the use of the correspondent account, which ended in 2015, and the rocket attack[] that caused [plaintiffs'] injury in 2019." *Id*. at 31. With respect to CPLR 302(a)(1), Judge Garaufis concluded that "[t]his temporal gap leaves the nexus between the Defendants' New York related acts and Plaintiffs' injuries far too attenuated" to satisfy even *Licci II*'s admittedly "liberal" and "low" "'completely unmoored'" standard of "'relatedness.'" *Id*. at 26, 27 (quoting *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 339 (2012) ("*Licci II*")). Judge Garaufis's reasoning in these respects, and others, is fundamentally flawed.

As Plaintiffs highlighted in opposing Defendants' motions here and in *Przewozman*, the Supreme Court has flatly rejected Judge Garaufis's view that due process requires plaintiffs to allege a causal link between U.S.-based conduct and plaintiffs' injuries. In *Ford Motor Co. v. Montana Eighth Judicial District Court*, the Court emphasized the disjunctive nature of the "arising out of or related to" standard for measuring minimum contacts. 141 S. Ct. 1017, 1026 (2021). Thus, the Court held that "Ford's causation-only approach finds no support in this Court's requirement of a 'connection' between a plaintiff's suit and a defendant's activities." *Id*. Here, as in *Przewozman*, the New York transfers are part of the conduct Plaintiffs will prove at trial to show Defendants' longstanding efforts to aid and abet Hamas by providing financial services and financial resources, and the conspiracy that motivated that conduct. Thus, personal jurisdiction over Defendants comports with due process because the New York transfers undeniably "relate to" Defendants' violations of the Anti-Terrorism Act ("ATA") and JASTA. *See Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 171 (2d Cir. 2013) ("*Licci III*") (concluding that "minimum contacts" are met when "a lawsuit seeking redress for the allegedly unlawful provision of banking services of which . . . [New York] wire transfers are a part" alleges "repeated, intentional

execution of U.S.-dollar-denominated wire transfers on behalf of [a customer], in order to further [an FTO's] terrorist goals").

*Przewozman's* CPLR § 302(a)(1) analysis suffers a similar flaw. As with the minimum contacts test, Section 302(a)(1)'s nexus inquiry imposes a minimal burden on Plaintiffs, who need only show that the New York transfers are not "completely unmoored" from their claims. *Licci II*, 20 N.Y.3d at 339. Plaintiffs satisfy that standard if ***any*** element of their claim "arises from the New York contacts." *Id.* at 341 (emphasizing that "CPLR 302(a)(1) does not require that every element of the cause of action pleaded must be related to the New York contacts"). Again, therefore, Judge Garaufis's adoption of Defendants' "causation only" arguments is irreconcilable with controlling precedent. Instead, Plaintiffs will prove that Defendants violated the ATA and JASTA, in part, by introducing evidence concerning the illicit transfers through New York. That connection between the New York transfers and Plaintiffs' claims suffices to satisfy CPLR 302(a)(1)'s nexus requirement. *See, e.g., id.* at 340 ("LCB engaged in terrorist financing by using its correspondent account in New York to move the necessary dollars. Taken as true, LCB arguably thereby violated duties owed to plaintiffs under the various statutes asserted as a basis for subject matter jurisdiction.").

None of the cases Judge Garaufis cites support ruling—as a matter of law—that a four-year gap between defendants' last U.S.-based conduct and an attack in which plaintiffs were injured renders claims "unrelated to" or "unmoored from" the in-forum activity. *See Przewozman*, slip. op. at 27; *Strauss v. Crédit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 20, 23-24 (E.D.N.Y. 2016) (finding "a close relatedness" for purposes of CPLR 302(a)(1) between a $5,000 New York transfer executed in 1997 and the ATA claims of plaintiffs injured in a 2001 terrorist attack);[1] *Universal Trading & Inv. Co. v. Credit Suisse (Guernsey) Ltd.*, 2012 WL 6186598, at *4 (S.D.N.Y. Dec. 12, 2012) (no personal jurisdiction because the New York wire transfers ***preceded by ten years*** the challenged concealment of the defendant judgment debtor's assets); *Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 131(2d Cir. 2022) (New York transfers occurred ***before*** the defendant banks engaged in the fraud, conversion, breach of contract, and other unlawful conduct alleged in the complaint, and none of the plaintiffs' causes of action involved transfers of funds through New York correspondent accounts). In any event, here the attack that killed Eitam Henkin occurred in 2015.

