UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

ANNE CHANA HENKIN, *Individually and as*
*Personal Representative of the* **ESTATE OF**
**JUDAH HERZEL HENKIN, ADERET**
**RIVKAH HENKIN STERN, ELIASHIR**
**ELIJAH HENKIN, JACOB BECHOR-**
**SHALOM HENKIN, JOSEPH GIL HENKIN,**
**TAAMA FREIDA HENKIN YAAKOVSON,**
**MIRIAM FULD,** *Individually, as Personal*
*Representative of the* **ESTATE OF ARI YOEL**
**FULD,** *and as the Natural Guardian of*
**N.S.F.** *(a minor)*, **NAOMI FULD, TAMAR GILA**
**FULD, ELIEZAR YAKIR FULD, HARVEY**
**JONAS YONAH FULD, MARY ALICE FULD,**
**DANIEL YAAKOV FULD, EYTAN FULD,** and
**HILLEL CHAIM SHLOMO FULD,**

                              Plaintiffs,

           – against –

**QATAR CHARITY, QATAR NATIONAL**
**BANK** and **MASRAF AL RAYAN**,

                              Defendants.

------------------------------------------------------------- X

**MEMORANDUM DECISION AND
ORDER**

21-CV-5716 (AMD) (VMS)

**ANN M. DONNELLY**, United States District Judge:

In October 2015, terrorists shot and killed Eitam and Na'ama Henkin in the West Bank.
About three years later, another terrorist murdered Ari Fuld at the Gush Etzion Junction.  The
plaintiffs are the victims' family members.  They allege that the defendants—Qatar Charity,
Qatar National Bank and Masraf Al Rayan—enabled the attacks by providing material support
and resources to Hamas, the terrorist organization behind the attacks.  The plaintiffs bring this
action under the Anti-Terrorism Act, 18 U.S.C. § 2333 (the "ATA"), as amended by the Justice
Against State Sponsors of Terrorism Act, Pub. L. 114-222, 130 Stat. 852 (2016) ("JASTA").

The defendants move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction and Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.[1]  For the reasons that follow, Qatar National Bank's motions is granted; Masraf Al Rayan and Qatar Charity's motions are denied without prejudice to renew, and jurisdictional discovery is ordered for those defendants.

## BACKGROUND

### I.   The Terrorist Attacks

Hamas is an offshoot of the Muslim Brotherhood, dedicated to radical Islamist principles and the destruction of Israel using violence.  (ECF No. 1 ¶¶ 88-90.)  The United States government has designated Hamas a Foreign Terrorist Organization ("FTO"), a Specially Designated Terrorist ("SDT"), and a Specially Designated Global Terrorist ("SDGT").   (*Id.* ¶¶ 3, 100-01, 103.)  Hamas routinely collects money for charitable and humanitarian purposes, which it then uses to fund terrorism, including the purchase of "weapons and explosives" and providing "transportation services, safehouses, training and salaries for its terrorist operatives and recruiters." (*Id.* ¶ 96.)

On October 1, 2015, Eitam and Na'ama Henkin were driving with their four children past Beit Furik in the West Bank when three Hamas-affiliated terrorists stopped their car and shot and killed them after a struggle.  (*Id.* ¶ 325.)

On September 16, 2018, Khalil Yusef Ali Jabarin stabbed Ari Fuld to death outside a supermarket at the Gush Etzion Junction.  (*Id.* ¶¶ 346-47.)  Jabarin allegedly targeted Mr. Fuld because Mr. Fuld spoke English.  (*Id.* ¶ 349.)  Hamas took responsibility for the attack.  (*Id.* ¶ 351.)

---

[1] The defendants moved to dismiss for improper service, but subsequently withdrew those challenges.
 (*See* ECF Nos. 69, 70, 72.)

## II.     The Defendants' Roles

The plaintiffs allege that the three defendants—Qatar Charity, Qatar National Bank, and

Masraf al Rayan—facilitated the attacks by providing resources to Hamas.

### a.     Qatar Charity

Qatar Charity was founded in 1992 as "Qatar Charitable Society."  (*Id.* ¶ 44.)[2]  The

plaintiffs allege that Qatar Charity is a "key funding source for international terrorists," and cite

examples of its funding activities.  (*Id.* ¶¶ 44, 47-58.)  The plaintiffs allege that in "March 2008,

the U.S. Interagency Intelligence Committee on Terrorism of the U.S. National Counterterrorism

Center listed Qatar Charity (then known as Qatar Charitable Society) as a 'priority III terrorism

support entity (TSE)' because of its 'intent and willingness' to support terrorist organizations

that attack the U.S. and its interests."  (*Id.* ¶ 46.)  While the plaintiffs do not allege that the

United States designated Qatar Charity as an FTO or SGDT, they allege that Israel designated

Qatar Charity a member of the Union of Good in July 2008, and in November 2008, the U.S.

Department of the Treasury designated the Union of Good as an SDGT.  (*Id.* ¶¶ 59, 61.)  The

Treasury Department described the Union of Good as "an organization created by Hamas leaders

to transfer funds to the terrorist organization" whose primary purpose was to "strengthen

Hamas's political and military position in the West Bank and Gaza, including by: (i) diverting

charitable donations to support Hamas members and the families of terrorist operatives; and (ii)

dispensing social welfare and other charitable services on behalf of Hamas."  (*Id.* ¶ 62.)  The

Union of Good's "charitable services" in the West Bank and Gaza included "martyr" payments

---

[2] The complaint alleges that the charity was founded in 2002.  However, public sources, including Qatar Charity's website, state the organization was founded in 1992.  The Court assumes the discrepancy is a typographical error.  *See, e.g.*, *What We Do*, Qatar Charity, https://www.qcharity.org/en/qa/home/whatwedo (last visited Mar. 20, 2023).

to the families of suicide bombers and direct payments to terrorist and their families as incentives to commit terrorist acts.  (*Id.* ¶ 63.)

Although the plaintiffs allege that Qatar Charity funded various terrorist organizations globally, they implicate only Hamas in the deaths of the Henkins and Ari Fuld.  The complaint alleges that Qatar Charity funded and was a partner of Islamic Relief Worldwide, which Israel banned in 2014 for funding Hamas.  (*Id.* ¶ 58.)  Additionally, the plaintiffs allege that from March 1, 2015, until September 7, 2015, Qatar Charity transferred over $28 million to its two branches in the Palestinian Territories, and ultimately "transferred a substantial portion of those funds to Hamas and supposed charities that it controlled."  (*Id.* ¶¶ 126-27.)  Qatar Charity transferred at least $150,000 between March 2011 and September 2015 to one such organization, the Hebron Islamic Charity Society, which Israel allegedly "outlawed . . . because it operated as an arm of Hamas."  (*Id.* ¶¶ 128-29.)  Qatar Charity also transferred money to the Elehssan Society, another "Hamas front[]."  (*Id.* ¶ 131.)

