UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------- X

ANNE CHANA HENKIN, Individually and as Personal Representative of the ESTATE OF JUDAH HERZEL HENKIN, ADERET RIVKAH HENKIN STERN, ELIASHIR ELIJAH HENKIN, JACOB BECHOR-SHALOM HENKIN, JOSEPH GIL HENKIN, TAAMA FREIDA HENKIN YAAKOVSON, MIRIAM FULD, Individually, as Personal Representative of the ESTATE OF ARI YOEL FULD, and as the Natural Guardian of N.S.F. (a minor), NAOMI FULD, TAMAR GILA FULD, ELIEZAR YAKIR FULD, HARVEY JONAS YONAH FULD, MARY ALICE FULD, DANIEL YAAKOV FULD, EYTAN FULD, and HILLEL CHAIM SHLOMO FULD,

Case No. 1:21-cv-5716

**PROPOSED INTERVENOR COMPLAINT**

                            Plaintiffs,

                -against-

QATAR CHARITY, QATAR NATIONAL BANK and MASRAF AL RAYAN

                       Defendants,

                -and-

MOSHE FULD; MICHAL FULD; ELI FULD; and BEN ZION FULD,

                    Proposed Intervenor Plaintiffs.

-------------------------------------------------------------------------- X

      Proposed Intervenor Plaintiffs Moshe Fuld, Michal Fuld, Eli Fuld, and Ben Zion Fuld are members of the same family and stand in the exact same shoes as Plaintiffs Miriam Fuld, Naomi Fuld, Tamar Gila Fuld, Eliezer Yakir Fuld, Harvey Jonas Yonah Fuld, Mary Alice Fuld, Daniel Yaakov Fuld, Eytan Fuld and Hillel Chaim Shlomo Fuld (collectively the "Fuld Plaintiffs").

Plaintiffs, by their undersigned counsel, hereby allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which they allege based upon their personal knowledge.

## INTRODUCTION

1.     Plaintiffs assert claims for wrongful death, personal injury and related torts pursuant to the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 *et seq.*, against the members of a terrorism-financing conspiracy spearheaded by the government and Royal Family of Qatar.

2.     The members of that conspiracy sponsored and carried out a series of heinous terrorist attacks in Israel, including the attacks Plaintiffs describe below.

3.     For more than a decade, Qatar has openly financed and supported the infamous Palestinian terrorist organization Hamas, which the U.S. government long-ago designated as a Specially Designated Terrorist ("SDT"). Hamas earned that designation by repeatedly committing violent terrorist attacks targeting innocent victims in Israel and the Palestinian Territories.

4.     In October 2012, Qatar publicly pledged $400 million to Hamas. That lawless act evoked widespread condemnation in the U.S. Congress. In addition to substantial financial support, Qatar has provided safe haven to Hamas's senior leadership since at least 2012.

5.     To accomplish its goal of spreading acts of terrorism and violence in Israel while evading international sanctions, Qatar co-opted several institutions that it dominates and controls to funnel coveted U.S. dollars (the primary currency of Middle East terrorist networks) to Hamas under the false guise of charitable donations.

6.     Three of those institutions are Defendants in this case – Qatar Charity, Masraf Al Rayan Bank and Qatar National Bank ("QNB" and, collectively with Qatar Charity and Masraf Al Rayan, "Defendants").

7.      Qatar Charity is a Qatari organization well-known for funding terrorism throughout the Middle East and North Africa.  It is a member of the Union of Good, a notorious funder of Hamas and international terrorism that the U.S. government has named as a Specially Designated Global Terrorist ("SDGT").  The chairman of Qatar Charity's board is Hamad bin Nasser al-Thani, a member of the Qatari Royal Family.

8.      Pursuant to their unlawful conspiracy, the Defendants and their co-conspirators provided material support and resources to Hamas that allowed it to carry out the attacks that killed or injured Plaintiffs and countless other civilians in Israel and the Palestinian Territories and injured an even larger number of non-combatants.

9.      In furtherance of that conspiracy, Qatar Charity collected and funneled millions of dollars in donations through the U.S. financial system.

10.     Qatar Charity solicited donations in Qatar and around the world and then transferred those funds to its account at Masraf Al Rayan in Doha, Qatar.  Masraf Al Rayan then utilized its "correspondent" bank account located in New York to conduct transactions involving U.S. dollars ("USD") and to transfer funds from Doha, through New York, to Qatar Charity's accounts in the Palestinian Territories at either the Bank of Palestine or the Islamic Bank in Ramallah.

11.     Once Qatar Charity's branches in the Palestinian Territories secured those funds, the branches distributed the U.S. dollars or funds denominated in other currencies to Hamas, as well as to supposed charities affiliated with that terrorist organization.

12.     Hamas then utilized those funds to finance terrorist activities in Israel and the Palestinian Territories, including the attacks more particularly described below.

13.     Masraf Al Rayan is currently under investigation in the United Kingdom for, among other things, knowingly providing financial services to Hamas and another terrorist organization, Palestinian Islamic Jihad ("PIJ"), by utilizing Qatar Charity to pass funds to those entities.

14.     Like Masraf Al Rayan, QNB took numerous overt acts in support of the conspiracy that resulted in Plaintiffs' injuries and the death of their family members.  In coordination with the other Defendants and their co-conspirators, QNB maintained at least six accounts for Qatar Charity and provided a host of banking services for the leaders of terrorist organizations.  Indeed, Qatar Charity specifically requested that donors send funds to its accounts at QNB.

15.     QNB maintained dozens of accounts for Hamas terrorists, including: (a) one of the FBI's most wanted female terrorists, who is currently fighting extradition to the U.S. from Jordan; (b) a spokesperson for, and the former leader of, Hamas's military wing in the West Bank, who was convicted for orchestrating murderous terrorist attacks in Israel; (c) a member of Hamas's politburo, who was convicted for his role as a Hamas terror cell operative; and (d) the Chairman of the Union of Good, a U.S.-designated terrorist organization sanctioned for funding Hamas's terrorist activities.

16.     All those QNB accounts were used to finance the terrorist activities of Hamas in Israel and the Palestinian Territories.

17.     As a result of the terrorist attacks, Plaintiffs have suffered severe physical and/or psychological injuries.

18.     Accordingly, Defendants are liable to Plaintiffs under the ATA for providing material assistance to Hamas, engaging in a conspiracy designed to support Hamas's terrorist activities, and aiding and abetting that unlawful conduct.

## JURISDICTION AND VENUE

19.     Plaintiffs, all citizens of the United States, were killed or injured by acts of international terrorism that arose from the Defendants' conspiracy to support Hamas.

20.     As a result, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. §§ 2333(a) and 2338.

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (d).

22.     Defendants are subject to personal jurisdiction in the United States pursuant to 18 U.S.C. § 2334(a), CPLR § 302, and Fed. R. Civ. P. 4(k)(1)-(2) because, pursuant to a conspiracy, they: transacted business and committed tortious acts within the United States (and New York) by transferring funds through the United States (and New York) for Hamas's benefit; and purposefully availed themselves of the benefits and protections offered by the New York banking system and New York law in the course of committing the wrongful acts Plaintiffs allege. Throughout the course of the conspiracy, all Defendants recognized that Hamas had a long history of utilizing the funding it obtained to conduct terrorist attacks that killed Americans who resided in, or were visiting, Israel or the Palestinian Territories.

23.     Specifically, in furtherance of their conspiracy, Qatar Charity and Masraf Al Rayan, with the knowledge of their co-conspirator, QNB, knowingly accessed and utilized the banking system in the United States to transmit funds to Hamas and effectuated U.S. dollar-denominated funds transfers on behalf of Qatar Charity through the Bank of New York Mellon in New York.

24.     Pursuant to their agreement with QNB, Qatar Charity and Masraf Al Rayan effectuated those bank transfers for the purpose of advancing the interests of Hamas and facilitating its ability to conduct attacks in Israel and the Palestinian Territories.  Furthermore, all

Defendants recognized that Hamas was a U.S.-designated terrorist organization at the time Defendants orchestrated those transfers.

## THE PARTIES

**A. The Fuld Family**

25.      Ari Yoel Fuld was murdered on September 16, 2018 by a terror attack that Hamas committed.  At the time of the acts alleged, and at all other times relevant hereto, Ari Yoel Fuld was a citizen of the United States.

26.      Plaintiff Moshe Fuld was, and at all times relevant hereto, the brother of Ari Fuld, and a citizen of the United States. Moshe Fuld has suffered severe mental anguish and extreme emotional pain and suffering as a result of the September 16, 2018 terror attack that claimed the life of Ari Yoel Fuld.

27.      Plaintiff Michal Fuld was, and at all times relevant hereto, the niece of Ari Fuld, and a citizen of the United States. Michal Fuld has suffered severe mental anguish and extreme emotional pain and suffering as a result of the September 16, 2018 terror attack that claimed the life of Ari Yoel Fuld.

28.      Plaintiff Eli Fuld was, and at all times relevant hereto, the nephew of Ari Fuld, and a citizen of the United States. Eli Fuld has suffered severe mental anguish and extreme emotional pain and suffering as a result of the September 16, 2018 terror attack that claimed the life of Ari Yoel Fuld.

29.      Plaintiff Ben Zion Fuld was, and at all times relevant hereto, the nephew of Ari Fuld, and a citizen of the United States. Ben Zion has suffered severe mental anguish and extreme emotional pain and suffering as a result of the September 16, 2018 terror attack that claimed the life of Ari Yoel Fuld.

**B. Defendants**

**1. Qatar Charity**

30.     Qatar Charity was founded in 2002 as the Qatar Charitable Society.  It soon became a key funding source for international terrorists.

31.     The Qatar Charitable Society renamed itself Qatar Charity after it became notorious under its prior name for financing international terrorism.

32.     In March 2008, the U.S. Interagency Intelligence Committee on Terrorism (IICT).[1] of the U.S. National Counterterrorism Center listed Qatar Charity (then known as Qatar Charitable Society) as a "priority III terrorism support entity (TSE)" because of its "intent and willingness" to support terrorist organizations that attack the U.S. and its interests.

33.     Long before then, however, Qatar Charity had engaged in a pattern of support and financing of international terrorist organizations.

34.     In testimony to the 9/11 Commission and Congress, Jamal al-Fadl, a former business aide to Osama bin Laden who defected to the United States in 1996, said that Bin Laden told him in 1993 that the Qatar Charitable Society was one of Bin Laden's major sources of funding.

35.     In 2002, in a terrorism-related criminal case in the United States District Court for the Northern District of Illinois, the U.S. government confirmed that the Qatar Charitable Society

---

[1] The IICT was established in 1997 pursuant to the National Security Act of 1947 to "advise and assist the Director of Central Intelligence (DCI) in the discharge of his duties and responsibilities with respect to the coordination and publication of national intelligence on terrorism issues and … promote the effective use of Intelligence Community resources for this purpose."  The DCI Terrorism Warning Group was charged with preparing "coordinated Intelligence Community threat warnings from the DCI to alert senior policy makers of possible foreign terrorist attacks against US and allied personnel, facilities and interests."  *See* https://fas.org/irp/offdocs/dcid3- 22.pdf.

financed Osama Bin Laden, who used the funds to carry out the 1998 East Africa embassy bombings.[2]

36.     The 2003 testimony provided by Matthew Epstein and Evan Kohlmann to the U.S. House Committee on Financial Services Subcommittee on Oversight and Investigations (the "Epstein/Kohlmann Testimony") provides additional evidence of the Qatar Charitable Society's support for terrorism.

