```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF NEW YORK
 2      - - - - - - - - - - - - - - - X
                                      :
 3      ANNE CHANA HENKIN, ET AL.,    :  21-CV-05716 (AMD)
                                      :
 4            Plaintiffs,             :
                                      :  United States Courthouse
 5                                    :  Brooklyn, New York
          -against-                   :
 6                                    :
                                      :  March 16, 2023
 7      QATAR CHARITY, ET AL.,        :  2:30 p.m.
                                      :
 8                                    :
              Defendants.             :
 9      - - - - - - - - - - - - - - - X
10            TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT
                 BEFORE THE HONORABLE JUDGE DONNELLY
11                UNITED STATES DISTRICT JUDGE

12

13                      A P P E A R A N C E S:

14    For the Plaintiff:      FLEISCHMAN BONNER & ROCCO LLP
                              81 Main Street, Suite 515
15                            White Plains, New York 10601

16                            BY:  JAMES P. BONNER, ESQ.
                                   PATRICK LOUIS ROCCO, ESQ.
17

18    For the Defendant:      ROPES & GRAY LLP
                              1211 Avenue of the Americas
19                            New York, New York 10036

20                            BY:  MICHAEL G. McGOVERN, ESQ.
                                   DOUGLAS HALLWARD-DRIEMEIER, ESQ.
21                                 BRITTANY GRACE NORFLEET, ESQ.

22
                              PILLSBURY WINTHROP SHAW PITTMAN LLP
23                            31 West 52nd Street
                              New York, New York 10019
24
                              BY:  ARYEH KAPLAN, ESQ.
25
```

```
 1              A P P E A R A N C E S: (Continued)

 2                   DLA PIPER
                     1251 Avenue of the Americas
 3                   New York, New York 10020

 4                   BY:  MICHAEL LEWIS, ESQ.
                          JOHN HILLEBRECHT, ESQ.
 5

 6   Court Reporter:        JAMIE A. STANTON, RPR, CRR
                            Official Court Reporter
 7                          Telephone: (718) 613-2274
                            E-mail:  JamieStanton.edny@gmail.com
 8
     Proceedings recorded by computerized stenography.  Transcript produced by
 9   Computer-aided Transcription.

10
                         *     *     *     *     *
11

12         (In open court.)

13         THE COURTROOM DEPUTY:  This is civil cause for

14   oral argument, docket number 21-CV-5716, Henkin, et al.,

15   versus Qatar Charity, et al.

16         Counsel, state your appearance.  Plaintiff first.

17         MR. BONNER:  Good afternoon, Your Honor.  My name

18   is Jim Bonner, with Fleischman Bonner & Rocco.

19         THE COURT:  Good afternoon.

20         MR. ROCCO:  Good afternoon, Your Honor, Pat Rocco,

21   Fleischman Bonner & Rocco, for Plaintiffs.

22         THE COURT:  Good afternoon.

23         MR. KAPLAN:  Good afternoon, Judge Donnelly.  My

24   name is Aryeh Kaplan.  I represent Masraf Al Rayan.  And I

25   am with the law firm of Pillsbury Winthrop Shaw Pittman.
```

1            THE COURT:  Good afternoon.

2            MR. HALLWARD-DRIEMEIER:  Good afternoon, Your

3    Honor, Doug Hallward-Driemeier, from Ropes & Gray, on behalf

4    of Qatar National Bank.

5            THE COURT:  Good afternoon.

6            MS. NORFLEET:  Good afternoon, Your Honor.

7    Brittany Norfleet, from Ropes & Gray, also on behalf of

8    Qatar National Bank.

9            THE COURT:  Good afternoon.

10           MR. McGOVERN:  Good afternoon, Your Honor.

11   Michael McGovern, also from Ropes & Gray, on behalf of QNB.

12           THE COURT:  Good afternoon.

13           MR. LEWIS:  Good afternoon, Your Honor.  Michael

14   Lewis, from DLA Piper, on behalf of Qatar Charity.

15           THE COURT:  Good afternoon.

16           MR. HILLEBRECHT:  Good afternoon, Judge.  John

17   Hillebrecht, also from DLA Piper, for Qatar Charity.

18           THE COURT:  Good afternoon.

19           All right.  No fast talking.  I know I had this

20   with you all before.  It's in everybody's interest, and I

21   think as I said before, I am a reformed fast talker, but you

22   can't get a good record if you talk too quickly, and it's

23   just not fair to the court reporter.  So I'm going to give

24   the court reporter license to interrupt anybody who speaks

25   too quickly, but I'll also -- listen, I know why people

1    speak quickly.  I was a trial lawyer for a long time, and

2    you feel passionately about your topic and you -- well, I

3    was nervous.  I'm sure none of you are nervous.  But please

4    do your best to modulate your speed, and we'll get through

5    this just fine.

6              Okay.  So this is a pre-motion conference -- it's

7    not a pre-motion conference.  It's an oral argument on the

8    motion to dismiss.

9              Just a couple of logistical questions.

10             Judge Cogan, I don't think, has issued a decision

11   in what I think is a pretty similar case.  Am I right about

12   that?

13             MR. BONNER:  That's correct, Your Honor.  There

14   are actually two very similar cases, and neither one of your

15   colleagues have yet ruled on a motion to dismiss.

16             THE COURT:  Who is the other judge?

17             MR. KAPLAN:  Judge Garaufis.

18             THE COURT:  Judge Garaufis, all right.

19             And are they both fully briefed?

20             MR. KAPLAN:  Yes, Your Honor.  They were basically

21   both were on a similar timeframe.  They have been briefed

22   for quite some time.

23             THE COURT:  So there's been no decision by anybody

24   about the question of jurisdictional discovery; is that

25   right?

*Proceedings*                                    5

1          MR. KAPLAN:  Your Honor, jurisdictional discovery,

2     just prior to the last hearing, was raised.  Plaintiffs

3     asked Judge Cogan for jurisdictional discovery.  Judge Cogan

4     declined the request pending a determination on the ruling

5     on the motion to dismiss.

6          THE COURT:  That's makes sense, okay, all right.

7          So there are so many topics to cover, and

8     obviously, you all know this far better than I do, and so

9     I'm sure you'll correct me if I have some of the facts

10    wrong.  But I just have a couple of -- just taking -- just

11    factually, I think the question I have is that MAR, M-A-R,

12    is the only Defendant that used a correspondent bank

13    account; is that correct?

14         MR. BONNER:  MAR was the bank that had a

15    correspondent bank account.  Of course the transactions were

16    on --

17         THE COURT:  Slow down.

18         MR. BONNER:  The transactions were on behalf of

19    Qatar Charity --

20         THE COURT:  Right.

21         MR. BONNER:  So it depends on what your definition

22    of used is, but it was MAR correspondent banking account.

23         THE COURT:  It's fine to stay seated because I can

24    hear you better with the microphone.  It's kind of my

25    preference because then I don't have to keep going like

1  this, so if it won't kill you to sit down, I promise I won't

2  tell anyone.

3          MR. BONNER:  I'm perfectly happy if you're happy.

4          THE COURT:  Okay, that's great, that's great.

5          So MAR is the only Defendant that actually has the

6  bank account.  And what about Qatar National Bank?

7          MR. BONNER:  Qatar National Bank does not have a

8  corespondent banking account, to the best of your knowledge,

9  at this point, Your Honor, their actions in connection with

10 the conspiracy are different than what Masraf Al Rayan's

11 actions were.

12         THE COURT:  So is it fair to say, then, that your

13 only theory with respect to, let's take the Qatar National

14 Bank, is conspiracy or is it agency too or is it just

15 conspiracy?

16         MR. BONNER:  With respect to jurisdiction, we are

17 focused on the conspiracy jurisdiction with respect to Qatar

18 National Bank.

19         THE COURT:  Under rule?  Which?  I know you cite

20 several.

21         MR. BONNER:  Our allegation, Your Honor, is that

22 all we have to satisfy in this circumstance is the due

23 process test because we have a federal claim and, as a

24 result, we're able to just satisfy due process.

25         THE COURT:  All right.  Are there any cases

1  anywhere, but let's stick in the Second Circuit, where -- I
2  know that the *Licci* case is -- it's not a customer of a
3  bank.  Any case where the customer of a bank -- not of a
4  bank, of an entity, where the bank has a corespondent bank
5  account in the United States?  Any case that has come out
6  your way?
7              MR. BONNER:  Neither for or against, to the best
8  of my knowledge, Your Honor, people have not pursued that
9  particular theory.
10             THE COURT:  Now, just -- I'll come back to that.
11 I'm sure the Defendants have something they want to say
12 about it.
13             I just want to clarify something else.  The
14 complaint suggests that Qatar Charity's local branches
15 distributed the money directly to Hamaas.  But your
16 opposition, I think, suggests that the funds went from the
17 Charity's local branches to entities that were controlled by
18 Hamas?  First of all, there a difference, or do I have it
19 wrong?
20             MR. BONNER:  In our estimation, there is no
21 difference, Your Honor.  The caselaw has recognized that
22 these charities, which are fronts for terrorist
23 organizations, are the same as a terrorist organization.  I
24 think it's also very important here to note that Qatar
25 Charity, itself, has been barred and designated by Israel as

1    a Hamas front organization.

2              THE COURT:  So in your view -- but what is the

3    answer?  Is it that went directly to Hamas or to entities

4    controlled by Hamas?

5              MR. BONNER:  I think that it's -- the allegations

6    in the Complaint are that it went to entities that are

7    controlled by Hamas.

8              THE COURT:  I see, okay.  Then there's another

9    factual question I have that's just not entirely clear.

10             Is it your contention that the Bank of New York,

11   well, BNYM, I guess, was that the entity that converted U.S.

12   dollars into shekels?

13             MR. BONNER:  The way the corespondent banking

14   relationship occurs is that the money came in from Qatar

15   Charity abroad.

16             THE COURT:  In what form?

17             MR. BONNER:  It would have come in in various --

18   there would have been various denominations in the Qatar

19   Charity's account.  Here, in the United States, the

20   jurisdictional hook are dollar transactions, Your Honor.

21             THE COURT:  Right.

22             MR. BONNER:  Money was transformed from the local

23   currency in Qatar and transformed into dollars, sent, then,

24   on into Israel, Palestinian territories.

25             THE COURT:  But when does it get converted into

1   shekels?

2          MR. BONNER:  The way the transaction occurs is

3   whatever course -- whatever currency is sent to Bank of New

4   York, here, in New York -- dollars are sent to Bank of New

5   York, here, in New York, and they are able to take that

6   money and send it to Israel or to the Palestinian

7   territories in shekels.

8          So dollars came into New York, and on the way out

9   the door to Qatar Charity back in the Palestinian

10  territories, that money was either in dollars or, in some

11  cases, kept in shekels, Your Honor, or transformed to

12  shekels, rather.

13         THE COURT:  I just want to address with the

14  lawyers who represent MAR.

15         Is there a theory under which there's personal

16  jurisdiction over MAR because it was the one with the

17  corespondent bank relationship?  I can't remember who

18  represents MAR, sorry.

19         MR. KAPLAN:  Judge Donnelly.

20         THE COURT:  Yes, sorry.

21         MR. KAPLAN:  I represent Masraf Al Rayan.  And for

22  the record, I'm Aryeh Kaplan.

23         THE COURT:  Right.

24         MR. KAPLAN:  I think the answer to your question

25  is that Plaintiffs have embraced that theory.  I think that

1    they have advanced that theory that the Court has

2    jurisdiction over my client on account of it having a

3    corespondent banking relationship.

4             THE COURT:  I mean, that can happen, right?

5             MR. KAPLAN:  I think so.  I think it didn't.  And

6    if the Court would permit me, I'll answer why.

7             THE COURT:  Sure.  Okay, if you do it slowly.

8             MR. KAPLAN:  Of course, I'm sorry, Judge Donnelly.

9             THE COURT:  It's okay.

10            MR. KAPLAN:  Judge, I think that in this case,

11   what makes this case different, Judge Donnelly, is that in

12   examining purposeful availment and the allegations in the

13   complaint that would establish that, what the Court is

14   really faced with is a series of conclusory allegations.  So

15   I don't think purposeful availment is met.  I also think

16   there is a plausibility argument.  I actually think the

17   Court just ceased on it.

18            There is some amount of internal contradiction in

19   Plaintiff's own complaint in describing the flow of money.

20   There's discussion, Your Honor, about how U.S. dollars are

21   sacrosanct to Hamas, but, then, as Your Honor noticed,

22   there's later a discussion that's a consequence, I believe,

23   of -- and this is what's alleged -- of arrests that occurred

24   in 2017, I believe.

25            THE COURT:  Is that in Israel?

1          MR. KAPLAN:  Yes, in Israel, yes, Your Honor.

2    Which obviously postdate the transaction at issue, which is

3    a huge problem in Honickman, but I'll put it to the side for

4    a moment.  But there is an allegation there that actually it

5    wasn't just U.S. dollars.  It was U.S. dollars.  It was

6    shekels.  It was Euros.

