# FLEISCHMAN BONNER & ROCCO LLP
## ATTORNEYS AT LAW

81 Main Street • Suite 515 • White Plains • New York • 10601
Tel: 908-516-2066 • Fax: 908-516-2049 • Web: WWW.FBRLLP.COM

Email: procco@fbrllp.com

August 7, 2023

**Via ECF**

The Honorable Vera M. Scanlon
United States Magistrate Judge
U.S. District Court, Eastern District of New York
Brooklyn, New York  11201

**Re:** *Henkin, et al. v. Qatar Charity, et al.*, **21-cv-05716-AMD-VMS**

Dear Judge Scanlon:

      This letter is submitted by Plaintiffs pursuant to this Court's July 27, 2023 minute order directing the parties to submit a joint letter identifying all unresolved jurisdictional discovery disputes.  The parties have met and conferred in accordance with the order, but have been unable to prepare a joint letter by the Court's 5:00 p.m. deadline.  This letter sets forth Plaintiffs' position only.

      Plaintiffs seek leave to serve a narrowly-tailored document subpoena on MAR's former correspondent bank, HSBC, in order to confirm the completeness and accuracy of Defendants' discovery responses.  The Court is familiar with the history of Defendants' efforts to thwart discovery in this action, including by arguing that discovery should be limited to MAR's alleged account at BONY Mellon, without disclosing—even to this Court—that MAR had no such account.  *See, e.g.*, Transcript of May 16, 2023 Hearing ("May Tr.") at pp.6-14.  Now, in their Court-ordered discovery responses, Defendants state that, during the Relevant Time Period,[1] MAR executed no transfers of QC funds to the Palestinian Territories using MAR's disclosed correspondent accounts—at HSBC and Citibank. So, rather than disclosing this highly relevant information in their initial May 15, 2023 discovery responses, Defendants instead chose to assert, and then litigate, multiple moot objections.  Indeed, MAR's counsel even convinced this Court to allow Defendants a second opportunity to brief their objections to producing records they now state do not exist.  *See* May Tr. at pp.9-10, 13-15.

      Plaintiffs have submitted compelling, admissible evidence that MAR did in fact transfer QC's funds through New York to the Palestinian Territories.  The July 26, 2017 amended indictment, guilty plea, conviction, and sentencing of QC employee Fadi Manasra (the "Manasra Confession")—which was submitted to Judge Donnelly (ECF 79-1) and is attached as **Exhibit 1** to this letter—fully supports Plaintiffs' jurisdictional allegations.[2]  As part of his confession to membership in an unlawful association—*i.e.*, QC (identified in the Manasra Confession as "Jam´qatar al-Khairiya")—Mr. Manasra, who was QC's accountant in Ramallah (*see* Ex. 1 at p.11

---

[1] The Relevant Time Period for Plaintiffs discovery requests as approved by this Court is October 1, 2012 to September 16, 2018.  *See* ECF 106.

[2] The Manasra Confession is admissible pursuant to Fed. R. Evid. 803(8) and (22).

¶ 2), described the flow of QC's funds from Doha to Ramallah during the period from March 2010 to September 2015 as follows:

> The funds were transferred from [QC in Doha] to the [Masraf] Al-Rayan Bank in Doha. From there . . . funds in dollars were transferred to a bank in New York. Afterwards, all the funds were transferred to the Bank of Palestine or to the Islamic Bank in Ramallah and were deposited in the bank account of [QC] in Ramallah. . . . All the funds were transferred . . . under the supervision of [Mr. Manasra].

Ex. 1 at p.11 ¶¶ 5-6. *See also id*. ¶ 2.

Judge Donnelly relied upon the Manasra Confession in concluding that jurisdiction discovery was appropriate. *See* ECF 81 at pp.4-5, 6, 14, 19, 27 (citing and quoting Manasra Confession). As QC's accountant in Ramallah during the core of the Relevant Time Period, Mr. Manasra knew how QC was transmitting its funds to Ramallah. Furthermore, given the facts that: (1) Mr. Manasra was confessing to a crime for which he had agreed to be sentenced to almost two years of imprisonment and a fine equivalent to $275,000, and (2) Israeli prosecutors no doubt possessed documentary evidence of the flow of money to QC in the Palestinian Territories, Mr. Manasra's statements are highly credible.

