UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
-----------------------------X   Docket#
HENKIN, ET AL.,                :  21-cv-05716-AMD-VMS
                               :
                Plaintiff,     :
                               :
    - versus -                 :  U.S. Courthouse
                               :  Brooklyn, New York
QATAR CHARITY, ET AL.,         :  August 8, 2023
                Defendants     :  11:18 a.m.
-----------------------------X
```

TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE
BEFORE THE HONORABLE VERA M. SCANLON
UNITED STATES MAGISTRATE JUDGE

**A  P  P  E  A  R  A  N  C  E  S:**


**For the Plaintiff**:        **Patrick L. Rocco, Esq.**
                              Fleischman Bonner & Rocco LLP
                              81 Main Street, Suite 515
                              White Plains, NY 10601


**For Qatar Charity**:        **John M. Hillebrecht, Esq.**
                              **Patrick Dwyer, Esq.**
                              DLA Piper LLP US
                              1251 Avenue Of The Americas
                              New York, NY 10020

**For Masraf al Rayan**:      **Carolina A. Fornos, Esq.**
                              **Max Winograd, Esq.**
                              Pillsbury Winthrop Shaw Pittman
                              31 West 52nd Street
                              New York, NY 10019


**Transcription Service**:    **Transcriptions Plus II, Inc.**
                              61 Beatrice Avenue
                              West Islip, New York 11795
                              RL.Transcriptions2@gmail.com


Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

                        Proceedings

1           THE COURT:  So this case is *Henkin v. Qatar*
2    *Charity*.  It's 21-cv-5716.
3           Let's start with counsel's appearances.  So for
4    the plaintiff?
5           MR. ROCCO:  Good morning, your Honor.  Pat
6    Rocco; Fleischman Bonner & Rocco, for plaintiffs.
7           THE COURT:  Okay.  Any order you like.
8           MR. HILLEBRECHT:  Thank you, your Honor.  Your
9    Honor, for Qatar Charity, John Hillebrecht; DLA Piper,
10   LLP and with my associate Patrick Dwyer also from DLA.
11          THE COURT:  Okay.
12          MS. FORNOS:  Good morning, your Honor.
13   Carolina Fornos and Max Winograd of Pillsbury Winthrop on
14   behalf of Masraf al Rayan.
15          THE COURT:  Okay.  So we're having this
16   conference just to check in, talk about your discovery
17   issues.  And even though I know it's quixotic, I always
18   ask if you think there's any possibility of having
19   settlement discussions, but I'll leave that till the end.
20          All right.  So is there any reason we should
21   deal with this in a particular order other than how you
22   presented it?  Just start with that question, plaintiffs.
23   You can all stay seated.
24          MR. ROCCO:  I don't think, you know, the -- it
25   boils down to, your Honor, we're seeking to serve a non-

3

Proceedings

1   party subpoena on MAR's correspondent bank HSBC.  So if
2   you want me to tell you about that, I'm happy to do that.
3          THE COURT:  Okay.  I mean I guess I would like
4   to know your responses to the defendant's position being
5   substantive but a big part of it being sort of case
6   specific procedure.  Seems like Judge Donnelly was
7   contemplating a time-limited process and anything that
8   mentions the word Hague directly or indirectly or akin to
9   that is never going to take a short amount of time.  So
10  your convention request seems like it would be quite
11  challenging to get an answer unless you have information
12  that would be different.  And then, you know, working
13  your way down from that it all seems pretty time
14  consuming at least on the face of it.
15         MR. ROCCO:  Well, your Honor, I would draw a
16  distinction between the Hague Convention request, which I
17  can't tell your Honor would take a matter of days or
18  months.  I agree with you that that's a lengthy process.
19  But simply naming the bank right here in New York is
20  going to take no longer than the defendants the way this
21  case with their motion practice -- I mean we lost about
22  60 days on the allotted time because they asserted a
23  bunch of objections.  They ended up withdrawing and then
24  telling us they had no relevant documents.  So it won't
25  take I don't think more than 60 days to get a full

4

Proceedings

1  response from HSBC.

2          And the reason why we're seeking that, Judge,

3  and now they're telling us that this is a fishing

4  expedition, but we have the 2017 guilty plea of a Qatar

5  Charity accountant in the Palestinian territories that

6  confessed to an indictment for which there was evidence

7  in Israel that said that these funds went through New

8  York.  And so they've told us that's not the case.

9          And after much jousting, if you recall, they

10  ultimately disclosed that HSBC Bank was their

11  correspondent account and they told us in their document

12  request not only that they don't have any transactions

13  that pass money from Qatar Charity in Doha through New

14  York and the Palestinian territories, but they said they

15  no longer have the HSBC account opening records which

16  were from 2010.