Although Judge Garaufis ultimately rejected Defendants' due process "purposeful availment" arguments, the opinion expresses "serious doubts" as to the sufficiency of the Przewozman plaintiffs' allegations in this respect. *See Przewozman*, slip. op. at 22-26.[2] Those

---

[1] Judge Irizarry's dictum concerning New York transfers executed "'at a time far removed from the attacks that caused Plaintiffs' injuries'" (quoted in *Przewozman*, slip. op. at 27) appears to relate to the following hypothetical: "if, for instance, one of the attacks for which Plaintiffs sought recovery occurred in 1992, ***five years before the first New York Transfer*** . . . the nexus between claims arising from the 1992 attack and a series of transfers that did not even begin to occur until five years later theoretically would be too attenuated to support jurisdiction under § 302(a)(1)." *Strauss*, 175 F. Supp. 3d at 23 (emphasis added). Here, and in *Przewozman*, Defendants' transfers preceded the attacks that injured Plaintiffs.

[2] But for his misguided concern regarding the "temporal gap" between the defendants' New York business transactions and the rocket attack that killed Pinches Przewozman, Judge Garaufis would have provided the plaintiffs the opportunity to flesh out their allegations concerning the number, value, and denominations of the New York transfers by conducting jurisdictional discovery. *See Przewozman*, slip. op. at 26. The Court denied that discovery only because of the temporal gap the Court mistakenly viewed as dispositive. To the extent this Court credits

doubts primarily arise from artificial pleading burdens inconsistent with *Licci II* that Judge Garaufis posits. *Licci II* does not require allegations concerning "how" a New York correspondent account was used (*see id.* at 22-23), beyond that the account was used "repeated[ly]," "deliberately," and not "once or twice by mistake." 20 N.Y.3d at 340. Nor does *Licci II* require allegations indicating "***why*** the transfers were made 'through' New York." *Przewozman*, slip. op. at 25. *See* 20 N.Y.3d at 340 (irrespective of whether LCB could have routed the dollar transactions elsewhere, or used the New York account because it "was cheaper and easier," or provided "financial and other benefits," "the fact that LCB used a New York account 'dozens' of times indicates desirability and a lack of coincidence").

Far from requiring additional allegations "giving rise to the inference that Masraf al Rayan specifically chose a New York-based account to take advantage of 'New York's dependable and transparent banking system'" (*Przewozman*, slip. op. at 23 (quoting *Licci II*, 20 N.Y.3d at 339)), *Licci II* states that "complaints alleging a foreign bank's repeated use of a correspondent account in New York on behalf of a client . . . ***show purposeful availment of New York's dependable and transparent banking system* ....**" 20 N.Y.3d at 339 (emphasis added). Judge Garaufis's critique that the *Przewozman* complaint fails to allege any of "the typical markers of deliberate use of [a] New York correspondent account" enunciated in *Vasquez v. H.K. & Shanghai Banking Corp.*, 477 F. Supp. 3d 241, 258 (S.D.N.Y. 2020) ignores the distinction between passive receipt of funds via a correspondent account—as occurred in *Vasquez* and *Amigo Foods Corp. v. Marine Midland Bank-N.Y.*, 39 N.Y.2d 391 (1979)—and the circumstances at issue in *Licci*, *Przewozman*, and this case, where defendants elected to use their own correspondent accounts to transfer funds. *See Przewozman*, slip op. at 23-24.

Judge Garaufis also erred in criticizing the *Przewozman* complaint for "fail[ing] to show [that] 2015 (or earlier) transfers ***were used in the course*** of the 2019 rocket attacks." *Id.* at 27 (internal quotation omitted; emphasis added). Even for liability purposes, the Second Circuit has unequivocally rejected Defendants' argument that Plaintiffs must tie specific funds to the attacks that injured them. *See, e.g., Honickman v. BLOM Bank SAL*, 6 F.4th 487, 499 n.15 (2d Cir. 2021) (the bank's customers "do not themselves need to be 'engaged in . . . violent or terrorist acts'") (citation omitted); *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 855 (2d Cir. 2021) (JASTA "simply says the defendant must have given 'substantial assistance'" to an act of international terrorism, not substantial assistance to the principal engaging in an act of international terrorism – *i.e.*, for aiding and abetting liability to attach under JASTA, a defendant's substantial assistance may be "indirect"); *see also Miller v. Arab Bank*, 372 F. Supp. 3d 33, 48 (E.D.N.Y. 2019) (Cogan, J.) (defendants "may be liable under the ATA for aiding and abetting the organization behind the attacks, not only the 'triggerman' or suicide bomber").