According to the plaintiffs, Qatar Charity's Ramallah Branch Director and two other staff members were convicted in Israel of operating an illegal organization and transferring funds to Hamas.  (*Id.* ¶¶ 130, 141-43.)  Those individuals confessed to a scheme in which Qatar Charity transferred donations worth more than $3.5 million in U.S. dollars and Euros to its branches in the Palestinian Territories between 2009 and 2015, and then "distributed a portion of those funds" to Hamas and its affiliates.  (*Id.* ¶ 130.)  In support of their claims, the plaintiffs attach the July 26, 2017 "amended indictment, guilty plea, conviction and sentencing of Qatar Charity employee Fadi Manasra" to their opposition.  (ECF No. 79 at 5.)  The indictment describes the scheme to which Manasra confessed: "The funds were transferred from Main Jam'iya to the Al-Rayan Bank in Doha.  From there, funds in Euros were transferred to Deutsche Bank in Germany

4

and funds in dollars were transferred to a bank in New York.  Afterwards, all the funds were transferred to the Bank of Palestine or to the Islamic Bank in Ramallah and were deposited in the bank account of the Jam'iya Ramallah."  (ECF No. 79-1, Ex. A at 11.)  The plaintiffs allege additionally that Qatar Charity's annual reports from 2013 to 2015 show that Qatar Charity transferred funds to various Hamas fronts, including the Elehssan Society.  (ECF No. 1 ¶ 131.)

Finally, the plaintiffs allege that Qatar Charity purchased "thousands of anonymous debit cards known as 'Sanabel Cards' from the Bank of Palestine," which "effectively operated as a source of financing for Hamas."  (*Id.* ¶¶ 149-51.)  According to the plaintiffs, Hamas terrorists used the cards to fund terrorist attacks and for their financial needs while they planned the attacks.  (*Id.* ¶ 151.)  In addition, the defendants used the cards to support families of Hamas terrorists who were imprisoned or killed.  (*Id.* ¶¶ 152-53.)

### b.  Qatar National Bank

Qatar National Bank was founded in 1964 and is Qatar's first domestically owned commercial bank.  (*Id.* ¶ 82.)  The plaintiffs allege that during the relevant time period, Qatar National Bank maintained at least seven bank accounts for Qatar Charity; six accounts were opened in March 2012, and one was opened in September 2006.  (*Id.* ¶¶ 169-70.)  Additionally, Qatar National Bank gave money directly to Qatar Charity—approximately $275,000 in November 2013 and approximately $550,000 in February 2020—to "promote Qatar Charity's ability to fund Hamas and other terrorist organizations."  (*Id.* ¶¶ 225-26.)[3]  The plaintiffs also allege that Qatar National Bank served as "a principal banker for Hamas leadership," maintaining bank accounts and providing banking services to multiple Hamas terrorists, whose

---

[3] The February 2020 payment from Qatar National Bank to Qatar Charity was "purportedly to assist Syrian refugees."  (*Id.* ¶ 226.)

bank accounts were "used to finance Hamas terrorist activities in Israel." (*Id.* ¶¶ 172-99, 210-24.)

The plaintiffs allege that Qatar National Bank violated internal policies and international banking requirements, including know-your-customer and due diligence obligations, by providing banking services to terrorists and Qatar Charity. (*Id.* ¶¶ 168, 315.)

### c.    Masraf al Rayan

Masraf al Rayan, one of the largest Islamic banks in the world, was founded in 2006 and is a publicly held banking company headquartered in Doha that "purports to engage in banking, financing and investing activities in conformity with the principles of Islamic Sharia Law." (*Id.* ¶¶ 71-72.) Like Qatar National Bank, Masraf al Rayan provided banking services to Qatar Charity. The plaintiffs allege that between March and September 2015, Masraf al Rayan facilitated the transfer of $28 million from Qatar Charity to its Palestinian branches (*id.* ¶ 126), and between 2009 and 2015, the conversion of $3.5 million of dollars and Euros into Israeli shekels, which were then transferred to the Palestinian territories. (*Id.* ¶ 130.) As noted above, the Manasra confession specifically identified Masraf al Rayan in the scheme. (*See* ECF No. 79-1, Ex. A at 11 ("The funds were transferred from Main Jam'iya to the Al-Rayan Bank in Doha.").) The plaintiffs also allege that Masraf al Rayan used its correspondent bank account with Bank of New York Mellon to effectuate these transfers. (ECF No. 1 ¶ 130.) A portion of these funds was later transferred to organizations affiliated with Hamas, which the plaintiffs allege gave Hamas access to U.S. dollars, a "coveted currency." (*Id.* ¶¶ 130, 164.)[4]

---

[4] The complaint states that "Qatar Charity [] distributed a portion of those funds to Hamas and its affiliates." (*Id.* ¶ 130.) However, during a March 16, 2023 hearing on the motions to dismiss, plaintiffs clarified that "the allegations in the complaint are that [the funds] went to entities that are controlled by Hamas." (Mar. 16, 2023 Hearing Transcript ("Mar. 16 H'rg Tr.") at 7-8.)

### III.    The Plaintiffs' Claims

The plaintiffs, family members of the victims, bring claims individually.  Anne Henkin

also brings claims as the personal representative of Mr. Henkin's estate, and Miriam Fuld brings

claims as the personal representative of Mr. Fuld's estate and on behalf of her minor child.  (*Id.*

¶¶ 25-43.)

The complaint alleges four counts: (1) aiding and abetting foreign terrorist

organizations—specifically Hamas—in violation of the ATA and JASTA (*id.* ¶¶ 353-66); (2)

conspiracy to violate the ATA and JASTA by facilitating acts of Hamas-led terrorism (*id.* ¶¶

367-80); (3) primary violations of the ATA by providing material support to Hamas with the

intent or knowledge that support will facilitate terrorism, (*id.* ¶¶ 381-97); and (4) primary

violations of the ATA by providing material support to Hamas with the knowledge that it was

designated an FTO.  (*Id.* ¶¶ 398-409.)  The plaintiffs allege that the defendants' support of

Hamas enabled Hamas to engage in the acts that killed Mr. Henkin and Mr. Fuld, causing the

plaintiffs significant physical, psychological, and emotional injuries.  (*Id.* ¶¶ 364, 379, 396,

408.)[5]  The defendants moved to dismiss on March 18, 2022 (ECF Nos. 54, 56, 58); the plaintiffs

filed an omnibus opposition on May 3, 2022.  (ECF No. 61.)  The Court held oral argument on

March 16, 2023, and the parties filed supplemental letters on March 23, 2023.  (ECF Nos. 77, 78,

79, 80.)

There are two substantially similar cases pending against these defendants in this district,

both of which raise nearly identical claims: that the defendants supported Hamas—and in those

cases also the Palestinian Islamic Jihad—in violation of JASTA and the ATA.  *See Force, et al.

v. Qatar Charity et al.*, No. 20-CV-2578 (E.D.N.Y.); *Przewozman, et al. v. Qatar Charity, et al.*,

---

[5] Although Hamas also killed Na'ama Henkin in the 2015 attack, the plaintiffs' claims relate only to
  Eitam Henkin.