37.     The Epstein/Kohlmann Testimony noted that the Qatar Charitable Society engaged in the "active financing of Al-Qaida and other designated international terror groups" and "served a critical role in the Arab-Afghan terrorist infrastructure by laundering money originating from bank accounts belonging to Bin Laden and his sympathetic patrons in the Arabian Gulf, providing employment and travel documents to Al-Qaida personnel worldwide, and helping 'to move funds to areas where Al-Qaida was carrying out operations.'" http://archives-financialservices.house. gov/media/pdf/ 031103me.pdf (quoting the Arnaout Proffer).

38.     The Epstein/Kohlmann Testimony also emphasized that, while Qatar Charitable Society touted its humanitarian work, its "charitable mission represented little more than an excuse to provide material support to terrorists."

39.     In addition to serving as a major financial conduit for Al-Qaida, Qatar Charity has financed and supported other terrorist organizations throughout the Middle East, Africa and elsewhere.

40.     For example, Qatar Charity actively aided radical quasi-official terrorist militias associated with the National Islamic Front (NIF) in Sudan.

---

[2] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements," *United States of America v. Enaam M. Arnaout*, Case #: 02 CR 892 (N.D. Ill. Jan. 31, 2003) (the "Arnaout Proffer").

41.     In the 1990s, Qatar Charity supported the Eritrean Islamic Jihad Movement, another terrorist organization in Africa.

42.     Outside of Africa, Qatar Charity was extremely active in terrorist activities in the Balkans and the turbulent republics of the Caucasus.

43.     Qatar Charity has also acted as a financier and agency for terrorist organizations in Chechnya and Mali and funded Syria's Ahfad al-Rasul Brigade.

44.     In addition, Qatar Charity provided funding to, and partnered with, Islamic Relief Worldwide, which Israel banned in 2014 for funding Hamas.

45.     In July 2008, Israel's Defense Minister signed an order banning Qatar Charity (then known as the Qatar Charitable Society) and all of its branches operating in the territories administered by the Palestinian Authority.  The same Israeli government order designated Qatar Charity as a member of the Union of Good, a notorious funder of Hamas terrorism.

46.     At the time of that designation, Israel also expressly warned all world banking and financial institutions to "prepare accordingly and act with caution in order to avoid criminal actions and civil lawsuits by victims of terrorism," including those brought in the United States.

47.     In November 2008, the U.S. Department of the Treasury ("Treasury") designated the Union of Good as an SDGT.

48.     That designation declared that the Union of Good was "an organization created by Hamas leaders to transfer funds to the terrorist organization."  The Treasury designation further emphasized that "the primary purpose of this activity is to strengthen Hamas's political and military position in the West Bank and Gaza, including by: (i) diverting charitable donations to support Hamas members and the families of terrorist operatives; and (ii) dispensing social welfare and other charitable services on behalf of Hamas."

49.     The Treasury designation stated that the supposed charitable services that the Union of Good provided in the West Bank and Gaza included making so-called "martyr" payments to the families of suicide bombers.  The Union of Good also promoted terrorism by making payments directly to other perpetrators of terrorism and by making support payments to the families of convicted terrorists serving jail time in Israel.  Those payments provide illegal financial incentives and rewards for committing murder, maiming and causing harm to the Plaintiffs and other victims of terrorism.

50.     In that regard, the Treasury designation stated, "In addition to providing cover for Hamas financial transfers, some of the funds transferred by the Union of Good have compensated Hamas terrorists by providing payments to the families of suicide bombers."

51.     Treasury further found that "Union of Good acts as a broker for Hamas by facilitating financial transfers between a web of charitable organizations…and Hamas-controlled organizations in the West Bank and Gaza."

52.     Long before the Union of Good designation, Treasury had designated Hamas as a terrorist organization in October 1997.

53.     In 2017, to avoid suspicion from international banks after a damning report by the UK Charity Commission noting its connections to Hamas and the Muslim Brotherhood, the UK branch of Qatar Charity renamed itself Nectar Trust.

54.     Saudi Arabia, Bahrain, Egypt, and the United Arab Emirates ("UAE") cut ties with Qatar on June 5, 2017, due to Qatar's connections with, and support of, terrorist organizations.

55.     In June 2019, Saudi Arabia, Bahrain, Egypt and the UAE designated Qatar Charity as a financial supporter of terrorism.

56.     At all times relevant to this Complaint, the chairman of the Qatar Charity board has been Hamad bin Nasser al-Thani, a member of the Qatari royal family.

### 2. Masraf Al Rayan Bank

57.     Masraf Al Rayan, founded in January 2006, is a publicly held banking company headquartered in Doha, Qatar.

58.     Masraf Al Rayan purports to engage in banking, financing and investing activities in conformity with the principles of Islamic Sharia Law.  It is regulated by the Qatar Central Bank and is one of the largest Islamic banks in the world, with a market capitalization of $7.5 billion.

59.     Masraf Al Rayan is controlled by the Qatari government and members of the Qatari royal family through their substantial stock ownership in the bank and membership on the Bank's board of directors.  Several members of the Qatari royal family (the House of Thani) are or have served as members of the bank's board.

60.     According to Masraf Al Rayan's most recent Annual Report, the bank's four largest shareholders are all agents or instrumentalities of the Qatari government: Qatar's General Retirement Authority's Pensions Fund holds 2.88% of the bank's stock; the Qatar Investment Authority, a Qatari government entity responsible for developing, investing and managing the reserve funds of the State of Qatar and other assets assigned to it, holds 4.09%; the Qatar Armed Forces Investment Portfolio holds 9.31%; and the Qatar Holding Company, the main direct investment subsidiary of the Qatar Investment Authority, holds 11.65%.

61.     Notwithstanding Qatar Charity's longstanding and highly publicized support for Hamas and other international terrorist organizations, Masraf Al Rayan provided Qatar Charity with financial services throughout the time relevant to Plaintiffs' claims. Indeed, Masraf Al Rayan continues to provide those services to Qatar Charity to this day.

62.     Masraf Al Rayan owns 70 percent of Al Rayan (UK) Limited, which owns 98.34% of its subsidiary, Al Rayan Bank PLC.   By virtue of its share ownership in Al Rayan (UK) Limited, Masraf Al Rayan controls that entity and its subsidiary, Al Rayan Bank PLC.

63.     Al Rayan Bank PLC, formerly known as Islamic Bank of Britain, is a commercial bank in the United Kingdom.   That entity was established in August 2004 to offer Sharia-compliant financial services to UK customers.

64.     Al Rayan Bank PLC notified its shareholders in late 2019 that it was under investigation by the United Kingdom's Financial Conduct Authority ("FCA").

65.     The FCA investigation arises from the financial services that Al Rayan Bank PLC provided to designated terrorist entities.   The bank's clients include Interpal, which Treasury designated as a terrorist entity in 2003 due to Interpal's funding links to Hamas.

66.     Al Rayan Bank PLC also provides services to the Nectar Trust, the U.K. branch of Qatar Charity.   Nectar Trust, previously known as Qatar Charity UK, has received more than £37 million (roughly $50.5 million as of the date of this pleading) from Qatar Charity.

67.     Nectar Trust is partners with the Emaan Trust, a group whose leaders have close links to the extremist Muslim Brotherhood in England's northern city of Sheffield.

### a.  **QNB**

68.     QNB, founded in 1964, was Qatar's first domestically owned commercial bank.

69.     The Qatar Investment Authority, Qatar's state-owned sovereign wealth fund, owns a 50% interest in QNB.

70.     The Qatar Investment Authority was founded in 2005 by Qatar's then-Emir, Hamad bin Khalifa Al Thani.   Hamad bin Jassim bin Jaber bin Mohammed bin Thani Al Thani,

the former Prime Minister and Foreign Minister of Qatar, ran the Qatar Investment Authority until 2013.  From 2015 to 2018, Sheikh Abdullah bin Mohammed bin Saud Al Thani, another member of the Qatari royal family, served as the Qatar Investment Authority's CEO.

71.     QNB is controlled by the Qatari government and members of the Qatari royal family through their substantial stock ownership in the bank and membership on the bank's board of directors.  Several members of the Qatari royal family are or have been members QNB's board, including the bank's current vice-chair.

72.     QNB markets its ability to provide "Sharia compliant current accounts in numerous currencies" and associated services throughout the Middle East and in the U.K. According to QNB, its "Islamic products and offerings are approved by our Sharia Supervisory Board (SSB)."

73.     Yousuf Abdulla Al-Qaradawi, the Chairman of the Union of Good, sits on the QNB SSB even though the Union of Good is a U.S.-designated terrorist organization created by Hamas to collect funding through purported charitable donations.

## THE FACTUAL BASES FOR PLAINTIFFS' CLAIMS

## THE CONSPIRACY AMONG QATAR AND DEFENDANTS TO FUND HAMAS IN CIRCUMVENTION OF U.S. AND INTERNATIONAL SANCTIONS

**A.  Hamas**

74.     Hamas is an acronym for "Harakat al-Muqawama al-Islamiyya," the Islamic Resistance Movement.  Hamas was founded in December 1987 by Sheikh Ahmed Yassin, Salah Shehada, Abd al-Aziz al-Rantisi, Muhammad Sham'a, Ibrahim al-Yazuri, Issa al-Nashar and Abd al-Fatah Dukhan.

75.     Hamas is an offshoot of the Muslim Brotherhood, a radical Islamic group founded in Egypt before World War II.

76.     Hamas is a U.S. government-designated Foreign Terrorist Organization ("FTO") dedicated to radical Islamist principles and the destruction of the State of Israel.  It uses violence, including suicide bombings and missile attacks, and threats of violence to pressure Israel to cede territory to the Palestinian people.

77.     Hamas is nominally divided into three interconnected wings: (i) a political organization; (ii) the "Da'wa," Hamas's social service or humanitarian component; and (iii) a military operational wing known as the Izz-al-Din al-Qassam Brigades.

78.     Although these components have separate responsibilities, the Hamas organization operates seamlessly, with each component working together to conduct and support the military operations and achieve the illegal objectives of the terrorist group as a whole.

79.     Hamas's social services are, in large part, administered by local "zakat" committees and charitable societies.  Hamas either established these committees or co-opted them by, *inter alia*, installing Hamas members, operatives and activists as members of the zakat committees' governing bodies.  These committees and organizations collect and distribute funds on behalf of Hamas for the organizations' purposes.

80.     The zakat committees play important roles in channeling funds to pay expenses for, and assist the families of, terrorist operatives who are arrested, injured or killed.

81.     The zakats also assist with providing housing subsidies to the families of suicide bombers, whose homes are often demolished by the Israeli army after the bombers' identities are confirmed.  The zakat committees also helped to identify and recruit potential terrorists.

82.     Hamas regularly routs significant sums that it nominally collects for charitable and humanitarian purposes to terrorist and other operational uses.  Hamas used (and still uses) those funds to obtain weapons and explosives and to provide transportation services, safehouses, training and salaries for its terrorist operatives and recruiters.

83.     Even the funds the zakats utilize for charitable purposes free up other money for use in connection with terrorist acts.  And the funds Hamas uses for charitable purposes directly support its military operations, as they bolster Hamas's image-making machine, which increases its fundraising and attracts new foot soldier recruits.

**B.  Hamas's Formal Designation as a Terrorist Organization**

84.     In 1989, the Government of Israel declared Hamas a terrorist organization and designated it an "unlawful organization" because of its terrorist acts.  Notice of the designation was placed in the Announcements and Advertisements Gazette, an official Government of Israel publication.

85.     On January 23, 1995, President Clinton issued Executive Order No. 12947, which found that "grave acts of violence committed by foreign terrorists that threaten to disrupt the Middle East peace process constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."

86.     Executive Order No. 12947 designated Hamas as an SDT and "blocked" all of its property and interests in property.