7          THE COURT:  And is the amount just -- I'm so --

8    I'm just trying to keep it straight.  The amount I think is,

9    what, three and a half million dollars; is that right?

10         MR. BONNER:  I will have to look Your Honor.

11         THE COURT:  Stay seated.  I think that's what it

12   was.

13         MR. BONNER:  In the relatively short timeframe

14   that's addressed by the criminal convictions and the pleas,

15   Your Honor, it was three and a half million dollars.

16         THE COURT:  And how much of it is dollars?  How

17   much of it is Euros?  How much of it is shekels?

18         MR. BONNER:  We don't have exact numbers in that

19   respect, Your Honor.

20         THE COURT:  Doesn't that matter?

21         MR. BONNER:  Well, that's one of the reasons why

22   we wanted to get the discovery, Your Honor, so that we could

23   actually -- instead of answering these questions in the

24   abstract, we would know what the numbers are.

25         THE COURT:  I see.

1            MR. BONNER:  These records are in the control of

2    Masraf Al Rayan --

3            THE COURT:  Right.

4            MR. BONNER:  And its corespondent bank here, in

5    New York.  And there's no reason why we can't get those

6    records and figure out what the exact numbers are.

7            But the criminal plea, what their employee, Qatar

8    Charity's employee, pled guilty to was that there was that

9    three and a half million dollars that passed over the span

10   of several years.  It was --

11           THE COURT:  Oh, so it wasn't just one time?

12           MR. BONNER:  No.  This was -- this was over the

13   course of a number of years, Your Honor.  And it's in both

14   Euros and in dollars.  We don't have a denomination with

15   respect to how much is dollars versus how much is Euros.

16           THE COURT:  All right.  I didn't mean to --

17           MR. KAPLAN:  Oh, no, of course.

18           THE COURT:  Go ahead.

19           MR. KAPLAN:  Judge Donnelly, I think -- so I want

20   to respond to two things, the issue of purposeful availment,

21   but also think it's very important to address nexus, because

22   you need both.

23           So I think I addressed purposeful availment and,

24   again, I would go one step further.  It's Masraf Al Rayan's

25   position that of the 409 paragraphs that the Court has in

1    this complaint --

2              THE COURT:  I didn't count them.  Go ahead.

3              MR. KAPLAN:  There are 15 that are conclusory and

4    two that actually purport to state non-conclusory

5    allegations.

6              I'll focus the Court on paragraphs 126 and 130.

7    And those speak to the plausibility issue that I just

8    describe where there's both lumping of Defendants and

9    there's also sort of an interchange and almost a discussion

10   of dollars and shekels and other currencies.  And I think

11   that that creates the plausibility issue under purposeful

12   availment.

13             But, Your Honor, I think the second point is a

14   critical one.  And that's nexus.  And Your Honor, that also

15   actually speaks to virtually every 12(b)(6) argument that I

16   would make for the Court, but to paraphrase it and try to be

17   judicious with your time, Judge Donnelly, it would go

18   something like this:  Masraf Al Rayan is a Qatari bank in

19   Doha, Qatar.  Qatar Charity is a Qatari charity in Doha

20   Qatar.  Neither of those two entities, neither of those two

21   Defendants, have ever been designated as an SDGT or an SDT

22   or an FTO.

23             And the allegations before the Court, Your Honor,

24   establish a very long chain of causation.  And that very

25   long chain of causation, I'm going to paraphrase, but I

1     think the complaint sets out something to the effect of:

2     Masraf Al Rayan, my client, maintained bank accounts and

3     provided normal banking services to Qatar Charity that

4     non-designate a customer.  And that Qatar Charity, at some

5     point in time, but no later than 2015 -- because I think

6     this is very important -- at some point in time, but no

7     later than 2015, provided normal banking services.  In this

8     case, what's at issue, I think, are these transfers that the

9     Court was focused on.  And we don't know how much and when

10    or specific denominations and -- and here, we're also seeing

11    some inconsistency between shekels and Euros and dollars,

12    but eventually, what happens is Qatar Charity, according to

13    the allegations in this complaint, uses Masraf Al Rayan to

14    obtain U.S. currency.  It takes that currency, and then at

15    some other point in time, again, but before 2015, that money

16    is then sent to one of several places.  It's described

17    differently in the complaint in different instances.  In

18    certain instances, the description is that it's sent to

19    Qatar Charity branches.  In others, it's to Qatar Charity

20    branches, and then to other charitable organizations.  And

21    still in others, it says to Qatar Charity branches or other

22    banks.

23            And after that, Your Honor, it's after that point

24    in time that at some other point in time that money is then

25    distributed to some unknown persons or entities which then

1    is used to actually, according to the allegations in this

2    complaint, finance the two attacks, one in 2015, and then

3    one in 2018.

4            And it's that very long chain of causation that

5    creates an enormous amount of attenuation, a distance

6    between Masraf Al Rayan providing normal banking services to

7    its customer, Qatar Charity, and the horrible attacks that

8    occurred.  And I think it's that lack of nexus, that

9    attenuation that strips the ability, in addition to

10   purposeful availment not being met, to exact jurisdiction

11   over Masraf Al Rayan.

12           There's also an temporal issue, as well.  It's not

13   just the attenuation and causation.  As I'm sure the Court

14   sees, there's an allegation that after 2015, no more

15   transactions are occurring where any amount of currency is

16   going.  And there is a later attack that occurs in 2018.

17   So, you know, Your Honor, Masraf Al Rayan, I would -- I

18   would argue, that will both attacks, which were tragic,

19   should be evaluated under the same lens.  I think neither

20   attack, because of nexus issues, for -- for different but

21   similar reasons -- similar because of the attenuation in the

22   line of causation, distant -- or different only insofar as

23   that 2018 attack is a little bit more temporally removed.  I

24   think both illustrate the same point, which is that the

25   amount of temporal and causational attenuation here is

1    inadequate to pull Masraf Al Rayan, who has no branches and

2    no -- you know, no -- no stores or anything else in the

3    United States, into a -- into this Court for the fact

4    pattern that I've described if we're focused on

5    jurisdiction.  But I also believe that a discussion of the

6    12(b)(6) issues really underscores, it girds that argument

7    and is pretty illustrative.

8            THE COURT:  We'll move to the 12(b)(6)

9    momentarily.  I just kind of want to pin down some of these

10   jurisdictional questions.

11           Do you want to respond to anything that Counsel

12   said?  Because I want to also just get some clarity on what

13   your theory is for jurisdiction over the other two entities.

14   I mean, I think you would probably agree that the strongest

15   case for jurisdiction you have is MAR.  I'm sorry, I'm not

16   using the whole name.

17           MR. KAPLAN:  It's okay.

18           THE COURT:  Is that right?

19           MR. BONNER:  I think it's the most obvious, Your

20   Honor, because it's the closest to the *Licci* cases, which

21   are the controlling precedent here in the Second Circuit.  I

22   think there is absolutely nothing, nothing, that

23   differentiates Masraf's conduct here from the bank that was

24   involved in the *Licci* cases.  We have transactions that are

25   flowing through New York.  They're flowing through New York

1    in dollars.  There is a bank account that's held, here, in

2    New York, in order to transform those dollars and to move

3    them from one location to another.

4            THE COURT:  There was a lot of -- I'm so sorry to

5    cut you off, but there was a lot more detail in that case,

6    wasn't there, in terms of amounts and frequency?

7            MR. BONNER:  I think not, Your Honor.  We have a

8    very specific allegation in the complaint that between 2009

9    and 2015, there was this three and a half million dollars in

10   Euro -- U.S. dollars and Euros that passed through the

11   corespondent bank, here, in New York.  In the *Licci* case,

12   all the Court says is that there were millions of dollars

13   over the course of a number of years.  It's no more detailed

14   than what we have in this case, Your Honor.

15           So I think that as far as Masraf Al Rayan is

16   concerned, *Licci* is directly on point.  It tells us that if

17   you use a corespondent bank, whether you're in Doha or

18   whether you're in Lebanon or wherever you may be, to pass

19   dollars to the U.S. banking system, you are subjecting

20   yourself to jurisdiction.

21           And there are some other considerations, Your

22   Honor, that have to be considered in connection with making

23   that determination.  What the courts have told us is that in

24   circumstances where Congress has attempted to enforce a

25   policy, we're going to look at the minimum contacts in that

1    lens, that even a very small contact with the United States,

2    in those circumstances, can be sufficient under the due

3    process clause to sustain jurisdiction.

4         So what we have here, Your Honor, of course, is

5    that in JASTA and in many of the other statutes related to

6    terrorism and the enforcement of Plaintiff's rights to

7    compensation, Congress has repeatedly acted to make sure

8    that Plaintiffs have the broadest possible remedy available

9    to them.  And by virtue of that, the courts have said,

10   because of this very special interest that Congress has

11   expressed in JASTA and the anti-terrorism act, that it's

12   even a lower amount of minimum contacts that would satisfy

13   the due process test in those circumstances.

14        THE COURT:  I mean, the other distinction in *Licci*

15   is that there was an allegation that the foundation was an

16   integral part of Hezbollah.  And I think, actually, was

17   acknowledged by Hezbollah as being -- being an integral part

18   of its financial operation.

19        MR. BONNER:  We have the very same thing here,

20   Your Honor.  We have Qatar Charity designated by Israel as a

21   support of Hamas, barred from operating in Israel and in the

22   Palestinian territories.  Same thing as in *Licci*, where the

23   Shaheed Foundation, I think it was, was also an entity that

24   was directly tied to Qatar -- or to Hamas -- or to

25   Hezbollah, rather.

1          And I think it's really important to note here
2   Your Honor, also, Qatar Charity was a member of the union of
3   good.  The Union of Good is an entity that was created
4   solely exclusively to finance Hamas.  And we see some
5   argument in their motion to dismiss papers, oh, we withdrew,
6   we sent a letter, we're not a member of that anymore.  But
7   they can't contradict our complaint with some hearsay letter
8   that they submit, on a reply, no less, on their motion to
9   dismiss.

10          So again, we have an entity here, Qatar Charity, a
11   designated supporter of Hamas, outlawed by the Israeli
12   Government, and yet all of these Defendants are assisting in
13   putting money into the Palestinian territories for use by
14   that very same barred entity.

15          THE COURT:  Well, I still -- I mean, I could be
16   wrong, but I think that *Licci* had some -- when I said it had
17   more detail, first of all, I think the Court stressed that
18   that was a pretty fact-intensive inquiry.  And I believe
19   there were numbers of transactions that were alleged, you
20   know, because there are other cases where it's been found
21   that there are too few transactions.  So I do think there is
22   a factual component in *Licci* that I'm not sure we have here.

23          MR. BONNER:  I think what -- what the *Licci* Court
24   said, though, at the end of the day, Your Honor, was we
25   didn't have an accident here.  This wasn't something that

1    happened once or twice by mistake.  We had millions of

2    dollars that passed over the course of a number of years.

3    We have exactly the same situation here.  This is not an

4    accident.  This didn't happen once or twice.

5          THE COURT:  I don't think -- just to be clear, I

6    think it's purposeful availment for that purpose.

7          MR. BONNER:  I think actually, my recollection,

8    Your Honor, is the word "accident" appears in the *Licci*

9    opinion, that the Court said this is not something that

10   happened once or twice, either by mistake or by accident, is

11   the phrase that the court utilized.  And here, we don't have

12   an accident, we don't have a mistake.  We have a confession.

13         THE COURT:  Can you slow down a little?

14         MR. BONNER:  Sure.

15         We have a confession, Your Honor, by their head

16   accounting person that from 2009 to 2015, they were

17   regularly passing dollars through the American banking

18   system.

19         Now, Your Honor, we have to admit, we don't have a

20   dollar amount, but that's why we asked for this discovery.

21   And if that's what the decision is going to turn on, Your

22   Honor, then the courts have said very clearly that in those

23   circumstances, as long as we have a good faith basis for

24   alleging jurisdiction, even if you were to find that you

25   don't quite have enough right here, these answers are easily

1    attained, okay.  Let's -- let's go and find who their

2    corespondent bank is in New York, let's send them a

3    subpoena, let's get some documents from Masraf Al Rayan and

4    Qatar Charity.

5             THE COURT:  You've got to slow down.

6             MR. BONNER:  Sorry, Your Honor.

7             THE COURT:  That's all right.

8             MR. BONNER:  And we will answer any remaining

9    questions that the Court may have in that regard.

10             THE COURT:  Did you want to respond?

11             MR. KAPLAN:  Just briefly, Judge Donnelly.

12             I think my first point would be that I agree with

13    the Court.  I think *Licci* is factually inapposite and there

14    is a factually-intensive effort that courts undertake.  And

15    it's for a very simple reason, right?  It's because if it

16    was as simple as a corespondent banking transaction happens,

17    then every single financial institution could end up in this

18    courtroom, in this courthouse.