The Manasra Confession provides ample justification for this Court to permit Plaintiffs to confirm Defendants' discovery responses by serving a narrowly-tailored document subpoena on HSBC in New York. MAR has produced no account opening documents or account agreements for the correspondent account it maintained at HSBC from 2011-2015—contemporaneously with Mr. Manasra's employment as QC's Ramallah accountant. For its part, QC has produced no account opening documents or account agreements for any of the 13 accounts it maintains at MAR—even though all of those accounts remain open and in use today, and one was opened within the past seven years. Counsel state that those unproduced records no longer exist, but are adamant that their clients have retained all records reflecting funds transferred through New York during the Relevant Time Period. In light of Defendants' failure to retain significant banking records, it is not unreasonable to conclude that they may have discarded, lost, or failed to locate records of the small number of transfers that would suffice to subject them to personal jurisdiction in New York. *See, e.g., Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 164, 165-66 (2d Cir. 2013) (specific personal jurisdiction based on foreign bank's use of N.Y. correspondent account to execute "dozens" of transfers totaling "millions of dollars"); *Banco Ambrosiano, S.p.A. v. Artoc Bank & Trust, Ltd.*, 62 N.Y.2d 65, 69, 72-73 (1974) (specific personal jurisdiction based on foreign bank's use of New York correspondent account to execute three transfers related to plaintiff's claim, plus regular use of the account for unrelated banking business).

Plaintiffs should be permitted to determine whether HSBC has any records of the transfers to which QC's accountant confessed. U.S. correspondent banks routinely maintain "transaction logs and swift messages" that identify the originator and beneficiary of every funds transfer they process. *In re Ulmans*, 2023 WL 3853703, at *2, *6 (S.D.N.Y. April 20, 2023). Those records "are computerized and thus searchable, and can be retrieved via the use of narrow search terms." *Id*. at *6 (authorizing service of subpoenas on multiple correspondent banks seeking records of all transfers to a particular individual). Such records are routinely produced in response to subpoenas. *See, e.g., In re Public Joint-Stock Co. Bank Otkritie Fin. Corp.*, 2023 WL 4928227, at *4 (S.D.N.Y. Aug. 2, 2023) (authorizing service of subpoena seeking all transfers to or from a

particular entity over a six-and-a-half-year period: "the sought materials are routinely produced by banks to satisfy discovery requests"); *In re Rodriguez Guillen*, 2020 WL 3497002, at *3 (S.D.N.Y., June 29, 2020) ("Bank of America should be able to search for and produce the records of wire transfers without significant burden.").

      The service of a narrowly tailored subpoena on a single bank is proportional to the needs of this case, particularly in light of "the importance of the issues at stake in the action"—the financing of Hamas terrorist attacks in which U.S. citizens were killed and injured—and "the importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(1). As this Court noted in admonishing Defendants for "play[ing] 'gotcha'" in their initial discovery responses, the transfers of QC's funds through New York are "the whole theory of the case." May Tr. at pp. 6, 9. *See also id*. at 10 ("[T]he whole complaint is about this theory that the money flowed from Qatar, [to] New York, [and] back out where it shouldn't have gone."). Judge Donnelly recognized that "[P]laintiffs have plausibly pleaded that they might reasonably be able to identify [key supporting] facts if given the opportunity to develop the record." ECF 81 at p. 26. Notwithstanding Defendants' discovery responses, Plaintiffs still might reasonably be able to identify the New York transfers through a subpoena directed to HSBC. Currently, it is impossible to reconcile Defendants' discovery responses and the criminal confession of QC's accountant in Ramallah.

      Finally, it is beyond cavil that Defendants have no standing to challenge the issuance of a subpoena to HSBC under Rule 45. *See, e.g., Tapjets Inc. v. United Payment Services, Inc.*, 2020 WL 13581674, at *10 (E.D.N.Y. Sept. 17, 2020) (*per* Scanlon, U.S.M.J.). Any privacy interests MAR or QC may claim in their financial records will be adequately protected by the parties' stipulated protective order submitted for Court approval on August 6, 2023.

      In the alternative, Plaintiffs request the Court to allow Plaintiffs to seek issuance of a Letter of Request pursuant to the Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters to obtain copies of documents reflecting transfers of QC's funds through New York contained in the files of the Israeli Ministry of Defense or the Israeli Military Courts related to the 2017 criminal convictions of Fadi Manasra and other QC employees. "[T]he most important factor for consideration" in evaluating such a request for foreign discovery is "the interests of the United States and the foreign state" where the information is located. *Bartlett v. Société Générale de Banque au Liban*, 2023 WL 2734641, at *10 (E.D.N.Y. Mar. 31, 2023) (citing *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 544 n.28 (1987)). Here, the relevant foreign state is Israel, which shares "the important U.S. and international interests in preventing the financial support of terrorist organizations." *Linde v. Arab Bank, PLC*, 706 F.3d 92, 115 (2d Cir. 2013).

                                                              Respectfully submitted,

                                                              /s/ Patrick L. Rocco

                                                              *Counsel for Plaintiffs*

Attachment: Exhibit 1