17          So that begged the question, your Honor, and I

18  posed this question point blank to defense counsel.  I

19  said well you're telling us you don't have any

20  transactions but do you still have the HSBC account

21  statements?  And I didn't get an answer to that question

22  in our meet and confer, your Honor.  Instead, I got an

23  email back from an associate at the Pillsbury firm that

24  said counsel for MAR had traveled to Doha and reviewed

25  all transactions relating to QC for the relevant time

Proceedings

1   period that involved New York correspondent banking and

2   counsel reviewed all transactions relating to QC that

3   involved the HSBC account.

4          And so it's one thing to say that there's no

5   transactions but if there aren't complete records, your

6   Honor, then it's possible that that conclusion could be

7   erroneous.  So we're seeking permission primarily to

8   subpoena HSBC directly to see whether their records

9   confirm what Mr. Manasra said in his confession and what

10  the indictment said based on the evidence that the

11  Israeli prosecutors had gathered.

12         And then later defendant's failure to retain

13  some records, which we know they didn't, you know, the

14  account opening documents, it's not unreasonable to

15  conclude that they may have discarded, lost, or failed to

16  locate records of the small number of transfers that it

17  would take to satisfy personal jurisdiction under the

18  *Leachy* (phonetic) case, which we cited to your Honor.

19         So you know, our position is first of all, they

20  can enlighten the Court if they have these HSBC account

21  statements.  They have not told us that, but if they have

22  it that's one thing. But if they don't, then we ought to

23  get it from the horse's mouth.

24         And I know that their claim, your Honor, is

25  that Judge Donnelly said nothing about non-party

6

Proceedings

1    discovery but she did limit us to just documentary

2    discovery.  And all we would seek from HSBC are

3    documents.  And because we're not able to take a

4    deposition or a 30(b)(6) or anything, we have no idea how

5    they came up with the transactions they claim to have

6    reviewed.  We don't know what documents they reviewed to

7    come to that conclusion.

8            And begging your Honor's pardon, but there's

9    been a history here in this case where first they told

10   us, you know, they went down the road and suggested they

11   had a BONY account because we had alleged that and they

12   were telling us they didn't.  We served a subpoena.  We

13   had a bunch of motion practice.  Then they contradicted

14   all of our definitions in our discovery request to

15   suggest they were going to give us something narrower.

16   They litigated those issues.

17           And then on Friday night, last Friday, they

18   withdrew all their objections and said even using your

19   definitions, we don't have any transactions or documents

20   about New York correspondent banking.

21           So you know, and even the guilty plea, your

22   Honor, in their letter to your Honor, they point to the

23   fact that in 2015 Mr. Manasra, the QC employee, had given

24   contrary accounts to the police interrogators.  And that

25   was like two years before his plea.  And it's

7

Proceedings

1    significant, your Honor, that QC raised that in their

2    reply papers on the motion to dismiss before Judge

3    Donnelly in order to accuse us of misleading the Court in

4    the complaint.  They had access obviously to his defense

5    counsel's files, so they knew he had pled guilty and

6    retracted that statement, yet they did not submit that

7    statement to the Court.  They only submitted the police

8    interrogation statement from two years prior where he

9    made a statement suggesting that the money didn't go

10   through New York.

11          And I'm not the only former federal prosecutor

12   in this room today, Judge, but it's not at all unusual

13   for a criminal defendant in his first interview with

14   police to tell a story that he later retracts and pleads

15   guilty to when he's faced with the evidence gathered by

16   the prosecutor.  And here we have -- it's not just his

17   statement.  We have an indictment by the Israeli

18   prosecutors.  The indictment says the money went from

19   Doha through New York to the Palestinian territories.

20   And presumably they had documentation to support that.

21   And Mr. Manasra ultimately pled to that under oath and

22   confessed.  So that trumps his prior inconsistent

23   statements in police interrogations.