Judge Garaufis also states in *dicta* that the Przewozman complaint "fails to allege in a non-conclusory manner any facts from which an inference of agreement between Qatar National Bank and the other defendants can be drawn." *Przewozman*, slip op. at 37. This observation appears to arise from a misunderstanding of conspiracy liability. For example, Judge Garaufis faults the

---

Defendants' arguments that additional specificity is required to support personal jurisdiction here, *Przewozman* and the precedent Plaintiffs discuss in their brief support permitting jurisdictional discovery.

**FLEISCHMAN BONNER & ROCCO LLP**
ATTORNEYS AT LAW

Honorable Ann M. Donnelly
March 23, 2023
Page 5

*Przewozman* complaint for making "no attempt to factually tie the Qatari government or royal family to the rocket attacks" or to allege "a connection between Qatar National Bank and the [New York] transfers effected by Masraf." *Id*. at 38. As explained above, the Second Circuit's recent decision in *Freeman* confirms that no such allegations are necessary. 57 F.4th at 78 ("[T]here is no requirement that each member of a conspiracy . . . be aware of all acts committed in furtherance of the conspiracy ...."") (internal quotation omitted). In any event, Plaintiffs have plausibly alleged a wealth of facts supporting Defendants' participation in a Qatar-sponsored conspiracy to promote Hamas terrorism. *See supra* at page 2.

**Clarification Concerning Documents Integral to the Complaint**

In its reply brief and at oral argument, Qatar Charity repeatedly pressed the Court to reject the Complaint's allegations based on two documents that counsel paradoxically described as both integral to, and contradictory of, Plaintiffs' allegations. At argument, I provided the Court and counsel with the July 26, 2017 amended indictment, guilty plea, conviction, and sentencing of Qatar Charity employee Fadi Manasra, a copy of which I annex at Exhibit A. This document contains Mr. Manasra's confession that, at Qatar Charity's direction, Masraf transferred roughly $3.5 million worth of currency from Doha to Ramallah through a bank in New York between 2009 and 2015. *See* Complaint at ¶ 130; Exhibit A at page 11 ¶ 5 ("funds in euros were transferred to Deutsche Bank in Germany and funds in dollars were transferred to a bank in New York") and page 14.

The document in Lewis Reply Exhibit 1 that Qatar Charity described as "the confession" incorporated into the Complaint is Mr. Manasra's initial police interview, which was conducted two days after he was first arrested, and almost two years before he entered the guilty plea upon which Plaintiffs rely. Plaintiffs' counsel did not acquire a copy of that interview until Qatar Charity submitted it to the Court.[3]

Respectfully submitted,

*James P. Bonner*

James P. Bonner

---

[3] Likewise, Mr. Manasra's 2017 testimony at the trial of his boss, Judah (or Jawda) Jamal, which is included in Lewis Reply Exhibit 4, was not in Plaintiffs' counsel's possession until Qatar Charity submitted it to the Court. Although Qatar Charity's reply brief emphasizes that Mr. Manasra was a prosecution witness, the examining prosecutor declared him a hostile witness because he repeatedly contradicted his prior statement to the police. *See* ECF 68-5 at p.7 line 1. *See also id*. at p.8 line 2. Contrary to Qatar Charity's assertion that Mr. Manasra's testimony concerning the Sanabel cards made "no mention of Hamas" (*see* QC Reply [ECF 68] at 7), Mr. Manasra identified two Hamas "charities"—Islamic Charity Society in Hebron and Zakat Committee Association—as being involved in the distribution of Sanabel cards to "orphans who live with the mother." *See* ECF 68-5 at p.8, lines 18-26; Complaint at ¶¶ 93-97, 128 (identifying both of these "charities" as Hamas fronts). As Qatar Charity's counsel know well from their decade-long representation of the defendant in the *Linde v. Arab Bank* matter, the term "orphans" is commonly used by Hamas-affiliated "charities" to refer to children who live with one parent because the other parent is a Hamas operative imprisoned or killed in connection with terrorist attacks. Manasra's testimony thus corroborates, rather than undermines, Plaintiffs' allegations regarding the Sanabel card scheme's role in promoting Hamas terrorism.