No. 20-CV-6088 (E.D.N.Y.).  The defendants also moved to dismiss those cases for lack of

personal jurisdiction and for failure to state a claim.  *Force*, No. 20-CV-2578 (ECF Nos. 55, 56,

57); *Przewozman*, No. 20-CV-6088 (ECF Nos. 48, 50, 52).  The motions in *Force* are pending

before Judge Brian Cogan.  On March 17, 2023, Judge Nicholas Garaufis granted the

defendants' motions to dismiss for lack of personal jurisdiction.  *Przewozman*, No. 20-CV-6088,

2023 WL 2562537 (E.D.N.Y. Mar. 17, 2023).  There is one significant factual difference

between this case and *Przewozman*: the terrorist attack in *Przewozman* occurred in 2019, more

than four years after the last Bank of New York Mellon transaction alleged in the complaint,

2023 WL 2562537, at *1-3, while the first attack in this case took place in 2015, and the second

in 2018.  As explained below, the Court adopts Judge Garaufis' detailed and persuasive analysis

of the jurisdictional questions but grants jurisdictional discovery with respect to Qatar Charity

and Masraf al Rayan.

## LEGAL STANDARD

### I.   Rule 12(b)(2)

"A court facing challenges as to both its jurisdiction over a party and the sufficiency of

any claims raised must first address the jurisdictional question and must dismiss the action

against any defendant over whom it lacks personal jurisdiction."  *Romero v. 88 Acres Foods,

Inc.*, 580 F. Supp. 3d 9, 14 (S.D.N.Y. 2022) (internal quotation marks and citation omitted).

When a defendant moves to dismiss pursuant to Rule 12(b)(2) for lack of personal

jurisdiction, the plaintiff bears the burden of establishing jurisdiction.  *In re Magnetic Audiotape

Antitrust Litig*., 334 F.3d 204, 206 (2d Cir. 2003).  "Prior to discovery, a plaintiff may defeat a

motion to dismiss based on legally sufficient allegations of jurisdiction."  *Id.*; *see also Koehler v.

Bank of Bermuda Ltd.*, 101 F.3d 863, 865 (2d Cir. 1996) ("[U]ntil discovery takes place, a

plaintiff is required only to make a *prima facie* showing by pleadings and affidavits that

jurisdiction exists."); *Troma Entm't, Inc. v. Centennial Pictures Inc.*, 729 F.3d 215, 217 (2d Cir. 2013) ("[A] complaint will survive a motion to dismiss for want of personal jurisdiction so long as its allegations, taken as true, are legally sufficient allegations of jurisdiction." (citations and quotation marks omitted)).

When evaluating whether the plaintiffs have met their burden at this stage, "the Court may look beyond the four corners of the complaint and consider materials outside of the pleadings, including accompanying affidavits, declarations, and other written materials." *Vasquez v. Hong Kong & Shanghai Banking Corp., Ltd.*, 477 F. Supp. 3d 241, 245 n.1 (S.D.N.Y. 2020). The Court "constru[es] all pleadings and affidavits in the light most favorable to the plaintiff and resolv[es] all doubts in the plaintiff's favor." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010).

## II.  Rule 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hogan v. Fischer*, 738 F.3d 509, 514 (2d Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ. of City Sch. Dist. of N.Y.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678). Although detailed factual allegations are not required, the pleading standard "requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (noting that courts "are not bound to accept as true a legal conclusion couched as a factual allegation" (citation omitted)).

**DISCUSSION**

## I.  Personal Jurisdiction

It is undisputed that the defendants are domiciled outside of the United States.  The complaint alleges that Masraf al Rayan and Qatar Charity are based in Qatar, (*see* ECF No. 1 ¶¶ 7, 71), and although the complaint does not allege a domicile for Qatar National Bank, the plaintiffs concede that it is a "Qatari bank headquartered in Doha."  (ECF No. 61 at 5; *see also* ECF No. 1 ¶¶ 77, 82.)

Because these are non-domiciliary defendants, the Court applies a two-step analysis to determine whether the plaintiffs have met their burden to establish personal jurisdiction for purposes of Rule 12(b)(2).  *Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167-68 (2d Cir. 2015).  First, the Court applies the long-arm statute used by the forum state.  *Id*.  If, as the plaintiffs argue, "the defendant is not subject to jurisdiction in any state's courts of general jurisdiction," the Court considers whether the plaintiffs effected proper service of federal claims, instead of looking to a state long-arm statute.  (ECF No. 61 at 60; Fed. R. Civ. P. 4(k)(2).)  Second, whether relying on the state long-arm statute or Rule 4(k)(2), the Court must analyze "whether personal jurisdiction comports with due process protections established under the Constitution."  *Eades*, 799 F.3d at 168; Fed. R. Civ. P. 4(k)(2)(B).

In the complaint, the plaintiffs assert that "Defendants are subject to personal jurisdiction in the United States pursuant to 18 U.S.C. § 2334(a), N.Y. C.P.L.R. § 302, and Fed. R. Civ. P. 4(k)(1)-(2) because, pursuant to a conspiracy, they: transacted business and committed tortious acts within the United States (and New York)[.]"  (ECF No. 1 ¶ 22.)  In their pre-motion letter, the plaintiffs relied solely on C.P.L.R. § 302(a)(1), on the theory that the defendants used a correspondent banking account in New York pursuant to a conspiracy.  (ECF No. 52 at 2-4

(citing *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 339 (2012) ("*Licci II*").)  The plaintiffs did not claim in that letter that there was personal jurisdiction under section 2334(a) or Rule 4(k), or because the defendants committed tortious acts within New York.  (*Id.*)  However, in their brief opposing dismissal, the plaintiffs cited Rule 4(k)(2) as a basis for personal jurisdiction, as well as C.P.L.R. sections 302(a)(1) and (2); they also requested jurisdictional discovery.  (ECF No. 61 at 60-86.)  I address each argument in turn.[6]

### a.  Masraf al Rayan and Qatar Charity

#### i.  New York's Long-Arm Statute

The plaintiffs assert jurisdiction under sections 302(a)(1) and (2) of New York's long-arm statute.  The statute provides that personal jurisdiction may be established over a non-domiciliary defendant who, acting in person or through an agent: (1) "transacts any business within the state," or (2) "commits a tortious act within the state."  C.P.L.R. § 302(a)(1), (2).