87.     On October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated Hamas as a Foreign Terrorist Organization ("FTO") pursuant to Section 219 of the Immigration and Nationality Act and the Antiterrorism and Effective Death

Penalty Act of 1996.  The designation of Hamas as an FTO has been renewed every two years since 1997.

88.     On September 23, 2001, in response to the September 11, 2001 terrorist attacks on the United States, President Bush issued Executive Order No. 13224, which declared a national emergency with respect to the "grave acts of terrorism ... and the continuing and immediate threat of further attacks on United States nationals or the United States."

89.     Executive Order No. 13224 designated Hamas as an SDGT.  That Executive Order also blocked all property and interests in property of SDGTs, including Hamas.

### C.  Qatar's Direct and Deliberate Funding of Hamas <u>and Provision of Safe Haven to Hamas Leadership</u>

90.     From at least 2011 through 2015, Hamas knowingly, willfully, and unlawfully combined, conspired, confederated and agreed with Defendants to commit numerous acts of international terrorism, as defined by 18 U.S.C. §§ 2331 and 2332.  Those acts of international terrorism included acts of murder, attempted murder, and solicitation to commit murder, as well as providing material support to designated FTOs.

91.     Like any enterprise, terrorist organizations like Hamas require money to operate. But unlike legitimate companies, terrorist organizations must conduct their fundraising and other financial activities in a clandestine manner.

92.     As a result, Hamas – like many other terrorist organizations – employs creative fundraising strategies that rely heavily upon sympathetic nation states and financial institutions to disguise Hamas's economic activities and thereby facilitate its efforts to evade anti-terrorism laws.

93.     In large part, Hamas endeavored to cloak its terror-financing efforts in a veneer of "charitable" donations.

94.     The government of Qatar has long maintained an official policy of providing financial support to Hamas, often disguised as purported charitable donations.

95.     Defendants, all of which the Qatari government and royal family dominate, have played integral roles in Qatar's support of Hamas.

96.     Qatar's support for Hamas started at least as early as 2006.  At that time, shortly after the elections that brought Hamas to power in Gaza, Qatar pledged $50 million to what was then a Hamas-dominated Palestinian Authority government.

97.     In 2008, Palestinian officials stated that Qatar provided Hamas with "millions of dollars a month" nominally intended for the people of Gaza.[3]

98.     In October 2012, Qatar pledged $400 million to Hamas.  In response, 24 U.S. members of Congress wrote to the Qatari ambassador, stating that Qatar's support of "Hamas, a U.S.-designated Foreign Terrorist Organization…legitimizes, and bolsters an organization committed to violence and hatred."

99.     A 2013 memo marked "secret" addressed to Sheikh Hamad bin Jassem (Qatar's Prime Minister and Foreign Minister and a Qatari royal family member) from Ali Fahad Al- Hajri, the Qatari Assistant Minister of Foreign Affairs, shows the extent of the Qatari government's support for Hamas.

100.     Al-Hajri's memo noted that, at bin Jassem's instruction, $250 million had been paid from the Qatar Central Bank directly to Hamas's leader, Khaled Meshal.  The memo stated: "I would like to inform Your Excellency that the approved payment was extracted from the emergency fund at the Ministry of Finance by check no. (060622496) dated 27/01/2013 and drawn

---

[3] Qatar Seen Bankrolling Hamas," *The Washington Times,* March 5, 2008 (available at http://www.washingtontimes.com/news/2008/mar/05/qatar-seen-bankrolling-hamas/?page=all).

from Qatar Central Bank on behalf of Mr. Khaled Abdel Rahim Ismail Abdel Kader Misha'al, (Hamas)."

101.    Qatar is Hamas's largest single funder.  Between 2012 and 2018, Qatar officially provided Hamas with over $1.1 billion.

102.    In March 2014, Treasury Under Secretary David Cohen singled out Qatar as an especially "permissive jurisdiction" for terrorist financing.  He noted that Qatar "has for many years openly financed Hamas, a group that continues to undermine regional stability."

103.    At the same time, Cohen noted that Qatari oversight is so lax that "several major Qatar-based fundraisers act as local representatives for larger terrorist fundraising networks that are based in Kuwait."  Cohen further stated that Qatar not only supports Hamas, but also extremist groups operating in Syria. *See* https://www.treasury.gov/press-center/press-releases/Pages/jl2308.aspx.

104.    Other Middle Eastern governments have also recognized the substantial role that Qatar's government plays in supporting terrorism in the region.  Saudi Arabia, Bahrain, Egypt, and the UAE all cut ties with Qatar on June 5, 2017, due to Qatar's longstanding connections with terrorist organizations.

105.    In addition to substantial financial support, Qatar has provided safe haven to Hamas's political leadership since 2012.  Among other Hamas officials, the organization's current leader, Khaled Meshal, has resided in Qatar since 2012.

106.    Moreover, in April 2013, Qatar chartered a private flight to transport senior Hamas political leader Ismail Haniyeh, who was at that time a leader of the Palestinian National Authority, to Doha.

107.     Qatar arranged for two founders of Hamas's military wing, Yehia Sinwar and Rawhi Mushtaha, to join Haniyeh on that flight.

108.     As of February 2020, Haniyeh was still living in and protected and supported by Qatar.

### D.  Qatar's Use of the Bank Defendants to Facilitate the Illicit Funding of Hamas

109.     The U.S. government has recognized the critical role that Qatar plays in funding terrorist organizations.

110.     According to the March 4, 2014 prepared statements of David Cohen, who was then serving as Treasury Under Secretary for Terrorism and Financial Intelligence:

> Private fundraising networks in Qatar…increasingly rely upon social media to solicit donations for terrorists and to communicate with both donors and recipient radicals on the battlefield.  This method has become so lucrative, and Qatar has become such a permissive terrorist financing environment, that several major Qatar-based fundraisers act as local representatives for larger terrorist fundraising networks…. There should be no doubt that while we remain committed to working with countries such as…Qatar to confront ongoing terrorist financing, the U.S. will not hesitate to act on its own to disrupt these terrorist financing networks.[4]

111.     Consistent with Under Secretary Cohen's remarks, Qatar exploited its control of Masraf Al Rayan to use the bank to funnel money to Hamas under the guise of donations to various purported "charitable" organizations.  Qatar Charity was the principal beneficiary of that illicit scheme.

112.     From March 1, 2015 until September 7, 2015 alone, Defendants conspired to use Masraf Al Rayan to transfer over $28 million in supposed charitable donations from Qatar Charity

---

[4] https://www.treasury.gov/press-center/press-releases/Pages/jl2308.aspx.

in Doha to its two branches in the Palestinian Territories (one in Gaza and the other in the West Bank).

113.    Qatar Charity eventually transferred a substantial portion of those funds to Hamas and supposed charities that it controlled.

114.    Among other supposed charities tied directly to Hamas, Qatar Charity transferred at least $150,000 to Hebron Islamic Charity Society between March 2011 and September 2015.

115.    Well before that time period, Israel had outlawed the Hebron Islamic Charity Society because it operated as an arm of Hamas.

116.    According to the confessions of the Director and staff of Qatar Charity's Ramallah Branch (located about 10 miles from Jerusalem), as well as that organization's financial books, the conspiracy to fund Hamas involved the following steps designed to pass U.S. dollars ("USD") through the American banking system for Hamas's benefit:

a.    Qatar Charity would solicit donations in Qatar and around the world.

b.    Qatar Charity would transfer those funds to its account at Masraf Al Rayan in Doha.

c.    Between 2009 and 2015, Masraf Al Rayan arranged for currency exchange transactions that involved converting in excess of $3.5 million in USD and Euros held by Qatar Charity in Doha into Israeli shekels and moving those funds to Qatar Charity in the Palestinian Territories.

d.    The USD used in connection with those transactions passed through Bank of New York Mellon in New York and on to the Qatar Charity accounts held at either the Bank of Palestine or the Islamic Bank in Ramallah.

e.    Qatar Charity then distributed a portion of those funds to Hamas and its affiliates.

f.    In addition to those funds, between 2011 and 2013, Qatar Charity moved $25 million from Doha to the banned Qatar Charity entity operating in the Gaza Strip.

g.    Those dollars also passed through the Bank of New York.

117.    Qatar Charity annual reports for 2013, 2014, and 2015 reflect that Qatar Charity transferred funds to, and carried out joint projects with, various Hamas fronts, including the Elehssan Society.

118.    On May 4, 2005, Treasury designated the Elehssan Society "a charitable front for the Palestinian Islamic Jihad."  A Treasury press release announcing the designation stated that "in addition to its use as a financial conduit, Elehssan is used by PIJ to recruit for its operational cadre.  In early 2003, Elehssan planned to open a youth center to support PIJ activity and conduct PIJ-related recruitment and training."

119.    Stuart Levey, then Treasury Under Secretary for the Office of Terrorism and Financial Intelligence, noted that "Elehssan masquerades as a charity, while actually helping to finance Palestinian Islamic Jihad's acts of terror against the Israeli people and other innocents."

120.    In a criminal proceeding involving a notorious PIJ finance ring operated by former University of South Florida professor Sami Al-Arian, Elehssan was also named as a recipient of support from the three defendants.

121.    Despite Qatar Charity's clear and substantial links to terrorist entities, Masraf Al Rayan completed USD transfers to Qatar Charity in the Palestinian Territories throughout the

conspiracy. Those transfers proceeded in defiance of Israeli law, which governs banking activity in the territories.

122.    During the entirety of the conspiracy, Qatar Charity was operating illegally in the Palestinian Territories, as Israel had designated Qatar Charity a member of the Union of Good, and specifically as a funder of Hamas, in 2006. Qatar Charity was therefore banned from operating within Israel.

123.    Additionally, during the entirety of the conspiracy, Qatar Charity was listed as a priority III terrorism support entity by the United States Interagency Intelligence Committee on Terrorism.

124.    In 2009, however, the Qatari government decided, in defiance of Israeli law, to re-open Qatar Charity's operations in the Palestinian Territories.

125.    Qatar Charity's operations again ceased in July 2015, however, when the Israeli government intervened to shutter the organization and arrest three of its senior executives (Fadi Mansra, Judeh Jamal and Najwan Odeh).

126.    The Qatari government demonstrated its loyalty to Qatar Charity even after the arrest of those three individuals and the closing of Qatar Charity's operations in the Palestinian Territories.

127.    In 2017, Mr. Jamal—who had served as Qatar Charity's Director—was convicted in Israel for operating an illegal organization and transferring funds to Hamas. Eventually, he served just less than 23 months for his offenses and was fined one million Israeli shekels. The Qatari Foreign Ministry eventually paid Mr. Jamal's fine.

128.    Ms. Odeh, who was the operations manager for Qatar Charity, received a 17-month sentence and a 100,000 shekel fine for the same offenses.  The Qatari government, directly or indirectly, also paid that criminal fine.

129.    Mr. Mansra, who worked in accounts at Qatar Charity, served roughly 2.5 years in jail for his offenses.  To secure Mr. Mansra's release, the Qatari Foreign Ministry paid his one million shekel fine.

130.    Even before Israel acted to shutter Qatar Charity's operations in the Palestinian Territories in 2015, other banks operating there had taken steps to eliminate their dealings with Qatar Charity.

131.    For example, Arab Bank, a large Jordanian bank, refused to process salary payments made by Qatar Charity to its employees in the Palestinian Territories.  In addition, the Banque du Caire, an Egyptian institution, refused to conduct banking activities for Qatar Charity in the Palestinian Territories.

132.    Pursuant to Defendants' conspiracy, Qatar Charity also used its accounts at Masraf Al Rayan to solicit contributions from donors, purportedly for humanitarian purposes such as assisting Syrian refugees.  In fact, however, Qatar Charity used a substantial portion of the funds that it solicited through the Masraf Al Rayan account to fund Hamas and other terrorist causes.