19             THE COURT:  I mean, Counsel's point is, well --

20    first of all, was there jurisdictional discovery in *Licci*?

21             MR. KAPLAN:  Your Honor, I don't want to represent

22    to the Court an answer yes or no, because I don't know

23    offhand.

24             THE COURT:  I don't know either.

25             MR. KAPLAN:  I am happy to look and find out.

1          THE COURT:  But why shouldn't there be

2    jurisdictional discovery?

3          MR. KAPLAN:  It's a perfectly reasonable question.

4    Your Honor, the --

5          THE COURT:  Every once in awhile I ask one.

6          MR. KAPLAN:  The reason why, Your Honor, is

7    because -- and I'm prepared to do this, obviously -- the

8    case -- and this goes to the question of whether there is a

9    nexus or substantial relationship between the claim and the

10   use of the corespondent bank.  The case that's before the

11   Court, it's factually -- it's deficient in its allegation

12   such that be under 12(b)(6), neither primary liability nor

13   secondary liability should be sustained and be permitted to

14   move forward as currently pled.

15         And I'm happy to walk the Court through the

16   precise reasons why.  I think that there are an abundant

17   number of cases that provide the Court with guidance that I

18   think will lead to that conclusion.  But when opposing

19   counsel says, well, it's easily obtained, well, no, it

20   isn't.  It's actually quite burdensome, obviously.  And all

21   the parties in here care very much about their clients and

22   their case.  Masraf Al Rayan is no different.  Whether or

23   not there was availment is different than whether there was

24   purposeful availment.  And whether or not there was

25   purposeful availment does not necessarily establish the

1     second prong that I'm describing for the Court.

2             And the attenuation issue, which is a very real

3     issue and is factual and is based --

4             THE COURT:  And just to clarify, so sorry to

5     interrupt --

6             MR. KAPLAN:  Yes.

7             THE COURT:  -- that is temporal, and what's the

8     second piece?

9             MR. KAPLAN:  Your Honor, and I'm using my own

10    phrasing, it's not a term of art.  But I would say there's

11    temporal attenuation, but I would also say that there's

12    attenuation in the chain of causation.  And I think it's on

13    both of those bases that there is no jurisdiction.  And I

14    don't think jurisdictional discovery would make up for the

15    deficit in the Complaint that doesn't plead out claims under

16    primary and secondary liability.

17            I'm not trying to be circular in my argument --

18            THE COURT:  No, I think I understand.

19            MR. KAPLAN:  -- but I think that a look, which is

20    factually intensive, reveals exactly that.

21            THE COURT:  All right.  The next question I want

22    to discuss, let's turn to the Qatar Charity.  And I think we

23    mentioned this -- we discussed this before -- it seems like

24    a long time ago -- when we had a pre-motion conference, but

25    Judge Caproni's decision in *Berdeaux*, which was a 2021

1    decision, where I think Judge Caproni observed that basing

2    jurisdiction -- I'm paraphrasing -- on a customer's use, not

3    the bank's use, but on a customer's use of a New York

4    corespondent account would be nonsensical.  And I know you

5    think that's a dicta.  But what is your answer?  I mean,

6    what case stands for the proposition that a customer -- is

7    this your conspiracy theory?

8              MR. BONNER:  There are two theories that provide

9    us with jurisdiction over the other Defendants here, Your

10   Honor, Qatar Charity and Qatar National Bank.  One is an

11   agency theory.

12             THE COURT:  Right.

13             MR. BONNER:  And then, secondly, there is a

14   conspiracy theory.  And if I could just note for one second

15   with respect to this causation analysis that Mr. Kaplan has

16   referred to.  The Supreme Court, *Ford Motor*, 2021, said you

17   do not need causation for personal jurisdiction.  That

18   was -- I'm not sure whether -- that that even made an

19   appearance in their initial brief, but the Supreme Court has

20   foreclosed this argument that you need causation in order to

21   have personal jurisdiction over a Defendant with respect to

22   jurisdictional issues, of course.

23             THE COURT:  So the conspiracy theory is based on

24   what?  I know you cite the *Berkshire Bank* case, but there

25   are e-mails and all kinds of things back and forth in that

1    case that I don't think we have here.

2          MR. BONNER:  Well, the question, Your Honor, is

3    whether we've adequately alleged the existence of a

4    conspiracy, so that would bring up some of the 12(b)(6)

5    issues that Mr. Kaplan has referred to.  It seems like the

6    Court is more focused on jurisdiction right now, so I

7    won't --

8          THE COURT:  It's -- I mean, it's kind of one of

9    the things in the case, so -- but I think it's related.  But

10   my understanding, at least on some of your theories, is that

11   doesn't the tort or injury have to happen here?

12         MR. BONNER:  It does not, Your Honor.

13         THE COURT:  Okay.

14         MR. BONNER:  Under any of the theories that we've

15   alleged.  You know, certainly with respect to other ATA

16   cases, raising claims under JASTA.  The injury has to occur

17   abroad.  People had -- people are generally being killed by

18   foreign terrorist organizations in foreign countries.  So

19   the actual physical injury to the plaintiff, never going to

20   occur here.  But with respect to these cases that have dealt

21   with agency principles or with conspiracy principles,

22   neither one of them say that the injury has to occur in the

23   jurisdiction.  It's that certain conduct has to occur,

24   either by the Defendant, him or herself, or by an agent of

25   the Defendant.

1          THE COURT:  What is your -- I think Judge Komitee

2    recently decided a case at least on the agency question,

3    *Spetner* against *Palestine Investment Bank*.

4          Is that a different case than this one?  I don't

5    want to -- I also don't want to make you -- I mean, I'm not

6    trying to put you on the spot, here.  If you are not

7    familiar with the case, that's fine.

8          MR. BONNER:  So I don't know if it's the most

9    recent *Spetner* case, Your Honor, but we -- I'm familiar with

10   it --

11         THE COURT:  It was just recently.  Well, let's

12   see, because I'm only saying, I guess I'm dating -- I'm

13   aging myself.  I keep think Judge Komitee is new, but he's

14   really not anymore.  So this is from 2020.

15         MR. BONNER:  2020.  So the *Spetner* case in 2020,

16   Your Honor, is interesting in a number of respects.

17         First of all, it decided that it would go beyond

18   what the allegations were in the complaint despite the fact

19   that the Second Circuit in the *Dorchester* case that we

20   cited, and in many other cases, has said that unless you

21   have full-blown jurisdictional discovery and a hearing, that

22   the Plaintiff's allegations are entitled to be credited in

23   connection with a motion to dismiss on personal and

24   jurisdictional grounds.

25         Let's see my notes, here.  So --

1              THE COURT:  Well, I guess the critical factor -- I

2      think -- and I might be missing this, but I find the issue

3      there was that there isn't any evidence -- and I think for

4      here -- that -- and maybe you say they don't have to, but

5      that Qatar Charity, you know, chose the New York bank or had

6      any control over whether -- whether that was the account

7      where the transactions were at issue.  I think -- I think

8      that's a little bit of a stumbler for you.  But tell me why

9      I'm wrong.

10             MR. BONNER:  So going back to *Spetner*, the 2020

11     opinion, the Court opened up its opinion, Your Honor, by

12     saying that if the Defendant had maintained a corespondent

13     banking account, that of course jurisdiction would lie.

14             Now, so that addresses Masraf Al Rayan.  They have

15     a corespondent banking account, here, in New York.  And so

16     actually *Spetner* supports exercising jurisdiction over

17     Masraf Al Rayan.

18             There is not a word or an argument made in *Spetner*

19     at all with respect to agency.  And the *Spetner* decision

20     also precedes some of these very recent Second Circuit cases

21     about conspiracy jurisdiction, so it's not persuasive

22     authority for anything, Your Honor, because there are no

23     arguments made --

24             THE COURT:  I'm not going to tell Judge Komitee

25     that you said that.  I'm just kidding, go ahead.

1           MR. BONNER:  I appreciate that, Your Honor.

2    It's -- I don't want to --

3           THE COURT:  No, no.  I'm really only kidding.  Go

4    ahead.

5           MR. BONNER:  But what we have said here with

6    respect to agency issues, Your Honor, is that the New York

7    courts have made extremely clear that the control that has

8    to be exercised in order to have some action of an agent

9    qualify as being relevant for personal and jurisdiction

10   grounds can be very attenuated.  The Second Circuit said

11   that in this *Cleveland* case that we spoke about.  And as a

12   result, we don't have to have Qatar Charity deciding, well,

13   we're going to have Masraf Al Rayan route this money here

14   and it's going to pass through New York.  As long as Qatar

15   Charity is the entity that says, transfer this money, we

16   want a wire transfer, dollars are going to move from this

17   place and we want that currency to go into the -- a west

18   bank, that that's a sufficient amount of control under

19   *Kulko,* this *Cleveland* case, others, where it suffices for

20   personal jurisdiction grounds.

21           And I think one case that's extremely informative

22   in that regard, Your Honor, there is a Kreutter case from

23   the New York Court of Appeals, K-R-E-U-T-T-E-R.  In that

24   case, the agent acting in New York didn't even know --

25   didn't even know it was acting on behalf of one of the

1   Defendants.  So there was no control actually exercised in

2   that circumstance.  But the Court said, nonetheless, because

3   of the practicalities of the situation, that that was a

4   sufficient contact in order to satisfy both C.P.L.R. 302,

5   and also the due process requirements for personal

6   jurisdiction.

7           THE COURT:  I do have just one sort of out of --

8   it's not really out of order, but it's on this question of

9   Rule 4(k)(2).  And one of the requirements for personal

10  jurisdiction under that rule is that the Defendant can't be

11  subject to jurisdiction in any state courts of general

12  jurisdiction.

13          Can you address that in the context of this case?

14          MR. BONNER:  So there are two rules, Your Honor.

15  A minority rule, which is the one that the Defendant

16  advocate, and of course there is the majority rule, which

17  makes a lot more sense, is the one that we advocate.

18          And our position, Your Honor, is that Federal

19  Rules allow us to make alternative pleadings.  And even if

20  the Court were to dismiss the case because we don't satisfy

21  C.P.L.R. 302, we could amend our complaint and we could just

22  say, Your Honor, we're only go to proceed under the due

23  process analysis, because we have a federal claim in this

24  circumstance.  And what the majority of courts said, the

25  Fifth Circuit, the Seventh Circuit, the Ninth Circuit, the

1    Eleventh Circuit, the Federal Circuit and the DC Circuit.

2           THE COURT:  I am a locally District Court Judge in

3    New York.  And so my circuit is the Second Circuit.  And

4    they don't take kindly to me telling -- well, maybe though

5    don't care, but I think I have to do what they say.

6           MR. BONNER:  I think all parties have agreed that

7    the Second Circuit has not yet ruled on this particular

8    issue, Your Honor.

9           THE COURT:  Right.

10          MR. BONNER:  So that's why we are looking outside

11   of the jurisdiction for the rule.  And all of those places

12   have applied the sensible approach where they've said,

13   there's no need for the plaintiff to get up and to say

14   formally, I can't possibly get jurisdiction in New York in

15   order to say that jurisdiction can be adequate under

16   4(k)(2).  That makes no sense, Your Honor.

17          THE COURT:  But what's the point of that -- of

18   that requirement, then?

19          MR. BONNER:  In our estimation, there is no

20   requirement, Your Honor.  4(k)(2) is an independent basis

21   for jurisdiction.  It says that you can have jurisdiction if

22   you have a federal claim and there's no jurisdiction

23   anyplace else.  Why are we bothering going through hoops in

24   order to say, yes, it's applicable under C.P.L.R. 302(a)(1)

25   or (a)(2), when we all know that at the end of the day, all

1   we have to satisfy is the due process clause.

2           THE COURT:  Oh, so just generally, I'm sure I

3   asked you if you wanted to amend your complaint before.  I

4   love -- it's too late now, but I love deciding cases only to

5   have to have it come back to me a second time.  I don't,

6   but, I mean, I think we did discuss this when we had our

7   pre-motion conference, whether you wanted to amend, didn't

8   we?

9           MR. BONNER:  We don't feel we need to amend, Your

10  Honor.

11          THE COURT:  Okay, good, that's --

12          MR. BONNER:  But -- but if you were to dismiss

13  because we didn't satisfy 302.

14          THE COURT:  Then you want to.

15          MR. BONNER:  We would be right back saying 4(k)(2)

16  is inadequate basis for jurisdiction.  It makes no sense.

17          THE COURT:  But it is a requirement under 4(k)(2)

18  and I -- just forgive me if I'm being dense, but that it has

19  to arise under Federal Law and the Defendant can't be

20  subject to jurisdiction in any state's court of general

21  jurisdiction and it must be consistent with the

22  Constitution.

23          MR. BONNER:  So if the Defendants want to tell us

24  that, no, California is the place, we're subject to

25  jurisdiction there.  That's what the courts have said.  If

1    they want to tell us California, we're subject to

2    jurisdiction there, we'll go to California tomorrow.  We'll

3    miss you, Your Honor.