24          So I think the nature in which that was

25   presented originally just makes us all the more

8

                        Proceedings

1   suspicious about what the defendants are doing and what

2   they've looked at.  And all we're asking for, you know,

3   with the ability to subpoena HSBC is a confirmation like

4   that those records still exist at HSBC.  It's not a

5   burden on them.  They can press a few buttons, do a

6   search, and see if there's any Qatar Charity transactions

7   that passed through that account in the Palestinian

8   territories and it would dispel any of the suspicions or

9   the like that we have and because we don't have the

10  ability to take a deposition is our only way to confirm

11  that things are as they appear to be and whether Mr.

12  Manasra was just wrong and the Israeli prosecutors were

13  just wrong despite their access to bank records and the

14  like.  But I think that's the basis on which we claim to

15  do this.

16          THE COURT:  I'm looking at page 5 of the letter

17  on the docket at 113, MAR further underscores that Mr.

18  Manasra stated only that funds were transferred to a bank

19  in Germany, not New York.

20          MR. ROCCO:  That was his initial --

21          THE COURT:  That was the initial statement that

22  you're saying is --

23          MR. ROCCO:  His initial statement to

24  interrogators, your Honor.  First of all, not under oath.

25  It was an interrogation with police.  And that's the one

Proceedings

1    that he retracted by virtue of his confession two years

2    later in 2017.

3              THE COURT:  So the confession addressed that

4    issue?

5              MR. ROCCO:  Yes.

6              THE COURT:  Okay.

7              MR. ROCCO:  The confession, your Honor, which

8    is the Exhibit 1 to the letter, it addresses it at -- the

9    exhibit has the Hebrew version first and then the

10   translation in the back, your Honor.  It's at page 11 of

11   Exhibit A.  It has the actual -- paragraph 5 has the

12   statement that the funds were transferred from the Main

13   Jam'iya, which is QC, to the Al-Rayan Bank in Doha.  From

14   there, funds in euros were transferred to Deutsche Bank

15   in Germany and funds in dollars were transferred to a

16   bank in New York.  Afterwards, all the funds were

17   transferred to the Bank of Palestine.  And it goes on.

18             And then the next page of that -- I'm sorry,

19   not the next page.  Page 14 of that same exhibit, your

20   Honor, is the defendant's actual plea to those charges

21   where he says that he's read the entire indictment that's

22   attributed to him and the amended indictment and he

23   understands and confesses to it.

24             So you know, we have an indictment where the

25   prosecutors no doubt have documentation and evidence to

10

Proceedings

1   make this claim.  They make the claim that a person with

2   personal knowledge, the QC, Qatar Charity employee

3   acknowledges it, confesses to it as it happened.

4          So this is not a fishing expedition as they say

5   in their papers because they apparently no longer have

6   these HSBC account statements and we have an indictment

7   that says the money went to New York.  So we just want to

8   confirm with HSBC whether that's the case.

9          And in terms of their undue delay, your Honor,

10  I said, you know, this is not -- yes, there's an argument

11  for the Hague Convention.  That may take some time.  But

12  for the actual subpoena to HSBC, it shouldn't take any

13  longer than the delay caused by their motion practice.

14  And likewise, the fact that they claim some privacy or

15  personal privilege or right, in the protective order

16  here, your Honor, they haven't banked with HSBC by their

17  own admission in seven years.  So this is not sensitive

18  data anymore.  There's a protective order that will

19  protect it.  And if they're right and there aren't these

20  transactions, there aren't going to be any documents from

21  HSBC so that will moot that point as well, your Honor.

22          THE COURT:  All right.  Okay.  Which of the

23  defendants would like to go first?

24          MS. FORNOS:  Your Honor, if I may on behalf of

25  Masraf al Rayan?

11

Proceedings

1      THE COURT:  Yes.

2      MS. FORNOS:  Well, the first thing I want to

3  underscore is we have complied with discovery.  We have

4  produced the documents.  We have responded to

5  interrogatories.  We've verified those interrogatories.

6  The reason that we're here is because the plaintiffs want

7  to do an end run on the district court's order.  That

8  specifically considered the confession and specifically

9  limited jurisdictional discovery of a foreign entity

10  without presence in the United States to document

11  requests and interrogatories.