Under longstanding New York law, section 302(a)(2) extends only to acts committed within the state—that is, the defendant must have been physically present in New York when committing the tort.  *Longines-Wittnauer Watch Co. v. Barnes & Reinecke, Inc.*, 15 N.Y.2d 443, 461-62 (1965) ("[T]he Legislature chose to adopt language which, in so many words, demands that the tortious act be one committed by the defendant, in person or through an agent, *within* this State." (internal quotation marks omitted) (emphasis in original); *see also Harvey v. Chemie Grunenthal, G.m.b.H.*, 354 F.2d 428, 431 (2d Cir. 1965) (following *Longines-Wittnauer* and concluding that the

---

[6]  Although the plaintiffs cited 18 U.S.C. § 2334(a) in their complaint as a basis for jurisdiction, they did not raise the argument in any subsequent filings.  That statute provides for venue and service "in the district court of the United States for any district where any plaintiff resides or where any defendant resides or is served, or has an agent."  18 U.S.C. § 2334(a).  Even assuming that § 2334(a) covers personal jurisdiction, the plaintiff does not claim that any party resides or has an agent in New York.

location of the consequence of the tort is irrelevant under section 302(a)(2)).  It is the

location of the act itself, not the location of the consequences of the act, that governs.

*Platt Corp. v. Platt*, 17 N.Y.2d 234, 237 (1966).  The single New York act that the

plaintiffs allege is the use of a correspondent banking account, but that is a plainly not a

tort.  And, the plaintiffs do not allege that either Masraf al Rayan or Qatar Charity was

ever physically present in New York.  Accordingly, section 302(a)(2) does not confer

jurisdiction over either defendant.

Section 302(a)(1) provides for specific jurisdiction when a party "'transacts

business within the state' and the 'cause of action arises from' that transaction."  *Reed*

*Int'l, Inc. v. Afghanistan Int'l Bank*, No. 21-CV-10626, 2023 WL 2138600, at *5

(S.D.N.Y. Feb. 21, 2023) (citing C.P.L.R. § 302(a)(2)).  "Proof of one transaction in New

York is sufficient to invoke jurisdiction, even though the defendant never enters New

York, so long as the defendant's activities here were purposeful and there is a substantial

relationship between the transaction and the claim asserted."  *Eades*, 799 F.3d at 168

(citing *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 170 (2d Cir. 2010).

"Purposeful activities are those with which a defendant, through volitional acts, avails

itself of the privilege of conducting activities within the forum State, thus invoking the

benefits and protections of its laws."  *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (2007)

(internal quotation marks and citation omitted).

The plaintiffs allege that Masraf al Rayan transacted business in New York as an

agent of Qatar Charity when Masraf al Rayan utilized its correspondent banking account

at Bank of New York Mellon, in New York, on behalf of Qatar Charity.  (ECF No. 61 at

68-73.)  "Correspondent banking is a system of interbank relationships in which a bank

sells services to other financial institutions and involves banks establishing relationships

with one another to facilitate transactions involving remote customers of certain banks."

*Berdeaux v. OneCoin, Ltd*., 561 F. Supp. 3d 379, 403 n.25 (S.D.N.Y. 2021) (internal

quotation marks omitted); (ECF No. 1 ¶¶ 157-60.)  Typically, the foreign bank—in this

case, Masraf al Rayan—utilizes a "correspondent account" at a local bank—here, Bank

of New York Mellon—to send and receive financial transfers in the area; the local bank

provides services in the region on behalf of the foreign bank's customers including

transfers or currency exchange transactions.  (*See, e.g.*, *id*.)

The New York Court of Appeals held in *Licci II* that a defendant may "transact

business" within New York under section 302(a)(1) by "use of a correspondent bank

account in New York, even if no other contacts between the defendant and New York can

be established, *if* the defendant's use of that account was purposeful."  20 N.Y.3d at 338

(quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 66 (2d Cir.

2012) ("*Licci I*") (emphasis in original)).  The court held that whether a defendant

purposefully availed itself of the New York forum is a fact-intensive inquiry, but as a

general matter, "complaints alleging a foreign bank's repeated use of a correspondent

account in New York on behalf of a client—in effect, a 'course of dealing'—show

purposeful availment of New York's dependable and transparent banking system, the

dollar as a stable and fungible currency, and the predictable jurisdictional and

commercial law of New York and the United States."  *Id.* at 339.  After analyzing the

facts alleged in the complaint, the court found that the defendant's intentional use of a

correspondent account "to effect 'dozens' of wire transfers on behalf of a foreign client"

constituted a "transaction of business" pursuant to section 302(a)(1).  *Id.* at 334, 340.

Here, the complaint alleges that Masraf al Rayan "pass[ed]" funds "through" its New York-based correspondent account at Bank of New York Mellon while facilitating currency exchanges and transfers of money from Qatar Charity to its branches in the Palestinian territories.  (ECF No. 1 ¶ 130.)  The complaint also alleges Qatar Charity received the money from donations "in Qatar and around the world," although not specifically in the United States.  The money was then transferred into Qatar Charity's Doha-based account at Masraf al Rayan, where it was converted from U.S. dollars or Euros into Israeli shekels, transferred to Qatar Charity's Palestinian accounts ("pass[ing] through" New York) before being distributed to Hamas affiliates.  (*Id.*)  The scheme alleged in the complaint is supported by the Manasra confession, although the confession does not name Bank of New York Mellon; it simply refers to transfers from Masraf al Rayan to "a bank in New York."  (ECF No. 79-1, Ex. A at 11.)

The plaintiffs allege that between 2009 and 2015, Masraf al Rayan used this process to move approximately $3.5 million in U.S. dollars and Euros, and transferred $25 million from Doha (through Masraf al Rayan, and possibly the correspondent account) to a Qatar Charity branch in the Gaza Strip between 2011 and 2013.  (ECF No.1 ¶ 130.)  The plaintiffs additionally allege the planned transfer through Masraf Al Rayan of $28 million from Qatar Charity to its branches in Palestine between March and September of 2015, although the complaint does not mention whether this sum was routed through the correspondent account.  (*Id.* ¶ 126.)  Some unspecified portions of these amounts ultimately reached Hamas and its affiliates, potentially including $150,000 to the Hebron Islamic Charity Society between March 2011 and September 2015 and unspecified amounts to "the Elehssan Society."  (*Id.* ¶¶ 128-32.)

It is not especially clear what the plaintiffs are alleging about Masraf al Rayan's use of the Bank of New York Mellon account.  The plaintiffs allege in the complaint that Masraf al Rayan used the account to "access USD and to distribute [] dollars to terrorists and their family members in the Palestinian Territories, where USD were a coveted currency."  (ECF No. 1 ¶ 164.)  On the other hand, they also maintain that Masraf al Rayan used the account to convert "USD and Euros held by Qatar Charity in Doha into Israeli shekels."  (*Id.* ¶ 130.)  Moreover, the complaint does not allege that Masraf al Rayan used the correspondent account for currency exchanges; on the contrary, the plaintiffs say that the currency exchanges took place in Doha.  (ECF No. 1 ¶ 130; *see also* ECF No. 79-1, Ex. A at 11.)[7]  The plaintiffs allege only that some portion of the money that Masraf al Rayan transferred for Qatar Charity "passed through" the correspondent account as part of "currency exchange transactions" that converted dollars into Israeli shekels.  (*Id.*; *see also* ECF No. 61 at 13-14 (stating that the funds at issue were "passed through" and "transferred . . . through" the correspondent bank account at issue).)