133.    These facts, along with the Qatari government's open support for Hamas, demonstrate that Masraf Al Rayan was knowingly complicit in financing Hamas.

134.    The transfers that Masraf Al Rayan made to Qatar Charity through the Bank of Palestine also enabled Defendants to distribute funds directly to terrorists and their family members anonymously under the guise of "charitable" donations.

135.    Defendants accomplished that objective by funding Qatar Charity's purchase of thousands of anonymous debit cards known as "Sanabel Cards" from the Bank of Palestine.

136.    Pursuant to the Defendants' conspiracy, those anonymous debit cards were then distributed in the Palestinian Territories to thousands of recipients.

137.    The Sanabel Card scheme effectively operated as a source of financing for Hamas. The organization's operatives utilized the debit cards to fund their personal financial needs while they planned terrorist attacks.  Hamas-affiliated terrorists also used the Sanabel cards to make the limited expenditures that their crude attacks required, such as securing ammunition and purchasing gasoline and other supplies.

138.    In addition, Defendants' Sanabel Card scheme effectively operated as an insurance policy for Hamas terrorists and their family members.  When the terrorists were imprisoned for their illicit conduct, both they and their family members received priority eligibility status for the distribution of the Sanabel Cards.

139.    Likewise, when Hamas terrorists were killed during their efforts to carry out terrorist attacks, their family members were provided with priority eligibility for Sanabel Cards.

140.    Thus, the anonymous distribution of Sanabel Cards permitted Defendants to encourage terrorism both by directly funding the low-cost attacks that Hamas operatives committed and by assuring those terrorists that both they and their family members could rely upon a financial safety net when the attackers were arrested or killed.

### E.    Masraf Al Rayan Provided Defendants with the Access to <u>the U.S. Financial System that Their Conspiracy Required</u>

141.    In furtherance of Defendants' conspiracy to provide the dollars that Hamas needed to conduct its terrorist operations, Masraf Al Rayan utilized the U.S. financial system to move Qatar Charity funds to the Palestinian Territories and into terrorist hands.

142.   Masraf Al Rayan had no U.S. branch or office.  As a result, it arranged with banking institutions that maintained offices located in New York to conduct "correspondent banking" transactions that allowed Masraf Al Rayan to move USD through the international banking system.

143.   A correspondent bank is a financial institution that creates and maintains accounts for other financial institutions.  The account holder uses the account with the correspondent bank to make deposits and payments and to engage in other financial transactions, particularly those requiring currency translation.

144.   Correspondent banks can act as intermediaries between banks in different countries or as an agent to process local transactions for clients of the account holder when they are traveling abroad.  At the local level, correspondent banks can accept deposits, process documentation, and serve as transfer agents for funds.

145.   The ability of correspondent banks to provide these services relieves foreign banks of the need to establish a physical presence in other jurisdictions, such as the U.S.

146.   Foreign banks often use correspondent banks in the U.S. to access the U.S. financial system and to conduct USD transactions.  Frequently, those transactions involve the exchange of currencies or transfers made in currencies other than the account holder's home currency.

147.   At all times relevant to Plaintiffs' claims, Masraf Al Rayan maintained a direct or indirect correspondent banking relationship with Bank of New York Mellon, and perhaps other U.S. banks.

148.   The correspondent banking relationship that Masraf Al Rayan maintained with Bank of New York Mellon allowed Masraf Al Rayan to access the U.S. financial system to

complete transactions in USD for its customers.  That correspondent banking relationship also enabled Masraf Al Rayan to benefit from the stability and reliability of New York's banking laws.

149.    By means of the transactions that Masraf Al Rayan conducted through its correspondent accounts, the bank was able to transfer USD for its clients, convert its clients' USD into other currencies (USD to Euros, for example), and convert other currencies held by its clients into USD (Euros to USD, for example).

150.    Masraf Al Rayan used its correspondent banking relationships in New York to process USD transactions for Qatar Charity.  As a result, those relationships allowed Qatar Charity and Hamas to access USD and to distribute those dollars to terrorists and their family members in the Palestinian Territories, where USD were a coveted currency during the time period relevant to this action.

151.    Qatar Charity and Hamas could not have obtained those USD without Masraf Al Rayan's participation in Defendants' terrorist funding scheme.  Reputable international banking institutions would not have passed USD through the American banking system on behalf of an entity such as Qatar Charity, which was a known supporter of Hamas.

152.    At the time Defendants participated in their conspiracy to pass USD to Hamas, Defendants knew or should have known that Hamas regularly targeted U.S. nationals for assassinations, suicide bombings and other terrorist attacks.

153.    Without the support that Masraf Al Rayan provided through the conspiracy Plaintiffs allege, Hamas would have been unable to carry out the attacks described below.

### F.  QNB's Support of Hamas and Defendants' Conspiracy by Providing Financial Services to Hamas Leadership, Qatar Charity, and the Union of Good

154.    Like Masraf Al Rayan, QNB violated its internal policies, U.S. law, and international banking standards by providing significant banking services that facilitated Qatar

Charity's efforts to pass USD to Hamas and to purported charities located in the Palestinian Territories that it controlled.

155.    During the time period relevant to this action, QNB maintained at least seven accounts for Qatar Charity.

156.    Six of these accounts were opened on March 18, 2012, while another was opened on September 20, 2006.

157.    Qatar Charity has utilized those accounts at QNB to pass funds to purported charities that Hamas controls.

158.    Throughout the time period relevant to Plaintiffs' claims, QNB has also served as a principal banker for Hamas leadership.  Those terrorists have used their QNB accounts to fund Hamas operations, including terrorist attacks.

159.    In 2011, Israel released numerous convicted Hamas terrorists from incarceration to save the life of an Israeli soldier.

160.    Shortly after that prisoner exchange, QNB opened accounts for at least 29 Hamas terrorists that Israel had freed.

161.    Two terrorists opened their accounts on July 8, 2015 at a QNB branch in Doha. Roughly a month later, an additional 27 terrorists opened accounts at the same QNB branch on August 4, 2015.

162.    Notably, at least 21 of those terrorists listed their addresses on the account opening documents as the same P.O. Box.  At least two other terrorists registered their accounts to a second P.O. Box.

163.    The fact that QNB allowed known Hamas terrorists, including one on the FBI's most-wanted list, to open accounts on the same day and to register them to the same P.O Box

-27-

demonstrates the bank's failure – in contravention of its own policies and international banking standards – to conduct any due diligence in connection with opening those accounts.

164.     The terrorists who opened QNB accounts in Doha on August 4, 2015 include Husam Badran, a Hamas Politburo spokesperson and former leader of Hamas's military wing in the northern West Bank.

165.     Badran was one of the most prominent leaders of the Izz al-Din al-Qassam Brigades, Hamas's military wing, in the West Bank during the Second Intifada, an uprising of Palestinian violence that took place between 2000 and 2005.  As a result, Badran was the target of a failed Israeli assassination attempt in 2002.

166.     Badran spent 14 years in Israeli jails, during which time he was a member of Hamas's "prisoner politburo."

167.     The name associated with the account in QNB's records is "Husam Badran," and the second and third digits of the Qatari national identification number associated with that individual indicate that this Husam Badran was born in 1966, the same year as the notorious terrorist of the same name.

168.     The address that Badran used to open that account is shared by at least 20 terrorists released from Israeli prisons who opened QNB accounts in Doha on either July 8, 2015 or August 4, 2015.

169.     QNB maintained that account although Badran is one of Hamas's most notorious terrorists.

170.     As a Hamas military leader, Badran orchestrated a series of bombings that killed scores of innocent civilians and injured hundreds more.

171.    The attacks that Badran planned include: the 2001 Sbarro Pizza bombing in Jerusalem that killed 15 and injured 130; the 2001 bombing of the Dolphinarium Discotheque in Tel Aviv that killed 21 and wounded 120; the 2002 bombing of the Passover Seder at the Park Hotel in Netanya that killed 30 and injured 140; and the 2002 bombing of the Matza restaurant in Haifa that killed 14 and injured 33.

172.    Israeli security forces captured Badran in 2002.  In 2004, he was sentenced to 17 years in prison for his role in the above attacks.

173.    In 2011, Israel released Badran as part of the prisoner exchange designed to save the life of an Israeli soldier.  Soon thereafter, Badran moved to Qatar, where he currently resides with other Hamas leadership and continues to act as a Hamas spokesperson.

174.    As a spokesperson for Hamas, Badran continues to advocate for Palestinian terrorism.

175.    Additionally, according to the Shin Bet (the Israeli General Security Service) and the Israeli Defense Forces ("IDF"), Badran continues to give orders to Hamas terror cells and to provide them with funds by smuggling gold and jewelry purchased in Jordan into the West Bank.

176.    QNB also opened an account for Musa Dudin, a member of the Hamas Politburo and a convicted Hamas terror cell operative, at the same Doha, Qatar branch on August 4, 2015.

177.    Like Badran, Dudin registered that account to the same P.O. Box address that 20 other terrorists released from Israeli prisons used to establish their QNB accounts in the summer of 2015.

178.    Israel arrested Dudin in 1992 for his role in directing West Bank terror cells. Israel convicted Dudin for that terrorist conduct.  As a result, he was serving a life sentence in Israel when he was released as part of the same 2011 prisoner exchange as Badran.

179.    Like Badran, Dudin moved to Qatar soon after his release.

180.    Dudin is currently responsible for maintaining Hamas's "prisoner portfolio."  In that role, Dudin determines which Hamas terrorists should be released from prison in Israel in exchange for the release of civilians and IDF soldiers that Hamas has kidnapped or in exchange for returning the remains of IDF soldiers killed by terrorists to the soldiers' family members.

181.    The name associated with the QNB account held by this terrorist is "Musa Dudin." The second and third digits of the Qatari national identification number associated with that individual indicate that this Musa Dudin was born in 1972, the same year as the notorious terrorist of the same name.

182.    QNB also maintains several accounts for Yousuf Abdulla Al-Qaradawi, the chair of the Union of Good, a U.S.-designated terrorist organization.

183.    Al-Qaradawi is a spiritual leader of the radical Muslim Brotherhood.

184.    He also has a long history of inciting terrorist attacks and violent jihad in the Middle East.  In response to international campaigns in Afghanistan against al-Qaida and the Taliban, and in Iraq against Saddam Hussein, al-Qaradawi issued religious rulings inciting Muslims to join jihadist groups and conduct attacks against U.S. and international forces.  Al-Qaradawi has also issued religious rulings that purport to justify suicide bombings.

185.    QNB has maintained accounts for Al-Qaradawi since at least 2006.  The identification numbers on the accounts indicate that the account holder shares the same birth year, 1926, as Al-Qaradawi.

186.    QNB has endeavored to capitalize upon its relationship with Al-Qaradawi by placing him on the bank's Sharia Advisory Board.  QNB maintains such close ties to Al-Qaradawi that he performed the ribbon-cutting at the opening of QNB's Islamic banking division.

187.   By providing Al-Qaradawi with those high-profile roles, QNB cemented its relationship with him and solidified the bank's reputation with the members of the Muslim religious community in Qatar, where Al-Qaradawi wields enormous social, political, and religious influence.

188.   Al-Qaradawi's influence as a leader in Qatar's religious, media, education, financial and charitable sectors is enhanced by his position as a close friend and confidante of the Qatari royal family.

189.   Indeed, the then-U.S. Ambassador to Qatar, Chase Untermeyer, wrote in a 2005 State Department cable that Al-Qaradawi is "the only Islamic thinker in Qatar who matters."