4              THE COURT:  No, it's good, it's good.  I'm

5    kidding.  But --

6              MR. BONNER:  But barring that, if they don't --

7    they are not saying they're subject to jurisdiction

8    anywhere, Your Honor.

9              THE COURT:  But I think, at least according to a

10   kind of recent Southern District Court, it's your burden to

11   make that allegation.  You're saying that that's a minority.

12             MR. BONNER:  That's a minority position, Your

13   Honor.  And the other thing, and the case that all of the

14   Defendants have cited, *Aqua Shield*, there was a hearing on

15   personal jurisdiction.  And then the Court said, well,

16   within 30 days after this hearing, I want you to tell me

17   whether you are going to proceed under 4(k)(2), or you are

18   going to proceed under the C.P.L.R.

19             You know, if we want to do that and the Court

20   wants to tell us, you know, it's my feeling that we're not

21   going to get jurisdiction under 302, then, you know, we're

22   probably happy to proceed under 4(k)(2), Your Honor.

23             THE COURT:  I think we need to give -- let's first

24   give Qatar Charity a chance to respond.

25             MR. HILLEBRECHT:  Yes, Your Honor.

1          THE COURT:  Pull the microphone up a bit, could

2     you?  Thanks.

3          MR. HILLEBRECHT:  I'll start with the very last

4     point.

5          Your Honor's correct, the courts in the Southern

6     District within the Second Circuit have held, indeed, that

7     it's the Plaintiff's burden under 4(k)(2), and we cited the

8     SSA case on our reply brief.

9          I also want to go back, Your Honor, to Judge

10    Caproni decision in the *Berdeaux* case, which Your Honor did

11    raise last time we were here.  And it's important, indeed,

12    pivotal, from Qatar Charity's point of view, it's pivotal

13    because, as *Berdeaux* recognized, the focus of this analysis

14    as the Supreme Court has said in *Walden* and in other cases,

15    focuses on contacts that the, quote, Defendant, himself, end

16    quote, had with the forum.  They don't allege anything.

17    Qatar Charity has never stepped foot here, and has done no

18    business of any kind here.

19          THE COURT:  Well, I think what they're saying is

20    that, you know, they're an agent or a co-conspirator.

21          MR. HILLEBRECHT:  I understand that, Your Honor,

22    and I will get to that in a minute.  Let me go through

23    *Berdeaux*, please, with permission.

24          THE COURT:  Okay.

25          MR. HILLEBRECHT:  And it's with that background in

*Proceedings*                                                34

1   mind that Judge Caproni held that relying on the theories

2   relied on here when discussing a bank customer and not a

3   bank, just makes no sense and, as Your Honor said,

4   nonsensical.  It was nonsense in that case and it's nonsense

5   in this case.

6        And Judge Caproni is not the only one, Your Honor.

7   As -- in answer to a question you asked earlier today, we

8   cite a number of cases on page 14 of our brief coming to the

9   same conclusion.  One of which is the *Tymoshenko* case,

10  T-Y-M-O-S-H-E-N-K-O.  And we have -- I will pull a quote

11  from there:  The Court's research has not revealed any

12  cases -- that's quote from the Court -- that support

13  argument that passage of money through New York corespondent

14  accounts can create jurisdiction over a foreign customer.

15       So that and other cases we cite on that page all

16  come to the same conclusion.  And, you know, it's even more

17  nonsensical in this case than in those cases for the reason

18  we articulated in our briefs.

19       The allegation here, of course, is that Qatar

20  Charity is trying to get money to a foreign terrorist

21  organization designated by the United States as such.  So

22  that raises the question if it is possible to do that

23  without going through New York, and we cite multiple cases

24  for the proposition that it is, why on earth would they go

25  out of their way to direct that New York be used?  It's

1   nonsensical on its face.  They don't even allege that, they

2   don't even try to allege that, but Judge Caproni and the

3   other cases we cited say at a minimum you need that, you

4   need direction, you need actual knowledge and you need

5   direction.  And they don't even allege that and there is

6   none here.

7            THE COURT:  I think -- and I'm sure you'll correct

8   me if I'm wrong, I think the motivation is the need for U.S.

9   dollars, is that?  But I guess you don't need to go to a New

10  York bank to do that.

11           MR. HILLEBRECHT:  You definitely don't, Your

12  Honor.  And we cite multiple cases including the *Licci* case.

13           And Your Honor leads me to another point I wanted

14  to make, which goes to the -- you've heard today, again,

15  from Counsel, about the purported confessions in Israeli

16  courts.  The complaint there, paragraph 130, completely

17  conclusory without any specifics at all.  Your Honor now has

18  before you as our Reply Exhibits 1 and 4, I believe, copies

19  of the interrogation and copies of the testimony --

20           THE COURT:  Can I consider those on a motion to

21  dismiss?

22           MR. HILLEBRECHT:  We think you can, Your Honor,

23  because they are expressly incorporated into the complaint,

24  they are argued heavily by Plaintiffs in their motion

25  papers.

1           THE COURT:  Well, let me just -- just nail that

2  down.  Can I consider -- since you refer to them, can I

3  consider the transcripts?

4           MR. BONNER:  We don't refer to those documents,

5  Your Honor, but actually, I welcome the opportunity --

6           THE COURT:  Okay, but just -- just -- so I don't

7  lose my train of thought.  Is that something that I can

8  consider on a motion to dismiss?  And you can just say yes,

9  no, I haven't decided.

10          MR. BONNER:  I think the documents that they have

11 cited, Your Honor, we can't consider.  What they --

12          THE COURT:  We can or we can't?

13          MR. BONNER:  Cannot.  They have cited one of four

14 police interviews with one of the people who ultimately pled

15 guilty two years later.  So they have the very first police

16 interview where this person is denying certain things.  And

17 we didn't incorporate that in our complaint.  It's not part

18 of the complaint.  It's not necessary to the complaint.

19          What we've alleged in our complaint is that two

20 years later, there is an indictment.  It says that money

21 passed through New York --

22          THE COURT:  Okay, but --

23          MR. BONNER:  And, Your Honor, not your turn.  I

24 get it.  I will let you respond, but I -- but I do want to

25 give Counsel a full opportunity.  I just -- I always like

1    to, you know, so I'm not, you know, working without a net,

2    if nobody objects to it, I'll consider it.  But it sounds

3    like you don't think I can consider it.  I mean, I'll look

4    at it and see if it's integral, I can make that decision,

5    but if it isn't -- if you said it is integral, then I

6    wouldn't have to do that extra work.  But I don't mind,

7    that's why I took the job.

8                 So I take it that your answer on that is that I

9    can't consider it.

10               You say that I can.

11               But we don't need to resolve that now.  So you can

12   just continue with your argument.

13               MR. HILLEBRECHT:  Fair enough, Your Honor.

14               I would just, before we move one, point out that

15   the principle reference is at paragraph, I believe, it is

16   130 of the complaint.

17               THE COURT:  Okay.

18               MR. HILLEBRECHT:  But the statements made by this

19   individual to the Israeli authorities are very telling, Your

20   Honor.

21               First of all, the individual is the staff

22   accountant in the occupied territories.  His

23   responsibilities included interacting with bank and, quote,

24   monitoring money transfers, end quote.  That's from

25   Exhibit 4.  And also, quote, recording the movements of

1    incoming and outgoing funds.  And that's in Reply Exhibit 1.

2    On page 5 of our brief, we have a block quote that we took

3    from his testimony.  And it's two, three sentences, Your

4    Honor.  I would like to read it, Your Honor, if I could.

5                 THE COURT:  Just direct me to the page?

6                 MR. HILLEBRECHT:  It's the reply brief on page 5,

7    Your Honor.  Our -- Qatar Charity's reply.

8                 THE COURT:  Okay.  And just take your time on

9    reading it, okay?

10               MR. HILLEBRECHT:  Sure.

11               THE COURT:  Go ahead.

12               MR. HILLEBRECHT:  The funds are at the Al Rayan

13   bank in Doha.  It is transferred to Deutsche Bank in

14   Germany.  From there, it is transferred to the Bank of

15   Palestine in Ramallah, branch number 1213.  At the bank

16   branch in Ramallah, we convert the bills from Euros to

17   dollars.  And this action is only done at the Bank of

18   Palestine.  This is the Qatar organization's policy for all

19   branches around the world.

20               Then, Your Honor, at the trial, he's actually

21   called as what we in America would call a cooperating

22   witness.  He's a prosecution witness.  And they take him

23   through all of this and he goes through the flow of money

24   from Doha, Qatar through Germany -- not through New York --

25   to the Palestinian territories.  And he's asked specifically

1   by the prosecutor, in what currency is the money when it's

2   being transferred and the reply is, in Euros.

3          So as I said, Your Honor, we, A, think it could be

4   considered by the Court, and, B, think it's very telling in

5   that it undercuts completely their entire theory of personal

6   jurisdiction.

7          THE COURT:  Anything else you want to say on any

8   of these topics?

9          MR. HILLEBRECHT:  I don't think at this time.  I

10  think Ms. Norfleet had some issues on personal jurisdiction,

11  and when Your Honor is ready to hear from her.

12         THE COURT:  I am.

13         I will give you a chance to respond, don't worry.

14         MR. BONNER:  That would be really, really

15  devastating, Your Honor, if any of it were true.

16  Fascinating --

17         THE COURT:  He put quotes around it.

18         MR. BONNER:  What we have here in front of us

19  today, I'll hand out to the various defense lawyers.

20         THE COURT:  Now, is this -- I just don't want to

21  lose the thread here.  This is a motion to dismiss.  So if

22  we are talking about things that are integral to the

23  complaint, happy to have that discussion.  But if your

24  position is -- I don't know if you are handing out something

25  that you referred to in the Complaint, but I don't want to

1    get ahead of ourselves, here.  Also, I don't have whatever

2    it is you are handing out.

3                MR. BONNER:  I'm so sorry, Your Honor.

4                THE COURT:  I am not a very good reader, so -- all

5    right, thank you.

6                MR. BONNER:  This is actually what's referred to

7    in the Complaint, Your Honor.  We have an indictment that's

8    two years after --

9                THE COURT:  It's in other language.

10               MR. BONNER:  Exactly.  The tab, Your Honor, has

11   the English translation.

12               THE COURT:  Oh, okay, okay.

13               MR. BONNER:  And if you look at the first page of

14   the English translation, it has Israel Defense Forces on

15   top, and there are numbered paragraphs below.

16               THE COURT:  Right.

17               MR. BONNER:  Paragraph 5 specifically says that

18   funds and dollars were transferred to a bank in New York.

19   This is the indictment by the court in Israel.  And if we

20   flip a few pages further, Your Honor, despite all these

21   accusations that we've heard in court and in the reply

22   brief, there is a page that's -- what is it -- it's one,

23   two -- three pages forward.  And it says hearing -- right

24   about in the middle, Your Honor.

25               THE COURT:  Right.

1              MR. BONNER:  And then below it, it has a defense

2    attorney for this gentleman who is pleading guilty to the

3    indictment that was left out of the reply brief and not

4    mentioned at all in court earlier today.

5              THE COURT:  Can I just say one thing here?  I -- I

6    don't want to attribute any bad motives to anybody.  I know

7    people feel passionately about their position, but I don't

8    think anybody's intentionally leaving anything out.  So I

9    see what you are saying here.  You are saying that he

10   confesses to the indictment.  And when -- and I believe your

11   theory is that when he confesses to the indictment, he's

12   confessing to that part that says it goes through New York

13   banks?

14             MR. BONNER:  Absolutely, Your Honor.

15             THE COURT:  Okay.

16             MR. BONNER:  And that's what was in the Complaint

17   and, for whatever reason, that somehow or other was omitted

18   from the reply brief which, of course, this points out

19   another issue, Your Honor, we shouldn't be considering all

20   these new documents and all these new arguments --

21             THE COURT:  Well, that's why I asked you the

22   question.-

23             MR. BONNER:  -- that are raised on reply.

24             THE COURT:  That's why I asked you the question

25   about whether -- you know, if it's not integral to the

1    complaint whether I can consider it.  It sounds to me as

2    though you are saying I can't, which is fine, but I'll have

3    to make that determination after I read everything.

4           What I would like to do now is just turn to

5    Ms. Norfleet, sorry, and just let's make sure that you have

6    the microphone.

7           And this is on behalf of Qatar bank, right?

8           MS. NORFLEET:  Qatar National Bank.

9           THE COURT:  Qatar National Bank.  Go ahead.

10          MS. NORFLEET:  I may refer to the bank as QNB.

11          THE COURT:  That's good, that's good.  Just pull

12   that up just a shade.  Thanks so much.