12      Your Honor, we have responded to those and we

13  want the record to be clear we traveled to Doha, we've

14  met with bank representatives, we looked at all of the

15  transaction records.  And this is important because when

16  we were last before the Court, we had not had the

17  opportunity to travel, to make sure that we understood

18  the records, we understood the transaction, and we have

19  reviewed those.  Those transaction records, there are

20  none that are responsive to this case.  Mr. Rocco --

21      THE COURT:  I'm confused.  Do you have records

22  and you reviewed them and you're saying nothing is

23  responsive?  Or you don't have all of the records

24  relating to the key account?

25      MS. FORNOS:  Your Honor, we have all

12

Proceedings

1    transaction records and we have reviewed them and there

2    are no responsive documents.  The distinction, and this

3    is important because that's all that is at issue, we do

4    not have account opening documents --

5              THE COURT:  Right.

6              MS. FORNOS:  -- with HSBC.  That's the only

7    thing we don't have.  Those would have come from a

8    different side of the bank.  They would have come from a

9    relationship manager opening an HSBC account.  Those are

10   different than actual records of transactions.

11             THE COURT:  And from your perspective, why are

12   they not relevant?

13             MS. FORNOS:  Your Honor, we're not saying that

14   the opening documents are not relevant.  They asked for

15   them.  But candidly, your Honor, they are not relevant.

16   The fact that an account was opened had nothing to do

17   with the jurisdiction.  We had disclosed a specific

18   account that was open, it exists.  It has been closed.

19   But what plaintiffs are complaining is they're trying to

20   use the 13-year-old opening account documents with the

21   correspondent bank as a means to expand the district

22   court's restriction limiting jurisdictional discovery to

23   document demands and interrogatories.

24             THE COURT:  Okay.  You've got to --

25             MS. FORNOS:  And that's what we oppose.

13

Proceedings

1    THE COURT:  I think put aside the limitation

2  because that can be revisited.  The question really is

3  where are the documents that the plaintiffs are entitled

4  to review, know about, et cetera.  And so you're saying

5  you have reviewed all of the transactional statements?

6  That's how I'm understanding this or not?

7    MS. FORNOS:  Your Honor, the traditional

8  statements -- no, it's a system.  It's a transactional

9  system.

10    THE COURT:  Okay.

11    MS. FORNOS:  We need not go back to every

12  single statement when the transactional system has a

13  record of all the transactions.  And that's what we have

14  reviewed and that's what we went and determined that

15  there were no responsive documents.  The reasonable --

16    THE COURT:  So I'm trying to walk the line

17  between asking you about your attorney-client work

18  product and your process and understanding what it is

19  that you did such that we shouldn't have plaintiffs go to

20  the bank itself and get the documents since you may or

21  may not have them all.

22    So what is it that your client, exactly what is

23  it your client has that you were able to review?

24    MS. FORNOS:  Understood, your Honor.  We

25  reviewed all transaction records to specifically

14

Proceedings

1  determine whether there were any transactions that went

2  to the Palestinian territories passing through a New York

3  correspondent bank during the relevant time period

4  regarding the requests that were specifically made by

5  plaintiffs in any currency.  There were none.  And we

6  have no responsive documents.  We are confident that we

7  have reviewed the records to ensure that we can

8  appropriately respond to their requests.

9         What the defendants -- I mean excuse me, what

10  the plaintiffs are focusing in on and the distinction

11  that they're drawing is you didn't physically go and

12  review every single paper.  Well, your Honor, discovery

13  requires a reasonable diligence, a reasonable search.  We

14  did.  We reviewed the actual system records that would

15  have maintained every transaction in their database and

16  that's what we have done and we are confident that there

17  are no responsive documents that exist.

18         THE COURT:  Can you tell me more about this

19  database?  What is it?  It was the statements are

20  uploaded, there were like electronic communications of

21  the statements and that's what's being maintained?  They

22  converted it to something more sophisticated than an

23  Excel spreadsheet but essentially that?  I mean what is

24  it that you're looking at?  How do we know that the

25  information that you have is the same as what will be

15

Proceedings

1  coming from the bank and that this is a repetitive

2  exercise that shouldn't be allowed and that you have

3  thoroughly examined what's available?

4          MS. FORNOS:  Understood, your Honor.  Your

5  Honor, the bank has its records.  It maintains every

6  transaction.  There is no reason to believe that their

7  records are deficient.  And it is a system.  I apologize,

8  I don't have the exact name and can certainly get it if

9  necessary, but it's a banking system which all banks

10  have.  They're able to look into their database and query

11  and determine whether or not there are transactions.  And

12  that's what we have reviewed.  We have, in addition to

13  not just reviewing that, we met with bank

14  representatives.  And this is important, your Honor.  We

15  traveled to Doha to make sure that we understood whether

16  or not there were responsive documents, and there are no

17  responsive documents to what they're seeking.