Nor do the plaintiffs allege that Masraf al Rayan chose a New York-based account specifically to take advantage of "New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States."  *Licci II*, 20 N.Y.3d at 339.  While the complaint alleges more than mere maintenance of a correspondent account, (ECF No. 1 ¶ 130), and the allegations could arguably be read to state that the transactions using the correspondent account "totaled several million dollars," *Licci I*, 673 F.3d at 56, there is no indication, as there was in *Licci*, that there

---

[7] Manasra did not say in his confession that the account was used to exchange currency.

were "dozens" of transactions.  (*Id.*)  Indeed, the complaint is silent on the volume or frequency of the transfers.  (*See also* ECF No. 79-1, Ex. A at 11 (stating that unspecified "funds" were transferred to a bank in New York).)

Courts in this circuit consider four factors to determine whether the use of a New York correspondent account is deliberate: "(1) the defendant bank's level of control over the transfers; (2) whether the defendant bank marketed the correspondent account or encouraged others to use it; (3) the extent to which the use of correspondent account was necessary to carry out the alleged scheme, and; (4) whether the defendant bank took other steps to project itself into the New York market."  *Przewozman*, 2023 WL 2562537, at *11 (citing *Vasquez*, 477 F. Supp. 3d at 258).  As noted above, the complaint does not include any detail about the number of transfers through the account, or about the amounts.  Nor do the plaintiffs allege that Masraf al Rayan directed or controlled the way the correspondent account functioned.  *Cf. Off. Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*, 549 B.R. 56, 68-69 (S.D.N.Y. 2016) ("The Banks . . . set the terms of each placement transaction. . . . The Banks selected U.S. dollars as the currency in which to execute the transaction.  The Banks designated New York correspondent bank accounts to receive the funds[.]").  Similarly, there are no allegations that Masraf al Rayan marketed the correspondent account, or encouraged others to use it, or that the correspondent account was necessary to exchange dollars for other currencies (or even "cheaper or easier" than other options).  *See Vasquez v. Hong Kong & Shanghai Banking Corp.*, No. 18-CV-1876, 2019 WL 2327810, at *12 (S.D.N.Y. May 30, 2019); *Vasquez*, 477 F. Supp. 3d at 259.[8]

---

[8] The complaint states that "Masraf al Rayan had no U.S. branch or office."  (ECF No. 1 ¶ 156.)

16

In short, the allegations do not establish that Masraf al Rayan purposefully availed itself of the New York banking system.  *See, e.g.*, *Singer v. Bank of Palestine*, No. 19-CV-6, 2021 WL 4205176, at *5-6 (E.D.N.Y. Apr. 30, 2021) (concluding there was a lack of jurisdiction where the jurisdictional allegations were a "conclusory web" lacking "information as to dates, dollar amounts, number of transactions, senders or recipients of [the] transfers," but allowing limited jurisdictional discovery).  Due to the nature of inter-bank activity, and "the widespread use of correspondent accounts nominally in New York to facilitate the flow of money worldwide . . . for transactions that otherwise have no other connection to New York," *Licci II*, 20 N.Y.3d at 338, allegations of jurisdiction based on a correspondent bank account need to be specific regarding the scope and the extent to which the account was used.  *See Przewozman*, 2023 WL 2562537, at *12. Otherwise, jurisdiction would be established for any financial transaction conducted in U.S. dollars that is routed through New York, regardless of whether it was purposeful. *See id.*; *see also Cmty. Fin. Grp., Inc. v. Stanbic Bank Ltd.*, No. 14-CV-5216, 2015 WL 4164763, at *4 (S.D.N.Y. July 10, 2015) (routing of U.S. dollar wire payment through New York correspondent account was adventitious, not purposeful use of forum); *Hau Yin To v. HSBC Holdings PLC*, No. 15-CV-3590, 2017 WL 816136, at *7 n.6 (S.D.N.Y. Mar. 1, 2017), *aff'd* 700 F. App'x 66 (2d Cir. 2017) (dismissing for lack of personal jurisdiction where wiring of U.S. dollars through correspondent account was "passive, rather than 'integral' to the alleged" fraud).  Accordingly, the Court cannot at this point determine whether there is personal jurisdiction under the first prong of § 302(a)(1) because of the deficiencies in the complaint.

The plaintiffs' allegations of jurisdiction over Qatar Charity are also premised on

Masraf al Rayan's use of its correspondent account. While the plaintiffs do not allege

any direct ties between Qatar Charity and New York, they allege that Masraf al Rayan

was Qatar Charity's agent and that by directing Masraf al Rayan to "make certain USD

transfers that could only be effectuated through a U.S. correspondent bank," (ECF No. 61

at 70), Qatar Charity is subject to this Court's jurisdiction.

"A correspondent bank relationship, standing alone, does not create an agency

relationship." *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat. Ass'n*, 731 F.2d

112, 122 (2d Cir. 1984). "The Second Circuit has directed that courts focus on the

realities of the relationship in question rather than the formalities of agency law when

determining whether an agency relationship exists for the purpose of establishing

personal jurisdiction under section 302. But even this practical analysis turns on the

elements of the classic agency relationship: that the in-forum intermediary acted (1) for

the benefit of, (2) with the knowledge and consent of, and (3) under some degree of

control of the non-resident principal." *Spetner v. Palestine Inv. Bank*, 495 F. Supp. 3d

96, 110 (E.D.N.Y. 2020) (internal quotation marks and citations omitted).[9] These

elements are satisfied when the non-resident defendant "played an active role in directing

---

[9] The plaintiffs assert that they do not need to demonstrate that Qatar Charity had control over Masraf al Rayan, only that Masraf al Rayan knew that it was acting on Qatar Charity's behalf. (ECF No. 61 at 73.) Once the agency relationship is established, they argue, Masraf al Rayan's knowledge is then attributed to the Qatar Charity. "Under [New York law], there is jurisdiction over a principal based on the acts of an agent where the alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 85 (2d Cir. 2018) (internal quotation marks and citations omitted). "This control requirement is vital: '[a]lthough the long-arm statute and the Due Process Clause are not technically coextensive, the New York requirements (benefit, knowledge, some control) are consonant with the due process principle that a defendant must have 'purposefully availed itself of the privilege of doing business in the forum.'" *Al Thani v. Hanke*, No. 20-CV-4765, 2021 WL 1895033, at *12 (S.D.N.Y. May 11, 2021) (quoting *Schwab*, 883 F.3d at 85).