190.   Al-Qaradawi's status in Qatar is demonstrated by the fact that, at both the 2017 and 2018 Ramadan banquets hosted by Qatar's Emir, Sheikh Tamim bin Hamad Al-Thani, Qaradawi was seated next to the Emir.  As the following photographs show, Al-Qaradawi chatted cordially with the Emir at those public holiday celebrations, and the Emir embraced Al- Qaradawi and kissed him on his forehead:





191.    As his leadership position in a designated terrorist organization dedicated to the financial support of Hamas suggests, Al-Qaradawi espouses extreme, violent views.  According to Mathew Levitt, Ph.D., a former counterterrorism official at the FBI and Treasury, "Qaradawi is one of the most public figureheads of the radical wing of the Muslim Brotherhood."

192.    Al-Qaradawi has officially provided his religious imprimatur to terrorist attacks in Israel.  For example, in 2017, Al-Qaradawi stated that he no longer viewed suicide attacks as religiously justified because Hamas could by then mount attacks with rockets and other more sophisticated weapons.

193.    As evidenced by the photograph that appears below, Al-Qaradawi continues to maintain close ties with Hamas leadership.  That photograph, which was taken in 2016 in Qatar, shows Al-Qaradawi sitting between, and chatting with, the leading Hamas terrorists Khaled Meshal (the former chair of the Hamas Politburo, pictured on the right) and Ismail Haniyeh (the current head of the Hamas Politburo, pictured on the left) while resting his hands on their knees. Both of those Hamas leaders have long benefited from the safe haven Qatar provides to them.



194.    The name associated with Al-Qaradawi's QNB accounts is "Yousu Abdulla A Al-Qaradawi," and the second and third digits of the Qatari national identification number associated with that individual indicate that this Al-Qaradawi was born in 1926, the same year as the Union of Good chair of the same name.

195.     The account information indicates that Al-Qaradawi opened his QNB accounts in September 2006 and lists a P.O. box address in Doha.

196.     QNB also opened an account for Ahlam Aref Ahmad Tamimi on August 4, 2015 at the same Doha branch as her fellow releasees from Israeli prisons.

197.     Tamimi is a Jordanian national and "journalist" who was involved in the 2001 Hamas suicide bombing of a Sbarro Pizzeria in Jerusalem that killed 15 people, including two Americans, and injured scores of other victims.

198.     Tamimi is one of the FBI's most-wanted women.  A warrant for Tamimi's arrest and extradition from Jordan was issued in 2013 and unsealed in 2017.

199.     The QNB records evidencing Tamimi's account confirm that the accountholder shares the same birth year as the terrorist.

200.     The terrorists who opened accounts at the same Doha branch of QNB on August 4, 2015 also include Zaher Ali Musa Jibril (a/k/a Zahar Jabarin).

201.     Like 20 other terrorists released from Israeli prisons in the 2011 prisoner exchange, Jibril listed the same Doha P.O. Box as his address on the account opening documents.  The account records for Jibril's QNB account demonstrate that the accountholder has the same birth year as the terrorist Jibril.

202.     Jibril has been named a Specially Designated National by Treasury.  Jibril earned that designation because he serves as a senior Hamas leader who helped found the Hamas military wing in the West Bank.

203.     Israel convicted Jibril of killing Israeli soldier Giti Avishar in 1993.  According to Treasury, the name that appears on the QNB account, Jibril, is an alias for Zahar Jabarin.  Jibril

has long served in top financial positions for Hamas and currently runs Hamas's financial operations from Turkey.

204.    The terrorists who opened a QNB account on August 4, 2015 at the same Doha branch also include Hisham Hijaz.  Like at least 20 other terrorists released from Israeli prisons in the 2011 prisoner exchange, Hijaz used the same Doha P.O. Box to open his QNB account during the summer of 2015.

205.    According to terrorism-info.org, Hijaz met with Bakr Atallah Samih Sa'ad in 2013 in Jordan.  The ISA later detained Sa'ad for planning to carry out shooting attacks and abductions in Israel.

206.    Hijaz also met in Istanbul with a Palestinian Imam and offered $20,000 to the family of anyone who carried out a suicide bombing in Israel.

207.    The account records for Hijaz's QNB account demonstrate that the accountholder shares the same birth year as the terrorist Hijaz.

208.    QNB also maintains accounts for Moustafa Mamdouh Mesalm, a senior accountant at Qatar Charity, and an individual named Ibrahim M A Al-Kaabi, both of whom list their address as a Qatar Charity P.O. Box.

209.    Other terrorists released from Israeli prisons as part of the 2011 prisoner exchange who opened accounts at QNB in the summer of 2015 include the following:

| Accountholder Name | Date Account Opened | Accountholder Address | History of Terrorist Conduct |
| --- | --- | --- | --- |
| Abedalaziz Amro | 8/4/15 | P.O. Box 38479 Doha, Qatar | Participated in the 2003 Café Hillel bombing in Jerusalem that killed seven and injured 50 more. |
| Majdi Amr | 8/4/15 | P.O. Box Doha, Qatar | Shot and killed 28-year-old David Cohen in July 2001 in front of his wife and children. In 2002, helped to organize the attack on Bus No. 37 in Haifa, Israel that killed 17 and |

| | | | injured 50 more. Played an important role in developing explosive devices for Hamas. |
|---|---|---|---|
| Ibrahim Sulaim Mahmud Shammasina | 8/4/15 | P.O. Box 5045 Doha, Qatar | A terrorist affiliated with the Fatah organization. He was involved in the 1990 murder of 23 Israelis and was later sentenced to an additional 20 years in jail in connection with his role in planning a kidnapping. |
| Abd al-Hakim Abd al-Aziz abd Hanaini | 8/4/15 | P.O. Box Doha, Qatar | A Hamas terrorist convicted of making explosives for use by militants against Israelis. |
| Nizar Muhammad Taysir Ramadan | 8/4/15 | P.O. Box 207338 Doha, Qatar | In August 1998, ambushed and killed Harel Bin-Nun, 18, and Shlomo Liebman, 24, who were on patrol at the Yitzhar settlement in the West Bank. |
| Nasir Sami Abd al-Razzaq Ali al-Nasser-Yataima | 8/4/15 | P.O. Box 207338 Doha, Qatar | Planned the deadly Passover 2002 bombing of the Park Hotel in Netanya that helped trigger Israel's reoccupation of the West Bank. |
| Muhammad Waal Muhammad Daghales | 8/4/15 | P.O. Box 207338 Doha, Qatar | A co-conspirator in the 2001 Sbarro Pizza bombing in Jerusalem that killed 15 and injured 130. |

210.    The accounts that QNB maintained for the above-mentioned terrorists were used to finance Hamas terrorist activities in Israel.  The accounts allowed the released terrorists to finance their personal expenditures, thereby freeing them to continue to conduct activities on behalf of Hamas.  In addition, the terrorists directly used those funds to further the efforts of Hamas to carry out terrorist attacks.

211.    QNB also contributed directly to Qatar Charity in order to promote Qatar Charity's ability to fund Hamas and other terrorist organizations.  For example, in November 2013, QNB contributed one million Qatari riyals, or roughly $275,000, directly to Qatar Charity.

212.    In or about February 2020, QNB also contributed 2 million Qatari riyals, or roughly $550,000, directly to Qatar Charity, purportedly to assist Syrian refugees.

### G.  The Bank Defendants' Purported Anti-Terrorism Policies Provided Them with Knowledge of the Unlawful <u>Purpose of Their Financial Dealings with Qatar Charity</u>

213.    Like other international banks, particularly those involved in transactions that touch upon areas plagued by terrorism such as the Palestinian Territories, Masraf Al Rayan and QNB (collectively, the "Bank Defendants") had to implement and employ anti-money laundering ("AML"), counter-terrorism financing ("CTF"), know-your-customer ("KYC"), and other duediligence requirements designed to prevent precisely the type of illicit activity that injured and killed Plaintiffs and their family members.

214.    Among other sources, those rules were provided by the banking law of Qatar and the U.S., as well as the CTF, AML, KYC, and customer due diligence procedures that the Bank Defendants purportedly maintained and that international banking standards imposed at all relevant times.

215.    Qatari AML and CTF laws, like U.S., European Union, and international law, prohibit collecting funds to support terrorism and require banks to implement procedures to combat the financing of terrorism.

216.    In addition, multiple internationally recognized banking organizations have published guidelines designed to guide best practices by financial institutions and to prevent them from becoming entangled with terrorist organizations or facilitating the flow of money to those illicit entities.

217.    Those international standards provided the Bank Defendants with well-accepted guidance regarding the AML, CTF, KYC and due diligence procedures that banks should employ to prevent the illicit use of their services by terrorist groups, individual terrorists, and their sympathizers.

218.    International AML and CTF standards are published by three broad categories of organizations: (a) those concerned primarily with financial/supervisory matters, including the

Basel Committee of Banking Supervision (the "Basel Committee"); (b) those concerned with financial/supervisory and legal/criminal enforcement matters, including the Financial Action Task Force ("FATF"), the United Nations, the Council of Europe, and the European Union; and (c) those primarily concerned with legal/criminal enforcement matters, including the Egmont Group of Financial Intelligence Units.

219.    In addition, the Wolfsberg Group is an association of global banks that has published guidelines based on its understanding of international standards, as well as the member banks' own policies and procedures for KYC, AML and CTF functions.

220.    The leading authorities that international banks follow to strengthen their AML and CTF policies include: FATF's International Standards on Combating Money Laundering and the Financing of Terrorism & Proliferation; the Wolfsberg Anti-Money Laundering Principles for Private Banking; and the Basel Committee's Anti-Money Laundering principles.

221.    Those internationally recognized standards obligate banks to adopt a risk-based approach to evaluate prospective customers, to monitor those customers on an ongoing basis, and to systematically monitor funds flowing into and out of their institutions.

222.    The risk-based approach that banks employ involves both customer-specific due diligence and systems-wide transaction monitoring.  The level of due diligence applied to a customer is based on the customer's risk profile.

223.    In evaluating the level of risk presented by a customer, banks do not look to any single indicator.

224.    Rather, risk assessment evaluates customers, accounts and transactions against established criteria.  Because banks are unable to check every transaction offline, they develop

risk-profiles, applying relatively greater scrutiny to those customers and transactions that pose the greatest risk of unlawful activity.

225.    The most commonly used risk criteria are country risk, customer risk, and service risk.

226.    Country risk is measured by the connections between customers or transactions and high-risk jurisdictions.  Relevant connections include any nexus between a high-risk jurisdiction and: the funds involved in a transaction; the customer or its officers and directors; or the counterparties or financial institutions involved in a transaction.

227.    High-risk jurisdictions include countries: (a) subject to sanctions, embargoes or similar measures; (b) identified by the FATF as non-cooperative; (c) identified by credible sources as providing funding or support for terrorist activities; (d) where terrorism or other violent conflict is prevalent; and (e) identified by credible sources as having significant levels of corruption, drug trafficking or other criminal activity.

228.    In addition, country risk includes the existence of unregulated charities and other unregulated not-for-profit organizations that do business with a bank's customers or are parties to transactions involving the bank.

229.    Customer risk involves an assessment of, among other things, the nature of the customer and the business in which it engages.  Well-established corporations, for example, present lower risks than unknown sole proprietorships, particularly where the latter are largely cash businesses.

230.    Charities warrant additional scrutiny because criminal enterprises, including terrorist organizations, frequently exploit purported charitable organizations to gather and move funds.

231.     Services risk relates to the kinds of banking services the customer anticipates or actually uses.  For example, wire transfers are considered a higher-risk service because they are a principal means used by criminal enterprises to move funds between and among persons, institutions and countries.

232.     While the occasional use of wire transfers alone may not give rise to suspicion, the number, frequency, origin and destination of wire transfers are risk factors that banks must consider as part of their ongoing evaluation of persons and entities with whom they conduct business.  Transactions involving the transfer of funds internationally or that involve some effort to render a participant anonymous to a bank present higher levels of service risk.