13          MS. NORFLEET:  No problem.

14          I think -- I think I should first start out with

15   just flagging for the Court that all of what we have been

16   talking about today has nothing to do with Qatar National

17   Bank.  I think we've heard today that Plaintiff said as much

18   that they are proceeding on a theory of conspiracy personal

19   jurisdiction with respect to QNB.  Something that

20   Plaintiff's Counsel just said a moment ago was -- or they

21   suggested that they are not proceeding on a theory under

22   4(k)(2).  They invoke that in the Complaint at paragraph 22.

23          THE COURT:  I think they were -- if I am correct,

24   I think they are saying they're doing alternative pleading,

25   I think that's what -- did I understand that correctly?

1            MR. BONNER:  That's correct, Your Honor.

2            THE COURT:  Okay, yeah.  So I think they're saying

3    if I don't buy that, I can do -- right?  I mean, you are

4    saying it much more elegantly than that, but if I don't

5    accept that, there are other bases for me to make that

6    determination.

7            But go ahead, I'm sorry.

8            MS. NORFLEET:  Right.  I guess I would maybe argue

9    that they are arguing both together.  And so -- and I think

10   last time we were before you, you also asked are you

11   proceeding on a theory of 4(k)(2) and they are and so I just

12   wanted to flag that, you know, I think that if you were to

13   dismiss on both theories, you should dismiss with prejudice

14   here today, but I will walk back to why -- to our reasons as

15   to why QNB -- there's no exercise of personal jurisdiction

16   over QNB in this case.

17           Sorry, give me one second.

18           So I think the issue here is minimum contacts.

19   And Plaintiffs are attempting to essentially vicariously

20   impart MAR's alleged contacts with New York to QNB here.

21   However, all of the -- all of the allegations in the

22   Complaint I would say are wholly conclusory and threadbare.

23   They're asking, Your Honor, to take their conclusions as

24   fact here.  And the two -- the two allegations with respect

25   to QNB's conduct in this case is that they maintain bank

1   accounts on behalf of Qatar Charity, and they maintain bank

2   accounts on behalf of individuals with affiliations to

3   Hamas.  There's no allegations with respect to whether money

4   was moved in and out of those accounts, if so, where money

5   was moved.  There's no allegation that tie those accounts at

6   all to this case.

7           So we would say that, you know, when I read

8   Plaintiff's complaint and their opposition, it reads as if,

9   okay, because QNB maintains these bank accounts, therefore,

10  they are part of this larger conspiracy to fund Hamas.  And

11  we -- that would just be highly conclusory.  There's no

12  specific facts pled that could present any sort of

13  jurisdictional issue here for us to even get to the point of

14  discovery.  And so we would say that, you know, Your Honor,

15  I don't think we can draw an inference -- or Plaintiffs are

16  asking you to take their argument as fact, and there is no

17  allegation with respect to QNB at all making any transfer in

18  this case.  All they are alleged to have done is maintain

19  accounts, and those aren't in dispute here.

20          THE COURT:  I mean, I think -- I don't think

21  there's any disagreement that your jurisdictional arguments

22  about Ms. Norfleet's client are based on the conspiracy --

23  not agency, though, right?

24          MR. BONNER:  It's conspiracy, Your Honor.

25          THE COURT:  Conspiracy.

1              MR. BONNER:  Agency addresses Qatar Charity --

2              THE COURT:  Right.

3              MR. BONNER:  -- and the conspiracy is all three

4    Defendants.

5              THE COURT:  I mean, I think I understand that.

6              Do you -- obviously, you know, in a motion to

7    dismiss, you assume the truth of all well-pleaded facts, but

8    I take it that your argument is that there's, even under

9    that standard, there's not enough to connect it to your

10   client; is that right?

11             MS. NORFLEET:  Correct.  Even the facts pled as to

12   QNB taken as true are not sufficient to subject QNB to

13   personal jurisdiction in this forum.

14             THE COURT:  And can you -- I think we already

15   discussed this, but just so I'm clear, your theory about QNB

16   as opposed to the other Defendants, what is that based on?

17             MR. BONNER:  It's based on the existence of the

18   conspiracy, Your Honor.

19             THE COURT:  Okay.

20             MR. BONNER:  And the Second Circuit has said, and

21   you highlighted earlier the *Berkshire Bank* case.  There are

22   two *Schwab* cases.  They have this theory of conspiracy

23   jurisdiction.  The *Walden* case that one of the opponents

24   mentioned earlier had been used repeatedly by courts to have

25   you can't have a conspiracy jurisdiction, and -- but since

1   then the Second Circuit has put the kibosh on that theory

2   and has said that you certainly can under a federal statute

3   have a conspiracy jurisdiction basis for personal

4   jurisdiction.

5             THE COURT:  And do you have any response that you

6   want to make to that, either as a matter of what the actual

7   allegations are, or just about the concept of conspiracy

8   jurisdiction?

9             MS. NORFLEET:  You know, I think -- and Plaintiffs

10  are correct, you know, a theory of conspiracy personal

11  jurisdiction is available under a due process analysis under

12  4(k)(2).  I would say that they haven't met any of the

13  requirements here with respect to QNB.

14            You know, there's three requirements:  One to

15  prove that a conspiracy existed, which speaks to the

16  12(b)(6) issues.  Two, that in our case, QNB participated in

17  that conspiracy.  And that's where we find that the

18  complaint is sufficiently lacking in any allegation that QNB

19  participated in this conspiracy.  And I don't have the

20  paragraph in front of me, but the complaint claims that --

21  or alleges that QNB joined -- or joined the conspiracy by

22  maintaining bank accounts and nothing else.  There's no

23  allegation as to how those bank accounts fit into the

24  greater conspiracy.  There's no allegations with respect

25  to -- and -- and I think it bears repeating -- of any

1  transfer in or out of those -- out of those accounts that

2  QNB maintained.

3          So again, even taken as true that if we were, you

4  know, taking as true that QNB maintains these bank accounts,

5  there's no -- that is not sufficient to subject QNB to

6  personal jurisdiction in this forum.

7          MR. HILLEBRECHT:  Your Honor, may I add one point?

8          THE COURT:  Sure.

9          MR. HILLEBRECHT:  Maybe it's two points.

10          I just wanted to point out again, flowing from

11  what I said earlier about the *Berdeaux* case and how there

12  are no acts whatsoever by the charity, itself, alleged here

13  and that it's kind of nonsensical to allege that they would

14  have directed --

15          THE COURT:  By the way, I didn't say that.  I

16  think Judge Caproni said that.

17          MR. HILLEBRECHT:  Yup, understood.

18          But I also want to point out that similarly, in

19  *Schwab* -- I think it was Schwab *II*, the courts instructed

20  that, quote, a conspiracy theory cannot get off the ground

21  if the Defendant was all together blindsided by its

22  co-conspirators contacts with the forum.  And here, as I've

23  said, there is no real allegation of the customer, Qatar

24  Charity, having any involvement at all whatsoever with the

25  use of a New York corespondent account.

1              And the second thing I wanted to mention on the

2    conspiracy argument is it's important to distinguish the

3    case here from all of the cases that Plaintiffs relied on in

4    their papers.  Here we have the complete absence of any

5    informed conduct by any member of the conspirator.  The

6    corespondent bank is explicitly not alleged to be a

7    co-conspirator.  And all the cases that are cited require

8    some act by a member of the conspiracy within the forum,

9    which we don't have here.

10             THE COURT:  First of all, I forgot to apologize to

11   you all for being late.  I know you got here on time.  I do

12   an Alternatives to Incarceration Court and we were there and

13   so it took me a minute to re-focus, so I apologize for that.

14             I do want to thank the parties for the very

15   thorough briefing.  It's an extremely interesting issue.

16   Personally, I'm a little sorry that Judge Garaufis and Judge

17   Cogan haven't told me what to do yet -- kidding, obviously,

18   but we'll get you a decision quickly.  I don't know if

19   anything -- I don't think it's necessary, but I always give

20   parties the opportunity if you want to submit like an

21   additional letter on anything that came up that you don't

22   think was covered in the briefing.  It seems to me like we

23   covered -- we've discussed everything, but, you know, I'm

24   happy to get additional letters, if that's what you feel is

25   appropriate.

1           So anybody on the defense side?  Sometimes I think

2    when I suggest this to lawyers they think they have to do

3    it.  You don't.  It's just an option that I like to give

4    lawyers after we have an oral argument.  Anything anybody

5    else wants to add?  You can also let us know on ECF, you

6    know, soon if you want to.

7           And same for you.  Is there something else you

8    want to address or?

9           MR. BONNER:  Just very quickly, Your Honor, is

10   that there was a very recent Second Circuit case, *Freeman*,

11   which deals with conspiracy under JASTA.  And it eliminates

12   many of the arguments that the Defendants had made in their

13   briefs with respect to the conspiracy claim that we have

14   under JASTA.  They had arguments that we had to allege that

15   they conspired directly with Hamas.  The Second Circuit said

16   no on that.  It might be helpful, I think, for the Court,

17   since there has been a lot of time that has passed since the

18   briefing was done, if things like the *Freeman* case and other

19   more recent cases were addressed in very brief manner by the

20   parties.  But I don't want to burden the Court, if you don't

21   want that.

22           THE COURT:  That's why I took the job.  So

23   let's -- I mean, if there are some additional things that

24   you haven't cited in your submissions, why don't we -- does

25   anyone mind doing -- I don't want to do a submission and a

1    response.  I mean, I don't think that's necessary, but if

2    you all want to get us additional letter on it, let's say,

3    not to exceed five pages, unless it's just absolutely

4    necessary, but if there's new precedent that you want to

5    address -- is there anything else besides *Freeman*?

6              MR. BONNER:  *Freeman* was, for me, the most

7    important case.  There have been some other Second Circuit

8    case addressing the ATA and aiding and abetting, but they're

9    not as important as the *Freeman* case.

10             THE COURT:  Is that something that would be

11   useful?

12             MR. KAPLAN:  Your Honor, I think it would be.  I

13   do want to just make sure.  I understand we have taken a

14   significant amount of Court's time.

15             THE COURT:  It's okay.

16             MR. KAPLAN:  But we have not -- this is for

17   defense anyway -- addressed any of the 12(b)(6) arguments

18   which are obviously very important to our respective clients

19   and I think also gird the jurisdictional arguments, as well.

20             THE COURT:  If you want to take a minute to

21   address those, I'll -- I am happy to hear you.

22             MR. KAPLAN:  Your Honor, I can be very thrifty.

23             THE COURT:  That's okay.

24             MR. KAPLAN:  So again, Judge Donnelly, I do

25   appreciate the time.  What I will do is I'll first focus on

1    primary liability, and then secondary liability because

2    obviously we have now discussed jurisdiction.  And I think

3    that both individually will provide individual basis for

4    dismissal of this complaint in it's entirety.  I think in

5    the aggregate, Judge Donnelly, the Court will be lead to the

6    unavoidable conclusion that not only is dismissal merited,

7    but I think to Ms. Norfleet's earlier point, that it should

8    be with prejudice.  And I'll explain why at the very end of

9    this argument, but --

10          THE COURT:  All right.  Hold on for just one

11   second.  I just want to check one thing with my brilliant

12   law clerk here.

13          (Pause.)

14          THE COURT:  Sorry, okay, go ahead.

15          MR. KAPLAN:  So Your Honor, as the Court's aware,

16   these plaintiffs have brought claims under primary

17   liability.  Very simply, the Court would need to find that

18   the pleading before this Court -- and we've discussed at

19   some length the actual allegations and the remoteness in

20   terms of placement in that chain of causation that Masraf Al

21   Rayan has.  I also want to, again, remind the Court that

22   Qatar Charity, notwithstanding various statements by

23   opposing counsel, in the Complaint itself, there is no

24   disagreement that Qatar Charity is not an SDGT or an FTO,

25   that it is a charitable organization.

1            The fact is the Court would need to make a finding

2    that Plaintiffs have pled that these routine banking

3    services, which are totally unexceptional, meaning no

4    exceptions are made, accounts are carried, transactions are

5    facilitated.  That that act, in and of itself, Your Honor,

6    is an act of international terrorism.  And it's not.  And

7    the caselaw would not support that finding.  It is an

8    objective standard that is required as the Court is aware.

9    An objective standard to make the determination that that

10   act was intended to coerce or to intimidate.  And Your

11   Honor, I don't want to belabor the point because I think

12   we've talked at quite a length about the fact pattern, but

13   the facts are not there, the allegations are not there to

14   support that conclusion.

15           I want to turn to secondary liability, which I

16   think probably requires a little bit more of a discussion

17   because I think it ties directly, Your Honor, into questions

18   of jurisdiction, the questions this Court has brought up

19   today.

20           There's aiding and abetting.  There are a set of

21   claims there.  There is conspiracy liability.  And I'm going

22   to address both because, again, I think both speak to the

23   totality of the complaint and the various bases which

24   require dismissal.