18          THE COURT:  Okay.  So you did this with search

19  terms?  I mean that's the other piece of this.  When you

20  say this kind of transaction didn't happen, what are you

21  looking for?  The PLO?  You know, that's not exactly what

22  they're going to put in the bank records.  So what are

23  you doing in terms of the search?

24          MS. FORNOS:  Sure, your Honor.  And we're

25  looking for all of Qatar Charity transactions.  That is

16

Proceedings

1   the easiest way to ensure that you have the universe.  So

2   we looked at all of those transactions.

3           THE COURT:  And your conclusion is what?

4           MS. FORNOS:  There are no responsive documents

5   to plaintiff's demands other than the account opening

6   documents --

7           THE COURT:  All right.

8           MS. FORNOS:  -- just to be clear, that we've

9   already produced with respect to the accounts.  We

10  identified our accounts that we had knowledge of.  We

11  identified the account opening documents.  Those were

12  produced to plaintiff's attorney.

13          THE COURT:  And what's the scope of the

14  records?  I mean just to get a sense of -- well, the

15  scope of what the record keeping is like? Are there tens

16  of thousands of transactions?  Is it an account with

17  limited activity?  Accounts with limited activity?  What

18  are you looking at?

19          MS. FORNOS:  Your Honor, we are looking at

20  Qatar Charity transactions that are responsive to the

21  requests that have been made.  I think going anything

22  further is getting into attorney-client privilege

23  information.

24          And what we have done is we have reviewed their

25  requests, we have reviewed their transactions, we have

17

Proceedings

1  reviewed Qatar Charity transactions which is what it
2  called for, and we determined that there are no
3  transactions at issue that they're seeking.  They
4  continue to focus -- the only reason that we're here is
5  because they continue to focus on this confession.  A
6  confession that your Honor, as we pointed out in our
7  papers, it's an excerpt.  I don't have the full context.
8  I don't know what language it was originally translated
9  from.  And if the Court will recall, we started this
10 entire process with BONY, Bank of New York Mellon, not
11 because we picked it, plaintiffs picked it.
12         THE COURT:  Well, you didn't voluntarily tell
13 them oops, you got it wrong and spend a lot of time
14 wasting energy.  So when you talk about the confession,
15 are you talking about the plea or something different?
16         MS. FORNOS:  Your Honor --
17         THE COURT:  The confession that was discussed
18 in the papers.
19         MS. FORNOS:  The confession is what plaintiffs
20 have appeared to have alleged in their papers which Judge
21 Donnelly already considered.
22         THE COURT:  Okay, but what about what the
23 plaintiff is pointing at, plaintiffs are pointing at
24 right now, this document -- I don't have the ECF
25 numbering, so on the lower left-hand corner it's marked

18

Proceedings

1    as 13 and it was originally page 1.  And paragraph 5 on

2    that first page, which if you read it, it says amended

3    indictment, aforesaid defendants hereby indicted for

4    committing the following offenses.  First count, five is

5    the paragraph that the plaintiff's attorney was reading.

6    Right?

7              MS. FORNOS:  Yes, your Honor.  And our

8    understanding is that that is the same reference, it's

9    the same documents that were contained in the

10   allegations.  But Mr. Rocco can clarify if I'm wrong.

11   But these are the same confessions that were alleged in

12   the complaint and which Judge Donnelly considered.  I

13   don't have much more information than that, your Honor.

14   Candidly, I don't have the file.  I don't have the

15   records.  I don't know the context of this document.  I

16   have no idea where it ended up.  I don't have any record

17   with respect to this.

18             THE COURT:  I guess I'm just -- I'm not

19   following what your objection is in terms of the content

20   of this document not being pretty relevant to the

21   plaintiffs being allowed to thoroughly examine what was

22   going on with the transfer of funds.  Because if you look

23   at page 13, you have paragraph 5.  And then if you skip

24   through, you go to -- it doesn't have a number on it.