18

the intermediary's activities relating to the specific in-forum transactions at issue."  *Id.* at

111.  In *Spetner*, the court found that there was no agency relationship, because the

plaintiffs did not allege that the defendant bank chose the providers of the intermediary

bank's correspondent accounts in New York or had any say about which of the accounts

were used for specific transactions.  *Id.* at 111-12.[10]

  The plaintiffs' claims of an agency relationship between Masraf al Rayan and

Qatar Charity do not sufficiently allege that Qatar Charity exercised control over Masraf

al Rayan in its dealings with the correspondent bank.  The plaintiffs cite the Manasra

confession as evidence of a "conspiracy to fund Hamas" that involved Qatar Charity and

Masraf al Rayan (ECF No. 1 ¶ 130; ECF No. 79-1, Ex. A at 11), but Manasra admitted

only that "funds in dollars were transferred to a bank in New York;" he said nothing

about whether Qatar Charity controlled the way Masraf al Rayan selected or used the

correspondent account.  The only allusion to control is conclusory: "Qatar Charity

originated multiple USD transfers that Masraf, at Qatar Charity's direction, processed

through New York."  (ECF No. 61 at 72); *see Pincione v. D'Alfonso*, 506 F. App'x 22, 24

(2d Cir. 2012) (holding that "allegations concerning [] agency were entirely conclusory

and thus inadequate" to establish personal jurisdiction); *Schwab*, 883 F.3d at 86

("Schwab's sparse allegations of agency, however, are too conclusory to make a prima

facie showing of personal jurisdiction."); *Polansky v. Gelrod*, 20 A.D.3d 663, 664 (3d

Dep't 2005) (declining to find agency where "plaintiff offer[ed] only the conclusory

allegation that [the alleged agent] was their agent, with no supporting evidentiary facts

---

[10] The plaintiffs say that *Spetner* is different because Qatar Charity and Masraf al Rayan acted in concert, while the *Spetner* plaintiffs made no similar allegations.  (ECF No. 61 at 68.)  While the plaintiffs have alleged that Masraf al Rayan and Qatar Charity acted in concert, they have not alleged or demonstrated control, which they must do.

establishing control").[11]  Finally, "[a]bsent unusual circumstances, an individual bank customer would have no reason to direct its foreign bank to use a New York-based correspondent account for a transaction that, such as those at issue here, has no other connection to New York." *Berdeaux*, 561 F. Supp. 3d at 403 n.25.

Accordingly, based on the plaintiffs' allegations, the Court cannot at this point determine whether an agency relationship existed between Masraf al Rayan and Qatar Charity sufficient to confer jurisdiction over Qatar Charity based on Masraf al Rayan's use of its correspondent bank account.[12]

        *ii.*      *Rule 4(k)(2)*

Rule 4(k)(2), the federal long-arm statute, allows federal courts to exercise personal jurisdiction if "(1) plaintiff's cause of action arise[s] under the federal law; (2) . . . the defendant is not subject to the jurisdiction of the courts of general jurisdiction of any one State; and (3) . . . the defendant's total contacts with the United States as a whole are sufficient to confer the court with personal jurisdiction without offending due process." *Hartford Fire Ins. Co. v. M/V MSC INSA*, No. 03-CV-2196, 2003 WL 22990090, at *3 (S.D.N.Y. Dec. 18, 2003) (quoting

---

[11] The plaintiffs submit the Declaration of Patrick McArdle for the proposition that wire transactions, like those here, must pass through a U.S.-based correspondent account, (ECF No. 61 at 64 n.36 (citing ECF No. 63 ¶¶ 6-14)); the plaintiffs say that the fact that Qatar Charity instructed Masraf al Rayan to make certain transfers demonstrates its knowledge that a U.S. correspondent bank would be involved. (*See* ECF No. 63 ¶ 19.)  The McArdle declaration states only the transfers were "almost certainly settled in the U.S." because that was how a "transaction involving U.S. dollars would typically operate." (*Id.* at 6-7.)  The Declaration does not establish that Qatar Charity intended that Masraf al Rayan effectuate transfers on its behalf in the United States specifically, or that Qatar Charity in any way controlled Masraf al Rayan's banking activities.  Indeed, as the *Spetner* court pointed out, "[the defendant] may have expected, or even known for a fact, that [the intermediary] would need to settle the wire transfers in New York; but knowing and expecting are not the same as directing and controlling." *Spetner*, 495 F. Supp. 3d at 110.

[12] Because I find that personal jurisdiction over Qatar Charity may be established after jurisdictional discovery pursuant to a theory of agency jurisdiction, I decline to consider the plaintiffs' argument that the Court has personal jurisdiction over Qatar Charity pursuant to a conspiracy theory of jurisdiction. The parties can re-brief this issue after jurisdictional discovery.

*Aerogroup Int'l, Inc. v. Marlboro Footworks*, Ltd., 956 F. Supp. 427, 434 (S.D.N.Y. 1996)).

Due process considerations require that the defendant "have certain minimum contacts [with the

forum state] such that the maintenance of the suit does not offend traditional notions of fair play

and substantial justice." *Int'l Shoe*, 326 U.S. at 316 (internal quotation marks omitted). "The

personal jurisdiction analysis under Rule 4(k)(2) mirrors the standard personal jurisdiction

analysis . . . except the question of whether exercising personal jurisdiction comports with due

process depends on whether the non-resident has sufficient minimum contacts with the United

States as a whole." *Zurich Am. Life Ins. Co. v. Nagel*, 571 F. Supp. 3d 168, 178 (S.D.N.Y.

2021).

      "In this Circuit, to meet the second requirement of Rule 4(k)(2), plaintiffs need to certify

that, to their knowledge, the foreign defendant is not subject to jurisdiction in any other state."

*Astor Chocolate Corp. v. Elite Gold Ltd*., 510 F. Supp. 3d 108, 125 (S.D.N.Y. 2020); *see also In

re SSA Bonds Antitrust Litig*., 420 F. Supp. 3d 219, 240 (S.D.N.Y. 2019). Because the plaintiffs

have not certified that the defendants are not subject to general jurisdiction in another state, they

have not met all of the elements of Rule 4(k)(2). *7 W. 57th St. Realty Co., LLC v. Citigroup,

Inc.*, No. 13-CV-981, 2015 WL 1514539, at *13 (S.D.N.Y. Mar. 31, 2015), *aff'd*, 771 F. App'x

498 (2d Cir. 2019) ("Accordingly, the second prerequisite for application of Rule 4(k)(2) has not

been met. A contrary holding would encourage similarly-situated plaintiffs—those suing foreign

corporations under federal law—to omit any allegations tying defendants to a specific state, in

hopes of engaging the broader minimum contacts analysis of Rule 4(k)(2), which only requires

contacts with the United States as a whole.")[13]  Moreover, as noted above, the plaintiffs have not

---

[13] Because the Court is ordering jurisdictional discovery, it also grants the plaintiffs the opportunity to
submit a certification before jurisdictional discovery commences. *See, e.g.*, *Miami Prod. & Chem. Co.
v. Olin Corp.*, 449 F. Supp. 3d 136, 177 (W.D.N.Y. 2020).

satisfied their burden to show that the defendants had sufficient minimum contacts with the United States.  In *Licci,* the court found that wire transfers through a correspondent bank in New York account created minimum contacts because the defendant was purposefully using the account to affect the alleged harm; the court emphasized, however, the "recurring" nature of the transfers at issue, which demonstrated the "selection and repeated use of New York's banking system." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170-71 (2d Cir. 2013) (finding that because the defendant effectuated dozens of wire transfers totaling several million dollars, its contacts with New York were not random, isolated, or fortuitous, but rather, the transfers were deliberate and recurring and constituted purposeful availment).