233.     KYC standards are well-established risk-management rules that obligate banks to develop a clear and concise understanding of their customers and their businesses.

234.     Those standards constitute an integral element of both opening and maintaining bank accounts and customer relationships.

235.     Thus, KYC procedures are an ongoing process.  By gaining familiarity with their customers, and the kinds of services and account activity each customer might reasonably undertake, banks can uncover and prevent potential, actual or suspected unlawful activity.

236.     Standard banking industry practice calls for banks to begin applying KYC measures when they first establish a new customer relationship, typically when that new customer seeks to open an account.

237.     Standard KYC account opening procedures include: obtaining proper documentation of the customer's legal status (e.g., sole proprietorship, corporation, or charitable association); verifying the customer's name, address and other identifier information; obtaining identification documentation for the customer's officers and directors, at least with respect to those

authorized to engage in banking transactions; gathering information on the customer's business, including its sources of funds, the kinds of services the customer will be using the bank for, and where the customer's funds will be going; and other information necessary to formulate a risk profile for that customer.

238.    In formulating a customer's risk profile, a bank must pay particular attention to the country risk posed by the customer or its officers and directors; *i.e.*, the connections they may have with high-risk jurisdictions.  Contacts with high-risk jurisdictions mandate closer scrutiny of the customer during the entire course of the business relationship.

239.    A bank's risk-management function includes the adoption of sound policies and procedures for determining expected or normal activity at account opening, as well as during the course of the relationship.  Evaluating reasonably expected account activity against actual transactional activity is a critical aspect of customer due diligence.  Account and transaction monitoring is the backbone of any AML or CTF compliance program.

240.    Banks constantly monitor their customers' accounts and transactions.  The monitoring of transactions encompasses the entire spectrum of the money flow of wire transactions, particularly those involving the international transmission of funds.  That monitoring includes gathering information concerning the originators and recipients of transactions because a bank cannot effectively evaluate a transaction or transactional pattern by looking only at one side of the money flow.

241.    The purpose of this monitoring activity is to identify: (a) transactions that by their very nature are inherently suspect; (b) unusual transactions, *i.e.*, transactions that do not have an obvious financial or legitimate purpose; and (c) suspicious transactions, *i.e.*, transactions that may

be considered inconsistent with the known and legitimate business of the customer or with the usual activity in the account in question.

242. Transaction monitoring compares transactional information against identified risks. Among other things, transaction monitoring compares account/transaction activity against the customer's profile, compares that activity to peer group data, measures the activity against established typologies, and highlights and investigates anomalous, unusual, or suspicious transactions.

243. Customer due diligence also utilizes and references third-party information such as newspapers, internet data, and the information available in banks' internal databases to maintain an adequate understanding of banks' clients and the environment in which each client does business, including unusual political or terrorism-related factors operative in the countries connected to the client's transactions.

244. The need for this ongoing analysis is particularly acute when customers are connected with global hot spots or conflict zones, or otherwise have high risk profiles.

245. Like other international banks, the Bank Defendants maintain compliance departments, ostensibly to ensure that the banks comply with their AML, CTF, KYC and other due diligence obligations.

246. To fulfill those obligations, banks—including the Bank Defendants—now use sophisticated software to monitor accounts and transactions, including products marketed by third parties expressly to fulfill banks' AML and CTF obligations.

247. The vendors of those products constantly enhance them in response to changes in the legal environment, revisions to sanctions and embargo lists, and other relevant factors, such as increased terrorist activity in particular regions or among particular groups.

248.    Banks employ two primary types of software in connection with AML and CTF compliance: (a) programs that monitor transaction trends and patterns and thus highlight potentially anomalous or suspicious activity; and (b) filtering software that identifies potential matches to embargo and sanction lists by scanning fields such as the names of originators and beneficiaries. The latter type of software is used to identify potentially suspicious parties and counterparties to transactions (*i.e.*, those that match to lists).

249.    Banks, particularly those that operate in terrorism hot spots such as the Bank Defendants, recognize that there have been numerous lists of terrorists and terrorist organizations in force since 1990, including those promulgated by Treasury's Office of Financial Assets Control ("OFAC"), the EU, the UN, and Israel.

250.    International banks input these lists to their filtering software to maintain a consolidated filtering system for monitoring accounts and transactions. As these lists are updated, the new information is loaded into the software as well.

251.    Bank compliance groups are responsible for researching and evaluating the transactions identified as suspicious by these systems. The compliance groups' role is critical because software systems simply scan data that, due to transactional volumes, the complexity of account activity, and the increasingly extensive nature of embargo lists, cannot be analyzed manually.

252.    The AML compliance function thus includes reviewing and researching the "hits" generated by compliance software, whether for anomalous activity or for identification of a name that matches one found on an embargo list (or both), and evaluating that information in light of the ongoing customer due diligence associated with the account in question.

253.   The steps that banks' compliance departments take in response to the hits generated by compliance software are therefore integral to banks' ability to avoid providing material assistance to terrorists and other money launderers.

254.   The compliance personnel must determine which hits are "false positives" that should not prevent the consummation of transactions and which involve a material risk of facilitating illicit behavior, including terrorist attacks.  Regulations applicable in most countries, including the U.S., require banks to report the transactions they have identified as suspicious to government officials.

255.   When bank policy or government regulations appear to prohibit the consummation of particular transactions, the involved funds are typically "blocked" in a segregated account, and the involved parties must usually receive government approval to release the funds after establishing the legitimacy of the blocked transaction.

256.   FATF is an intergovernmental body created in 1989 by the G-7 countries (Canada, France, Germany, Italy, Japan, the United Kingdom, and the United States).  Currently, its membership consists of 31 countries and territories.

257.   FATF has published authoritative guidance designed to strengthen banks' AML and CTF policies, particularly the influential Forty Recommendations on Money Laundering (along with interpretive notes) that FATF issued in 1990.  The Forty Recommendations have been updated and revised since their initial publication.

258.   In response to the September 11, 2001 attacks, FATF issued eight additional Special Recommendations specifically related to Terrorist Financing.  A ninth recommendation was added in October 2004.

259.     The FATF Forty Recommendations include a recommendation that banking authorities implement customer due diligence procedures (including identity verification) and record keeping and suspicious transactions reporting requirements for financial institutions and designated non-financial businesses and professions.

260.     Expanding on that recommendation, FATF Recommendation Number Five states that banks should undertake customer due diligence measures designed to identify and verify the identity of their customers, when: (a) establishing business relations; (b) carrying out occasional transactions; (c) there is a suspicion of money laundering or terrorist financing; or (d) the bank has doubts about the veracity or adequacy of previously obtained customer identification data.

261.     FATF's Nine Special Recommendations include recommendations that banks: (a) freeze and confiscate terrorist assets; and (b) report suspicious transactions related to terrorism and money laundering to government authorities.

262.     The Nine Special Recommendations also recognize the critical role that purported charities play in terrorist financing.

263.     FATF recommended that countries should review the adequacy of laws and regulations governing non-profit organizations because those entities are particularly vulnerable to abuse in connection with the financing of terrorism, either intentionally or through terrorist organizations' exploitation of unwitting participants.

264.     The Basel Committee was formed in 1974 by the central bank governors of the G-10 countries.

265.     The Basel Committee works by consensus to formulate broad supervisory standards and guidelines and to publish statements on a wide range of banking issues.

266.     Three of the most important Basel Committee statements of banking standards concern AML issues.

267.     Basel Committee statements are directed to national bank supervisory authorities beyond the organization's core membership.  By issuing those statements, the Basel Committee hopes to persuade banking supervisors to protect the integrity of the global banking system by implementing the Basel Committee standards and guidelines.

268.     Because the Basel Committee guidelines are formulated as the result of a consensus building exercise by the G-10's national bank regulators, they carry substantial weight within the banking industry.  Therefore, Basel Committee guidelines are generally regarded as reflecting the minimum standards for individual banks with regard to AML and CTF policies.

269.     In 1988, the Basel Committee issued its Statement on Prevention of Criminal Use of the Banking System for the Purpose of Money Laundering (the "Basel Statement on Prevention").

270.     The Basel Statement on Prevention outlines basic policies and procedures that bank management should ensure are in place within their institutions both domestically and internationally.

271.     The Basel Statement on Prevention further recognizes that the most important safeguard against the use of financial institutions for purposes of money laundering is the integrity of banks' management and their vigilant determination to prevent their institutions from becoming associated with criminals or being used as channels for money laundering.

272.     The Basel Statement on Prevention sets forth four key principles: (a) banks should make reasonable efforts to determine the true identity of all customers requesting the institution's services; (b) banks should ensure that business is conducted in conformity with high ethical

standards and adheres to laws and regulations pertaining to financial transactions; (c) banks should cooperate fully with national law enforcement authorities to the extent permitted by local regulations relating to customer confidentiality and, where a bank has reason to suspect that funds on deposit are from criminal activity or that transactions entered into are for a criminal purpose, the bank should take appropriate measures, including denial of assistance, severing of the customer relationship, and closing or freezing the account; and (d) banks should adopt formal policies consistent with the Basel Statement on Prevention.

273.    In 1997, the Basel Committee issued its Core Principles for Effective Banking Supervision (the "Core Principles").  Those principles were intended to provide a comprehensive blueprint for a safe and sound banking system.

274.    The Basel Committee emphasized that the Core Principles are "minimum requirements" and are "intended to serve as a basic reference" in formulating an effective bank compliance environment.

275.    Core Principle 15 deals with money laundering and reinforces the importance of KYC policies and procedures.  It provides that banks must have adequate policies, practices and procedures in place, including strict KYC rules that promote high ethical and professional standards in the financial sector and that prevent banks from being used, intentionally or unintentionally, by criminal elements.

276.    The Basel Committee also issued a further "Core Principles Methodology" in 1999 that set forth widely accepted benchmarks for bank supervision.

277.    The Core Principles Methodology was drafted to assist bank supervisors worldwide in self-assessments of the degree to which their banking systems, and the banks operating within them, had policies and practices consistent with the Core Principles.

278.    The Core Principles Methodology contains a Principle-by-Principle discussion of "essential" and "additional" criteria.  The section on Core Principle Methodology 15 contains eleven essential criteria and five additional criteria to help assess the adequacy of KYC policies and procedures.

279.    The first additional criterion specifically references the FATF Forty Recommendations as reflecting "international sound practices."

280.    Among the essential criteria are: (a) banks must have in place policies and procedures to prevent them from being used, intentionally or unintentionally, by criminal elements; (b) banks must have clear and effective KYC policies and procedures, including effective recordkeeping and records retention for both customer identification and individual transactions; (c) banks must have formal procedures to recognize potentially suspicious transactions; (d) banks must have clear lines of authority and communication for implementation of their AML programs; and (e) banks must report suspicious activities to their regulators where they potentially may be material to the safety, soundness or reputation of the bank.

281.    In 2001, the Basel Committee also issued standards governing minimum customer due diligence for banks (the "Customer Due Diligence Statement").

282.    The Customer Due Diligence Statement notes that customer due diligence involves developing customer risk-profiles, including consideration of factors such as a customer's background, country of origin, public or high-profile position, linked accounts, business activities, use of wire transfers (particularly for international remittance of funds) and other risk indicators.

283.    The Due Diligence Statement also clarifies that even basic KYC is not simply a function of account opening procedures.  Rather, it remains an ongoing process.

284.    The Due Diligence Statement also highlights the importance of ongoing monitoring of accounts and transactions as part of an effective AML program.

285.    Specifically, the Due Diligence Statement provides, "Ongoing monitoring is an essential aspect of effective KYC procedures.  There should be intensified monitoring for higher risk accounts."