25           The question for the Court, relative to Masraf Al

1    Rayan, and dare I say Qatar National Bank as well, in

2    evaluating second liability, Your Honor, on an aiding and

3    abetting, analysis is whether -- and I'm turning to

4    *Honickman* for this guidance, a case out of this courthouse,

5    whether Qatar Charity was so closely intertwined with Hamas

6    and its terrorist activities, that one could reasonably

7    infer that Masraf Al Rayan was generally aware of the

8    attacks or the activity that was to occur.  And the facts

9    aren't there.  The allegations aren't there.

10          Now, I'm not diminishing the fact that Plaintiffs

11   have made allegations, you've heard some of them today, and

12   I would group those allegations into two buckets, and I

13   would respectfully argue to the Court that neither bucket

14   would be adequate under the caselaw in the Second Circuit to

15   support the notion that there is general awareness.

16          So the first bucket, Your Honor, is allegations of

17   opinions or arrests or information that post date the last

18   transaction alleged to have occurred to give rise to the

19   injuries in this complaint.  So that would be 2015.  So

20   all --

21          THE COURT:  Sorry.  So sorry.  So you are talking

22   about the 2018?

23          MR. KAPLAN:  Exactly, Your Honor.

24          All of those allegations, whether it is an arrest,

25   an alleged confession, characterizations of other countries

1    regarding Qatar Charity's status in the community, all of

2    those are after the fact.  And under *Honickman*, there is no

3    question they cannot be used to impute general awareness to

4    Masraf Al Rayan because it's intuitive, you couldn't know it

5    if it happened in the future, right?  So that, all of those

6    allegations -- and there are a number of them -- those

7    allegations would not suffice under the caselaw, and I'll

8    talk about some of the cases that I think are directly on

9    point other than *Honickman*.  But then we have allegations

10   that predate that last transaction.  And, Your Honor, I'm

11   paraphrasing from the complaint, but I think those cover

12   references to congressional and trial testimony.  They cover

13   a U.S. interagency intelligence committee which apparently

14   listed Qatar Charity as being associated with terrorism.

15   And I believe the Union of Good designation that was

16   referred to by opposing counsel before.  So I will take each

17   one in turn.

18          We will start with the 2002 congressional

19   testimony.

20          Your Honor, this -- this -- this -- this reference

21   to a -- what appears to be a relatively esoteric hearing

22   does not arise to what the courts would require for general

23   awareness because the question is, to Judge Cogan's

24   description, whether this supports the notion that there are

25   so many warning signs and red flags such that it would be

1   ubiquitous to impute general awareness to my client.  And,

2   Your Honor, the answer there would be no.  The question of

3   this interagency intelligence committee terrorism

4   classification, Your Honor, I can dispositively tell you is

5   no because it wasn't declassified until after 2015.  So

6   while there may have been statements in private and in a

7   classified document, none of it was public until well after

8   that fact.

9           THE COURT:  And, I'm sorry, when you are talking

10  about which entity in terms of being designated?

11          MR. KAPLAN:  These are references to Qatar

12  Charity, not as a designation, but as discussions of whether

13  or not it could be considered to support Hamas or terrorism

14  in any way.

15          THE COURT:  Okay.  Sorry, go ahead.

16          MR. KAPLAN:  No, of course.

17          And then, of course, the Union of Good

18  designation, which I am sure my colleagues at Qatar Charity

19  will speak more about, but I think as opposing Counsel

20  already referred to in his own argument, there is a direct

21  discussion in a footnote of Qatar Charity about how that

22  designation was -- or excuse me, the association was

23  rescinded.

24          But herein lies the critical issue, Your Honor,

25  with all of those.  A congressional hearing and trial

1    testimony, a U.S. interagency intelligence committee, and

2    all of the discussions that happened back and forth between

3    these individuals and entities did not yield a designation.

4    It didn't result in Qatar Charity being an SDGT or an FTO or

5    an SDT.  This is what we have in this complaint.  And what

6    we don't have are allegations of ubiquitous news or website

7    claims where Hamas says:  Qatar Charity is our organization

8    that we look to for sponsorship.

9            And the reason why -- I'm sorry, Your Honor.

10           THE COURT:  I'm just curious about how much of

11   this I can consider on a motion to dismiss.

12           MR. KAPLAN:  These are in Plaintiff's allegations.

13           THE COURT:  Okay.

14           MR. KAPLAN:  This is in their complaint.

15           THE COURT:  Okay, all right.

16           MR. KAPLAN:  What's critical is that these

17   allegations -- and they are alleged in their complaint --

18           THE COURT:  I'm talking about more your response

19   to them.

20           MR. KAPLAN:  I'm entirely basing my argument in

21   the caselaw here, and I'm going to focus in a moment on

22   three cases in particular from this Circuit; *Miller*, *Kaplan*

23   and *Henkin*.

24           These are not the type of warnings or types of

25   information that I think any of the courts in this

1    jurisdiction would consider to arise to the level

2    individually or in the aggregate as general awareness.  So

3    let's contrast it for a moment.

4           The *Miller* case was a case that what was in front

5    of -- or is in front of Judge Cogan.  And the facts of that

6    case are very particular.  They include references to the

7    fact that the bank willfully assisted terrorist activity by

8    facilitating martyr payments.

9           So what does that mean?  What were the

10   allegations?

11          Judge Donnelly, the allegations were that the bank

12   had, in its own ledgers, references to the manner in which

13   individuals died in carrying out horrible terrorist attacks.

14   And the annotations included phrases like:  By bullets, by

15   bombs, by assassinations.  And the contact as between the

16   bank and those families of the individual who would have

17   died, didn't require an intermediary, like Qatar Charity,

18   they were direct to the customer.  And in that instance,

19   there was a finding that the bank -- or not a finding, there

20   was even an allegation that the bank employee reached out to

21   a member of a family of somebody who had been deceased, and

22   under those circumstances there was a finding that there was

23   general awareness.  And those are not approximately the

24   facts in the case before this Court.

25          The *Kaplan* case, I think there's been some

1    discussion already about *Kaplan* before the Second Circuit

2    focused again on aiding and abetting.  And again, what was

3    special about that case, Your Honor, is that the banking

4    services that were provided, unlike the banking services

5    before you, Judge Donnelly, were not ordinary.  They were

6    extraordinary.  There was a special treatment afforded to

7    the customers in that case.

8           And on top of that, and this is from the opinion,

9    it said that Hezbollah repeatedly publicized its

10   relationships to the bank on websites and in news, media,

11   and included Hezbollah's own radio and television stations,

12   and that was a reference to the individuals who received

13   money.  There were statements made by senior Hezbollah

14   officials in that complaint, at press conferences, in news

15   media interviews, on Hezbollah's own websites.  And this

16   repeated reference, and this egregious participation from

17   the bank gave rise to a finding in *Kaplan* by the Second

18   Circuit that these are the types of red flags that create

19   general awareness.

20          The last case that I want to talk about briefly is

21   *Henkin*, which was another Judge Cogan case.  And in that

22   case, Judge Cogan examined the complaint and when he wrote

23   his order, he said that there were, quote/unquote, quote,

24   red flags, unquote.  And they were so ubiquitous to impute

25   the bank's knowledge.  For example, he said:  A single

1    search for a bank customer would have confirmed its status

2    as a Hamas conduit.

3           And he described a litany of other red flags.  In

4    particular there, there was a report that the bank received.

5    At the same time all of this conduct was occurring and it

6    said that it was essentially facilitating money laundering

7    and terrorism and everything else, and the bank responded by

8    saying it was Zionist propaganda.  The Court found that

9    there was general awareness.  Those facts don't exist in

10   this case, Judge Donnelly.  Not even remotely.  Just to

11   ground us again.  The facts in this case are that Masraf Al

12   Rayan provided normal banking services to Qatar Charity

13   which was not designated in any way.  There are no

14   allegations in this complaint that Hamas was advertising

15   Qatar Charity the way that they were in some of these other

16   cases, that there were spokes people, or ubiquitous media

17   attention or the kind of things that one would expect would

18   actually create this notion of general awareness so that a

19   bank would say:  Shouldn't do this.

20          And consequently, Your Honor, under the aiding and

21   abetting theory, the facts, I think, are not sufficient to

22   sustain this cause of action -- these causes of action.  I

23   would think that *Honickman* would be particularly instructive

24   to the Court because I would say that even the fact pattern

25   there is a little bit more egregious than the one before the

1  Court, and there, the aiding and abetting claim was

2  dismissed.

3          Your Honor, that takes me to conspiracy liability.

4  And I really do want to focus on this for a moment -- excuse

5  me, I jumped over knowing and substantial assistance, which

6  is another --

7          THE COURT:  It's probably the same, isn't it?

8          MR. KAPLAN:  It's a little circular because you

9  can't knowing if there is a general awareness.  So I didn't

10  mean to be dismissive, but were the Court to run through

11  each of those factors, all it would do would be impress upon

12  you, Your Honor, that this complaint doesn't establish what

13  would be necessary in order for plaintiff to continue with

14  its aiding and abetting claims.

15          The conspiracy here is important.  It's not just

16  important because it's a cause of -- you know, gives rise to

17  cause of action, but it's also for the purposes of the

18  Court's evaluation on jurisdiction.  And the problem, Your

19  Honor, is what the Court has in front of it, is a complaint

20  that lays out conclusory allegations regarding conspiracy,

21  and those allegations discuss the Government of Qatar and

22  Qatar, and those don't have a place in this complaint or in

23  this Court.  Qatar is not a party.  And they don't establish

24  conspiracy either.  In fact, if anything, just to take a

25  brief left turn, all those allegations relative to Qatar do

1    is create a really significant plausibility issue to the

2    complaint here because if the claim in the Complaint is that

3    Qatar has funded, allegedly, hundreds of millions -- I think

4    it was actually a billion dollars to the same FTO that's at

5    issue, I don't know how they can, at the same time, say that

6    the money that they're alleging was transferred in this

7    instance was absolutely critical to the attacks that

8    occurred.  But that is a plausibility issue, it's a

9    secondary issue.

10          But the liability, the conspiracy liability issue

11   is whether or not the allegations here, which would have to

12   be non-conclusory, provide the Court with a basis to make a

13   finding that they've pled that they all entered, all the

14   Defendants entered into an agreement.  But here there is a

15   slight distinction from the aiding and abetting.  And the

16   distinction, which I think was elucidated in *Kaplan*, Your

17   Honor, at page 855 is that unlike an aiding and abetting,

18   Masraf Al Rayan would have to be shown to have conspired

19   with the principal.  The principal isn't Qatar Charity.  The

20   principal is Hamas.  There is not a single allegation in

21   this complaint, Your Honor, nor could there be, that Masraf

22   Al Rayan conspired with Hamas.  Instead, as I said, there

23   are a series of heavy-handed conclusory allegations relative

24   to the Government of Qatar and what Qatar does, but those

25   don't fill the void.  Those don't establish the actual

1   pleading that would be required to establish that there was

2   an agreement in fact and steps taken in furtherance of that

3   agreement.  And as the agreement wasn't just with one

4   another -- which, again, I don't think the allegations would

5   suffice to show any way -- but under *Kaplan*, it would be an

6   agreement with the principal, and the principal here is

7   Hamas.

8              So for those reasons, I don't think conspiracy has

9   been adequately pled in order to carry those claims.  And,

10  Your Honor, I would submit that it just, again, just like

11  general awareness, I think makes it much more difficult for

12  the Court to ever find that jurisdiction existed, and I

13  don't think it was pled even under purposeful availment.  I

14  think general awareness speaks -- the lack of general

15  awareness speaks to the issue of nexus, which is an

16  important factually intensive prong for jurisdiction.  I

17  think the lack of general awareness obviously results in the

18  necessity that the aiding and abetting claim gets dismissed.

19  And then I think the conclusory allegations and just the

20  lack of necessary allegations to sustain the conspiracy

21  liability claim speak to why dismissal is appropriate under

22  12(b)(6), but they only gird the argument that there can't

23  be conspiracy jurisdiction because there's no conspiracy.

24             Your Honor, I think that when you take a step

25  back, when the Court takes a step back, and we talked at

1    great length about jurisdiction, but then when you take --

2             THE COURT:  Well, I did just because I think

3    that's the first thing I have to decide.

4             MR. KAPLAN:  I agree.  But I think one of the

5    unavoidable questions is what would jurisdiction get you?

6    And jurisdictional discovery is not intended to create a fix

7    it for a complaint that can't sustain a 12(b)(6) motion.  In

8    fact, it's quite the opposite, right?  And that's why I said

9    that it was a very reasonable question to ask, why not

10   jurisdictional discovery, and my answer is because there's

11   futility here.  Because jurisdictional discovery is not

12   intended to, nor could it cure, the deficiencies and the

13   allegations relative to each one of these claims that I have

14   identified for the Court.  Whether it is *Miller* or *Kaplan* or

15   *Henkin* or *Averbach* or *Bartlett*, every one of those cases

16   require a level of general awareness and very clear points

17   that the Court can point to to say that this is not some

18   babe in the woods, you knew better.  And that's not what is

19   before the Court.  So that's why I think jurisdictional

20   discovery is not appropriate.