25   The heading of it is Israel Defense Forces, Emblem

19

Proceedings

1    Advocate General, Judea Military Court.  And you go below

2    the heading hearing, I'm reading select parts of it, "We

3    have reached a plea bargain under which the indictment

4    will be amended.  Defendant will confess to the amended

5    indictment.  The parties will argue on an agreed penalty.

6    I confirm."  And the defendant says, "The Court has read

7    to me what is attributed to me in the amended indictment.

8    I understand it and confess it."  And then he's

9    convicted.

10           MS. FORNOS:  Your Honor, this is not a bank

11   employee.  I do not have any knowledge on this particular

12   indictment and criminal proceeding plea negotiations.  I

13   can't even comment on how it happens in Israel.

14           Accordingly, your Honor, I understand that this

15   is what they're putting before this Court but they also

16   put this before Judge Donnelly and Judge Donnelly was

17   very clear in her instruction in limiting discovery to

18   ensure that there wasn't a fishing expedition.  And we

19   therefore object to plaintiff's request.

20           THE COURT:  Let me just go back to the

21   plaintiff so that I can thoroughly understand it.

22           MR. ROCCO:  Well, two --

23           THE COURT:  There was the confession and the

24   plea.

25           MR. ROCCO:  Two things, your Honor.

20

Proceedings

1      THE COURT:  Just so I'm super clear, two
2  different things, yes?
3      MR. ROCCO:  Yeah, and they go together
4  obviously.  And let's be clear, your Honor, this
5  pretending that they don't know if it's accurately
6  translated and we can't possibly understand this, QC,
7  those guys have the file.  They submitted their versions
8  of the earlier interrogatories.  They know these
9  documents are actual.  No one's disputing that this
10  happened.  They've had months to translate it differently
11  if they thought it didn't say what it says it says.  So
12  they've had these documents, QC, Qatar Charity, they have
13  the file because they were able to present it to the
14  Court misleadingly, so the 2015 statements to
15  interrogators that were later retracted.  And they used
16  those as a basis to accuse us of misleading the Court.
17  They've gotten the defense --
18      THE COURT:  I'm not Judge Donnelly and we're
19  not rearguing that.
20      MR. ROCCO:  I know.  They've got the defense
21  file.  So this says what it says, your Honor.  And you
22  know, what we heard from Ms. Fornos --
23      THE COURT:  I'm sorry if it's pedantic, but
24  you're saying two different kinds of documents, yes?
25      MR. ROCCO:  Well, there's an indictment which

                    Proceedings

1   obviously has to be the imprimatur of the prosecutor --

2            THE COURT:  Yes.

3            MR. ROCCO:  -- and the evidence that backs that

4   up.  And then there's the admission to the indictment

5   which is the confession and the hearing that your Honor

6   just read from.

7            THE COURT:  Okay.  All right.

8            MR. ROCCO:  Yes, correct.

9            MR. HILLEBRECHT:  Your Honor, may I be heard?

10           THE COURT:  No.  I want to understand

11  plaintiff's position.  Go ahead.

12           MR. ROCCO:  And so I think what we've heard,

13  your Honor, which is helpful now because I couldn't get

14  this answer in meet and confers, is they don't have the

15  HSBC, or at least they didn't consult the HSBC account

16  statements.  They have something other than that.  And

17  it's in Qatar.  And we have no idea what the retention

18  policies are in Qatar.  We have no discovery of that.  We

19  don't know whether they retained transactions for five

20  years, ten years, 20 years, whether the database that

21  she's talking about, how it was prepared or the like.

22           So this is just confirmatory discovery.

23  They've acknowledged they don't have the HSBC account

24  statements.  We want to get those statements and to see

25  if what Mr. Manasra said is right and money passed

22

Proceedings

1  through New York.  And there is no burden on them for

2  that.  It's a small burden on the bank because it's going

3  to be, you know, pushing buttons, your Honor, to do

4  searches for QC.  And they're either going to have the

5  SWIFT messages and the like, which are the back and forth

6  that they use to identify transactions or they won't.

7  And if they don't have any, then this is not a burden at

8  all.  They're going to tell us, you know, we did a quick

9  search, there's not Qatar Charity stuff.

10          But we can get that subpoena out tomorrow, your

11  Honor, and we'll get a response within, you know, a month

12  or two, not years.  And we would respectfully request

13  that your Honor just extend the discovery period long

14  enough for us to do that.

15          THE COURT:  All right.  Let me just go to MAR.

16  Anything else you want to say about what this database is

17  that you looked at basically responding to the

18  plaintiff's position?