As noted above, "key supporting facts such as number of transfers, dates, and monetary amounts, which other courts have relied upon to find a prima facie showing of personal jurisdiction are lacking here." *Singer*, 2021 WL 4205176, at *7.  "When determining whether the use of a bank branch constitutes purposeful availment, courts typically consider the number of transfers identified and volume of money transferred, as well as whether plaintiffs allege the dates of the transfers." *Brown v. Nat'l Bank of Pakistan*, No. 19-CV-11876, 2022 WL 1155905, at *3 (S.D.N.Y. Apr. 19, 2022).  Finally, as noted above, the plaintiffs merely allege that some portion of the money transferred by Masraf al Rayan on behalf of Qatar Charity "passed through" the correspondent account.  (ECF No. 1 ¶ 130.)  Accordingly, just as the plaintiffs' generalized allegations are insufficient to satisfy New York's long-arm statue, they are insufficient to satisfy the due process requirement. *Brown*, 2022 WL 1155905, at *3.  ("The allegations do not allege plausibly a course of dealing, or that Defendant has purposefully availed itself of the forum by engaging in a frequent and deliberate use of its New York branch.").

**b.      Qatar National Bank**

The plaintiffs advance the same theory of jurisdiction for Qatar National Bank that they advanced in *Przewozman*: that "personal jurisdiction over Qatar National Bank may be established based on their participation in a conspiracy with the other Defendants, who used a correspondent banking account in New York to transact in United States Dollars." *Przewozman*, 2023 WL 2562537, at *15; (*see generally* ECF No. 61 at 60-82.)  In *Przewozman*, Judge Garaufis dismissed the claims against Qatar National Bank for lack of personal jurisdiction.  I adopt that thorough and cogent analysis of the plaintiffs' claims against Qatar National Bank, and conclude, as Judge Garaufis did, that the claims against Qatar National Bank should be dismissed for lack of personal jurisdiction.

New York's long-arm statute does not provide for co-conspirator jurisdiction, *Przewozman*, 2023 WL 2562537, at *16, and thus does not establish personal jurisdiction over Qatar National Bank.

I also agree with Judge Garaufis that Rule 4(k)(2) does not confer conspiracy jurisdiction over Qatar National Bank.  As explained above, Rule 4(k)(2) states that proper service establishes personal jurisdiction in federal courts over a defendant for claims arising under federal law if "(A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws."  Fed. R. Civ. P. 4(k)(2).  The Second Circuit has established a three-prong test to determine whether there are sufficient contacts with the forum jurisdiction under a conspiracy theory of jurisdiction.  *Schwab*, 883 F.3d at 86-87.  The plaintiffs must allege "that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state."  *Id.* at 87.  Although the constitutional analysis "does not

require a relationship of control, direction, or supervision" between the defendant and its co-conspirator, "the conspiratorial contacts must be of the sort that a defendant 'should reasonably anticipate being haled into court' in the forum as a result of them." *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. Plc*, 22 F.4th 103, 125 (2d Cir. 2021) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

As Judge Garaufis observed in *Przewozman*, the plaintiffs did not "allege in a non-conclusory manner any facts from which an inference of agreement between Qatar National Bank and the other defendants can be drawn." *Przewozman*, 2023 WL 2562537, at *18. The plaintiffs allege that Qatar National Bank maintained bank accounts and provided banking services for Qatar Charity and various Hamas-affiliated individuals, (ECF No. 1 ¶¶ 14-15, 171-172, 174-225), contributed to Qatar Charity (*id.* ¶¶ 225-26), and was controlled by members of the Qatari government and royal family, who themselves have ties to Hamas. (*Id.* ¶¶ 85-87, 111-122.) The complaint does not allege that the Qatari government or royal family were involved in the terrorist attacks at issue, and as Judge Garaufis pointed out, the plaintiffs do not even establish a connection between Qatar National Bank and the transfers effected by Masraf al Rayan. *Przewozman*, 2023 WL 2562537, at *18. Indeed, the only allegation about the Qatar National Bank accounts are the conclusory statements that the accounts "were used to finance Hamas [] terrorist activities in Israel," and that they "allowed the released terrorists to finance their personal expenditures, thereby freeing them to continue to conduct activities on behalf of Hamas []" and were "directly used . . . to further the efforts of Hamas [] to carry out terrorist attacks. (ECF No. 1 ¶ 224.) "How or when these accounts were used is left to the imagination." *Przewozman*, 2023 WL 2562537, at *18. Accordingly, the plaintiffs have not sufficiently demonstrated that Qatar National Bank participated in the alleged conspiracy and this Court does

not have personal jurisdiction over Qatar National Bank based on a conspiracy theory of personal jurisdiction.

### c.    Jurisdictional Discovery

Plaintiffs who do not make a *prima facie* showing of personal jurisdiction typically are not entitled to jurisdictional discovery.  *See Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 255 (2d Cir. 2007) (holding that "the district court acted well within its discretion in declining to permit discovery because the plaintiff had not made out a prima facie case").  Moreover, "[c]ourts . . . will not permit jurisdictional discovery on the basis of a generalized request more akin to a fishing expedition."  *Alexander v. Porter*, No. 13-CV-6834, 2014 WL 7391683, at *6 (E.D.N.Y. Dec. 29, 2014).

However, it is well settled under Second Circuit law that a court may order discovery, in its discretion, even where plaintiff has not made a *prima facie* showing of personal jurisdiction, when it concludes that the plaintiff may be able to establish jurisdiction if given the opportunity to develop a full factual record.  *Leon v. Shmukler*, 992 F. Supp. 2d 179, 194 (E.D.N.Y. 2014).  "[J]urisdictional discovery is only appropriate when Plaintiff has asserted 'specific, non-conclusory facts that, if further developed, could demonstrate substantial state contacts.'"  *Russo v. Sys. Integrators Inc.*, No. 17-CV-4317, 2018 WL 4100493, at *5 (E.D.N.Y. Aug. 28, 2018) (quoting *Leon*, 992 F. Supp. 2d at 195); *see also Ayyash v. Bank Al-Madina*, No. 04-CV-9201, 2006 WL 587342, at *5 (S.D.N.Y. Mar. 9, 2006) ("Such discovery has typically been authorized where the plaintiff has made a threshold showing that there is some basis for the assertion of jurisdiction, facts that would support a colorable claim of jurisdiction." (internal quotation marks and citation omitted)).  The Court has "broad discretion" in deciding

whether to allow jurisdictional discovery.  *Lehigh Valley Indus., Inc. v. Birenbaum*, 527

F.2d 87, 93 (2d Cir. 1975).