286.    The Basel Committee's 2012 Core Principles for Effective Banking Supervision (the "2012 Core Principles") stressed the need for banks to "have adequate policies and processes that promote high ethical and professional standards and prevent the bank from being used, intentionally or unintentionally, for criminal activities."  Basel Committee on Banking Supervision, Core Principles for Effective Banking Supervision (September 2012), https://www.bis.org/publ/ bcbs230.pdf.

287.    The 2012 Core Principles explained that the essential elements of "customer due diligence" standards include a policy identifying "business relationships that the bank will not accept based on identified risks," an ongoing "customer identification, verification and due diligence" program, and policies and processes that require the bank to monitor "unusual or potentially suspicious transactions" and to apply enhanced scrutiny to high-risk accounts.

288.    The Wolfsberg Group is an association of 13 global banks.  In addition to its formal members, other significant global banks are recognized as being affiliated with Wolfsberg.

289.    The Wolfsberg Group has published its own sets of methodologies in an effort to assist banks worldwide in complying with international AML standards.  The banking community considers the guidance published by the Wolfsberg Group as representative of the views of the global banking community.

290.   On October 30, 2000, the Wolfsberg Group published the Wolfsberg AML Principles.

291.   The Wolfsberg AML Principles set forth guidelines regarding client acceptance, including the client identification and due diligence procedures banks should undertake when accepting a new client.  The due diligence procedures require banks to ascertain the client's reasons for opening the account, the source of its funds, and the client's anticipated activity. Those procedures also specify steps that banks should employ to undertake risk-based customer due diligence.

292.   The Wolfsberg AML Principles also set out practices for identifying unusual or suspicious transactions and for the on-going monitoring of account activity.  In addition, the principles stress the need for a reporting and control system within the bank, staff education and training, and setting record retention requirements.

293.   The Wolfsberg Group also designed a questionnaire intended to help banks develop internal policies and practices for KYC, AML and CTF policies.

294.   This questionnaire provides an overview of a financial institution's AML policies and practices and can help determine whether a financial institution is complying with industry best practices.

295.   The questions relate to the following areas: (a) general AML policies, practices and procedures; (b) risk assessment; (c) KYC, due diligence and enhanced due diligence; (d) reportable transactions and prevention and detection of transactions with illegally obtained funds; (e) transaction monitoring; and (f) AML training.

296.   The questions the Wolfsberg Group questionnaire sets forth include:

a.   Does the Bank have record retention procedures that comply with applicable law?

b.  Are the Bank's AML policies and practices being applied to all branches and subsidiaries of the Bank, both in the home country and in locations outside of that jurisdiction?

c.  Does the Bank have a risk-based assessment of its customer base and their transactions?

d.  Does the Bank determine the appropriate level of enhanced due diligence necessary for those categories of customers and transactions that the Bank has reason to believe pose a heightened risk of illicit activities at or through the Bank?

e.  Does the Bank require the collection of information regarding its customers' business activities?

f.  Does the Bank have policies or practices for the identification and reporting of suspicious transactions?

g.  Does the Bank have a monitoring program for unusual and potentially suspicious activity that covers funds transfers and monetary instruments, such as travelers' checks, money orders, etc.?

297.   The Wolfsberg Statement on the Suppression of Financing of Terrorism (the "Wolfsberg Terrorism Statement") was published in January 2002.

298.   The Wolfsberg Terrorism Statement reiterated and elaborated upon the existing international standards designed to prevent financial institutions from becoming entangled with terrorism and the financing of terrorist organizations and attacks.

299.    The most critical components of the Wolfsberg Terrorism Statement include the following: (a) Paragraph four emphasizes the importance of KYC policies and procedures; (b) Paragraph five refers to high-risk sectors and activities and focuses on a financial institution's application of enhanced and appropriate due diligence; and (c) Paragraph six addresses monitoring and how financial institutions should apply existing monitoring procedures to identify unusual or suspicious transactions because, although transactions may be unclear, monitoring and then identifying and reporting unusual or suspicious transactions may assist government agencies by linking seemingly unrelated activity to the financing of terrorism.

300.    The Bank Defendants completely disregarded the international banking standards identified in paragraphs 227-313 in connection with the transactions that they conducted with Qatar Charity, Hamas terrorists and Hamas front organizations.

301.    The violations of those standards that the Bank Defendants committed include, but are not limited to, the following:

302.    The Bank Defendants provided banking services for Qatar Charity despite their knowledge that the charity was a leading contributor to Hamas.

303.    QNB directly provided banking services to known Hamas terrorists and opened accounts for those individuals without performing the minimum KYC and due diligence procedures required by international banking standards, including verifying the addresses of those individuals and checking them against the available databases of known terrorists.

304.    QNB failed to monitor the transactions undertaken by these Hamas terrorists to promote Hamas's illicit activities, to report those transactions to authorities in Qatar and abroad, and to block the terrorists' funds before they could be transferred to the intended beneficiaries;

305.     The Bank Defendants failed to develop a suitable risk profile for Qatar Charity and to subject its transactions to enhanced due diligence despite the significant money-laundering and terrorism-financing risks presented by Qatar Charity's activities as a purported charity affiliated with terrorist organizations and their sponsors, the concentration of Qatar Charity's contributions in terrorism hot spots like the Palestinian Territories and other Middle Eastern areas prone to terrorist conduct, Qatar Charity's history of donations to purported charities affiliated with Hamas and other terrorist organizations, and the unusual and substantial nature of the wire transfers that Qatar Charity made;

306.     The Bank Defendants subordinated their AML and CTF obligations to the desire of their largest shareholders, the members of the Qatari Royal Family and the entities they control, to fund Hamas and other terrorist groups;

307.     The Bank Defendants failed to adopt and/or apply a risk-based analysis for assessing whether (i) to provide banking services to Qatar Charity, Hamas operatives, and Hamas front organizations, (ii) to continue to process transactions for those accountholders and beneficiaries, and (iii) to maintain accounts for those accountholders;

308.     The Bank Defendants failed to consider the risks associated with providing banking services to Qatar Charity—particularly its supposed status as a charitable entity operating in Middle Eastern locations prone to terrorism—or to design appropriate measures for counteracting those risks and thereby preventing money laundering and terrorism financing;

309.     The Bank Defendants failed to consider the risks of money laundering and terrorism financing presented by the Sanabel Card scheme, particularly whether those debit cards could be used by terrorist front organizations to distribute funds directly to terrorists and to their family members as an incentive to commit terrorist acts, to compensate them for carrying out

terrorist activities, or to offset the personal costs (including loss of income resulting from injury or imprisonment) associated with terrorist activity;

310.    The Bank Defendants ignored their obligation to detect and block transactions with people and organizations included on terrorist and money laundering sanctions and embargo lists propounded by the E.U., the U.N., the U.S., Israel, and other nations;

311.    The Bank Defendants failed to undertake any research to determine the terrorist affiliations of their account holders and the beneficiaries of transfers made from the account holders' accounts despite the suspicious nature of those transactions and the availability of information corroborating the terrorist ties of the account holders and the transfer beneficiaries on the Internet, databases such as Lexis/Nexis, and specialized software widely used by international banks;

312.    The Bank Defendants either ignored the feedback provided by their AML and CTF software regarding transactions involving account holders or transferees tied to terrorism or money laundering, or failed to update that software to prevent the banks from participating in those transactions; and

313.    The Bank Defendants ignored the well-accepted guidance for international banking provided by, among other standards, FATF's Forty Recommendations on Money Laundering, FATF's Special Recommendations specifically related to terrorist financing, the Basel Statement on Prevention, the Basel Committee's Core Principles for Effective Banking Supervision, the Basel Committee's Core Principles Methodology, the Basel Committee's Customer Due Diligence Statement, the Basel Committee's 2012 Core Principles, the Wolfsberg AML Principles, the Wolfsberg AML questionnaire, and the Wolfsberg Terrorism Statement.

314.    Despite these AML and CTF failings, Masraf Al Rayan endeavored to create the appearance that it was complying with Qatari CTF law, the bank's internal policies barring terror financing, and the foregoing international CTF and AML principles.

315.    For example, in its 2018 Annual Report, Masraf Al Rayan touted its role "in complying with the anti-money laundering and counter-terrorism financing within the local, regional and international system; in addition to its responsibility towards the society and the environment in which it operates."

316.    The Annual Report further stated that the bank maintained a risk management system to keep its Board apprised of the bank's "internal control work and results," including the bank's "Anti-Money Laundering and Counter Terrorism Financing" policies and procedures.

317.    The Annual Report also emphasized that Masraf Al Rayan employed a "bank transfers monitoring system to ensure that there are no names that appear in the banned lists or those related to anti-money laundering and counter terrorism financing; and integrate[s] this system with the SWIFT system to intercept any suspicious names at the same time when the transactions are taking place."

318.    Given the notorious nature of Qatar Charity's sponsorship of Hamas, including its designation by Israel in 2008 as a member of the Treasury-designated Union of Good, the due diligence steps Masraf Al Rayan's policies and procedures required the bank to undertake would have revealed the critical role that Qatar Charity played in financing and promoting Hamas terrorism.

319.    Thus, Masraf Al Rayan could have utilized the AML and CTF policies and procedures that it described to prevent the financing of Hamas terrorism, had the bank actually wanted to eliminate that illicit conduct.

320.     Despite overwhelming public evidence that Qatar Charity actively raised money to support Hamas and other global terrorist organizations, Masraf Al Rayan continued to provide banking services to Qatar Charity.

321.     Indeed, Masraf Al Rayan knowingly transferred millions of dollars of Qatar Charity funds into local bank branches operating in Hamas territory despite the bank's actual knowledge that Qatar Charity (1) was a known sponsor of Hamas and (2) was operating illegally in the Palestinian Territories.

## THE TERRORIST ATTACKS THAT INJURED THE PLAINTIFFS AND KILLED THEIR FAMILY MEMBER

322.     Pursuant to the unlawful conspiracy that Plaintiffs allege, Defendants and their co-conspirators provided material support and resources to Hamas that allowed that notorious terrorist organization to carry out the terror attacks that injured Plaintiffs and killed their family members.

323.     On September 16, 2018, Ari Fuld, an American citizen, was stabbed and killed in the Gush Etzion Junction in Israel, which is located adjacent to a community where Israelis and Americans reside, work, shop and live.

324.     On that day, Fuld was attacked by the Hamas terrorist Khalil Yusef Ali Jabarin while Fuld was standing outside the popular Rami Levy supermarket at the Gush Etzion Junction. Jabarin stabbed Fuld multiple times in the upper back and neck with an 8-inch knife.

325.     After Fuld was stabbed, he pursued, shot, and wounded Jabarin, who was then chasing a shop employee.  Although Jabarin never reached the shop employee, Fuld, who was transported to the hospital, subsequently died from his injuries.

326.     Jabarin specifically targeted an English speaker for his attack.  Before the attack against Fuld, Jabarin twice asked a worker in a local falafel shop whether she or others in the restaurant spoke English.

327.     Jabarin was arrested, indicted, and convicted for the murder of Ari Fuld and the attempted murder of three others.

328.     Hamas has acknowledged its responsibility for the Fuld murder.  A few hours after the murder, Hamas praised the attack.

329.     Hamas also took responsibility for the attack by releasing a video on the Al-Qassam Brigades' official website.  In the video, an Al-Qassam Brigades spokesman shows photographs of Jabarin and a video of him fleeing the scene of the attack.  The video also includes captions proclaiming that Hamas's jihadist soldiers will continue their presence in the West Bank and will not leave.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## AIDING AND ABETTING FOREIGN TERRORIST ORGANIZATIONS IN VIOLATION OF 18 U.S.C. § 2333(d) AGAINST ALL DEFENDANTS

330.     Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

331.     Plaintiffs assert this cause of action against all Defendants under 18 U.S.C. § 2333(d) and the Justice Against Sponsors of Terrorism Act ("JASTA") § 2b.