21            Now, the Court asked a year ago, Judge Donnelly,

22   whether these Plaintiffs wanted to amend.  And the Court

23   asked again --

24            THE COURT:  I was just checking.  I was pretty

25   sure I did ask that.

*Proceedings*                                                     64

1          MR. KAPLAN:  And the Court asked that question

2     again.  And this complaint is over two years old, and it has

3     required an enormous amount of resources from each of our

4     respective clients, and we take these allegations, just as

5     the Court does, very seriously.  An amendment isn't

6     appropriate when given multiple opportunities but more so

7     when it would be futile.  And the issues that I have

8     described for the Court in the way of deficiencies are not

9     deficiencies that can be cured vis-a-vis an amendment, and

10    nor should they be permitted at this point.  There is a

11    futility there.  Consequently -- oh, and by the way, Your

12    Honor, I just want to underscore that point because we spent

13    a considerable amount of time talking about confessions,

14    too.  This isn't a situation where these Plaintiffs provided

15    the Court with a complaint that was bereft of any amount of

16    effort or support.  On the contrary, they rely on

17    information that they apparently obtained from a criminal

18    proceeding involving one of the parties allegedly giving

19    rise to the allegations they have in this complaint.  And so

20    the Court, I think, can take a step back and see that when

21    you evaluate that, a 400 paragraph-plus complaint that's

22    over two years old, having given the plaintiff multiple

23    opportunities, now, to amend and inviting significant

24    argument from both sides, dismissal with prejudice,

25    respectfully, Judge Donnelly, is what we request, and I

1    think what is appropriate.

2         So those were the arguments I did want to provide

3    the Court with, and I appreciate your time.

4         THE COURT:  No, that's fine.  And I think most of

5    those arguments apply to the other Defendants, but I don't

6    want to keep you from arguing if you want to.

7         MR. HALLWARD-DRIEMEIER:  I would just add for QNB,

8    Your Honor, that once again, as Ms. Norfleet said, we find

9    ourselves sort of the tail on this dog.  The allegations as

10   to QNB are nonexistent.  That only allegation --

11        THE COURT:  She made a great argument on that.  I

12   mean, I --

13        MR. HALLWARD-DRIEMEIER:  Yes.

14        THE COURT:  I think she made all those points.

15        MR. HALLWARD-DRIEMEIER:  And I just want to make

16   the point that those same arguments apply to the aiding and

17   abetting because under *Honickman*, which Mr. Kaplan

18   explained, it requires that the focus be on awareness of the

19   Defendant's own role in the unlawful activities.  The only

20   activity by QNB was maintaining a passive thing, accounts

21   for individuals.  There is no allegation about how the money

22   in those accounts was used.  And I take it back, there are

23   two allegations --

24        THE COURT:  That's not --

25        MR. HALLWARD-DRIEMEIER:  There are two

1    allegations, there's 172 and 2 -- is it 242?  Both of which

2    conclusory say that the terrorist used the funds in the

3    account or the accounts funds were used by the terrorist to

4    support Hamas.  It doesn't specify who among them.  It

5    doesn't specify how the funds were used.  Much less, on what

6    basis QNB would have had knowledge of that supposed use.

7    And, of course, again, it's the general awareness of one's

8    own role in.  And so I think that that underscores that the

9    allegations of this complaint really have nothing to do with

10   QNB and certainly provide no basis of liability.  The

11   conspiracy, whether for jurisdiction or liability, requires

12   some agreement to a common purpose.  There is no allegation

13   of fact on which one can infer an agreement to a purpose on

14   the part of QNB to further Hamas's terrorism when there are

15   no allegations that they did anything, certainly nothing out

16   of the ordinary, the way that *Honickman*, you know,

17   identifies, the way that *Kaplan -- Halberstam*, unusual

18   actions done in an unusual way or over a considerable period

19   of time.  Nothing like that alleged here with respect to

20   QNB.

21             Thank you, Your Honor.

22             THE COURT:  Okay.  Anything else you want to say?

23             MR. LEWIS:  Yes, Your Honor.

24             THE COURT:  Can I get you into the microphone

25   there?

1            MR. LEWIS:  Again, Michael Lewis on behalf of

2   Qatar Charity.

3            THE COURT:  Go ahead.

4            MR. LEWIS:  Thank you.  So while Congress enacted

5   JASTA to provide civil litigants with a means to seek relief

6   against persons and entities that provided material support

7   to those engaged in terrorist activities, it did so by

8   explicitly providing that it should be consistent with the

9   Constitution of the United States.  What JASTA did not do

10  was expand the reach of the ATA beyond the constitutional

11  protections afforded foreign Defendants with no U.S.-based

12  contacts.  Nor did JASTA relieve Plaintiffs of their

13  obligation to plead sufficient and factual matter to state a

14  claim for relief that is plausible on its face.  Despite the

15  400-paragraph complaint, it fails to include any

16  non-conclusory allegations that Qatar Charity assisted with

17  any terrorist act.  While Qatar Charity is alleged to have

18  transferred funds from bank accounts in its -- from a bank

19  account in Doha to its own accounts in the Palestinian

20  territories, Plaintiffs do not identify the purported

21  recipient of the only transfers alleged with any detail in

22  the Complaint.  Plaintiffs, instead, purport to tie Qatar

23  Charity to some grand conspiracy, years-long conspiracy

24  involving the state of Qatar, the bank Defendants, Hamas,

25  and critically unnamed co-conspirator front organizations.

1   And the object of that conspiracy is alleged to have been to

2   fund Hamas's activity.  That's it.  That is the -- the

3   terrorist nexus we have here in this case.

4           And despite that fantastical conspiracy, the only

5   allegations supporting any connection whatsoever here to

6   Hamas is conclusory allegations, wholly unsupported by any

7   factual averments.  And the Court need not credit those

8   allegations here.

9           Plaintiff's primary liability theory rests

10  entirely on Defendant's purported provision of financial aid

11  to almost entirely unnamed charitable organizations that are

12  alleged without any specificity to be fronts for Hamas.

13  They can't simply, by including the labels "terrorism" and

14  "conspiracy" plausibly allege that the transfers were -- at

15  issue here were made in furtherance of Hamas's efforts.  And

16  that's particularly true here where we don't even know who

17  the recipients of the fund transfers are purported to be.

18  And the Court may evaluate -- to go to Your Honor's

19  question -- the Court may evaluate the plausibility of

20  Plaintiff's allegations by consulting the material cited by

21  Plaintiffs, themselves, for the false proposition that Qatar

22  Charity financed Hamas.  It may take judicial notice of the

23  documents Qatar Charity has put forth in support of its

24  motion to dismiss because they are either incorporated into

25  the complaint or constitute reliable material in the public

1    domain.

2          With respect to the 12(b)(2) arguments, we would

3    assert that Plaintiff's theory of jurisdiction here is

4    premised entirely on such conclusory allegations of a

5    conspiracy involving Hamas such that where it serves as the

6    only basis by which the Court might conceivably exercise

7    jurisdiction over Qatar Charity as a foreign Defendant on a

8    motion to dismiss for lack of personal jurisdiction, a Court

9    may consider outside materials --

10          THE COURT:  I'm just going to cut you off there,

11    because I'm not -- you know, I'm not a hundred percent

12    sure -- I would have to look at the complaint again, but I

13    think it would involve two determinations first, whether it

14    necessarily relied on those.  And I think that's the other

15    aspect is to the extent that -- I don't know if you are

16    saying that they're judicial documents or in the public

17    domain, I'm not sure to what extent any of these things are.

18    And I just don't know -- I don't know that it's worth

19    discussing at this point because I would have to look at it.

20    And in the absence of an agreement that I can look at the

21    full record, I think that's what the argument is, that I

22    would need to examine the full -- I don't know -- I don't

23    know if one of those documents you referred to, is it, you

24    know, a document, a record of -- is it in Israel, the

25    decision?  I just don't know the answer.  But I think

1    generally the rule is that, you know, I'm limited to the

2    four corners of the complaint.  And I think it has to be --

3    you have to necessarily rely on it.

4           So just hearing what the arguments are with

5    respect to some of those documents, I'm not so sure that's

6    something I can consider.  But I do -- did I -- I cut you

7    off.  Did you have anything else you wanted to say?

8           MR. LEWIS:  I was just going to direct Your Honor

9    to *Spetner v. Palestine* where a similar issue involving

10   outside materials was addressed.

11          THE COURT:  Was that Judge Komitee's case?  Is

12   that the one?  I think we talked about that before.  Yes,

13   yes.

14          MR. LEWIS:  And that addressed the issue of

15   whether to determine -- for the Court's ability to determine

16   whether or not the prima facie case of personal jurisdiction

17   is made --

18          THE COURT:  Right.

19          MR. LEWIS:  -- or it may consider materials that

20   would undermine that determination.  And that is separate

21   and apart from the 12(b)(6) grounds under which the Court

22   may consider materials incorporated in reference -- in the

23   Complaint.

24          Here, I believe that if you review the allegations

25   of the complaint, you will find that there are a handful,

1    and only a handful, that are sufficient or that rise beyond

2    a conclusory basis.  One of which, for example, is that at

3    complaint paragraph 131, Plaintiff's rely on Qatar Charity's

4    annual reports for the period of 2013 to 2015 to suggest

5    that Qatar Charity carried out joint projects with various

6    Hamas fronts.  And the report, which is attached to my

7    declaration in support of our moving brief, it says nothing

8    of the sort.  None of those reports say anything about

9    Hamas.  There's no reference in any of the reports to

10   violence or terrorism.  And there is no reference that the

11   Ellison Society, as alleged by Plaintiffs, there is a

12   similarly spelled entity, but in one -- in one of the

13   reports, but upon information and belief, there is no

14   relation to that entity.  And more importantly, for the

15   Court's purposes, the Ellison Society, as alleged in the

16   Complaint, is not purported to be a front of Hamas.  It's --

17   it's purported to be a front of the PIJ, which is an

18   entirely separate FTO, and it not alleged to have any

19   involvement with the instant attacks.  So the relevance of

20   that allegation is nil.

21            THE COURT:  All right.  I think I understand your

22   arguments.  I haven't given Plaintiff's Counsel a chance to

23   respond.  I think we discussed the jurisdictional question.

24   I think I'm going to go out on a limb here and say that you

25   could cite me specific paragraphs in your complaint that

*Proceedings*                                                   72

1   would be sufficient; is that right?

2          MR. BONNER:  That's true, Your Honor.  And those

3   are all in our briefs and so I'm not going to waste your

4   time now.

5          THE COURT:  It's not a waste of my time, but I

6   think it was addressed.

7          MR. BONNER:  For sure, Your Honor.

8          THE COURT:  Yeah.

9          MR. BONNER:  There are very specific allegations

10  in the Complaint, for example, these purported charities

11  that Qatar Charity is distributing money to, those are

12  recognized fronts for terrorist organizations.  That's in

13  their own documents.

14         But just very, very briefly, Your Honor, because I

15  want to be respectful of the Court's time, just to go

16  through a few of the things that have been said here that

17  are particularly important.

18         Mr. Kaplan has said four or five times now that

19  the alphabet soup of U.S. designations of various entities

20  as terrorist organizations don't apply to Qatar Charity, but

21  Qatar Charity is operating in Israel and in the Palestinian

22  territories, more specifically.  They're getting money there

23  that's being utilized to fund terrorism.  And in 2008, the

24  Israeli defense minister designated Qatar Charity as a

25  terrorist organization, and it told everybody at that point

1   in time in a very unusual announcement, it said that they're

2   a member of the Union of Good, which, again, is a U.S.

3   designated -- one of the alphabet soups that Mr. Kaplan was

4   talking about.

5         So the idea that Qatar Charity has not been

6   designated, which is the foundation of so many of the

7   arguments that the defendants are making, totally false.

8   Where this violence is occurring, Israel has designated it

9   as a terrorist organization and as a member of the Union of

10  Good.  And at the time that designation was made, Your

11  Honor, the Defense Minster said all financial institutions

12  should prepare accordingly and act with caution in order to

13  avoid criminal actions and civil lawsuits by victims of

14  terrorism, including those brought in the United States.

15  There is no fact in *Kaplan* or *Honickman* or any of these

16  decisions that have been spoken about today that's even

17  remotely similar to the Israel defense minister broadcasting

18  to the world, including specifically the financial

19  institutions operating in the Palestinian territories that

20  Qatar Charity is a sponsor of Hamas terrorism.

21        Another thing that Mr. Kaplan and his colleagues

22  just said, and I had said this earlier, but -- but

23  apparently not clearly enough, Freeman, Second Circuit

24  decision, 2023, perhaps a month or two ago, did away with

25  this idea that you can only be liable for a conspiracy if

1    you directly conspire with the terrorist organization

2    itself.