19          MS. FORNOS:  Certainly.  Your Honor, it's your

20  standard banking transaction database.

21          THE COURT:  Okay.  I'm not an expert, so what

22  does that mean?  Sorry.

23          MS. FORNOS:  It means that all records of

24  transactions are digitally maintained.  The law is you

25  want to make reasonable efforts to ensure that you cover

23

Proceedings

1   all of the transactions.  And here, we have no reason to

2   think that we're missing transactions.  We have reviewed

3   them.  We are confident that there are no responsive

4   documents to plaintiff's demands.

5           I think at this point, your Honor, the

6   plaintiffs are just continuing to try to expand the scope

7   of discovery over and over again and that's what has been

8   their M.O. from the beginning.

9           THE COURT:  All right.  Why is it burdensome

10  though?  I mean you're not really responding.  It would

11  be the former correspondent bank that would be

12  responding.

13          MS. FORNOS:  Your Honor --

14          THE COURT:  If it confirms your database, it

15  confirms your database.  You know, I'm putting aside the

16  question of how this fits with what Judge Donnelly did

17  and whether it requires a modification from the judge or

18  whatever.  Just let's talk about the substance of the

19  process.  What's the problem with doing what the

20  plaintiffs want?

21          MS. FORNOS:  Your Honor, the problem is that

22  we're not in Rule 26.  We're in jurisdictional discovery.

23  That's really the problem.  And anything that goes beyond

24  what the district court has ordered is arguably a burden.

25          THE COURT:  Okay.  How many times am I going to

24

Proceedings

 1    tell you put aside that question?  I will deal with what
 2    the issue is with Judge Donnelly's order and what should
 3    happen here.  But I want to understand so that I can
 4    understand and Judge Donnelly can understand what are the
 5    challenges that are involved here?  How burdensome is it?
 6    Why is it something that shouldn't happen on the merits
 7    of giving the plaintiffs a fair shot at understanding is
 8    there not a connection with New York?  I mean --
 9              MS. FORNOS:  Your Honor, I can't answer for
10    Hong Kong Shanghai Bank as to what is burdensome for
11    them.
12              THE COURT:  Exactly.
13              MS. FORNOS:  But I do know that it is a non-
14    party that is being burdened by a request when we have
15    already responded to it.
16              THE COURT:  All right.  Well, they can come in
17    and complain if they have a problem with it.
18              All right.  Let's see, how about for you?
19              MR. HILLEBRECHT:  Yeah, your Honor, just to
20    respond to a couple of things that have been said.  In
21    terms of a fair shot, certainly our position is they've
22    had a fair shot.  The bank has represented they've done a
23    diligent search and there simply are no U.S. dollar
24    denominated transactions or transactions in any other
25    denomination that pass through any of MAR's New York

Proceedings

1    correspondent accounts and went to the Palestinian

2    territories.

3           My client, Qatar Charity, has done a similar

4    thorough search.  It doesn't have the same kinds of

5    record systems that the bank does.  But we see nothing,

6    we have nothing responsive indicating that those kinds of

7    transactions went through New York and ended up in the

8    Palestinian territories.  So I think they have had a fair

9    shot.

10          In terms of this confession, again, and I won't

11   belabor the point, it had been considered by Judge

12   Donnelly.  The allegation that we have the file and we

13   have some kind of great insight into what happened to the

14   Israeli military court is simply false.  We had some

15   additional documents.  Everything that we have at DLA

16   Piper in connection with Qatar Charity was before Judge

17   Donnelly and before your Honor.  We quote what we have in

18   the letter filed yesterday, and it's a bit of a muddle.

19   There are two statements from 2015, one of them elicited

20   by the prosecutors, which make no mention of New York,

21   and quite to the contrary say explicitly the money went

22   through Germany and was in euros.

23          I acknowledge what plaintiff has focused on

24   that in the guilty plea later that detail has changed.  I

25   question, you know, he alluded to everybody here is a

26

Proceedings

1   former federal prosecutor.  I've never known a situation

2   where somebody changes his story about which bank was

3   used for the money transfer which seems to be completely

4   irrelevant.  So I think it's a very thin read, as we said

5   in the letter, for them to hang their hat on.  And also,

6   you know, Judge Donnelly considered it.