     Here, because the plaintiffs have pleaded facts which could support a colorable claim of

jurisdiction over Masraf al Rayan, jurisdictional discovery will enable the plaintiffs to determine

whether there are additional facts that would permit the Court to determine whether there is

personal jurisdiction under the first prong of § 302(a)(1) and whether exercising personal

jurisdiction would comport with due process.

     The plaintiffs assert that Masraf al Rayan used a correspondent bank account in New

York to conduct large-volume U.S. dollar transfers to organizations affiliated with Hamas during

the relevant period.  (ECF No. 1 ¶ 130.)  The plaintiffs also allege that Masraf al Rayan

knowingly assisted Hamas, the party responsible for the terrorist attacks at issue, by facilitating

these dollar transfers.  (*Id.* ¶¶ 161-67.)  Because some of these allegations could support a

colorable basis for personal jurisdiction, the plaintiffs have made a sufficient start to establishing

personal jurisdiction.  And indeed, as the plaintiffs noted at the March 16th conference, there is

no way for them to know, without some discovery, anything about the number of transfers, the

amounts transferred, or the denominations in which the transfers were made, information in the

control of Masraf al Rayan and Qatar Charity.  (Mar. 16 H'rg Tr. at 11-12, 20-21.)

     In short, while the complaint currently lacks key supporting facts, the plaintiffs have

plausibly pleaded that they might reasonably be able to identify these facts if given the

opportunity to develop the record.  Accordingly, limited jurisdictional discovery is appropriate to

determine whether the Court has personal jurisdiction over Masraf al Rayan.

     The plaintiffs have also pleaded facts that could support a colorable claim that Masraf al

Rayan was acting as Qatar Charity's agent.  The plaintiffs allege that Qatar Charity directed

Masraf al Rayan to use its account in the United States to gain access to U.S. dollars, which were "coveted" by Hamas.  (ECF No. 1 ¶¶ 5, 164.)  Moreover, Manasra, a former Qatar Charity employee, stated in his confession that "funds in dollars were transferred to a bank in New York," demonstrating that Qatar Charity may have had direct knowledge that Masraf al Rayan was using the Bank of New York Mellon account.  (ECF No, 79-1, Ex. A at 11.)  To be sure, Manasra also said that Qatar Charity had access to U.S. dollars *before* those funds were transferred to the New York bank, which is inconsistent with the plaintiffs' assertion that the correspondent bank was used to gain access to "coveted" U.S. dollars.  The defendants also question as a factual matter whether the funds were transferred through the correspondent bank at all.  (*See* ECF No. 68 at 5-6.)  However, at this stage of the proceedings, drawing inferences in the plaintiffs' favor, the Court finds that the plaintiffs could plausibly allege that Qatar Charity exercised some control over Masraf al Rayan.

Judge Garaufis denied jurisdictional discovery in *Przewozman* because the terrorist attack at issue in that case occurred in 2019, well after the last transaction through the correspondent account in 2015.  *Przewozman*, 2023 WL 2562537, at *13. Judge Garaufis concluded that under those circumstances, the "temporal gap [made] the nexus between the Defendants' New York-related acts and Plaintiffs' injuries far too attenuated."  *Id.*  In this case, however, there is no similar temporal gap with respect to the first attack, which took place in 2015, when Masraf al Rayan is alleged to have been using the correspondent New York account.[14]

---

[14] The defendants do not address the temporal proximity of the 2015 attack.  (*See* ECF No. 54 at 11 n.8; ECF No. 56-1 at 9-10, 17-18; ECF No. 58-1 at 16.)

While the second attack occurred later, in 2018, I cannot determine at this point whether the 2018 attack was attenuated, as it was in *Przewozman*.  A nexus may be "too attenuated if, . . . Defendant . . . executed the New York transfers at a time far removed from the attacks that caused Plaintiffs' injuries."  *Strauss v. Crédit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 20 (E.D.N.Y. 2016).  One court has determined that there is no articulable nexus or substantial relationship when ten years separates the wire transfers and the plaintiffs' injuries.  *Universal Trading & Inv. Co. v. Credit Suisse (Guernsey) Ltd.*, No. 12-CV-198, 2012 WL 6186598, at *4 (S.D.N.Y. Dec. 12, 2012), *aff'd*, 560 F. App'x 52 (2d Cir. 2014).  However, a two-year gap does not preclude finding an articulable nexus. *See Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 632 (E.D.N.Y. 2006) ("I cannot conclude as a matter of law that [defendant's] transaction in 2000 could not be the proximate cause of an attack that occurred less than two years later in 2002."); *Averbach v. Cairo Amman Bank,* No. 19-CV-4, 2020 WL 486860, at *2-3, 6-7 (S.D.N.Y. Jan. 21, 2020), *report and recommendation adopted sub nom. Averbach for Est. of Averbach v. Cairo Amman Bank*, No. 19-CV, 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020) (finding an articulable nexus when the fund transfers at issue were made between December 1999 and September 2001 and the terrorist attacks occurred between December 1, 2001 and August 19, 2003).

In this case, because of "the fungible nature of money and the fact that it is difficult to say when the particular dollar given to a terrorist is actually used," *Weiss*, 453 F. Supp. 2d at 632, there could be an articulable nexus between the transfer of funds that occurred between 2009 and 2015 and the 2018 terrorist attack.  Qatar National Bank is different.  The plaintiffs do not allege that it had any direct contact with New York, or the United States generally, and their allegations

28

regarding its involvement in the alleged conspiracy are conclusory.  The plaintiffs have not made a threshold showing that the record could be further developed to support a colorable claim of jurisdiction as to Qatar National Bank.  Accordingly, granting jurisdictional discovery with respect to Qatar National Bank would amount to a fishing expedition, so that request is denied.

Discovery will be limited to document requests and interrogatories that could show the frequency with which Masraf al Rayan used of the Bank of New York Mellon account, and whether that use was deliberate, during the time period relevant to the terrorist attacks, and that the plaintiffs' claims arose from Masraf al Rayan contacts with New York.  For Qatar Charity, discovery will be limited to document requests and interrogatories sufficient to show whether Masraf al Rayan was acting as Qatar Charity's agent.  Discovery must be reasonably tailored to this jurisdictional issue.  The parties will have 120 days from entry of this order to conduct this discovery.

## CONCLUSION

Accordingly, Qatar National Bank's motion to dismiss is granted without prejudice.  Qatar Charity and Masraf al Rayan's motions to dismiss are denied without prejudice to renew as set forth in this Order.  Magistrate Judge Vera M. Scanlon will manage the jurisdictional discovery and set a briefing schedule for any additional dispositive motions by Masraf al Rayan and/or Qatar Charity.

**SO ORDERED.**

s/Ann M. Donnelly
_____
ANN M. DONNELLY
United States District Judge

Dated: Brooklyn, New York
        March 31, 2023