332.     Plaintiffs are nationals of the United States or the estates, survivors or heirs of U.S. nationals.

333.     Hamas was a foreign terrorist organization ("FTO") when it committed, planned, and authorized the terrorist attacks that injured the Plaintiffs and killed their family members.

334.     Those terrorist attacks were acts of international terrorism, as defined by 18 U.S.C. § 2331.  The attacks: (a) involved violence and endangered human life; (b) would have violated federal and state criminal law, had they been committed in the United States; (c) appeared to be intended to intimidate or coerce the civilian populations of Israel and the United States, to influence the policies of the Israeli and American governments, and to affect the policies of those governments through violent action; and (d) occurred primarily outside the United States and transcended national boundaries in that Hamas raised money internationally, intended to impact the citizens and governments of Israel and the United States, operated internationally and sought asylum in multiple countries in the Middle East.

335.     Defendants knowingly provided substantial assistance to those acts of international terrorism.

336.     The substantial assistance that Defendants knowingly provided to Hamas included: (a) transferring significant sums of money to Hamas, its operatives and its front organizations; (b) maintaining bank accounts for the benefit of Hamas, its front organizations, and its senior operatives; (c) providing Hamas with access to U.S. dollars and the U.S. banking system; (d) providing seeming legitimacy to Hamas's efforts to raise funds to finance its operations and to compensate terrorists and their family members following terrorist attacks; and (e) enabling Hamas to convert funds nominally intended to support humanitarian causes into the resources necessary to commit terrorist attacks.

337.    Defendants' services and support provided encouragement to would-be terrorists and incentivized their future attacks, including the attacks that killed and injured Plaintiffs and their family members.

338.    At the time Defendants provided that substantial assistance to Hamas, Defendants knew that: (a) the U.S. government had designated Hamas as a terrorist organization; (b) Hamas and its operatives engaged in terrorism, including the attacks alleged herein; and (c) the financial assistance that Defendants were providing to Hamas was essential to its ability to carry out terrorist attacks, including the attacks that killed and injured Plaintiffs and their family members.

339.    Defendants also intended that their substantial assistance would facilitate the ability of Hamas to carry out its terrorist attacks against Plaintiffs, their family members, and other civilians.  As a result, Defendants recognized that they played an integral role in Hamas's terrorist activities.

340.    The assistance that Defendants provided to Hamas was a substantial factor in causing Plaintiffs' injuries.  Moreover, Plaintiffs' injuries were a foreseeable result of that substantial assistance.

341.    As a direct and proximate result of the substantial, knowing assistance that Defendants provided to Hamas, Plaintiffs have suffered significant physical, psychological and emotional injuries.

342.    Defendants knowingly aided and abetted Hamas within the meaning of 18 U.S.C. § 2333(d), which Congress enacted to provide "civil litigants with the broadest possible basis" for relief against those "that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States."  *See* JASTA, § 2b.

343.     Defendants are therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## SECOND CAUSE OF ACTION
## VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)
## AGAINST ALL DEFENDANTS (CONSPIRACY LIABILITY)

344.     Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

345.     Plaintiffs assert this cause of action against all Defendants under 18 U.S.C. § 2333(d) and JASTA § 2b.

346.     Plaintiffs are nationals of the United States or the estates, survivors or heirs of U.S. nationals.

347.     Defendants conspired with each other, Hamas, the government of Qatar and others to bring about acts of international terrorism against Americans in Israel.

348.     Defendant Qatar Charity joined the conspiracy by agreeing, among other things, expressly or tacitly to raise funds for Hamas although the U.S. government had designated Hamas as an FTO, and other nations, including Israel, had deemed Hamas a terrorist organization.  Qatar Charity further agreed to distribute those funds on behalf of Hamas.  By engaging in that conduct, Qatar Charity furthered the goals of the conspiracy.

349.     Defendant Masraf Al Rayan joined the conspiracy by agreeing, among other things, expressly or tacitly:  (a) to allow Qatar Charity to use accounts at Masraf Al Rayan to funnel money to and fund Hamas; (b) to allow other Islamic groups linked to Hamas, including Interpal, to maintain accounts at the bank that were used to funnel money to Hamas; and (c) to give Qatar Charity and Hamas access to U.S. dollars through Masraf Al Rayan's correspondent

banking relationships in the U.S.  By engaging in that conduct, Masraf Al Rayan furthered the goals of Defendants' conspiracy.

350.    Defendant QNB joined the conspiracy by agreeing, among other things, expressly or tacitly: (a) to provide banking services to Hamas leadership headquartered in Doha; (b) to provide banking services to its co-conspirator, Qatar Charity; and (c) to employ and provide banking services to the chair of the Union of Good, a U.S.-designated SDGT and a fundraising front for Hamas.

351.    The close relationships among Defendants and the Qatari government, including the Qatari royal family, connected the two banks to the conspiracy.

352.    Defendant Masraf Al Rayan knew that it facilitated acts of terrorism and Defendants' conspiracy by allowing a notorious designated financer of terrorism like Qatar Charity to maintain accounts at the bank and by disregarding suspicious transactions involving those accounts.

353.    Defendant QNB knew that it facilitated acts of terrorism and Defendants' conspiracy by providing services to notorious Hamas terrorists who were released in a prisoner exchange from their terrorism-related prison sentences in Israel to the safe haven of Qatar, where they continued to run Hamas.

354.    The Bank Defendants knew that the government of Qatar and members of the Qatari royal family, who had leadership positions at both banks, openly supported Hamas by financing its operations and providing a safe haven to Hamas's leadership.

355.    The Bank Defendants knew that, by allowing Qatar Charity to use accounts at the banks to funnel money to Hamas, the banks were joining a conspiracy intended to commit acts of international terrorism, including the murder of Americans in Israel.

356.     As a direct and proximate result of the Defendants' conspiracy and the steps they knowingly took in furtherance thereof, Plaintiffs have suffered significant physical, psychological and emotional injuries.

357.     Defendants are therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

### THIRD CAUSE OF ACTION
### PROVIDING MATERIAL SUPPORT TO TERRORISTS IN VIOLATION OF 18 U.S.C. §§ 2339A AND 2333(a) AGAINST ALL DEFENDANTS

358.     Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

359.     Plaintiffs assert this claim against all Defendants for violations of 18 U.S.C. §§ 2333(a) and 2339A.

360.     Plaintiffs are nationals of the United States or the estates, survivors or heirs of U.S. nationals.

361.     The financial assistance that Defendants provided to Hamas constituted material support of that terrorist organization and facilitated Hamas's efforts to engage in acts of international terrorism, including the attacks that killed and injured Plaintiffs and their family members.

362.     Defendants provided that material assistance to Hamas knowing or intending that Hamas would use that material assistance to prepare for or carry out terrorist attacks, including the attacks that killed and injured Plaintiffs and their family members.

363.     Defendants provided that material assistance to Hamas in furtherance of the conspiracy to facilitate the acts of terrorism that Hamas perpetrated, including the attacks that killed and injured Plaintiffs and their family members.

364.     The material assistance that Defendants provided to Hamas constituted activities dangerous to human life that violated 18 U.S.C. § 2339A and that were either unlawful under state law, including New York Penal Law §§ 490.10 and 490.15, or would have been unlawful under that state law if committed in the United States.

365.     The material assistance that Defendants provided to Hamas was dangerous to human life because that assistance enabled Hamas to finance its violent attacks and recruit individuals to carry out those attacks.  The financial assistance that Defendants provided to Hamas also enabled it to expand its purported charitable activities, and thereby attract additional donors and recruits for its terrorist operations.

366.     The actual and apparent intention of the material assistance that Defendants provided to Hamas was: (a) to intimidate or coerce the civilian populations of Israel and the United States; (ii) to influence the policies of Israel and the United States by means of intimidation and coercion; or (iii) to affect the conduct of the governments of Israel and the United States by mass destruction, assassination, or kidnapping.

367.     The substantial financial assistance that Defendants provided to Hamas occurred primarily outside the United States and transcended national boundaries in that Defendants operated internationally in providing financial assistance to Hamas.

368.     As a result, Defendants committed acts of international terrorism, as defined by 18 U.S.C. § 2331.

369.    Hamas did rely upon the financial assistance and material support provided by Defendants in carrying out its terrorist activities.

370.    Hamas engaged in acts of physical violence outside of the United States with the intent to kill or to cause serious bodily injuries to Plaintiffs, nationals of the United States. Hamas engaged in that illicit conduct pursuant to a joint plan and conspiracy with Defendants and others.

371.    Hamas's acts of violence caused the injuries that Plaintiffs suffered and the deaths of Plaintiffs' family members.

372.    The material support and substantial assistance that Defendants provided to Hamas was a substantial factor in causing Plaintiffs' injuries.  Moreover, Plaintiffs' injuries were a foreseeable result of the material support and substantial assistance that Defendants provided to Hamas.

373.    As a direct and proximate result of the material support and substantial assistance that Defendants knowingly provided to Hamas, Plaintiffs have suffered significant physical, psychological and emotional injuries.

374.    Defendants are therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

### FOURTH CAUSE OF ACTION
### PROVIDING MATERIAL SUPPORT TO FOREIGN TERRORIST ORGANIZATIONS IN VIOLATION OF 18 U.S.C. §§ 2339B(a)(1) AND 2333(a) AGAINST ALL DEFENDANTS

375.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

376.     Plaintiffs assert this claim against all Defendants for violation of 18 U.S.C. §§ 2333(a) and 2339B(a)(1).

377.     Plaintiffs are nationals of the United States or the estates, survivors or heirs of U.S. nationals.

378.     At the time of the attack that injured Plaintiffs, Hamas was an FTO.

379.     At that time, Defendants knew that Hamas was an FTO, that it engaged in terrorist activity (as defined in 8 U.S.C. § 1182(a)(3)(B)), and that it engaged in terrorism (as defined in 22 U.S.C. § 2656f(d)(2)).

380.     As Plaintiffs allege in detail above, Defendants provided material support to Hamas.

381.     That material support was integral to the ability of Hamas to carry out its terrorist attacks, including the attacks that injured Plaintiffs and killed their family members.

382.     As Plaintiffs allege in detail above, the material support that Defendants provided to Hamas constituted acts of international terrorism, as defined in 28 U.S.C. § 2331(1).

383.     The material support that Defendants provided to Hamas was a substantial and foreseeable factor in causing Plaintiffs' injuries.

384.     Moreover, Plaintiffs' injuries were a foreseeable result of the material support and substantial assistance that Defendants provided to Hamas.

385.     As a direct and proximate result of the material support and substantial assistance that Defendants knowingly provided to Hamas, Plaintiffs have suffered significant physical, psychological and emotional injuries.

386.    Defendants are therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that this Court:

(a)     Accept jurisdiction over this action;

(b)     Enter judgment against Defendants jointly and severally and in favor of Plaintiffs for compensatory damages in amounts to be determined at trial, and pre-judgment interest thereon;

(c)     Enter judgment against Defendants jointly and severally and in favor of Plaintiffs for treble damages pursuant to 18 U.S.C. § 2333(a), and pre-judgment interest thereon;

(d)     Enter judgment against Defendants jointly and severally and in favor of Plaintiffs for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a), and pre-judgment interest thereon; and

(e)     Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated:  May 24, 2023
        Brooklyn, New York

Respectfully submitted,

THE BERKMAN LAW OFFICE, LLC
*Counsel for Intervenor Plaintiffs*

By: _____
        Robert J. Tolchin

829 East 15th Street, Box 7
Brooklyn, New York 11230
(718) 855-3627
rtolchin@berkmanlaw.com