3              So we don't need a conspiracy, an actual agreement

4    or a piece of paper that's Masraf Al Rayan agreeing with

5    Hamas to commit terrorism.

6              THE COURT:  Can I just ask you one question?  Is

7    it enough, in your view, that -- I just want to make sure I

8    understand.  Isn't it enough in your view that -- that they

9    had -- that, I guess it's just -- I keep referring to them

10   as MAR, but that they had the Charity as a client?  Is that

11   enough?

12             MR. BONNER:  Well, if he had the Charity as a

13   client and they know that the Charity is directly tied to

14   terrorism, of course, yes, that's sufficient, Your Honor.

15             THE COURT:  That's all they need.

16             MR. BONNER:  Well, there are other elements that

17   we have to prove, substantial assistance and the like, but

18   for this general awareness and -- and there are a litany of

19   factors I would like to go through just with the Court's

20   indulgence that relate to that, but if they know that their

21   customer is sending money to Hamas, which is a terrorist

22   organization that's notorious not only here that the United

23   States, imagine how note tears it is in the pal stain and

24   Israel --

25             THE COURT:  I get it.

1          MR. BONNER:  So if they know they're sending money

2    to this violent terrorist organization, in our estimation,

3    and in what Kaplan has to say, is that that's sufficient --

4          THE COURT:  Is that alleged in your complaint that

5    they sent it directly to Hamas or to -- I think that's what

6    I started asking you at the beginning, or entities that were

7    associated with?

8          MR. BONNER:  But Qatar Charity, itself, is a front

9    for Hamas.  Israel has told us that.

10         THE COURT:  Okay.  I think I understand -- I think

11   we went through this before, but I don't want to cut you

12   off, so.

13         MR. BONNER:  So *Freeman* does away with many of

14   their conspiracy arguments.  The fact that Qatar Charity is

15   designated does away with many of their aiding and abetting

16   arguments.  I think -- the idea to me that they want to

17   characterize what they have done as routine banking, it

18   really is -- it cannot possibly be squared with the

19   complaint.

20         So let's take just, for example, Qatar National

21   Bank.  Qatar National Bank has on its customer list two

22   chairman of Hamas.  Several founders of the military wing of

23   Hamas.  A woman who is on the FBI's most wanted list --

24         THE COURT:  But, again, is that alleged in your

25   complaint?

*Proceedings*                                                        76

1              MR. BONNER:  Absolutely, Your Honor.  All of that

2    is in the Complaint.

3              THE COURT:  Okay.

4              MR. BONNER:  A woman who is on the FBI's most

5    wanted list, responsible for the most notorious terrorist

6    attacks in the history of Israel, the Sbarro Pizza bombing

7    in Jerusalem.  They have on there, their list of clients,

8    the head of the Union of Good, a U.S.-designated terrorist

9    organization that exists to raise funds for Hamas.  They

10   are -- another proud customer of theirs.  And in addition,

11   they exalted that gentleman, Mr. Al-Qaradawi, by putting him

12   on the Shariah Supervisory Board at the bank.

13             Now, you cannot possibly square this list of

14   clients -- and whoever is doing the marketing to terrorists

15   at QNB, they're doing a great job, because they got all of

16   them.  You can't say that those are routine banking

17   transactions.  With respect to Mr. Kaplan's client, they

18   were sending millions and millions of dollars, we allege

19   $28 million over a three-month period, into the Palestinian

20   territories, where Qatar Charity was a banned entity because

21   of its support of Hamas and its membership in the Union of

22   Good.  It is not -- it is not, under international

23   standards, a routine banking transaction to send millions of

24   dollars to a banned entity in an area of the world where

25   there is extreme violence occurring --

1          THE COURT:  But I think we're only talking about
2     the banking -- I might be wrong, but only the transactions
3     that occurred in this case, right?
4          MR. BONNER:  Your Honor, the numbers we were
5     focused on earlier are related to dollar transfers.
6          THE COURT:  Right.
7          MR. BONNER:  That relates to jurisdiction, the
8     dollar transfers.
9          THE COURT:  Right.
10          MR. BONNER:  But the conspiracy and the aiding and
11     abetting goes well beyond dollar transactions, and so there
12     is a much, much, much larger amount of money that has been
13     provided to Qatar Charity than the smaller amount that we
14     are talking about in terms of whether that is a sufficient
15     hook for jurisdiction.
16          THE COURT:  I see, okay.
17          MR. BONNER:  Now, with respect to Qatar National
18     Bank, the idea that there's nothing but conclusory
19     allegations, we do have allegations in the Complaint that
20     these terrorists, senior members of Hamas, in addition to
21     founders of the military wing of Hamas, did provide money to
22     Hamas.  It would probably be surprising that when you
23     provide money to leaders of Hamas and the head of the
24     military wing, that that money would be passed on to Hamas,
25     itself.

*Proceedings*                                              78

1          But I say again, if they want to say there is no
2    jurisdiction because we can't say that that money was passed
3    on to Hamas, let's see the bank accounts.  Let's see the
4    bank records with respect to these leaders of Hamas, and
5    we'll know for sure whether this money was passed on to
6    Hamas to promote terrorism.
7          Okay.  Very briefly, Your Honor, because I think
8    what Your Honor has said is true.  These facts, they're
9    overlapping with respect to many of the elements of aiding
10   and abetting and with respect to the conspiracy.  So I just
11   want to talk very briefly about the *Kaplan* case, which is
12   from the Second Circuit.  Talk about some of the facts that
13   the Court there thought were sufficient to play aiding and
14   abetting, and I am going to compare it to some of the facts
15   that we have in our case, if the Court will indulge me for
16   just a few minutes.
17         In *Kaplan*, there are some public reports that the
18   Defendants were tied to Hezbollah.  In addition to that, the
19   Court highlighted four, what are called, circumstantial
20   facts that, but also added to the inference that the
21   Defendant was generally aware of the participation of its
22   customers or the connection of its customers with Hezbollah.
23         The charity was located in Lebanon where the bank
24   was headquartered.  The bank was headquartered there as
25   well.  There are know your customer regulations at the

1    banks, had to adhere to, so they should have known what kind

2    of transactions their customers were engaging in and the

3    customers had been long-term customers of a Lebanese bank,

4    Canadian bank, in that circumstance.

5            So here, Your Honor, again, the Court in *Kaplan*

6    said certain public information that there were no

7    allegations that the Defendant was aware of, in addition,

8    these four circumstantial facts.

9            So here we have all the facts that are alleged in

10   *Kaplan*.  We have Qatar Charity as one of the most prominent

11   charities in Qatar.  It's headed up by the Qatari government

12   and by members of its royal family.  Everybody knows who

13   Qatar Charity is.  The banks and Qatar Charity, unusually,

14   different than what happened in *Kaplan*, they are controlled

15   by the same entities.  So the people who are sending money

16   to Qatar Charity, Masraf Al Rayan, and QNB, they also are

17   controlled by the Qatari royal family.  In addition, we've

18   alleged these are long-term clients of the banks, going back

19   to 2006 in some circumstances, there is no denial of that.

20   And the very same know your customer regulations that were

21   applicable in *Kaplan* also apply to these Defendants, to

22   these very, very unusual transactions, including QNB opening

23   up accounts for 20 Hamas terrorists in one day and putting

24   them all in one P.O. Box as a home address.  This is -- this

25   is not, in any real world, a normal business transaction.

1          So here are the facts that we allege, Your Honor,

2     that would provide the Defendants with general awareness.

3     The controlling shareholders have been supporting Hamas for

4     a decade.  Billions of dollars.  They are the biggest

5     supports of Hamas.  Their customer is a designated terrorist

6     organization.  We don't have that in *Kaplan*.  We don't have

7     that in *Honickman*.  We don't have that in any of these cases

8     that the Defendants have been talking about.  They are a

9     member of the Union of Good which exists exclusively to

10    raise money for Hamas.  We don't have that in any of the

11    cases that the Defendants have spoken about.

12         Israel issued this extraordinary, extraordinary

13    warning to all financial institutions at the time it

14    designated Qatar Charity.  They put all of these

15    institutions on notice that if you are going to support

16    Qatar Charity, that you are supporting Hamas terrorism.  We

17    have annual reports, funds being sent to Hamas fronts.  We

18    have the U.S. in 2008, something that Mr. Kaplan spoke

19    about, identifying Qatar Charity as a priority three

20    terrorism support entity.

21         Now, that's not public, Your Honor.  We concede

22    that.  But these folks have these know your customer and

23    other banking regulatory requirements, they need to know

24    where their customer's transactions are going.  And the

25    reason why the U.S., of course, designated Qatar Charity as

1    a priority three terrorism support entity is because they

2    knew what they were providing financial support for.  These

3    folks knew the same thing, because they have all the bank

4    records.

5           We have this Sanibel card scheme, Your Honor, that

6    we have alleged in our complaint, very similar to the facts

7    that Mr. Kaplan referred to in the *Miller* case in Arab Bank,

8    which is a case we are all familiar with.  We have other

9    banks in the Palestinian territories refusing to bank with

10   Qatar Bank -- or -- Qatar Charity, sorry, Your Honor, for

11   the very same reasons that we say it's a supporter of Hamas.

12   We have U.S. Congress condemnation of Qatar's behavior with

13   respect to giving money to Hamas.  We have the U.S.

14   treasury, talking about Qatar being a particularly

15   permissive jurisdiction for terrorist financing.

16          THE COURT:  When did that happen?

17          MR. BONNER:  That was 3/14, March of 2014.  We

18   have in June of 2019 -- now, this is after the attacks, Your

19   Honor, but it does lend further credence to the fact that

20   these folks who have absolute access to all of Qatar

21   Charity's banking records, we have all of their neighbors in

22   the Middle East:  Saudi Arabia, Bahrain, Egypt, United Arab

23   Emirates, all of them designating Qatar Charity as a

24   supporter of terrorism.  And we have the apathy that they

25   all showed with respect to this tie to terrorism because

1    after Qatar Charity was, again, kicked out of Israel and the

2    Palestinian territories in 2015, they all continued to bank

3    for it.  They don't care that it's supporting terrorism.

4    They're all continuing to bank for them to this day is the

5    allegation in the Complaint.

6            And then lastly, we have these remarkable,

7    remarkable facts concerning QNB.  They are the go-to bank

8    for Hamas members, murders, senior people, most wanted

9    people.  There are no allegations like that in any other

10   case that has been mentioned today or in any of the

11   briefings.  They have held accounts for Hamas leaders while

12   they were serving as Hamas leaders.  No allegations like

13   that in any other case.  And we also have this extraordinary

14   treatment of Mr. Al-Qaradawi, the head of the Union of Good,

15   an avowed supporter of Hamas and its terrorism.  A person

16   who said that American soldiers should be killed.  Who

17   called for suicide bombings.  A proud account holder at

18   Qatar National Bank.  And they put him on their Shariah

19   Supervisory Board.

20           So we can -- all of those facts, Your Honor, all

21   they have to do is to raise a plausible inference giving all

22   the benefits to the Plaintiffs and considering what Congress

23   has said in JASTA, where they are intending the statute to

24   be as broadly interpreted as possible, all we need is an

25   inference plausible at this point without any discovery that

1    they were generally aware of the tie of their customer to

2    Hamas and its terrorism.  And I would say, Your Honor, that

3    if we were to stand up before a jury today, and we were to

4    outline those facts that I just described for you, we all

5    know what the result of that case would be.  They would find

6    that these people are supporters of Hamas and its terrorism.

7    And at the pleading stage, we certainly don't need to do any

8    more than what we have alleged in this complaint.

9           And again, I don't want to occupy too much of the

10   Court's time and I thank you very much for a very lengthy

11   argument.  And I'm sorry if I have burdened you, all of you,

12   with the briefs.

13          THE COURT:  It's my job.  It's not a burden.  I do

14   want to apologize to the court reporter, because I did not

15   alert her that we would be going quite this long, but it's

16   completely fine.  It's a very interesting case.  And I do

17   want to thank the parties for the care with which they have

18   made their submissions and with all of the excellent

19   arguments today.

20          And so if you are going to file a letter, if you

21   can file a letter by the 23rd.  I know people like to file

22   as late as possible, so they can try to respond.  Don't do

23   that because it just makes me nervous when I get home and I

24   look at something and I see that I have got a midnight

25   submission.  So if you can do it by close of business, it

1    would make me less anxious.  All right?

2           So I was just about to ask if anybody wanted to

3    say anything else, but I think -- I think we've had a lot of

4    talking today.  So if there is anything you want to address

5    in that letter, that's fine, okay?

6           MR. BONNER:  Thank you so much, Your Honor.

7           MR. KAPLAN:  Thank you, Your Honor.

8           (Matter concluded.)

9

10                    *      *      *      *      *

11

12   I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.
13

14   /s/ Jamie A. Stanton              March 16, 2023

15   _____          _____
        JAMIE A. STANTON                 DATE

16

17

18

19

20

21

22

23

24

25