7          Also, there's been a continual suggestion that

8   the defendants have been engaged in some kind of

9   gamesmanship.  That's not the case.  We've consistently

10  said from the beginning that we question whether there

11  were any funds transferred relevant here to the

12  correspondent banks at all, period.  And Judge Donnelly

13  quotes that from us or at least ascribes that to us on

14  page 27 of her decision.

15          So the idea that we knew all along that there

16  was no BONY transfers is just false.  The idea that we

17  knew that going through the time and expense, and in the

18  bank's case counsel traveling all the way to Doha to be

19  sure that our answers and responses to the amended

20  discovery demands were accurate and complete and then

21  discovered there is no there there is not gamesmanship.

22  I believe Mr. Kaplan said explicitly to your Honor when

23  we were last here that as an officer of the Court he

24  couldn't make that representation at that time though he

25  expected it to be the case.  Well, now we've gone through

27

Proceedings

1    the time, the trouble, the expense, and we determined it

2    is the case.  There are no such transactions.

3            So we think they've had a fair shot.  We

4    think -- I was about to mention Judge Donnelly's order

5    but I won't.

6            THE COURT:  I got it.  I have it.

7            MR. HILLEBRECHT:  I think we should be done

8    here.  I think that what we should be talking about is

9    moving towards additional dispositive motions as

10   somebody's order contemplated, your Honor.

11           THE COURT:  All right.  Back to MAR.  So the

12   focus of the discovery that was permitted was documentary

13   but you're relying on work that was done with regard to

14   reviewing this computer system.  Would you be willing,

15   I'm not saying that this is what I want, but to put in --

16   is there somebody who could put in an affidavit about

17   what that system is, what the record keeping is, that it

18   has all of the information from the statements from the

19   correspondent bank with whatever else is relevant?

20           MS. FORNOS:  Yes, your Honor.

21           THE COURT:  All right.  Is there anything else

22   anyone wants to say about this particular issue?

23           MR. ROCCO:  No, your Honor.  The only

24   housekeeping matter is if your Honor needs to make a

25   decision, which we appreciate, our time expires today I

28

Proceedings

1   believe for the discovery period so that would have to be

2   extended so we could deal with this issue.  And as I say,

3   we're prepared to, if your Honor gives us permission, to

4   serve a subpoena tomorrow.

5          THE COURT:  If you were to get a declaration or

6   affidavit from a person with knowledge with regard to the

7   record keeping that was discussed by counsel from the

8   Doha trip, would that deal with your concerns or --

9          MR. ROCCO:  Your Honor, I think we'd need a

10  30(b)(6) where we actually get to probe what they say

11  because we're just going to get the operation of

12  something, you know, albeit under oath, but it's not

13  going to answer the questions.  And we know that they --

14         THE COURT:  I mean how could you possibly know

15  that?  You just heard here what the counsel did.

16         MR. ROCCO:  Correct.  But we know they don't

17  have the HSB account statements, your Honor, so that's

18  why we want to get them.

19         THE COURT:  But why do -- if what counsel is I

20  believe saying which is that the information that's in

21  this computer system includes all the information from

22  HSB statements with regard to transactions, then other

23  than the opening documents it appears to be inclusive.

24         MR. ROCCO:  I guess we'd have to see what that

25  says obviously, your Honor.  I'm not a seer, so I can't

29

Proceedings

1  tell you.

2          THE COURT:  All right.  Are there, other than

3  this issue, any other discovery issues outstanding on the

4  jurisdictional inquiry?

5          MR. ROCCO:  There are not as far as I'm aware,

6  your Honor.

7          THE COURT:  No?  All right.  Anybody have any

8  settlement discussions?  Anyone interested in that?  You

9  know, I'm relentless.

10          MR. ROCCO:  Thanks for asking.

11          THE COURT:  Deafening silence.  All right.

12  We'll try to deal with this quickly.  Thank you.

13          MR. ROCCO:  Thank you very much, your Honor.

14          THE COURT:  Take care.  Bye.

15          MS. FORNOS:  Thank you, your Honor.

16          MR. HILLEBRECHT:  Thank you.

17          THE COURT:  All right.

18                      (Matter concluded)

19                          -oOo-

20

21

22

23

24

25

# C E R T I F I C A T E

I, MARY GRECO, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **9th** day of **August**, 2023.

*Mary Greco*

Transcriptions Plus II, Inc.